IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

_____

ANDRE YOUNGBLOOD,

                          Plaintiff,            Civil Action No.
                                                9:10-CV-1430 (NAM/DEP)

        v.

SGT. GLASSER, Greene Correctional Facility,
*et al.*,

                          Defendants.

_____

APPEARANCES:                          OF COUNSEL:

FOR PLAINTIFF:

ANDRE YOUNGBLOOD, *pro se*
03-A-1665
Auburn Correctional Facility
P.O. Box 618
Auburn, NY 13021

FOR DEFENDANTS:

HON. ERIC T. SCHNEIDERMAN          DEAN J. HIGGINS, ESQ.
Attorney General of                Assistant Attorney General
the State of New York
The Capitol
Albany, NY 12224-0341

DAVID E. PEEBLES
U.S. MAGISTRATE JUDGE

## REPORT AND RECOMMENDATION

        Plaintiff Andre Youngblood, a New York State prison inmate who is

proceeding *pro se* and *in forma pauperis* ("IFP"), has commenced this action pursuant to 42 U.S.C. § 1983, alleging deprivation of his civil rights. In his complaint Youngblood contends that, in violation of his rights under the Eighth Amendment, the two named defendants were deliberately indifferent to his serious medical needs by their refusal to allow him to participate in emergency sick call to address his complaints of bleeding hemorrhoids. As relief, plaintiff's complaint seeks compensatory damages in the amount of $3,000,000.

Currently pending before the court is a motion for summary judgment brought by the defendants, seeking dismissal of plaintiff's claims. In their motion defendants argue that plaintiff has failed to establish a violation of the Eighth Amendment, and additionally that his claims are procedurally barred based upon his failure to exhaust available administrative remedies before commencing suit. Having carefully reviewed defendants' motion and plaintiff's opposition, I conclude that genuine issues of fact preclude the dismissal of plaintiff's complaint for failure to exhaust administrative remedies before filing suit, but that defendants are entitled to summary judgment dismissing plaintiff's claims on the merits.

I.      BACKGROUND[1]

        Plaintiff is a prison inmate being held in the custody of the New York

Department of Corrections and Community Supervision ("DOCCS"); at the

times relevant to his claims in this action, Youngblood was designated to

the Greene Correctional Facility ("Greene"), located in Coxsackie, New

York.  *See generally* Complaint (Dkt. No. 1).

        On November 1, 2010, plaintiff was seen at a regular sick call in the

facility's special housing unit ("SHU") by defendant Susan Derr, a

registered nurse then employed by the DOCCS at Greene.  Derr Decl.

(Dkt. No. 34-7) ¶¶ 2, 7.  During that visit plaintiff complained of

hemorrhoids, but declined to describe his symptoms to Nurse Derr, and

refused any treatment.  *Id.* at ¶ 10; *see also* Plaintiff's Ambulatory Health

Record ("AHR") (Dkt. No. 35) p. 26.  Plaintiff was advised at that time that

an appointment with a facility physician could not be scheduled until his

symptoms were disclosed to the nurse.  Derr Decl. (Dkt. No. 34-7) ¶ 11.

        Plaintiff was seen by another nurse on November 2, 2010,

complaining of intermittent rectal bleeding.  Derr Decl. (Dkt. No. 34-7) ¶

---

        [1] In light of the procedural posture of the case the following recitation is derived
from the record now before the court, with all inferences drawn and ambiguities
resolved in favor of the plaintiff.  *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003).

3

12; Plaintiff's AHR (Dkt. No. 35) p. 25.  On that occasion Youngblood was

provided with over-the-counter medication for his condition.  *Id.*

Plaintiff was again seen by Nurse Derr on November 4, 2010, during

sick call.  Derr Decl. (Dkt. No. 34-7) ¶ 13; Plaintiff's AHR (Dkt. No. 35) p.

25.  After renewing his complaints of rectal bleeding from internal

hemorrhoids, plaintiff was provided with an over-the-counter medication

for the condition.  Derr Decl. (Dkt. No. 34-7) ¶ 14; Plaintiff's AHR (Dkt. No.

35) p. 25.  At that time plaintiff did not appear to be in any distress, and

Nurse Derr concluded that no emergent situation existed requiring an

immediate appointment with a prison physician.  Derr Decl. (Dkt. No. 34-7)

¶ 16.  Nurse Derr thereafter scheduled the plaintiff to see a prison

physician on November 11, 2010.  *Id.* at ¶ 15; *see also* Plaintiff's AHR

(Dkt. No. 35) p. 25.

Plaintiff was again seen by defendant Derr on November 5, 2010, an

encounter upon which Youngblood's complaint is centered.  Complaint

(Dkt. No. 1) § 6; Derr Decl. (Dkt. No. 34-7) ¶ 17.  On that occasion he first

saw Nurse Derr during regular morning sick call, but expressed no specific

medical complaints concerning his hemorrhoids at that time. Derr Decl.

(Dkt. No. 34-7) ¶ 17; Plaintiff's AHR (Dkt. No. 35) p. 24.  Later in the day,

4

however, Youngblood requested emergency sick call, claiming that his hemorrhoids had flared up, and he was bleeding from his rectum, exhibiting for Nurse Derr toilet tissue containing blood.  Complaint (Dkt. No. 1) § 6; Derr Decl. (Dkt. No. 34-7) ¶ 18.  Nurse Derr examined plaintiff's boxer shorts, which did not show any signs of blood, either old or new, and performed a visual examination of the affected area of the plaintiff's body, which failed to reveal any sign of active bleeding.  Derr Decl. (Dkt. No. 34-7) ¶¶ 19-20; Higgins Decl. (Dkt. No. 34-2) Exh. A ("Plaintiff's Dep. Tr.") pp. 18-19.  Plaintiff did not claim to be in pain from the hemorrhoids during the time of Nurse Derr's examination.  Derr Decl. (Dkt. No. 34-7) ¶ 21.

At this point the parties' versions of the relevant events diverge somewhat.  Plaintiff alleges that following the examination defendant Derr told Youngblood she had to "talk to security for an escort", and for that purpose went to speak with Corrections Sergeant Glasser.  Complaint (Dkt. No. 1) § 6.  Plaintiff claims he "could see everything" and witnessed Derr conversing with Glasser, and responding to Glasser's question of whether it "was a life or death situation" with a "no".  Plaintiff's Dep. Tr. at p. 22.  Glasser then allegedly denied plaintiff's request to be seen during

emergency sick call.  *Id.*

Defendants assert that plaintiff's request to see a doctor was immediately denied, based upon Nurse Derr's assessment that his condition was not life threatening or serious enough to require immediate attention.  Derr Decl. (Dkt. No. 34-7) ¶¶ 22-23.  Corrections Sergeant William Glasser has no recollection of the incident and specifically states that he was never informed of the existence of a serious medical condition involving the plaintiff, and that if he had been it would have been reported promptly to appropriate medical staff personnel. Glasser Decl. (Dkt. No. 34-8) ¶¶ 3, 7.  Nurse Derr also notes that if an inmate patient presents with a life threatening medical emergency a doctor is immediately notified. Derr Decl. (Dkt. No. 34-7) ¶ 29.  At that point it is the doctor's decision, and not that of a nurse, as to whether the inmate should be sent to an emergency room for treatment.  *Id.* at ¶ 30.  Only after a doctor has made the decision that the inmate should be transported would security then be contacted and advised of the doctor's orders.  *Id.* at ¶ 31.

Youngblood's scheduled doctor's appointment was moved up one day, and he was seen on November 10, 2010 by Dr. Smith, a prison physician.  Derr Decl. (Dkt. No. 34-7) ¶ 25; Plaintiff's AHR (Dkt. No. 35) p.

6

23.  During that visit Dr. Smith diagnosed the plaintiff as suffering from internal and external hemorrhoids, with no bleeding.  Derr Decl. (Dkt. No. 34-7) ¶ 25; Plaintiff's AHR (Dkt. No. 35) at p. 23.  Plaintiff's records reveal no further complaints of hemorrhoids noted through May 2011.  Derr Decl. (Dkt. No. 34-7) ¶ 26; *see also* Plaintiff's AHR (Dkt. No. 35) p. 1-22.

II.    PROCEDURAL HISTORY

Plaintiff commenced this action on November 26, 2010, and was thereafter granted IFP status.  Dkt. Nos. 1, 4.  Plaintiff's complaint names Nurse Derr and Sergeant Glasser as defendants, and asserts a claim of deliberate indifference to his serious medical needs, in violation of the Eighth Amendment.  *See generally* Complaint (Dkt. No. 1).

On January 9, 2012, defendants moved for the entry of summary judgment dismissing plaintiff's claims, arguing that he cannot establish a violation of his rights under the Eighth Amendment, and further that he failed to satisfy his statutory obligation to exhaust available administrative remedies before commencing suit.  Dkt. No. 34.  Defendants' motion also challenges plaintiff's request for compensatory damages and the personal involvement of defendant Glasser in the constitutional violations alleged.  *Id.*  Plaintiff has since responded in opposition to that motion in papers

7

filed on February 20, 2012.  Dkt. No. 43.   Defendants' motion, which is

now ripe for determination, has been referred to me for the issuance of a

report and recommendation, pursuant to 28 U.S.C. § 636(b)(1)(B) and

Northern District of New York Local Rule 72.3(c).  *See also* Fed. R. Civ. P.

72(b).

III.    DISCUSSION

    A.    Summary Judgment Standard

Summary judgment motions are governed by Rule 56 of the Federal

Rules of Civil Procedure.  Under that provision, the entry of summary

judgment is appropriate when "the pleadings, the discovery and disclosure

materials on file, and any affidavits show that there is no genuine issue as

to any material fact and that the movant is entitled to judgment as a matter

of law."  Fed. R. Civ. P. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317,

322, 106 S. Ct. 2548, 2552 (1986); *Anderson v. Liberty Lobby, Inc.*, 477

U.S. 242, 247, 106 S. Ct. 2505, 2509-10 (1986); *Security Ins. Co. of*

*Hartford v. Old Dominion Freight Line, Inc.*, 391 F.3d 77, 82-83 (2d Cir.

2004).  A fact is "material", for purposes of this inquiry, if it "might affect

the outcome of the suit under the governing law."  *Anderson*, 477 U.S. at

248, 106 S. Ct. at 2510; *see also Jeffreys v. City of New York*, 426 F.3d

549, 553 (2d Cir. 2005) (citing *Anderson*).  A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson*, 477 U.S. at 248, 106 S. Ct. at 2510.

A party moving for summary judgment bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue; the failure to meet this burden warrants denial of the motion.  *Anderson*, 477 U.S. at 250 n.4, 106 S. Ct. at 2511 n.4; *Security Ins.*, 391 F.3d at 83.  In the event this initial burden is met the opposing party must show, through affidavits or otherwise, that there is a material issue of fact for trial.  Fed. R. Civ. P. 56(e); *Celotex*, 477 U.S. at 324, 106 S. Ct. at 2553; *Anderson*, 477 U.S. at 250, 106 S. Ct. at 2511.  Though *pro se* plaintiffs are entitled to special latitude when defending against summary judgment motions, they must establish more than mere "metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S. Ct. 1348, 1356 (1986); *but see Vital v. Interfaith Med. Ctr.*, 168 F.3d 615, 620-21 (2d Cir. 1999) (noting obligation of court to consider whether *pro se* plaintiff understood nature of summary

9

judgment process).

When deciding a summary judgment motion, a court must resolve any ambiguities, and draw all inferences from the facts, in a light most favorable to the nonmoving party. *Jeffreys*, 426 F.3d at 553; *Wright v. Coughlin*, 132 F.3d 133, 137-38 (2d Cir. 1998). The entry of summary judgment is warranted only in the event of a finding that no reasonable trier of fact could rule in favor of the non-moving party. *See Building Trades Employers' Educ. Ass'n v. McGowan*, 311 F.3d 501, 507-08 (2d Cir. 2002) (citation omitted); *see also Anderson,* 477 U.S. at 250, 106 S. Ct. at 2511 (summary judgment is appropriate only when "there can be but one reasonable conclusion as to the verdict").

B.     Plaintiff's Failure to Oppose Defendants' Motion

Before turning to the merits of plaintiff's claims, a threshold issue to be addressed is the legal significance, if any, of his failure to include with his opposition papers a response to defendants' Local Rule 7.1(a)(3) Statement. That failure is not without potential consequences.

The court's rules require that a motion seeking the entry of summary judgment must be accompanied by a statement of material facts with respect to which, the moving party contends, there exists no genuine

issue.  *See* N.D.N.Y.L.R. 7.1(a)(3).  The purpose underlying this rule, which is typical of many local court rules governing summary judgment motion practice, is to assist the court in framing the issues and determining whether there exist any triable issues of fact that would preclude the entry of summary judgment. *Anderson v. Dolgencorp of New York*, Nos. 1:09-CV-360, 1:09-CV-363, 2011 WL 1770301, at * 1 n. 2 (N.D.N.Y. May 9, 2001) (Sharpe, J.).[2]  In order to fulfill this salutary purpose, it is essential for the court to have the benefit of both the moving party's statement and an opposition statement addressing the facts set forth in the initial statement.

In this instance the defendants have complied with Local Rule 7.1(a)(3), providing a statement setting forth forty-three facts as to which, they contend, there is no genuine triable issue.  Plaintiff had failed to respond to that statement.  By its express terms, the governing rule provides that "[t]he Court shall deem admitted any facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert."  N.D.N.Y.L.R. 7.1(a)(3).  Ordinarily, I would recommend that this portion of the rule be invoked based upon plaintiff's failure to respond

---

[2]  Copies of all unreported decisions cited in this document have been appended for the convenience of the *pro se* plaintiff.

to defendants' Local Rule 7.1(a)(3) Statement.  I note, however, that the defendants' motion in this case was not accompanied by a notice warning the plaintiff of the consequences of failing to respond to Defendants' Local Rule 7.1(a)(3) Statement, as required by this court's local rules in cases involving *pro se* litigants.  *See* N.D.N.Y.L.R. 56.2.  Based upon this failure, I recommend that the court not deem the facts set forth in defendants' Local Rule 7.1(a)(3) to have been admitted by Youngblood, despite his failure to respond to that statement.

### C.   Failure to Exhaust Administrative Remedies

In support of their motion for summary judgment, defendants argue that plaintiff's complaint must be dismissed for failure to exhaust administrative remedies.  The Prison Litigation Reform Act of 1996 ("PLRA"), Pub. L. No. 104-134, 110 Stat. 1321 (1996), which imposes several restrictions on the ability of prisoners to maintain federal civil rights actions, expressly requires that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."  42 U.S.C. § 1997e(a); *see Woodford v. Ngo,* 548 U.S. 81, 84, 126 S. Ct.

2378, 2382 (2006); *Hargrove v. Riley,* No. CV-04-4587, 2007 WL 389003, at *5-6 (E.D.N.Y. Jan. 31, 2007).  "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong."  *Porter v. Nussle*, 534 U.S. 516, 532, 122 S. Ct. 983, 992 (2002) (citation omitted).  In the event a defendant named in such an action establishes that the inmate plaintiff failed properly to exhaust available remedies prior to commencing the action, his or her complaint is subject to dismissal.  *See Pettus v. McCoy*, No. 04-CV-0471, 2006 WL 2639369, at *1 (N.D.N.Y. Sept. 13, 2006) (McAvoy, J.); *see also Woodford*, 548 U.S. at 94-95, 126 S. Ct. at 2387-88 (holding that the PLRA requires "proper exhaustion" of available remedies).  "Proper exhaustion" requires a plaintiff to procedurally exhaust his or her claims by "compl[ying] with the system's critical procedural rules."  *Woodford*, 548 U.S. at 95, 126 S. Ct. at 2388; *see also Macias v. Zenk*, 495 F.3d 37, 43 (2d Cir. 2007) (citing *Woodford*).[3]

---

[3]     While placing prison officials on notice of a grievance through less formal channels may constitute claim exhaustion "in a substantive sense", an inmate plaintiff nonetheless must meet the procedural requirement of exhausting his or her available administrative remedies within the appropriate grievance construct in order to satisfy the PLRA.  *Macias*, 495 F.3d at 43 (quoting *Johnson v. Testman*, 380 F.3d 691, 697-98 (2d Cir. 2004) (emphasis omitted).

New York prison inmates are subject to an Inmate Grievance Program ("IGP") established by the DOCS and recognized as an "available" remedy for purposes of the PLRA.  *See Mingues v. Nelson*, No. 96 CV 5396, 2004 WL 324898, at *4 (S.D.N.Y. Feb. 20, 2004) (citing *Mojias v. Johnson*, 351 F.3d 606 (2d Cir. 2003) and *Snider v. Melindez*, 199 F.3d 108, 112-13 (2d Cir.1999)).  The IGP consists of a three-step review process.  First, a written grievance is submitted to the Inmate Grievance Review Committee ("IGRC") within twenty-one days of the incident.[4]  7 N.Y.C.R.R. § 701.5(a).  The IGRC, which is comprised of inmates and facility employees, then issues a determination regarding the grievance.  *Id.* at §§ 701.4(b), 701.5(b).  If an appeal is filed, the superintendent of the facility next reviews the IGRC's determination and issues a decision.  *Id.* at § 701.5(c).  The third level of the process affords the inmate the right to appeal the superintendent's ruling to the Central Office Review Committee ("CORC"), which makes the final administrative decision.  *Id.* at § 701.5(d).  Ordinarily, absent the finding of a basis to excuse non-compliance with this prescribed process, only upon exhaustion of these three levels of review may a prisoner seek relief

---

[4]     The IGP supervisor may waive the grievance timeliness requirement due to "mitigating circumstances."  7 N.Y.C.R.R. § 701.6(g)(1)(i)(a)-(b).

pursuant to section 1983 in a federal court.  *Reyes v. Punzal*, 206 F.

Supp. 2d 431, 432 (W.D.N.Y. 2002) (citing, *inter alia*, *Sulton v. Greiner*,

No. 00 Civ. 0727, 2000 WL 1809284, at *3 (S.D.N.Y. Dec. 11, 2000)).

Despite an inmate's entitlement in most instances to file and pursue

a grievance in accordance with the IGP, there are circumstances under

which the grievance procedure nonetheless is deemed not to have been

available to an inmate plaintiff.  *See Hemphill*, 380 F.3d at 687-88.  Thus,

for example, "[e]xhaustion may be considered unavailable in situations

where plaintiff is unaware of the grievance procedures or did not

understand it, . . . or where defendants' behavior prevents plaintiff from

seeking administrative remedies."  *Hargrove,* 2007 WL 389003, at *8

(citations omitted) (noting, for example, that a defendant's failure to

advance plaintiff's grievances or the issuance of threats against an inmate

to deter the filing of a grievance may effectively render the administrative

process unavailable).  When testing the availability of administrative

remedies in the face of claims that undue influence from prison workers

has caused a plaintiff inmate to forego the formal grievance process,

courts employ an objective test, examining whether "a similarly situated

individual of ordinary firmness [would] have deemed them available."  *Id.*

15

at 688 (quotations and citations omitted); *see Hargrove,* 2007 WL 389003, at *8.

In his complaint, which is given under penalty of perjury and is thus the functional equivalent of an affidavit, *see Bennett v. Goord*, 343 F.3d 133, 139 (2d Cir. 2003), plaintiff alleges that he filed a grievance concerning the alleged medical indifference, and that after it was initially denied he appealed the matter to the prison superintendent, and then on to the CORC.  *See* Complaint (Dkt. No. 1) § 4.  Similarly, in his deposition testimony, plaintiff claims that he filed a grievance regarding defendants Derr and Glasser based upon their denial of his request for emergency sick call, and that he pursued the grievance through to the CORC. Plaintiff's Dep. Tr. at p. 25.

It is true that plaintiff's deposition testimony is somewhat equivocal regarding his appeal to the CORC.  At one point during his deposition plaintiff appears to have confirmed the statement contained within his complaint, to the effect that his appeal to the CORC was unsuccessful. *See* Plaintiff's Dep. Tr. at p. 25.  Later in the deposition, however, he seemingly retreats from that position, testifying that after appealing to the CORC he received no response from that body.  *Id.* at p. 26.  This

potential inconsistency, particularly in the absence of any proof submitted

by the defendants to the effect that no appeal to the CORC was taken, is

insufficient to establish, as a matter of law, that plaintiff failed to satisfy his

exhaustion requirement under the PLRA.[5]  I therefore recommend that the

portion of defendants' motion seeking dismissal of plaintiff's claims on the

procedural basis of failure to exhaust be denied.

>    D.    Plaintiff's Eighth Amendment Claim

Plaintiff claims that by denying him emergency sick call on

November 5, 2010, defendants were deliberately indifferent to his serious

medical needs.  Claims that prison officials have intentionally disregarded

an inmate's medical needs fall under the umbrella of protection from the

imposition of cruel and unusual punishment afforded by the Eighth

Amendment.  *Estelle v. Gamble,* 429 U.S. 97, 102, 104, 97 S. Ct. 285,

290, 291 (1976).  The Eighth Amendment prohibits punishment that

involves the "unnecessary and wanton infliction of pain" and is

incompatible with "the evolving standards of decency that mark the

---

[5]    Although plaintiff has not provided a copy of a grievance related to the November 5, 2010 claim, he has provided a copy of a "Formal Complaint" submitted by him to the Office of the DOCCS Inspector General on November 7, 2010.  *See* Dkt. No. 30 at pp. 9-12.  In it, plaintiff describes Nurse Derr's examination and treatment as well as Sergeant Glasser's alleged involvement, and claims both were deliberately indifferent to his serious medical needs and guilty of Eighth Amendment violations.  *Id.*

progress of a maturing society." *Id.; see also Whitley v. Albers,* 475 U.S. 312, 319, 106 S. Ct. 1078, 1084 (1986) (citing, *inter alia, Estelle).*  While the Eighth Amendment does not mandate comfortable prisons, neither does it tolerate inhumane treatment of those in confinement.  *Farmer v. Brennan,* 511 U.S. 825, 832, 114 S. Ct. 1970, 1976 (1994) (citing *Rhodes v. Chapman,* 452 U.S. 337, 349, 101 S. Ct. 2392, 2400 (1981)).  To satisfy their obligations under the Eighth Amendment, prison officials must "ensure that inmates receive adequate food, shelter, and medical care, and must take reasonable measures to guarantee the safety of inmates." *Farmer*, 511 U.S. at 832, 114 S. Ct. at 1976 (quoting *Hudson v. Palmer*, 468 U.S. 517, 526-27, 104 S. Ct. 3194, 3200 (1984)) (internal quotations omitted).

A claim alleging that prison officials have violated the Eighth Amendment by inflicting cruel and unusual punishment must satisfy both objective and subjective requirements.  *Wright v. Goord*, 554 F.3d 255, 268 (2d Cir. 2009); *Price v. Reilly*, 697 F. Supp. 2d 344, 356 (E.D.N.Y. 2010).  Addressing the objective element, to prevail a plaintiff must establish a violation sufficiently serious by objective terms, "in the sense that a condition of urgency, one that may produce death, degeneration, or

extreme pain exists." *Hathaway v. Coughlin*, 99 F.3d 550, 553 (2d Cir.

1996).  With respect to the subjective element, a plaintiff must also

demonstrate that the defendant had "the necessary level of culpability,

shown by actions characterized by 'wantonness.'" *Blyden v. Mancusi*, 186

F.3d 252, 262 (2d Cir. 1999).  Claims of medical indifference are subject

to analysis utilizing this Eighth Amendment paradigm.  *See Salahuddin v.*

*Goord,* 467 F.3d 263, 279-81 (2d Cir. 2006).

### 1.    Objective Requirement

Analysis of the objective, "sufficiently serious," requirement of an

Eighth Amendment medical indifference claim begins with an inquiry into

"whether the prisoner was actually deprived of adequate medical care . .

.", and centers upon whether prison officials acted reasonably in treating

the plaintiff.  *Salahuddin*, 467 F.3d at 279.  A second prong of the

objective test addresses whether the inadequacy in medical treatment

was sufficiently serious.  *Id*. at 280.  If there is a complete failure to

provide treatment, the court must look to the seriousness of the inmate's

medical condition.  *Smith v. Carpenter*, 316 F.3d 178, 185-86 (2d Cir.

2003).  If, on the other hand, the complaint alleges that treatment was

provided but was inadequate, the seriousness inquiry is more narrowly

confined to that alleged inadequacy, rather than focusing upon the seriousness of the prisoner's medical condition.  *Salahuddin*, 467 F.3d at 280.  "For example, if the prisoner is receiving on-going treatment and the offending conduct is an unreasonable delay or interruption in treatment. . . [the focus of] the inquiry is on the challenged delay or interruption, rather than the prisoner's underlying medical condition alone."  *Id.* (quoting *Smith*, 316 F.3d at 185) (internal quotations omitted).  In other words, at the heart of the relevant inquiry is the seriousness of the medical need, and whether from an objective viewpoint the temporary deprivation was sufficiently harmful to establish a constitutional violation.  *Smith*, 316 F.3d at 186.  Of course, "when medical treatment is denied for a prolonged period of time, or when a degenerative medical condition is neglected over sufficient time, the alleged deprivation of care can no longer be characterized as 'delayed treatment', but may properly be viewed as a 'refusal' to provide medical treatment."  *Id.* at 186, n.10 (quoting *Harrison v. Barkley*, 219 F.3d 132, 137 (2d Cir. 2000)).

Since medical conditions vary in severity, a decision to leave a condition untreated may or may not raise constitutional concerns, depending on the circumstances.  *Harrison,* 219 F.3d at 136-37 (quoting,

20

*inter alia, Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir. 1998)).

Relevant factors informing this determination include whether the plaintiff

suffers from an injury or condition that a "'reasonable doctor or patient

would find important and worthy of comment or treatment'", a condition

that "'significantly affects'" a prisoner's daily activities, or "'the existence of

chronic and substantial pain.'" *Chance,* 143 F.3d at 702 (citation omitted);

*Lafave v. Clinton County,* No. CIV. 9:00CV774, 2002 WL 31309244, at *3

(N.D.N.Y. Apr. 3, 2002) (Sharpe, M.J.) (citation omitted).

  In this instance the plaintiff complained of hemorrhoids over a period

of only a few days, during which he claims to have experienced rectal

bleeding associated with a hemorrhoidal condition for which he had

received treatment previously.  Plaintiff maintains that his constitutional

rights were violated as a result of a five-day delay in arranging for a

physician to examine his hemorrhoids.  Proof of such complaints and the

modest delay at issue is not sufficient to establish an Eighth Amendment

claim.  Generally speaking, hemorrhoids do not constitute a serious

medical condition, the delay in treatment of which would amount to a

constitutional violation.  *Lowman v. Perlman*, No. 9:06-CV-0422, 2008 WL

4104554, at *5 (N.D.N.Y. Aug. 29, 2008) (Kahn, D.J. and Treece, M.J.);

21

*Cabassa v. Gummerson*, No. 01-CV-1039,  2006 WL 1559215, at *9-10

(N.D.N.Y. Mar. 30, 2006) (Lowe, M.J.), *report and recommendation*

*adopted*, 2006 WL 1555656 (N.D.N.Y. Jun. 1, 2006) (Hurd, D.J.); *Kendall*

*v. Kittles*, No. C0 Civ. 628(GEL), 2004 WL 1752818, at *6 (S.D.N.Y. Aug.

4, 2004) ("Hemorrhoids, albeit, uncomfortable, are a minor issue, far

removed from the category of medical conditions that have been deemed

'sufficiently serious' by other courts."); *but see Muhammad v. New York*

*Dep't of Corrs.*, No. 10 Civ. 1707, 2011 WL 797506 (S.D.N.Y. Feb. 3,

2011) (where plaintiff alleged that his hemorrhoids caused him to

experience "unbearable and excruciating pain, left him chronically

weakened, and has interfered with daily activities by making it practically

impossible for him to use the bathroom", plaintiff "sufficiently pled that his

medical condition constituted a serious medical need" although "at some

later stage in the litigation" it may become clear that the claims are not

adequately supported), *report and recommendation adopted*, 2011 WL

797672 (S.D.N.Y. Mar. 3, 2011).

I note, moreover that it cannot seriously be argued that plaintiff did

not receive medical attention for his hemorrhoids.  *Compare Black v.*

*Fischer*, No. 9:08-CV-0232, 2010 WL 2985081, at *11 (N.D.N.Y. July 1,

2010) (Peebles, M.J.) (plaintiff was visited by a nurse, provided with ointment, and "reassured by a physician that, despite some bleeding, his condition was not serious or life threatening").  Plaintiff complained of the condition beginning in early November 2010.  *See generally* Plaintiff's AHR (Dkt. No. 35).  Each time he complained he was examined by a nurse, provided with stool softeners and ointment, and scheduled to meet with a physician a few days later.  *See id.*  When plaintiff complained of some bleeding he was examined by Nurse Derr, who did not observe any old or new blood on his boxer shorts or in his buttock area.  It does not appear that plaintiff claimed to have been in pain as a result of hemorrhoids – a fact which distinguishes this case from such cases as *Muhammad*.  Moreover, plaintiff's medical records reflect that after being examined by a prison physician on November 10, 2010 for the condition, Youngblood did not register any further complaints regarding his hemorrhoids.

In sum, the record now before the court clearly establishes that prison officials were attentive, to the plaintiff's complaints, and acted reasonably in treating plaintiff's hemorrhoids.  Plaintiff's apparent dissatisfaction or disagreement with the treatment that he received for his

hemorrhoids is patently insufficient to establish an Eighth Amendment

violation.  *Tafari v. McCarthy*, 714 F. Supp. 2d 317, 366 (N.D.N.Y. 2010)

(citation omitted); *McQueen v. Cnty. of Albany*, No. 9:08-CV-799, 2010

WL 338081, at *12 (N.D.N.Y. Jan. 28, 2010) (Hurd, J. and Peebles, M.J.)

(citations omitted).

### 2.   Subjective Element

The second, subjective, requirement for establishing an Eighth

Amendment medical indifference claim mandates a showing of a

sufficiently culpable state of mind, or deliberate indifference, on the part of

one or more of the defendants to a plaintiff's serious medical needs.

*Salahuddin*, 467 F.3d at 280 (citing *Wilson v. Seiter*, 501 U.S. 294, 300,

111 S. Ct. 2321, 2325 (1991)).  Deliberate indifference, in a constitutional

sense, exists if an official "knows of and disregards an excessive risk to

inmate health or safety; the official must both be aware of facts from which

the inference could be drawn that a substantial risk of serious harm exists,

and he [or she] must also draw the inference."  *Farmer,* 511 U.S. at 837,

114 S. Ct. at 1979; *Leach v. Dufrain,* 103 F. Supp. 2d 542, 546 (N.D.N.Y.

2000) (Kahn, J.) (citing *Farmer*); *Waldo v. Goord,* No. 97-CV-1385, 1998

WL 713809, at *2 (N.D.N.Y. Oct. 1, 1998) (Kahn, J. and Homer, M.J.)

(same).  Deliberate indifference is a mental state equivalent to subjective

recklessness as the term is used in criminal law.  *Salahuddin*, 467 F.3d at

280 (citing *Farmer,* 511 U.S. at 839-40, 114 S. Ct. 1970).

For the same reasons that plaintiff cannot prove the objective

element of a medical indifference claim, he fails with respect to the

subjective prong.  Plaintiff's hemorrhoids did not expose him to substantial

risk of harm if left untreated, and the condition, in fact, was not ignored by

prison personnel, who instead considered his complaints and

administered what they regarded to be appropriate treatment.  Simply

stated, the record is devoid of any evidence suggesting that either of the

defendants was deliberately indifferent to plaintiff's medical needs.  *See*

*Black*, 9:08-CV-0232, 2010 WL 2985081, at *11.

IV.   <u>SUMMARY AND CONCLUSION</u>

Addressing first defendants' exhaustion argument, I conclude that

defendants have failed to establish, without contradiction, that plaintiff did

not satisfy his exhaustion requirements obligations under the PLRA before

commencing this action, and therefore recommend denial of the portion of

defendants' motion seeking dismissal of plaintiff's complaint on this

procedural basis.  Turning to the merits, I find that despite plaintiff's claim

that he was subjected to cruel and unusual punishment because defendants Nurse Derr and Sergeant Glasser denied him access to emergency sick call when he complained of hemorrhoids, based upon the record before the court no reasonable factfinder could conclude that plaintiff can meet both the subjective and objective prongs of the controlling Eighth Amendment test.  Accordingly, I recommend that defendants' motion for summary judgment dismissing plaintiff's Eighth Amendment claims on the merits be granted.

Accordingly, it is hereby respectfully

RECOMMENDED that defendants' motion for summary judgment dismissing plaintiff's complaint (Dkt. No. 34) be GRANTED, and that plaintiff's complaint be DISMISSED in its entirety, on the merits.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report.  Such objections must be filed with the clerk of the court within FOURTEEN days of service of this report. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P.  6(a), 6(d), 72; *Roldan v.  Racette,* 984 F.2d 85 (2d Cir. 1993).

It is hereby ORDERED that the clerk of the court serve a copy of this

report and recommendation upon the parties in accordance with this

court's local rules.

David E. Peebles
U.S. Magistrate Judge

Dated:      August 22, 2012
            Syracuse, NY



Not Reported in F.Supp.2d, 2011 WL 1770301 (N.D.N.Y.)

(Cite as: 2011 WL 1770301 (N.D.N.Y.))

**C**

Only the Westlaw citation is currently available.
United States District Court,

N.D. New York.
Janet ANDERSON, Plaintiff,
v.
DOLGENCORP OF NEW YORK, INC., Defendant.
Betty Pulver, Plaintiff,
v.
Dolgencorp of New York, Inc., Defendant.
Nos. 1:09–cv–360 (GLS\RFT), 1:09–cv–363
(GLS\RFT).

May 9, 2011.

Beasley, Allen Law Firm, Roman A. Shaul, Esq., Elizabeth A. Cordello, Esq., of Counsel, Montgomery, AL, for the Plaintiffs.

Hinman, Howard Law Firm, James S. Gleason, Esq., Dawn J. Lanouette, Esq., of Counsel, Binghamton, NY, for the Defendant.

Morgan, Lewis Law Firm, Joel S. Allen, Esq., Ronald E. Manthey, Esq., of Counsel, Dallas, TX.

### MEMORANDUM–DECISION AND ORDER

GARY L. SHARPE, District Judge.

#### I. Introduction

*1 In this consolidated action, plaintiffs Janet Anderson and Betty Pulver allege that their former employer, defendant Dolgencorp of New York, Inc. (Dollar General) deprived them of lawful overtime wages in violation of the Fair Labor Standards Act (FLSA).[FN1] (See No. 09–cv–360, 2d Am. Compl., Dkt. No. 4; No. 09–cv–363, 2d Am. Compl., Dkt. No. 4.) Pending are Dollar General's motions for summary judgment as against each plaintiff and to strike certain evidence offered by plaintiffs in opposition to the summary judgment motions. (See No. 09–cv–360, Dkt. Nos. 38, 50; No. 09–cv–363, Dkt. No. 27.) For the reasons that follow, the motions are

denied.

FN1. 29 U.S.C. § 201, *et seq.*

#### II. Background[FN2]

FN2. Unless otherwise noted, the facts are derived directly from Dollar General's various Statements of Material Facts (SMF) and plaintiffs' responses thereto. (See No. 09–cv–360, Def. SMF (Anderson), Dkt. No. 38:1; No. 09–cv–360, Def. Common SMF, Dkt. No. 39; No. 09–cv–360, Pls. Common SMF Resp., Dkt. No. 44:1; No. 09–cv–360, Anderson SMF Response, Dkt. No. 46:1; No. 09–cv–363, Pulver SMF Resp., Dkt. No. 27:1; No. 09–cv–363, Def SMF (Pulver), Dkt. No. 29:1.) In that regard, the court notes that plaintiffs have failed in most instances to specifically admit or deny Dollar General's factual assertions as required by Local Rule 7.1(a)(3), instead choosing—in a somewhat boilerplate fashion—to "object" to the "implications" of those assertions or to assert additional facts that do not directly or necessarily contradict them. (See generally, e.g., Anderson SMF Resp., Dkt. No. 46:1; see also N .D.N.Y. L.R. 7.1(a)(3) (requiring a "non-movant's response [to] mirror the movant's Statement of Material Facts by *admitting and/or denying each of the movant's assertions* in matching numbered paragraphs" (emphasis added)).) As plaintiffs' counsel is likely aware, however, the purpose of the Rule 7.1(a)(3) response requirement is not to highlight and broadly contradict intended "implications" of a movant's factual assertions, or to imply the inaccuracy of those assertions; it is to aid the court in isolating the relevant facts so that it may discern whether and to what extent disputes relating to those facts exist. Thus, a non-movant's failure to tailor her responsive SMFs in accordance with the Local Rules significantly impedes the court's ability to effectively and efficiently resolve these critical inquiries.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 1770301 (N.D.N.Y.)

(Cite as: 2011 WL 1770301 (N.D.N.Y.))

Accordingly, to the extent plaintiffs have failed to properly respond to Dollar General's statements of fact, the court will, where it deems appropriate, treat those statements as admitted for purposes of this motion. *Id.* ("The Court shall deem admitted any facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert.").

**A. *Dollar General***

Defendant Dollar General is a retailer of basic consumable goods, such as cleaning supplies, health and beauty aids, foods and snacks, housewares, toys, and basic apparel. (*See* No. 09–cv–360, Def. Common SMF ¶ 1, Dkt. No. 39.) As of 2005, Dollar General operated approximately 7,500 stand-alone Dollar General Stores in thirty states, with an average sales volume of over $1 million per store. (*See id.* at ¶ 2.) Each Dollar General store is staffed by a Store Manager, an Assistant Manager (ASM), a Lead Clerk, and multiple store clerks. (*See id.* at ¶ 3.) Of these employees, Store Managers occupy the highest level of supervisory authority and are the only employees paid on a salaried basis. (*See id.*) Each Store Manager reports to a District Manager (DM), each of whom oversees from fifteen to twenty-five stores. (*See id.* at ¶ 4.)

During the relevant times, Dollar General described a Store Manager's general responsibilities as "the management of all employees in the effective planning and implementation of all store processes, including ordering, receiving, stocking, presentation, selling, staffing and support." (No. 09–cv–360, Shaul Aff., Ex. 11, Store Manager Job Description, Dkt. No. 45:11 (filed under seal) .) Encompassed within these broadly-defined responsibilities are the specific, "essential" duties to:

  • Recruit, select and retain qualified employees according to federal and state labor laws and company policies; ensure store is properly staffed;

  • Provide proper training for employees; conduct performance evaluations; identify gaps for appropriate solutions and/or counseling, up to and including termination;

  • Make recommendations regarding employee pay rate

and advancement;

• Communicate performance, conduct and safety expectations regularly; coordinate meetings and events to encourage safety, security and policies;

• Ensure that the store is appropriately staffed and effectively opened and closed each day;

• Evaluate operating statements to identify business trends (including sales, profitability, and turn), expense control opportunities, potential shrink, and errors;

• Ensure that all merchandise is presented according to established practices; utilize merchandise fixtures properly including presentation, product pricing and signage;

**\*2** • Maintain accurate inventory levels by controlling damages, markdowns, scanning, paperwork, and facility controls;

• Ensure the financial integrity of the store through strict cashier accountability, key control, and adherence to stated company security practices and cash control procedures;

• Provide superior customer service leadership;

• Maintain a clean, well-organized store; facilitate a safe and secure working and shopping environment;

• Ensure that store is adequately equipped with tools necessary to perform required tasks; and

• Complete all paperwork and documentation according to guidelines and deadlines.

  (*Id.*)

The job description further outlines certain "Working Conditions and Physical Requirements" associated with the Store Manager position. (*See id.*) These include: "[f]requent walking and standing"; "[f]requent bending, stooping and kneeling to run check out station, stock merchandise, and unload trucks"; "occasional climbing";

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 1770301 (N.D.N.Y.)

(Cite as: 2011 WL 1770301 (N.D.N.Y.))

and "frequent and proper lifting of up to 40 pounds [, and] occasional lifting of up to 65 pounds." (*Id.*)

With respect to compensation, in addition to their weekly salaries, Store Managers are generally eligible for certain bonuses, such as annual "Teamshare" bonuses and quarterly "in stock" bonuses. (*See* No. 09–cv–360, Def. Common SMF ¶ 13, Dkt. No. 39 .) Teamshare bonuses are tied to the financial performance of the Store Manager's individual store and the manager's individual performance as a manager. (*See id.*) To the extent that Assistant Managers have also been eligible for Teamshare bonuses, it appears that their eligibility never exceeded 30% of what a Store Manager could earn. (*See id.* at ¶ 14.) As to in-stock bonuses, they were awarded in the amount of $250 per quarter if certain in-stock goals were met, and only to Store Managers. (*See id.* at ¶¶ 13, 14.)

In assessing the financial performance of a Store Manager's individual store, Dollar General considers whether and to what extent the store is meeting its quarterly and annual sales goals, minimizing inventory shrink and controllable expense, and maximizing profit. (*See* No. 09–cv–360, Allen Aff., Ex. 3, Store Manager Performance Evaluation Form, Dkt. No. 41:3 (filed under seal). Relatedly, in evaluating a Store Manger's managerial and leadership skills, Dollar General examines the manager's performance in seven focus areas: sales volume, controllable expense, inventory shrink, merchandising/in stock, training and development, customer satisfaction, and safety awareness. (*See id.*)

**B. *Janet Anderson***

In February 2002, plaintiff Janet Anderson was hired by Dollar General as an ASM for Store No. 8576 in Burnt Hills, New York. (*See* No. 09–cv–360, Def. SMF (Anderson) ¶ 1, Dkt. No. 38:1.) In April 2002, Anderson was promoted to the position of Store Manager, which she held until her resignation in November 2002. (*See id.* at ¶ 2.) According to Anderson, other than the on-the-job training she received as an ASM, she did not receive any training when she was promoted to Store Manager. (*See* No. 09–cv–360, Anderson SMF Resp., Additional Facts ¶ 20, Dkt. No. 46:1.)

**\*3** As a Store Manager, Anderson was paid a fixed

weekly salary of $425.00, was eligible for the performance-based bonuses discussed above, and worked an average of fifty hours per week. (*See* No. 09–cv–360, Def. SMF (Anderson) ¶¶ 6, 8, 25, Dkt. No. 38:1.) According to Anderson, she understood when she took the Store Manager position that she would be working more than forty hours per week, and that her salary was to compensate her for all hours worked since she would not be paid for overtime. (*See id.* at ¶¶ 6, 7; No. 09–cv–360, Anderson SMF Resp. ¶ 7, Dkt. No. 46:1.) During Anderson's tenure as Store Manager, the next highest paid employee, an ASM, earned $7.00 per hour and worked an average of thirty-one hours per week. (*See id.*)

With respect to her job functions, Anderson acknowledged in deposition that she performed all of the duties outlined in the Store Manager job description, and agreed that the description provides an accurate general summary of her position as Store Manager. (*See* No. 09–cv–360, Def. SMF (Anderson) ¶ 15, Dkt. No. 38:1.) In line with that testimony, Anderson explained that she was responsible for supervising the other store employees, including an ASM, a "Third–Key" or Lead Clerk, and the other store clerks, and for performing other managerial duties. (*See id.* at ¶ 3.)

As part of her supervisory duties, Anderson testified that she trained employees on store policy and other related issues; directed, supervised, and evaluated employees' work; coached, disciplined, and counseled employees where necessary; recommended employee pay raises and promotions to her DM (recommendations that were always accepted); and scheduled employees' hours. (*See id.* at ¶¶ 14, 16.) With respect to scheduling, Anderson managed approximately 168 to 212 labor hours per week, meaning that she allocated Dollar General's labor hour allotment amongst the employees she supervised. (*See id.* at ¶ 4.)

In addition to these supervisory tasks, Anderson also performed other duties, including interviewing and hiring employees; monitoring and evaluating weekly sales reports and store operating reports; ensuring that cash registers "balanced"; completing daily paperwork, such as payroll and bank deposits; managing inventory levels; ensuring that merchandise was properly staged and

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 1770301 (N.D.N.Y.)

(Cite as: 2011 WL 1770301 (N.D.N.Y.))

stocked, largely in accordance with Dollar General "Plan–O–Grams" [FN3]; leading team meetings; and ensuring that the store was properly open and closed. (*See id.* at ¶¶ 14, 16.)

> FN3. "Plan–O–Grams" are store diagrams that direct the placement of products in a store. (*See* No. 09–cv–360, Def. SMF (Anderson) ¶ 23, Dkt. No. 38:1.) According to Anderson, however, because her store did not comport with the standard Plan–O–Gram layout, she relied largely on her own discretion to merchandise approximately fifteen of the store shelves. (*See id.*)

Anderson also performed non-managerial tasks in her role as Store Manager. Specifically, she testified to running the cash register, stocking shelves, facing products on the shelves, helping unload delivery trucks, and cleaning the store. [FN4] (*See* No. 09–cv–360, Anderson SMF Resp., Additional Facts ¶¶ 4, 6, 7, Dkt. No. 46:1.) With respect to the division of her time, Anderson testified to spending at least half of her time on managerial duties. (*See* No. 09–cv–360, Def. SMF (Anderson) ¶ 26, Dkt. No. 38:1.) Anderson agreed, however, that when she was performing non-managerial tasks, she would continue to monitor and manage the operation of the store. (*See* No. 09–cv–360, Def. SMF (Anderson) ¶ 27, Dkt. No. 38:1.) Anderson further testified that if Dollar General would have allotted larger labor hour budgets, she would have been able to focus more time on her managerial duties and less on non-managerial tasks. (*See* No. 09–cv–360, Anderson Dep. at 237:11–16, Dkt. No. 38:4.) According to Anderson, the labor budget was allocated such that only two employees, including herself, could typically be working at one time. (*See* No. 09–cv–360, Anderson SMF Resp., Additional Facts ¶¶ 5–7, Dkt. No. 46:1.) Often, then, as Anderson testified, she would stock the shelves, unload a delivery truck, or clean the store while the only other employee working would run the cash register. (*See id.*)

> FN4. In addition to her routine duties, Anderson was also sent to two other Dollar General stores for two days each to set up the stores by setting up shelving and stocking merchandise. (*See* No.

09–cv–360, Anderson SMF Resp., Additional Facts ¶ 19, Dkt. No. 46:1.)

**\*4** In performing her duties as Store Manager, managerial or otherwise, Anderson was expected to act in accordance with Dollar General's standard policies and procedures. (*See* No. 09–cv–360, Def. SMF (Anderson) ¶ 19, Dkt. No. 38:1.) Those policies and procedures, which were contained in the company's Standard Operating Procedures Manual (SOP), provided direction in how to perform certain store operations. (*See id.*) According to Anderson, however, while the SOP provided general guidance and direction, it did not cover every issue that would arise in the store on a daily basis. (*See id.*)

During her tenure as Store Manager, Anderson reported to DM Bob Seaman. (*See id.* at ¶ 12.) Mr. Seaman, unlike Anderson, did not have an office in or a key to Anderson's store, but would visit the store on a periodic basis. (*See id.*) According to Anderson, Mr. Seaman visited her store approximately once every five to six weeks. (*See id.*) During those visits, which typically lasted one hour, Mr. Seaman would walk through the store with Anderson and provide her with ideas and recommendations for improving the store. (*See id.*) Anderson testified that implementation of these ideas and recommendations was not mandatory, explaining that she used some of Mr. Seaman's suggestions but not others. (*See id.*) Apart from these store visits, it appears from Anderson's testimony that her communications with Mr. Seaman were relatively infrequent. According to Anderson, she spoke with Mr. Seaman on the telephone approximately six times—about once per month—and received a voice mail message from him every four or five weeks. (*See id.*) And with respect to those voice mail messages, Anderson testified that they were typically "district wide" and not specific to Anderson or her store. (*See id.*) Overall, despite Mr. Seaman's oversight, Anderson felt that she was "in charge" of her store, and further testified that Mr. Seaman did not interfere with the performance of her managerial duties. (*See id.* at ¶¶ 13, 17.)

Ultimately, as noted above, Anderson resigned from her employment with Dollar General in November 2002. (*See id.* at ¶ 2.)

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 1770301 (N.D.N.Y.)

(Cite as: 2011 WL 1770301 (N.D.N.Y.))

**C. Betty Pulver**

Plaintiff Betty Pulver was hired as a Store Manager for Dollar General in April 2002. (*See* No. 09–cv–363, Def SMF (Pulver) ¶ 1, Dkt. No. 27:1.) At the time of her hiring, Pulver understood that she would be responsible for opening and managing a new store in Hudson, New York. (*See id.;* No. 09–cv–363, Pulver Dep. at 45–46, Dkt. No. 27:4.) Prior to opening the Hudson store, however, and for approximately one month after being hired, Pulver worked at the Broadway store in Schenectady, New York, apparently for training purposes. (*See* No. 09–cv–363, Def SMF (Pulver) ¶ 2, Dkt. No. 29:1.) Pulver testified, however, that while at the Broadway Store, the only training she received related to loading and unloading delivery trucks and stocking shelves. (*See* No. 09–cv–363, Pulver SMF Resp., Additional Facts ¶ 10, Dkt. No. 29:1.) According to Pulver, she received no instruction with respect to following Plan–O–Grams or completing paperwork, and was given no experience running a cash register, making a schedule, or opening or closing the store. (*See id.*) Pulver testified that the Store Manager who was supposed to train her went on vacation a week after she started, leaving no training instructions with the ASM who was left in charge of the store. (*See* No. 09–cv–363, Pulver Dep. at 50–51, Dkt. No. 27:4.)

**\*5** In May 2002, with the opening of the Hudson store behind schedule, Pulver was transferred to open a different store, the State Street store. (*See* No. 09–cv–363, Def SMF (Pulver) ¶ 2, Dkt. No. 27:1.) According to Pulver, it wasn't until this transfer that she received training on completing paperwork, scheduling, Plan–O–Grams, etc. (*See* No. 09–cv–363, Pulver Dep. at 53–54, Dkt. No. 27:4.) Anderson testified that this training, which was conducted over the telephone, occurred over the course of one month, but did not specify the frequency or duration of each session. (*See id.*) Ultimately, in July 2002, Pulver was transferred to open the Hudson store, where she remained as Store Manager until her resignation in July 2003. (*See* No. 09–cv–363, Def SMF (Pulver) ¶ 2, Dkt. No. 27:1.)

In "opening" the Hudson and State Street stores, Pulver supervised crews of twenty-five employees hired

on a temporary basis to assist in setting up the stores. (*See id.* at ¶ 3.) Once the Hudson store was set up and ready to be opened, Pulver made recommendations as to which of the temporary employees should be hired on a permanent basis to staff the store's ASM and "Third Key Clerk" positions. (*See id.*) After the necessary hiring decisions were made and the Hudson Store was opened, Pulver began performing the duties and responsibilities associated with the day-to-day operations of the store. (*See, e.g., id.* at ¶¶ 4, 5, 12.)

Like Anderson, Pulver agreed in deposition that the duties she regularly performed as Store Manager matched those recited in Dollar General's description of the Store Manager position. (*See id.* at ¶ 14.) Those duties, as with Anderson, included managing the Hudson store's labor budget of 160 to 240 labor hours per week; directing and supervising the work of the ASM, Third Key Clerk, and store clerks Pulver supervised; ordering store merchandise; ensuring that merchandise was properly staged and stocked; interviewing and hiring employees; scheduling employees; ensuring the store was appropriately staffed and properly opened and closed each day; ensuring the safety and security of the store and employees; ensuring that all store paperwork was properly completed and forwarded to the Dollar General corporate office; recommending employees for promotion (recommendations that were always accepted); implementing Dollar General directives regarding, among other things, new store policies and procedures, product recalls, and compliance with state and local laws; and training, disciplining, counseling, and, under certain circumstances, firing employees.[FN5] (*See id.* at ¶¶ 4, 5, 12, 13, 15, 21.)

FN5. Pulver had the authority to terminate employees for certain types of misconduct, such as failing to report to work or cash register shortages, without District Manager approval. (*See* No. 09–cv–363, Def SMF (Pulver) ¶ 13, Dkt. No. 29:1.) In other situations, however, such as those involving employee performance issues, Pulver was required to seek her District Manager's approval before she could terminate an employee. (*See id.*) According to Pulver, her termination recommendations were always

Not Reported in F.Supp.2d, 2011 WL 1770301 (N.D.N.Y.)

(Cite as: 2011 WL 1770301 (N.D.N.Y.))

followed. (*See id.*)

In addition to these and similar duties, Pulver testified to also performing non-managerial duties, such as stocking shelves, running the cash register, cleaning the store, and unloading delivery trucks. (*See* No. 09–cv–363, Pulver SMF Resp., Additional Facts ¶ 2, Dkt. No. 29:1.) Like Anderson, Pulver testified to spending at least half of her time on managerial duties. (*See* No. 09–cv–363, Def SMF (Pulver) ¶ 26, Dkt. No. 27:1.) She further agreed in deposition that when she was performing nonmanagerial tasks, she was simultaneously managing the store, evaluating employees, and ensuring proper customer service. (*See id.*) And like Anderson, Pulver agreed that Dollar General's limited labor hour budget required her to spend more time on non-managerial tasks than she otherwise would have. (*See* No. 09–cv–363, Pulver Dep. at 287:12–16, Dkt. No. 27:4.)

**\*6** Also like Anderson, Pulver was required to comply with Dollar General SOP, and to follow Dollar General Plan–O–Grams in merchandising her store. (*See id.* at ¶¶ 22, 23.) But also similar to Anderson, Pulver testified that the SOP did not address every situation that could arise in the store on a daily basis, requiring her to exercise discretion in those situations. (*See id.* at ¶ 22.) As to Plan–O–Grams, Pulver testified that because her store did not always comport with the Plan–O–Gram layout, she would exercise discretion in deciding what products to place on approximately ten to twenty percent of the store shelves. (*See id .* at ¶ 23.)

As with all Dollar General Store Managers, Pulver reported to a DM. (*See id.* at ¶ 10.) Similar to Anderson's experience in that regard, Pulver's DM would visit the Hudson store for between one and two hours to review store paperwork and discuss employee performance and ways to improve the store's overall performance. (*See id.*) Pulver recalls only five of these visits occurring during her tenure as Store Manager of the Hudson store, and testified that she rarely spoke to her DM on the telephone and that she could not recall receiving any voice mail messages from him. (*See id.*) Rather, Pulver was responsible for leaving weekly voicemail reports for her DM regarding her store's sales performance. (*See id.*) Like Anderson, Pulver testified that her DM did not interfere with the performance of her managerial duties. (*See id.* at ¶ 16.)

With respect to compensation, Pulver was hired at a salary of $423.00 per week. (*See id.* at ¶ 6.) Beginning in July 2002, however, and continuing until the end of her employment in July 2003, Pulver's weekly salary was $480.00. (*See id.*) Like Anderson, Pulver testified that she understood when she was hired that this weekly salary was to compensate her for all hours worked since she would not be paid for overtime. (*See id.* at ¶ 7.) Pulver testified to working between sixty and seventy hours per week as Store Manager of the Hudson store. (*See* No. 09–cv–363, Pulver SMF Response, Additional Facts, ¶ 1, Dkt. No. 29:1.) During that time, the next highest paid employee in the Hudson store, an ASM, earned $7.00 per hour and worked an average of thirty to thirty-five hours per week. (*See* No. 09–cv–363, Def SMF (Pulver) ¶ 8, Dkt. No. 27:1.) In Pulver's view, she was "worth more" than the other store employees because she had more responsibilities, including hiring, firing, interviewing, scheduling, assigning, disciplining, and training employees in her store. (*See id.* at ¶ 9.) According to Pulver, she was "in charge" of her store. (*See id.* at ¶ 11.)

### D. *Procedural Background*

On March 21 and 29, 2004, Pulver and Anderson consented to join numerous other plaintiffs in this collective FLSA action against Dollar General, alleging that Dollar General improperly classified them as exempt from the FLSA's overtime compensation requirement. (*See* No. 09–cv–363, Ex. B, Pulver Consent, Dkt. No. 27:11; No. 09–cv–360, Ex. B, Anderson Consent, Dkt. No. 38:10; No. 09–cv–363, 2d Am. Compl., Dkt. No. 4; No. 09–cv–360, 2d Am. Compl., Dkt. No. 4.) While the collective action was originally filed in the Northern District of Alabama, Pulver and Anderson's claims, among others, were transferred to this court, where jurisdiction and venue is proper. (*See* No. 09–cv–360, Dkt. No. 1; No 09–cv–363, Dkt. No. 1 .)

**\*7** On May 11, 2009, Magistrate Judge Randolph F. Treece consolidated Anderson and Pulver's cases for discovery, pretrial proceedings, and the filing of common summary judgment briefing. In addition, Judge Treece designated Anderson's case, No. 09–cv–360, as the lead case, directing all filings to be made to that docket. (No.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 1770301 (N.D.N.Y.)

(Cite as: 2011 WL 1770301 (N.D.N.Y.))

09–cv–363, Dkt. No. 25.)

Now pending are Dollar General's motions for summary judgment as against each plaintiff and to strike certain evidence offered by plaintiffs in opposition to the summary judgment motions. (*See* No. 09–cv–360, Dkt. Nos. 38, 50; No. 09–cv–363, Dkt. No. 27.)

### III. *Standard of Review*

The standard for the grant of summary judgment is well established and will not be repeated here. For a full discussion of the standard, the court refers the parties to its previous opinion in *Bain v. Town of Argyle,* 499 F.Supp.2d 192, 194–95 (N.D.N.Y.2007).

### IV. *Discussion*

**A.** *Motion to Strike*

Defendants have moved to strike certain evidence offered by plaintiffs in opposition to the current motions. (*See* No. 1:09–cv–360, Dkt. No. 50.) That evidence includes documents relating to a 2004 Dollar General Survey, articles about Dollar General, Dollar General Story Newsletters, and numerous other Dollar General internal documents. Because the court has not relied on this evidence in rendering its decision, Dollar General's motion to strike is denied as moot. And to the extent the motion seeks to preclude this evidence at trial, it is denied as premature.

**B.** *The FLSA Overtime Compensation Requirement*

As noted above, plaintiffs allege that Dollar General deprived them of overtime wages in violation of FLSA's overtime compensation requirement. Dollar General responds that plaintiffs, as Store Managers, were properly classified as "executive" employees and are therefore exempt from the FLSA overtime requirement.

Under the FLSA, an employer must pay overtime to employees working more than forty hours per week. 29 U.S.C. § 207(a)(1). However, individuals "employed in a bona fide executive ... capacity" are exempt from the FLSA's overtime requirements. 29 U.S .C. § 213(a)(1). Congress has not defined what it means to be a "bona fide executive employee," instead delegating that responsibility to the Department of Labor (DOL), which has promulgated a body of clarifying regulations. *See* 29 U.S.C. § 213(a)(7); 29 C.F.R. § 541, *et seq.* Under the

pre–2004 regulations,[FN6] whether an employee qualifies for the executive exemption is a question of law, and is determined based on "different legal tests according to salary level." *Donovan v. Burger King Corp.,* 675 F.2d 516, 518 (2d Cir.1982) (citation omitted). Salaried employees earning more than $250 per week, like plaintiffs here, must satisfy the so-called "short test" to qualify for the exemption. *Id.* (citing 29 C.F.R. § 541.1(f)). To satisfy this test, the employee must be one who regularly directs the work of two or more other employees, and whose "primary duty" is management. *Id.*

> **FN6.** Effective August 23, 2004, the DOL regulations defining the executive exemption were amended. *See* 69 Fed.Reg. 22,122 (Apr. 23, 2004). Because the relevant employment of each plaintiff in this case terminated before the effective date of these amendments, the court agrees with Dollar General—and plaintiffs do not appear to dispute—that the pre–2004 regulations should be applied to plaintiffs' claims. *See, e.g., Clougher v. Home Depot U.S.A., Inc .,* 696 F.Supp.2d 285, 290 n. 6 (E.D.N.Y.2010) (applying pre–2004 regulations to pay periods predating amendment and amended regulations to pay periods postdating amendment); *Baden–Winterwood v. Life Time Fitness, Inc.* 566 F.3d 618, 629 (6th Cir.2009) (same); *Slusser v. Vantage Builders, Inc.,* 576 F.Supp.2d 1207, 1215 n. 4 (D.N.M.2008) ("The revised FLSA regulations adopted ... in August of 2004 do not apply retroactively.").

*\*8* In this case, there is no dispute that Anderson and Pulver regularly directed the work of two or more employees. (*See* No. 09–cv–360, Allen Aff., Ex. 1, Joint Stipulations of Fact ¶ 4, Dkt. No. 41:1; No. 09–cv–360, Pls. Common Response Br., Dkt. No. 44 (focusing solely on issue of primary duty).) Rather, the only issue in dispute is whether Anderson and Pulver's primary duty as Dollar General Store Managers was management.

Whether an employee's primary duty is management under the regulations is determined based on the following five factors:

Not Reported in F.Supp.2d, 2011 WL 1770301 (N.D.N.Y.)

(Cite as: 2011 WL 1770301 (N.D.N.Y.))

(1) time spent in the performance of managerial duties; (2) relative importance of managerial and non-managerial duties; (3) the frequency with which the employee exercises discretionary powers; (4) the employee's relative freedom from supervision; and (5) the relationship between the employee's salary and the wages paid employees doing similar non-exempt work.

*Donovan, 675 F.2d at 521* (citing 29 C.F.R. § 541.103). Thus, the primary duty inquiry is "necessarily fact-intensive." *Rodriguez v. Farm Stores Grocery, Inc.,* 518 F.3d 1259, 1264 (11th Cir.2008); *see* 29 C.F.R. § 541.103 (2002) ("[The] determination of whether an employee has management as his primary duty must be based on all the facts in a particular case."). And given this "deeply factual ... inquiry ... courts are often reluctant to grant summary judgment based on the executive exemption ." *Indergit v. Rite Aid Corp.,* Nos. 08 Civ. 9361 & 08 Civ. 11364, 2010 WL 1327242, at *7 (S.D.N.Y. Mar. 31, 2010). Further, in examining the primary duty factors, courts must be mindful that "[the executive] exemption must be narrowly construed," and that "[t]he employer has the burden of proving that the employee clearly falls within [its] terms." *Young v. Cooper Cameron Corp.,* 586 F.3d 201, 204 (2d Cir.2009) (citations and internal quotation marks omitted).

**1. Time Spent on Managerial Activities**

As to the first factor, the court must consider the amount of time Anderson and Pulver spent on managerial duties. " 'In the ordinary case[,] it may be taken as a good rule of thumb that ... an employee who spends over 50 percent of [her] time in management would have management as [her] primary duty.' " *Donovan, 675 F.2d. at 520 n. 5* (quoting 29 C.F.R. § 541.03). " 'Time alone, however, is not the sole test.' " *Id.* (quoting 29 C.F.R. § 541.03). Where an employee " 'does not spend over 50 percent of [her] time in managerial duties, [she] might nevertheless have management as [her] primary duty if the other pertinent [factors] support such a conclusion.' " *Id.* (quoting 29 C.F.R. § 541.03). In general, however, how an employee spends her time working is a question of fact for a jury. *Icicle Seafoods, Inc. v.. Worthington,* 475 U.S. 709, 714 (1986).

Here, Dollar General argues that plaintiffs' deposition testimony should "end the legal analysis in its favor"

because it conclusively demonstrates that plaintiffs' spent more than half of their time on managerial activities. The court disagrees. As to Anderson, Dollar General points to the following exchange:

**\*9** Q: .... When you're just performing management type duties, would you say that would be half of the time?

A: At least.

Q: Okay. So over half?

A: Yes

(No. 09–cv–360, Anderson Dep. at 211:7–12, Dkt. No. 38:4.) However, when later asked how much time she spent on non-managerial duties, Anderson responded, "[e]asily half the day," arguably implying that she may have spent more than half the day on those duties. (*Id.* at 242:5–12.) Following this response, the following exchange ensued:

Q: You're not changing your testimony that you spent more time performing managerial duties than you did nonmanagerial duties, are you?
A: No, I don't think so.

(*Id.* at 242:22–25.) Pointing to this latter exchange, Dollar General dismisses Anderson's contention that she spent "half of her day" on managerial duties, arguing that Anderson's "testimony is unequivocal that she spent more time performing managerial duties than non-managerial duties." (No. 09–cv–360, Def.Resp.(Anderson), at 4–5; Dkt. No. 52.)

Having reviewed the deposition transcript, and construing all reasonable inferences in Anderson's favor, the court is not persuaded that Anderson's testimony compels summary judgment. Specifically, given Anderson's arguably inconsistent responses, her less than definitive "clarification" of those responses, and the fact that her testimony was based upon what appear to be rough estimations of the time she spent on certain duties, the court is not satisfied that Anderson's testimony is conclusively unequivocal.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 1770301 (N.D.N.Y.)

(Cite as: 2011 WL 1770301 (N.D.N.Y.))

The same is true with respect to Pulver. As to her testimony, Dollar General points to the following exchange as unequivocal proof that she spent more than half her time on managerial activities:

Q: ... So you spent more than 50 percent of your time on managerial work before you even think about what you did when you were doing the nonmanagerial work and you were still supervising and operating the store, but just out and out managerial work, you spent more than have your time on it didn't you?

A: Sitting down and thinking about it all, yes, maybe at the time I didn't feel like I was doing, you know. But sitting down here and talking and thinking about it, yes.

(No. 09–cv–363, Pulver Dep. at 252:24–25, 253:2–10, Dkt. No. 27:4.) As with Anderson's testimony, however, additional portions of Pulver's testimony weigh against characterizing this exchange as an unequivocal admission. For example, when the "time spent" issue first arose, Pulver testified as follows:

Q: And if we were trying to get a handle on how much time you spent on the non-managerial duties, stocking, cleaning, waiting on customers, running a cash register, cleaning up, those would be less than half of the time?
A: I wanna say no because a lot of paperwork I took home and did on my own time. The scheduling did home, on my own time. I did a lot of stocking and—

Q: I'm not saying you didn't do a lot of stocking.

**\*10** A: But I spent as much time—I want to say as much time doing both. I mean, I was constantly on the floor helping and stocking.

Q: So you would say about 50/50 doing management/nonmanagement?

A: Yes.

(*Id*. at 247:13–25, 248:2–5.) Again, having construed all reasonable inferences in Pulver's favor in light of this arguably inconsistent testimony, the court disagrees with Dollar General that it is entitled to summary judgment on

the time spent issue with respect to Pulver. Accordingly, Dollar General's motions for summary judgement as to both Anderson and Pulver are denied insofar as they seek dismissal based on the time spent issue.

**2. Relative Importance of Managerial and Non–Managerial Duties**

This finding, however, does not end the primary duty inquiry. As noted above, "time alone is not the sole test," and the court must proceed to an examination of the second factor—the relative importance of managerial and non-managerial duties. This factor evaluates which of plaintiffs' duties—managerial or non-managerial—were more important to the employer. *See Donovan,* 675 F.2d at 521. In gauging this relative importance, "many courts look to[, among other things,] a manager's training, evaluation, and factors affecting eligibility for bonuses and pay raises." *Mayne–Harrison v. Dolgencorp, Inc.,* No. 1:09–CV–42, 2010 WL 3717604, at \*20 (N.D.W.Va. Sept. 17, 2010) (citing examples). As many courts have recognized, however, resolving this "difficult and intensive factual inquiry" is generally "inappropriate at summary judgment." *Indergit,* 2010 WL 1327242, at \*6 (collecting cases).

Here, in arguing that plaintiffs' managerial duties were most important to it, Dollar General points primarily to the Store Manager job description, which lists the variety of essential job functions that are managerial in nature; plaintiffs' compensation structure, which provides for higher weekly earnings and store-performance-based bonuses; and the fact that Store Managers were evaluated on the basis of management-focused criteria.

In response, plaintiffs point to, among other things, the fact that the Store Manager job description explicitly contemplates the frequent performance of manual labor; that plaintiffs' received very little training in preparation for their role as Store Manager; that plaintiffs' weekly pay, when accounting for the number of hours worked, was comparable to other employees; and that Dollar General's restrictive labor budget forced plaintiffs to perform more non-managerial tasks than they otherwise would have. Based primarily on these facts, plaintiffs argue that a reasonable jury could find that their non-managerial duties were more important to Dollar General than their managerial duties.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 1770301 (N.D.N.Y.)

(Cite as: 2011 WL 1770301 (N.D.N.Y.))

Undoubtedly, each of the facts cited by Dollar General offers support for the conclusion that it placed significant value on the plaintiffs' performance of managerial duties. Moreover, the court is not persuaded based on plaintiffs' submissions that the second factor should conclusively weigh in their favor. Nonetheless, the court does agree with plaintiffs that summary judgment on this issue, as in most cases, is not warranted here.

**\*11** As to training, for example, plaintiffs' testimony calls into question the nature and amount of critical management training plaintiffs actually received. As other courts have recognized, the extent to which an employer trains its managers is relevant in determining the value that employer places on managerial duties. *See, e.g., In re Dollar General Stores FLSA Litigation,* Nos. 5:09–MD–1500–JG, 4:09–CV–57–BR, 4:09–CV–58–BR, 2011 WL 197804, at \*10 (E.D.N.C. Jan. 19, 2011) (finding that plaintiff's "value to Dollar General [was] shown by the fact that, unlike the other employees in her store, she went through four weeks of training before she was assigned her own store"). In this case, Anderson testified to receiving no additional training when promoted to Store Manager, and Pulver testified that the brunt of her managerial training occurred over the phone. When viewed in a light most favorable to plaintiffs, these facts cut against a finding in favor of Dollar General.

Similarly, with respect to the Store Manager job description, while Dollar General is correct that it lists numerous managerial functions as "essential," the accuracy of that label is at least somewhat lessened in light of both the limited managerial training plaintiffs appear to have received and the fact that the job description also explicitly contemplates the frequent performance of manual labor.

And most significantly in the court's view is the restrictiveness with which Dollar General appears to allot its labor budget. As noted above, both plaintiffs testified that Dollar General's limited labor budget forced them to spend more time on non-managerial duties than they otherwise would have. (*See* No. 09–cv–360, Anderson Dep. at 237:11–16, Dkt. No. 38:4; No. 09–cv–363, Pulver Dep. at 287:12–16, Dkt. No. 27:4.) As Anderson

explained, the labor budget operated such that she could typically only schedule herself and one additional employee to be in the store at one time, often requiring her to perform non-managerial tasks such as stocking and cleaning. (No. 09–cv–360, Anderson Dep. at 236–37, 238–40, Dkt. No. 38:4.) Pulver testified to operating under similar constraints, explaining that "[w]e all complained about not getting enough hours, every store manager did." (No. 09–cv–363, Pulver Dep. at 161, Dkt. No. 27:4.) Pulver further testified that she "wasn't getting the help she needed" with, among other things, "[h]iring certain employees for key positions," which "put more pressure on [her] to open and close stores everyday, rearrange [her] schedule to open and leave and then come back and leave." (*Id.* at 160–61.) Given this testimony, the court is unable to definitively conclude, especially in light of other record evidence, that no reasonable jury could find that Dollar General more highly valued plaintiffs' non-managerial duties. *See, e.g., Pierce v. Dolgencorp, Inc.,* Nos. 3:09cv079 & 4:09cv097, 2011 WL 398366, at \*9 (M.D.Pa. Feb. 3, 2011) (denying summary judgment and holding that a reasonable jury could plausibly conclude that plaintiff's managerial duties were less highly valued where employer limited employee's ability to perform managerial tasks by failing to allot more labor hours); *Plaunt v. Dolgencorp, Inc.,* Nos. 3:09cv079 & 1:09cv084, 2010 WL 5158620, at \*8 (M.D.Pa. Dec. 14, 2010) (same).

**\*12** On balance, then, having considered the parties' competing arguments and reviewed the record evidence in a light most favorable to plaintiffs, the court is not convinced that Dollar General has conclusively demonstrated an entitlement to summary judgement with respect to the second factor.

**3. Relationship Between Salary and Other Employee Wages**[FN7]

> **FN7.** Ordinarily, the court would next turn to an examination of the third and fourth factors—the frequency with which discretion was exercised and freedom from supervision. In this case, however, because the court discerns questions of fact with respect to the fifth factor—the relationship between plaintiffs' salary and other employees' wages—the court need not do so, for

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 1770301 (N.D.N.Y.)

(Cite as: 2011 WL 1770301 (N.D.N.Y.))

even if the third and fourth factors were found to decidedly weigh in Dollar General's favor, Dollar General's failure to conclusively establish the fifth, in light of the court's findings above, weighs heavily against summary judgment.

The fifth factor in the primary duty analysis compares an employee's salary to the wages of non-exempt employees performing similar work. In this case, the parties agree that the relevant comparison is between plaintiffs and their respective ASMs, each of whom, at all relevant times, earned $7.00 per hour.

Dollar General argues that this factor weighs conclusively in its favor because plaintiffs earned significantly more than their ASMs. In drawing that conclusion, Dollar General compares plaintiffs' weekly salaries with the weekly earning potential of their respective ASMs. With respect to Anderson, for example, Dollar General compares her $425.00 weekly salary to her ASM's potential weekly earnings of $280.00, and concludes that "Anderson's weekly salary was at least 151 % of the weekly earnings of her next highest paid employee." (No. 1:09–cv–360, Def. Mem. of Law (Anderson) at 14, Dkt. No. 38:2.) Dollar General also highlights the fact that "Anderson was eligible for up to $10,000 per year in bonuses based upon her store's performance, where her ASM was eligible only for up to $3,000 in bonuses." (Id.)

As to Pulver, Dollar General relies on the same calculation, comparing Pulver's weekly salary—which ranged from $423.00 to $480.00—to her ASM's potential weekly earnings of $280.00, and finding Pulver's salary to be 151% to 171% of those earnings. (No. 1:09–cv–363, Def. Mem. of Law (Pulver) at 13, Dkt. No. 27:2.)

Plaintiffs counter that their salaries were not significantly higher than their ASMs' potential wages when considering the amount of hours they worked. As to Anderson, for instance, she testified to working an average of fifty hours per week as a Store Manager. When dividing her $425.00 weekly salary, she contends, her effective hourly rate would have been $8.50 an hour, only $1.50 more per hour than her ASM. (See No. 1:09–cv–360, Anderson Mem. of Law at 11, Dkt. No. 46.)

Converting Pulver's weekly salary to an hourly rate produces similar results. As noted above, Pulver earned $425.00 per week in the beginning of her employment, and later earned $480.00 per week. Thus, when considering Pulver's testimony that she worked an average of sixty to sixty-five hours a week, her effective hourly rate was between $6.51 and $7.08 initially, and between $7.38 and $8 .00 once her salary increased. (See No. 1:09–cv–363, Pulver Mem. of Law at 11, Dkt. No. 29.) Based on these figures, Pulver argues, the gap in earnings between her and her ASM is not so significant as to compel summary judgment on this issue. (Id. at 11–12.)

As the parties' submissions reflect, there is some divergence of opinion with respect to which of these methods of calculation and comparison is the "correct" one. Compare, e.g., Moore v. Tractor Supply Co., 352 F.Supp.2d 1268, 1279 (S.D.Fla.2004) (declining to reduce salary to hourly rate), with Johnson v. Big Lots Stores, Inc., 604 F.Supp.2d 903, 918 (E.D.La.2009) (finding hourly rate analysis both relevant and appropriate to proper executive exemption determination). To the limited extent that courts in this Circuit have addressed the issue, however, they have not foreclosed use of the method espoused by plaintiffs, suggesting that the hours worked by an employee can be taken into account. See Donovan, 675 F.2d at 522 (finding that "[a]ssistant [m]anagers earning $250 or more were paid substantially higher wages even taking their longer hours into account" (emphasis added)); Clougher v. Home Depot U.S.A., Inc., 696 F.Supp.2d 285, 293 (E . D.N.Y.2010) (2010) ("[T]here is nothing in the record to render [plaintiff's] counter-argument implausible; namely, that his hourly pay rate, where properly calculated, is substantially less than comparable hourly-wage supervisors.... Given the potential import of an hourly-wage analysis, this Court is compelled to reject [defendant's] all too pat concern for the burdens of engaging in such 'mathematical gymnastics.' " (citations omitted)).

*13 This court likewise declines to reject plaintiffs' hourly rate conversion. In the court's view, converting plaintiffs' weekly salary into an approximate hourly wage is an appropriate way of finding a common basis with which to compare the wages paid to others. As one court

Not Reported in F.Supp.2d, 2011 WL 1770301 (N.D.N.Y.)

(Cite as: 2011 WL 1770301 (N.D.N.Y.))

reasoned, "[t]o ignore the fact that [a plaintiff] worked more than forty hours per week would largely frustrate the purpose of this inquiry: to determine whether the employer sought to subvert the FLSA by attaching an overtime exemption to an employee who otherwise performs the same non-exempt tasks as hourly employees." *Plaunt,* 2010 WL 5158620, at *13 ("Without some standard unit, there can be no useful comparison in this already-amorphous inquiry."). The persuasiveness of this reasoning is enhanced, in the court's view, when considering the overarching principle that "[e]xemptions from the FLSA are to be narrowly construed against the employer, and [it is] the employer [that] has the burden of establishing an exemption." *Pignataro v. Port Auth. of N.Y. & N.J.,* 593 F.3d 265, 268 (3d Cir.2010); *Young,* 586 F.3d at 204.

Thus, in viewing the wage and salary evidence in a light most favorable to plaintiffs—i.e., in accordance with the hourly-rate conversion—the court finds that the question of whether the difference in plaintiffs' salary was so significant as to justify their exemption is one more properly left to a jury. *See Morgan v. Family Dollar Stores, Inc.,* 551 F.3d 1233, 1271 (11th Cir.2008) (finding that "[g]iven the relatively small difference between the store managers' and assistant managers' hourly rates[—two or three dollars—] it was within the jury's province to conclude that this factor either did not weigh in [defendant's] favor or at least did not outweigh the other factors in Plaintiffs' favor").

And finally, with respect to Anderson, while having considered that she was, in addition to her salary, eligible for a larger bonus than was her ASM, the court is not convinced that that fact compels a contrary result. While a jury could find that this eligibility differential, in light of Anderson's higher salary, renders her compensation significant enough to justify the exemption, it could similarly find that her compensation, including the bonus eligibility, fails to meet that threshold. *See Clougher,* 696 F.Supp.2d at 293 ("[D]isparate compensation, even where it includes performance bonuses, stock options, and other tokens of executive employment, has never been held strictly dispositive." (citing, inter alia, *Johnson,* 604 F.Supp.2d at 904 (finding fact that bonuses paid to exempt workers is not strictly dispositve)).) Thus, Anderson's

bonus eligibility, while relevant, does not, in the court's view, conclusively tip the scales in favor of summary judgment.

Accordingly, having failed to demonstrate that the fifth factor weighs definitively in its favor, and in light of the court's findings with respect to the first and second factors, Dollar General's motions for summary judgment as to the primary duty issue are denied.

**C.** *Liquidated Damages*

**\*14** Finally, Dollar General claims it is entitled to summary judgment on plaintiffs' claims for liquidated damages because it acted in good faith in classifying plaintiffs as exempt employees. (*See* No. 09–cv–360, Def. Common Br., at 26, Dkt. No. 40.) At this juncture, the court declines to rule on this issue and denies Dollar General's motion with leave to renew at a later stage of the litigation.

**V.** *Conclusion*

**WHEREFORE,** for the foregoing reasons, it is hereby

**ORDERED** that Dollar General's motion to strike certain evidence (No. 09–cv–360, Dkt. No. 50) is **DENIED;** and it is further

**ORDERED** that Dollar General's motions for summary judgment as against Janet Anderson (No. 09–cv–360, Dkt. No. 38) and Betty Pulver (No. 09–cv–363, Dkt. No. 27) are **DENIED;** and it is further

**ORDERED** that the Clerk provide a copy of this Memorandum–Decision and Order to the parties.

**IT IS SO ORDERED.**

N.D.N.Y.,2011.

Anderson v. Dolgencorp of New York, Inc.
Not Reported in F.Supp.2d, 2011 WL 1770301 (N.D.N.Y.)
END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

C  Only the Westlaw citation is currently available.

United States District Court,
E.D. New York.
Wayne HARGROVE, Plaintiff,
v.
Sheriff Edward RILEY; Nassau County Correctional
Facility, et al; Nassau County University Medical Staff
and Nassau County Correctional Facility, Defendants.
**Civil Action No. CV-04-4587 (DGT).**

Jan. 31, 2007.

Wayne Hargrove, Ossining, NY, pro se.

Alexander V. Sansone, Troy & Troy, Lake Ronkonkoma,
NY, Joseph Carney, Mineola, NY, for Defendants.

*MEMORANDUM AND ORDER*

TRAGER, J.

**\*1** Inmate Wayne Hargrove ("Hargrove" or "plaintiff")
brings this *pro se* action pursuant to 42 U.S.C. § 1983
against the Nassau County Sheriff, Nassau County
Correctional Facility ("NCCF") and NCCF's medical staff,
(collectively, "defendants"), seeking damages for injuries
allegedly caused by defendants while he was incarcerated
at NCCF. Defendants now move for summary judgment
pursuant to Fed.R.Civ.P. 56 arguing, *inter alia,* that
Hargrove's claims should be dismissed because he failed
to exhaust administrative remedies, as required by the
Prison Litigation Reform Act of 1995 ("PLRA"), 42
U.S.C. § 1997e. For the following reasons, defendants'
motions for summary judgment are granted.

**Background**

On August 27, 2004,[FN1] Hargrove filed a complaint,
alleging that defendants violated his civil rights when they
forcibly administered purified protein derivative skin tests
("PPD test") to test for latent tuberculosis ("TB") in April
2002, 2003 and 2004 while he was incarcerated at NCCF.
Complaint, Ex. C; Aff. in Opp. at 1-4, Ex. A. Hargrove
named Nassau County Sheriff Edward Reilly ("Reilly"),
NCCF and Nassau County University Medical Staff [FN2] as
defendants.[FN3] On November 22, 2004, after discovery,
County Defendants and NHCC Defendants filed separate
motions for summary judgment pursuant to Fed.R.Civ.P.
56. Both defendants properly filed a Local Rule 56.1
Statement and served Hargrove a Notice to *Pro Se* Litigant
Opposing Motion for Summary Judgment, pursuant to
Local Civil Rule 56.2.

FN1. Hargrove signed the complaint August 27,
2004. The *pro se* clerk's office received and filed
the complaint on September 20, 2004. Under the
prison mail-box rule, a *pro se* prisoner's
complaint is deemed filed when it is delivered to
prison authorities. *See, e.g., Walker v.
Jastremski,* 430 F.3d 560, 562 (2d
Cir.2005)(deeming *pro se* prisoner's § 1983
action filed on date complaint was handed to
prison officials). There is no evidence in the
record as to when Hargrove handed the
complaint to prison officials. However, it is clear
the operative date is between August 27, 2004
and September 20, 2004. As discussed, *infra,*
both of these dates occur before Hargrove
properly exhausted the administrative remedies
available to him at NCCF.

FN2. The Nassau County University Medical
Staff are employed by the Nassau Health Care
Corporation ("NHCC"). Pursuant to the
Correctional Center Health Services Agreement
between the County of Nassau and NHCC, dated
September 24, 1999, NHCC provides medical
services for inmates at NCCF. County Defs.'s

© 2010 Thomson Reuters. No Claim to Orig. US Gov.
Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

Not. of Motion, Decl., at 1.

> FN3. Reilly and NCCF are represented separately from NHCC. Accordingly, when a distinction is necessary, Reilly and NCCF will be referred to as "County Defendants" and Nassau County University Medical Staff and NHCC will be referred to as "NHCC Defendants."

**(1)**

**Tuberculosis Testing at NCCF**

Upon entering NCCF, new prisoners must first go through medical intake. Aff. of Kim Edwards, ("Edwards Aff.") ¶ 3. This standard process usually takes seventy-two hours. Edwards Aff. ¶ 4. During medical intake, NCCF tests inmates for TB. Aff. of Getachew Feleke ("Feleke Aff.") ¶ 3. NCCF generally uses a PPD test to detect latent TB. Feleke Aff. ¶ 3. However, if an inmate has previously tested positive for TB, it is NCCF's policy to test for TB using an x-ray instead.[FN4] Feleke Aff. ¶ 3. As part of its Infectious Disease Program, NCCF re-tests inmates for TB each year, beginning after they have been housed in that facility for one year. Edwards Aff. ¶ 5.

> FN4. According to WebMD, "[a] tuberculin skin test should not be done for people who have a (1) Known TB infection [or a] (2) Positive tuberculin skin test in the past. A second test may cause a more severe reaction to the TB antigens." Jan Nissl, RN, BS, *Tuberculin Skin Tests,* W E B M D , h t t p : / / www.webmd.com/hw/lab_tests/hw203560.asp (last visited Jan. 31, 2007).

**(2)**

**Hargrove's Tuberculosis Testing at NCCF**

On March 15, 2002, Hargrove was incarcerated at NCCF.

NHCC Defs.' 56.1 Statement ¶ 1. Before entering the general population, Hargrove was processed through medical intake. NHCC Defs.' 56.1 Statement ¶ 2. The NCCF Medical Intake Chart for Hargrove, dated March 15, 2002 ("3/15/02 Chart"), shows that Hargrove informed medical staff that he had previously been exposed to tuberculosis. NHCC Defs.' Notice of Mot., Ex. C, at 1; NHCC Defs.' 56.1 Statement ¶ 2. The 3/15/02 Chart also shows that Hargrove reported testing positive to a prior PPD test and that he had been treated for TB in 2000. NHCC Defs.' Notice of Mot., Ex. C, at 1. Hargrove alleges that he was exposed to and treated for TB in 1997. Hargrove's Aff. in Opp. to Mot. for Summary Judgment, ("Aff. in Opp."), Ex. A at 1-2. Defendants contend that Hargrove was given an x-ray during the medical intake process because of his reported positive PPD test, and that the x-ray was negative, showing no active TB infection. NHCC Defs.' 56.1 Statement ¶ 2; Edwards Aff. ¶ 3. Without specifying a date, Hargrove generally states that his "request to be x-rayed was denied." Aff. in Opp. at 3.

**\*2** Pursuant to NCCF's Infectious Disease Program, after being incarcerated in NCCF for a year, Hargrove was scheduled to be re-tested for TB. Edwards Aff. ¶ 5; NHCC Defs.' 56.1 Statement ¶ 4. On May 24, 2003, Hargrove was given a PPD skin test. Edwards Aff. ¶ 5; NHCC Defs.' 56.1 Statement ¶ 4. This test was negative. Edwards Aff. ¶ 5; NHCC Defs.' 56.1 Statement ¶ 4. According to Hargrove, he requested an x-ray instead of a PPD test because of his previous exposure to TB, but was forced to submit to the PPD test. He also alleges that defendants threatened to put him in "keep lock" or "lock up" unless he submitted to the PPD test.[FN5] Complaint, Ex. C; Aff. in Opp. at 1-4, Ex. A.

> FN5. Hargrove has made contradictory statements about being placed in "keep lock" or "lock up". It is unclear whether he is alleging that defendants threatened to place him in "lock up" unless he submitted to the PPD test or whether he was actually placed in "lock up" until such time that he agreed to submit to the PPD tests. For example, in his complaint, Hargrove states that when he "refused to submit to another [PPD] test, the Correctional Authorities were brought in and placed [him] in lock up." Complaint ¶ 4. In a hearing before Magistrate Judge Bloom on

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

January 31, 2005, Hargrove stated that he took the PPD tests because he was told that he would be placed in "lock up" until he submitted to the test. Hr'g Tr. 6:1-18; 9:5-10:10. In Exhibit B to his complaint, Hargrove alleges both that he was given an unwarranted TB shot and that when he refused the same shot he was placed in "keep lock." Complaint, Ex. B. There is no evidence in the record that Hargrove was ever segregated from the general population while housed at NCCF, outside of the seventy-two hour initial medical intake period. Aff. of Sgt. Neumann ("Neumann Aff.") at 1-2 (referring to prison records showing Hargrove's holding locations which demonstrate that he was never placed in "lock up"); NCCF 56.1 Statement ¶ E. Whether or not Hargrove was actually placed in "lock up" is not a material fact for purposes of this motion; as explained in detail, *infra,* Hargrove's failure to exhaust administrative remedies under the PLRA precludes a consideration of the merits of his Section 1983 claim.

The following year, in June of 2004, Hargrove was scheduled to be retested. Edwards Aff. ¶ 6; NHCC Defs.' 56.1 Statement ¶ 5. Because of the contradiction between the negative May 2003 PPD test and his reported positive history, NCCF contacted the Infectious Disease Department of the Nassau County Medical Center. Edwards Aff. ¶ 6. It was suggested that Hargrove be given a two-step PPD test, administered fifteen days apart. Feleke Aff. ¶ 4; Edwards Aff. ¶ 6. Hargrove was given these two PPD skin tests in June 2004. Edwards Aff. ¶ 6; NHCC Defs.' 56.1 Statement ¶ 5. Again, Hargrove alleges that these tests were administered against his will and under threat of being placed in quarantine. Complaint, Exs. A, B; Aff. in Opp., Ex. A.

On December 3, 2004, Hargrove was seen by a physician's assistant. NHCC Defs.' 56.1 Statement ¶ 6. During this meeting, Hargrove complained of a dry cough and that the site on his forearm where the June 2004 PPD tests had been administered was red and swollen. NHCC Defs.' 56.1 Statement ¶ 6; 11/28/04 Sick Call Request.

Hargrove's December 18, 2004 chart notes a positive PPD

test and an order was placed in the chart that Hargrove not be submitted for future PPD tests. Edwards Aff. ¶ 7; NHCC Defs.' 56.1 Statement ¶ 8. *See also* 11/19/2004 Grievance.

Hargrove alleges that the following physical ailments were caused by the PPD tests: chronic coughing, high blood pressure, chronic back pain, lung infection, dizzy spells, blurred vision and a permanent scar on both his forearms. Complaint, Ex. C; Aff. in Opp. at 3-4.

(3)

**NCCF's Inmate Grievance Procedure**

NCCF has had an inmate grievance program ("IGP") in place since 2001. Aff. of Kenneth Williams, ("Williams Aff."), at 2. NCCF's IGP is carried out in conformance with the New York State Commission of Corrections Minimum Standards and Regulations for Management of County Jails and Penitentiaries ("Minimum Standards"). *Id.*

The IGP is designed to resolve complaints and grievances that an inmate may have regarding the inmate's care and treatment while incarcerated at NCCF. Williams Aff. at 2. Upon entering NCCF, all inmates receive a copy of the NCCF inmate handbook, which outlines the IGP. *Id.*

**\*3** The record does not include an actual copy of NCCF's IGP, but the NCCF's IGP is detailed in the affidavit of NCCF Investigator Kenneth Williams. FN6 The IGP encourages inmates to resolve their grievances informally with the staff member assigned to the inmate housing unit first. *Id.* If an acceptable resolution cannot be reached, inmates must then proceed through the formal three-step process set out in the IGP. *Id.* at 3.

FN6. Hargrove does dispute any statements made by Investigator Williams regarding the inmate grievance procedure, time limits or its availability to him. Furthermore, Hargrove does

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

not dispute that he received a handbook outlining the IGP.

The first step requires an inmate to submit his grievance form FN7 to the Inmate Grievance Unit by placing it in a locked box located in each housing area, "within five days of the date of the act or occurrence giving rise to the grievance." FN8 *Id.* at 2-3. NCCF indexes all grievance forms filed by inmates in a log book and in a computer system. *Id.* at 1, 3. Once a grievance form is received by the Inmate Grievance Unit, the grievance is investigated and the inmate will receive a written determination of the outcome from the Inmate Grievance Coordinator in Section II of the grievance form. FN9 *Id.* at 3. The inmate is then given a choice to accept or appeal the decision by checking the desired selection and signing his name in Section III of the grievance form. *See, e.g.,* 11/19/2004 Grievance form. If the inmate is not satisfied with the decision of the Inmate Grievance Coordinator, the inmate may appeal the determination to the Chief Administrative Officer. Williams Aff. at 3. Finally, if the inmate is not satisfied with the Chief Administrative Officer's determination, the inmate may appeal to the New York State Commission of Correction Citizen's Policy and Complaint Review Council ("Council"). *Id.* at 3. The Council will then render a final determination. *Id.* at 3.

FN7. The grievance forms contain four sections to be utilized throughout all three steps of the IGP. Section I provides space for the inmate to explain his complaint and the actions he requests as relief. Section II is for the decision of the Inmate Grievance Coordinator. Section III is titled "Acceptance/Appeal of Grievance Coordinator's decision" and contains two mutually exclusive options in which the inmate must choose one or the other: "I have read and accept the Grievance Coordinator's decision," or "I have read and appeal the Grievance Coordinator's decision." Section IV provides space for the decision of the Chief Administrative Officer.

FN8. Hargrove has not argued that he was unaware of this five-day deadline.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

FN9. There is no evidence in the record specifying the how long an inmate has to appeal inaction by the Inmate Grievance Unit.

(4)

**Authenticity of the Grievance Forms and Other Documents Submitted by Hargrove**

In support of his allegations that he continuously informed defendants that he had been exposed to TB and, therefore, should not have been given PPD tests, Hargrove submitted three letters with his complaint, two of which were addressed to the Inmate Grievance Committee and one of which was addressed to "To whom it may concern." Complaint, Exs. A-C. He also submitted five complaint letters written to Sheriff Reilly, seventeen sick call requests and nine grievance forms during discovery and with his Affidavit in Opposition to Defendants' Motion for Summary Judgment, explaining that some of the medical records and notarized letters were "missing." Aff. in Opp, Ex. A at 2. Defendants call the authenticity of most of these documents into question, contending that Hargrove never submitted any grievance form or complaint letter before he filed his complaint. County Defs.' Mem. of Law at 16-21; County Defs.' 56.1 Statement at ¶¶ B2, C3, D3.

Kenneth Williams, an investigator at NCCF in the Inmate Grievance Unit, testified that he reviewed all of the grievance forms, complaint letters and sick call requests annexed to Hargrove's Complaint and to Hargrove's Affidavit in Opposition to Defendants' Motion for Summary Judgment. Williams Aff. at 2. Williams testified that he examined the grievance records at NCCF and searched "for any grievances by plaintiff/inmate Hargrove" and found "only two." FN10 Williams Aff. at 1. The first grievance, dated November 19, 2004, complained that the medical staff continued "forcing [Hargrove] to take a T.B. shot while [he] keep[s] telling them that [he] has been exposed to T.B." 11/19/2004 Grievance; Williams Aff. at 1. In response to this grievance, Hargrove's "positive" TB status was noted in his medical records and an order was placed in Hargrove's medical chart, stating that Hargrove not be subjected to future PPD tests. 11/19/2004 Grievance, Section II;

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

Williams Aff. at 1; NHCC Defs.' 56.1 Statement ¶ 8; Edwards Aff. ¶ 7. In Section III of the 11/19/2004 Grievance, Hargrove acknowledged that he had read the Grievance Coordinator's decision, and that he chose to accept the decision instead of appealing it. 11/19/2004 Grievance. The other grievance received by the Grievance Unit, dated May 11, 2005, complained of an unrelated matter. 5/11/2005 Grievance (complaining of back problems and requesting the return of his medical shoes); Williams Aff. at 1. Thus, Williams concluded that, beside the 11/19/2004 and 5/11/2005 Grievance Forms, none of the other documents were "received by the grievance unit, and, given the locked box system, the grievance-forms were never submitted by plaintiff/inmate." Williams Aff. at 2.

> FN10. It is NCCF's procedure to forward to the attention of the Grievance Unit all official grievance forms and complaint letters-even ones not specifically addressed to the Grievance Unit. Williams Aff. at 3.

**\*4** A visual examination of the grievance forms Hargrove submitted in support of his claims suggests forgery. Five of the nine grievance forms were requests to stop PPD testing. *See* April 19, 2002 grievance; April 28, 2002 grievance; April 20, 2003 grievance; April 28, 2003 grievance; November 19, 2004 grievance. The remaining grievance forms concerned Hargrove's requests for medical shoes. *See* March 18, 2002 grievance; July 6, 2002 grievance; February 20, 2003 grievance; May 11, 2005 grievance. Of the grievance forms complaining of unwanted PPD tests, the April 28, 2002 grievance form is a patent photocopy of the April 19, 2002 grievance form, and the April 28, 2003 grievance form is a patent photocopy of the April 20, 2003 grievance form, with only the handwritten dates changed. The only potentially authentic grievance forms relating to Hargrove's complaint about the PPD testing are dated April 19, 2002, April 20, 2003, and November 19, 2004. Of these grievance forms, only the November 19, 2004 has been authenticated by NCCF personnel. *See generally* Williams Aff. at 1-4.

Turning to the complaint letters addressed to Reilly, many contain notary stamps cut from the bottom of unrelated

documents and photocopied onto the bottom of the complaint letters. *See* County Defs.' Mem. of Law at 18-21. C.O. Thomas McDevitt and C.O. Paul Klein, both of whom perform notary services for prisoners at NCCF, have submitted sworn affidavits, stating that they kept individual Notary Log Books covering all dates relevant to this litigation. Aff. of C.O. Klein, ("Klein Aff."), at 1; Aff. of C.O. McDevitt, ("McDevitt Aff."), at 1. McDevitt's Notary Log Book shows that he notarized only one document for Hargrove. This document, dated May 13, 2002, was a motion related to Hargrove's criminal trial. McDevitt Aff. at 1-2. Hargrove signed the Notary Log Book acknowledging receipt of that notarized motion. McDevitt Aff. at 2. McDevitt states that he never notarized any other documents for Hargrove. McDevitt Aff. at 2. However, McDevitt's stamp and signature dated May 13, 2002 (the date of the legitimate notarization) appear on Hargrove's letter to Sheriff Reilly dated May 10, 2002. County Defs.' Not. of Motion, Ex. A.

These facts repeat themselves in regard to the documents bearing the notary stamp and signature of Klein. Klein had performed several legitimate notarizations for Hargrove in connection to Hargrove's criminal trial. Klein Aff. at 1-2. Hargrove signed Klein's Notary Log Book acknowledging receipt of those notarized documents. Klein Aff. at 2. However, Klein states that he never notarized any of Hargrove's letters addressed to Sheriff Reilly that bear Klein's stamp and signature. Klein Aff. at 2. On all of the documents that Hargrove submitted bearing Klein's stamp and signature, the dates and signatures of Klein match identically to the dates on which he had performed legitimate notarizations for Hargrove in connection with his criminal trial. Defendants argue it is clear that the documents bearing the stamps and signatures of McDevitt and Klein were not actually notarized by these notaries. County Defs.' Mem. of Law at 17-22.

**\*5** Hargrove does not deny these allegations. Instead, he resubmits the documents that McDevitt and Klein testify they did not notarize with his Affidavit in Opposition and insists that the documents "refute[ ] the assertions put forth by the defendants." Aff. in Opp. at 2.

**Discussion**

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

**(1)**

**Summary Judgment Standard**

A motion for summary judgment is granted when "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). A court ruling on a summary judgment motion must construe the facts in the light most favorable to the non-moving party and draw all reasonable inferences in his favor. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986); *Williams v. Metropolitan Detention Center,* 418 F.Supp.2d 96, 100 (E.D.N.Y.2005). Defendants, the moving party in this action, bear the burden of demonstrating the absence of a genuine issue of material fact. *Baisch v. Gallina,* 346 F.3d 366, 371 (2d Cir.2003).

As Hargrove is proceeding *pro se,* his complaint must be reviewed carefully and liberally, and be interpreted to "raise the strongest argument it suggests," *Green v. United States,* 260 F.3d 78, 83 (2d Cir.2001), particularly when civil rights violations are alleged, *see, e.g., McEachin v. McGuinnis,* 357 F.3d 197, 200 (2d Cir.2004). Plaintiff's complaint does not specify the legal theories upon which it relies, but, in construing his complaint to raise its strongest arguments, it will be interpreted to raise claims under 42 U.S.C. § 1983. *See, e.g., Dufort v. Burgos,* No. 04-CV-4940, 2005 WL 2660384, at *2 (E.D.N.Y. Oct. 18, 2005) (liberally construing plaintiff's complaint, which failed to specify the legal theory or theories upon which it rested, as, *inter alia,* a claim under 42 U.S.C. § 1983); *Williams,* 418 F.Supp.2d at 100 (same).

**(2)**

**Prison Litigation Reform Act**

**a. Purpose of the Prison Litigation Reform Act**

The PLRA was intended to "reduce the quantity and improve the quality of prisoner suits." *Woodford v. Ngo,*

--- U.S. ----, 126 S.Ct. 2378, 2387 (2006) (quoting *Porter v. Nussle,* 534 U.S. 516, 524 (2002)). It seeks to eliminate unwarranted interference with the administration of prisons by federal courts, and thus " 'affor[d] corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case.' " *Woodford,* 126 S.Ct. at 2387 (quoting *Porter,* 534 U.S. at 525).*See also Booth v. Churner,* 532 U.S. 731, 739 (2001). Formal grievance procedures allow prison officials to reconsider their policies, implement the necessary corrections and discipline prison officials who fail to follow existing policy. *See Ruggiero v. County of Orange,* 467 F.3d 170, 177-78 (2d Cir.2006).

**b. The Exhaustion Requirement**

The PLRA's "invigorated" exhaustion provision, 42 U.S.C. § 1997e(a), provides the mechanism to reduce the quantity and improve the quality of prisoners' suits by requiring that prison officials have the opportunity to address prisoner complaints through internal processes before allowing a case to proceed in federal court. *Woodford,* 126 S.Ct. at 2382 (citing *Porter,* 534 U.S. at 524).Section 1997e(a) provides that:

**\*6** [n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other federal law, by a prisoner confined in any jail, or other correctional facility until such administrative remedies as are available are exhausted.

42 U.S.C. § 1997e(a).

The exhaustion requirement is a mandatory condition precedent to any suit challenging prison conditions, including suits brought under Section 1983. *Woodford,* 126 S.Ct. at 2383;*Ruggiero,* 467 F.3d at 174;*Williams,* 418 F.Supp.2d at 100-01. The exhaustion provision is applicable to suits seeking relief, such as money damages, that may not be available in prison administrative proceedings, as long as other forms of relief are obtainable through administrative channels. *Giano v. Goord,* 380 F.3d 670, 675 (2d Cir.2004); *see also Woodford,* 126 S.Ct. at 2382-83 ("[A] prisoner must now exhaust

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

administrative remedies even where the relief sought-monetary damages-cannot be granted by the administrative process.") (citing *Booth*, 532 U.S. at 734).

In June 2006, the Supreme Court held that the PLRA requires "proper exhaustion" before a case may proceed in federal court. *Woodford*, 126 S.Ct. at 2387. "Proper exhaustion" requires a prisoner to use " 'all steps that the agency holds out, and doing so *properly* (so that the agency addresses the issues on the merits).' " *Ruggiero*, 467 F.3d at 176 (citing *Woodford*, 126 S.Ct. at 2385 (emphasis in original)). Although the level of detail necessary to properly exhaust a prison's grievance process will vary from system to system, *Jones v. Bock*, 127 S.Ct. 910, 2007 WL 135890, at *12 (Jan. 22, 2007), "proper exhaustion" under the PLRA " 'demands compliance with [that] agency's deadlines and other critical procedural rules.' " *Ruggiero*, 467 F.3d at 176 (quoting *Woodford*, 126 S.Ct. at 2386). Thus, the PLRA's exhaustion requirement is not satisfied by "untimely or otherwise procedurally defective attempts to secure administrative remedies." *Ruggiero*, 467 F.3d at 176 (citing *Woodford*, 126 S.Ct. at 2382).

(3)

**Exhaustion Analysis: Hargrove did not Exhaust the Administrative Remedies Made Available by NCCF prior to Bringing Suit**

Section 1997e(a) of the PLRA applies to Hargrove's complaint; Hargrove was and continues to be confined in a correctional facility, *see Berry v. Kerik*, 366 F.3d 85, 87 (2d Cir.2004), and Hargrove's claim is about a "prison condition" within the meaning of the PLRA, *see Williams*, 418 F.Supp.2d at 101. *See also Sloane v. W. Mazzuca*, No. 04-CV-8266, 2006 WL 3096031, at *4 (S.D.N.Y. Oct. 31, 2006) (recognizing PLRA's application to complaint alleging retaliation by prison officials for plaintiff's refusal to consent to a PPD test). Accordingly, the merits of Hargrove's Section 1983 claims can only be addressed if it is first determined that Hargrove properly exhausted each claim under Section 1997e(a) of the PLRA before filing his complaint in federal court.

*7 Hargrove has submitted both forged [FN11] and authentic grievance forms in opposing defendants' motions for summary judgment. Excluding, for the moment, the forged documents, NCCF's records reflect that Hargrove did not submit his first grievance until after he filed the instant complaint. Williams Aff. at 1. Hargrove's first grievance complaining of unwanted PPD testing is dated November 19, 2004, Williams Aff. at 1, two to three months after Hargrove filed his complaint. Additionally, this first grievance, dated November 19, 2004, was submitted five months after the last PPD test was administered to him in June 2004. NHCC Defs.' 56.1 Statement ¶¶ 5,6. This five-month period far exceeds the five-day window provided by NCCF's IGP. Since Hargrove failed to comply with the IGP's deadlines, he did not properly exhaust the available administrative remedies. *Ruggiero*, 467 F.3d at 176 (" 'untimely or otherwise procedurally defective attempts to secure administrative remedies do not satisfy the PLRA's exhaustion requirement.' ") (quoting *Woodford*, 126 S.Ct. at 2382).

> FN11. Based on an examination of the documents themselves, as well as the uncontradicted testimony of the notaries performing services for prisoners at NCCF, *see generally* Klein Aff.; McDevitt Aff., and of the investigator in the Inmate Grievance Unit, *see generally* Williams Aff., it appears that many of the documents submitted by Hargrove are forgeries. However, in order to view the facts in the light most favorable to Hargrove, and so as to avoid making findings of fact in a summary judgment motion, for the purposes of the exhaustion analysis, all of the documents will be considered to be authentic. However, for purposes of the sanctions analysis, the documents will be explored and the consequences of Hargrove's misrepresentations will be addressed.

Furthermore, even if the falsified grievance forms Hargrove submitted in support of his claim are considered authentic, they are still untimely. The diagnostic TB tests (whether x-ray or PPD tests) were given to Hargrove on March 15, 2002, May 24, 2003 and in June of 2004, but the grievance forms Hargrove submitted complaining of unwanted PPD tests are dated April 19, 2002, April 28, 2002, April 20, 2003, April 28, 2003 and November 19,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

2004. None of these grievances were filed "within five days of the of the date of the act or occurrence giving rise to the grievance." Williams Aff. at 3. There is no evidence in the record suggesting that NCCF's IGP allows for a tolling of the five-day time limit in which to file a grievance.[FN12]

> FN12. Even if the submitted grievances had been filed within the proscribed time period, they only show that Hargrove's grievances reached an Inmate Grievance Coordinator, the first formal step of NCCF's three-step administrative grievance process; Hargrove never appealed to the Chief Administrative Officer. By failing to take the next available step in NCCF's IGP, Hargrove failed to satisfy the mandatory exhaustion requirement. *See, e.g., Williams, 418 F.Supp.2d at 101, 102* (dismissing *pro se* complaint where plaintiff could only show he exhausted two of the four-step process mandated by prison's administrative process).

While the letters to Reilly and sick call requests show that Hargrove attempted to bring his complaints about the PPD testing to the attention of the prison staff, *see, e.g.,* Aff. in Opp., Exs. A-D, NCCF's IGP requires use of formal grievance forms. Thus, writing complaint letters and submitting sick call requests did not properly exhaust NCCF's available administrative remedies. *See, e .g., Hernandez v. Coffey,* No. 99-CV-11615, 2006 WL 2109465, at *4 (S.D.N.Y. July 26, 2006) (holding letters did not satisfy plaintiff's exhaustion obligation); *Williams, 418 F.Supp.2d at 101* (holding that because plaintiff's efforts to convey his medical condition through letters and conversations with the warden and medical staff did "not include the required steps of the PLRA's administrative remedy process," plaintiff failed to exhaust); *Mills v. Garvin,* No. 99-CV-6032, 2001 U.S. Dist. LEXIS 3333, at *8 (S.D.N.Y. Mar. 2, 2001) ("letter writing is not the equivalent of an exhaustion of administrative remedies under the PLRA").

As Hargrove failed to properly exhaust his administrative remedies, this action is precluded by *42 U.S.C. § 1997e(a)* unless Hargrove can establish excuse for his failure to exhaust.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

(4)

**No Grounds to Excuse Plaintiff's Failure to Exhaust**

**\*8** Exhaustion is an affirmative defense that defendants have the duty to raise. *Jones, 2007 WL 135890, at * 8-11;Sloane, 2006 WL 3096031, at *4;Williams, 418 F.Supp.2d at 101.* Once argued by the defendants, a plaintiff has an opportunity to show why the exhaustion requirement should be excused or why his failure to exhaust is justified. *See Ruggiero, 467 F.3d at 175;Collins v. Goord, 438 F.Supp.2d 399, 411 (S.D.N.Y.2006)* ("[T]he Second Circuit has cautioned that 'while the PLRA's exhaustion requirement is 'mandatory,' certain caveats apply.' ")(internal citations omitted). Thus, before concluding that a prisoner failed to exhaust available administrative remedies as required by *Section 1997e(a)* of the PLRA, the following three factors must be considered: (1) whether administrative remedies were actually available to the prisoner; (2) whether defendants have either waived the defense of failure to exhaust or acted in such a way as to estop them from raising the defense; and (3) whether special circumstances, such as a reasonable misunderstanding of the grievance procedures, exist justifying the prisoner's failure to comply with the exhaustion requirement. *Ruggiero, 467 F.3d at 175* (citing *Hemphill v. New York, 380 F.3d 680, 686 (2d Cir.2004)*).[FN13]

> FN13. Courts in the Second Circuit have questioned what effect, if any, the Supreme Court's recent decision in *Woodford* requiring "proper exhaustion" may have on the three-step *Hemphill* inquiry. The Second Circuit has yet to address this issue. *See Ruggiero, 467 F.3d at 175-76* (declining to "determine what effect *Woodford* has on our case law in this area ... because [plaintiff] could not have prevailed even under our pre-*Woodford* case law"). To date, district courts have acknowledged the tension, but resolved to apply *Hemphill* to exhaustion claims until instructed otherwise by the Second Circuit. *See, e.g., Larkins v. Selsky,* 04-CV-5900, 2006 WL 3548959, at *9, n. 4 (S.D.N.Y. Dec. 6,

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

2006) (applying the current law of the Second Circuit to exhaustion claims); *Sloane,* 2006 WL 3096031, at \*5 ("Until such time as the Court of Appeals considers the impact of *Woodford,* if any, on its prior rulings, this Court must follow the law of the Second Circuit. The Court will therefore apply the current law of this circuit to the exhaustion claims."); *Collins v. Goord,* 438 F.Supp.2d at 411 n. 13 (acknowledging that *Woodford* and *Hemphill* may be in tension, but deciding exhaustion claims under *Hemphill* inquiry); *Hernandez v. Coffey,* No. 99-CV11615, 2006 WL 2109465, at \*3 (S.D.N.Y. July 26, 2006) (same). Here, Hargrove does not prevail under *Hemphill;* therefore, there is no occasion to address the potential effect *Woodford* may have had in his case.

**a. Whether administrative remedies were "available" to Hargrove**

The first step in the *Hemphill* inquiry requires a court to determine whether administrative remedies were available to the prisoner. *Hemphill,* 380 F.3d at 686. The test for assessing availability is an "objective one: that is, would a similarly situated individual of ordinary firmness have deemed them available." *Id.* at 688 (internal quotation marks omitted). In making this determination, "courts should be careful to look at the applicable set of grievance procedures." *Abney v. McGinnis,* 380 F.3d 663, 668 (2d Cir.2004). Exhaustion may be considered unavailable in situations where plaintiff is unaware of the grievance procedures or did not understand it, *Ruggiero,* 467 F.3d at 179, or where defendants' behavior prevents plaintiff from seeking administrative remedies,[FN14]*Hemphill v. State of New York,* 380 F.3d 680, 686 (2d Cir.2004).

FN14. Case law does not clearly distinguish between situations in which defendants' behavior renders administrative remedies "unavailable" to the plaintiff and cases in which defendants are estopped from asserting non-exhaustion as an affirmative defense because of their behavior. As such, there will be some overlap in the analyses.

Here, Hargrove has not claimed that NCCF's administrative grievance procedure was unavailable to him. In fact, Hargrove demonstrated his access to and knowledge of NCCF's IGP by filing proper grievances on November 19, 2004 and on May 10, 2005. Hargrove did not dispute any part of Investigator Williams's affidavit detailing the IGP and its availability to inmates since 2001. Specifically, Hargrove did not dispute, upon entering the facility, that he received a copy of the inmate handbook outlining the IGP. He has not claimed that he is unfamiliar with or unaware of NCCF's IGP. Hargrove has not alleged that prison officials failed to advance his grievances [FN15] or that they threatened him or took any other action which effectively rendered the administrative process unavailable.

FN15. Although not specifically alleged, interpreting the evidence to "raise the strongest argument," Hargrove may be arguing that NCCF's IGP was not available to him because the Grievance Coordinator failed to respond to his grievances. In the single grievance regarding PPD tests that defendants concede is authentic, Hargrove writes, "[n]ow for the third time your office refused to answer my grievances so please look into this matter because the T.B. shot is [sic] effecting my health." 11/19/04 Grievance. This language implies that Hargrove filed grievances in the past and received no response from the Inmate Grievance Coordinator. Furthermore, Hargrove wrote on one of the submitted copies of the November 19, 2004 grievance that "[t]his is the only accepte[sic] that Plaintiff got back from all grievances and letters that the Plaintiff sent to Sheriff Riley and his medical staffs about his staff making [sic] take T.B. test for 3 year[s]." County Defs'. Not. of Motion, Ex. A, 11/19/2004 grievance.

First, it must be reiterated that filing of the initial grievances was untimely. However, even assuming *arguendo* that the original grievances had been timely filed, district courts in the Second Circuit have held that the "lack of a response from the [Inmate Grievance Review Committee] does not excuse an inmate's obligation to exhaust his

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

remedies through available appeals." *Hernandez v. Coffey,* 2006 WL 2109465, at *3-5. *See also Hemphill,* 380 F.3d at 686 ("Threats or other intimidation by prison officials may well deter a prisoner of 'ordinary firmness' from filing an internal grievance, but not from appealing directly to individuals in positions of greater authority within the prison system"); *Acosta v. Corr. Officer Dawkins,* No. 04-CV-6678, 2005 WL 1668627, at *3 (S.D.N.Y. July 14, 2005) (inmate required to appeal lack of response to exhaust administrative remedies); *Mendoza v. Goord,* No. 00-CV-0146, 2002 U.S. Dist. LEXIS 22573, at *6 (S.D.N.Y. Nov. 21, 2002) ("If, as a result of a negligent error by prison officials-or even their deliberate attempt to sabotage a prisoner's grievance-the prisoner [does not receive a response] on his complaint, he is not thereby forestalled from appealing"). Hargrove did not assert or offer evidence suggesting that he appealed the unresponsiveness or that those appeals were not advanced.

*9 Additionally, Hargrove's transfer from NCCF to Sing Sing Correctional Facility ("Sing Sing") in July 2005 did not excuse his previous failure to properly exhaust. *See, e.g., Sims v. Blot,* No. 00-CV-2524, 2003 WL 21738766, at *4 (S.D.N.Y. July 25, 2003) (determining that failure to exhaust administrative remedies is not excused by transfer to another facility); *Santiago v. Meinsen,* 89 F.Supp.2d 435, 440-41 (S.D.N.Y.2000) (determining that plaintiff should not be "rewarded" for failing to participate in grievance procedure before being transferred). Hargrove had ample opportunity to properly file his grievances and to appeal their results as required by NCCF's procedures while he was imprisoned at NCCF. The last PPD test Hargrove complains of was given in 2004; therefore, Hargrove had until June or July of 2004 to timely file his grievance in accordance with NCCF's IGP. Hargrove was not transferred to Sing Sing until July 2005. County Defs.' Mem. of Law at 2. Thus, Hargrove's transfer cannot excuse his previous failure to properly exhaust.

**b. Estoppel**

The second step of the inquiry asks whether defendants are estopped from raising exhaustion as a defense. Specifically, "whether the defendants may have forfeited the affirmative defense of non-exhaustion by failing to raise or preserve it, or whether the defendants' own actions inhibiting the inmate's exhaustion of remedies may estop one or more of the defendants from raising the plaintiff's failure to exhaust as a defense." *Hemphill,* 380 F.3d at 686 (internal citations omitted).

Here, Hargrove has not made any statements that would permit a finding that defendants should be estopped from raising the affirmative defense of exhaustion or that defendants waived the right to raise the defense. Defendants first raised the PLRA's exhaustion requirement as an affirmative defense in their respective answers. *See* County Defs.' Am. Answer at 3; NHCC Defs.' Answer at 1. County Defendants raised it again in their motion for summary judgment. *See* County Defs.' Mem of Law at 15-23. Thus, defendants are not estopped from raising the affirmative defense now. *See, e.g., Sloane,* 2006 WL 3096031, at *8 (exhaustion defense not waived where defendants first raised it in their motion to dismiss).

Additionally, defendants have not threatened Hargrove or engaged in other conduct preventing him from exhausting the available administrative remedies. *Cf. Ziemba v. Wezner,* 366 F.3d 161, 162 (2d Cir.2004) (holding defendants were estopped from asserting non-exhaustion because of prison officials' beatings, threats and other conduct inhibiting the inmate from filing proper grievances); *Feliciano v. Goord,* No. 97-CV-263, 1998 WL 436358, at *2 (S.D.N.Y. July 27, 1998) (holding defendants were estopped from asserting non-exhaustion where prison officials refused to provide inmate with grievance forms, assured him that the incidents would be investigated by staff as a prerequisite to filing a grievance, and provided prisoner with no information about results of investigation). Hargrove has not argued otherwise. *See Ruggiero,* 467 F.3d at 178 (holding defendants were not estopped from asserting a failure to exhaust defense where plaintiff pointed to no affirmative act by prison officials that would have prevented him from pursing administrative remedies); *Sloane,* 2006 WL 3096031, at *8 (finding no estoppel where plaintiff did not argue that defendants prevented him from pursuing the available administrative remedies); *Hernandez,* 2006 WL 2109465,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

at *4 (finding no estoppel where plaintiff did not argue that any threats or intimidation prevented him from pursuing his appeals). Thus, for the same reasons that administrative remedies were not deemed unavailable to Hargrove, defendants are not estopped from raising a failure to exhaust defense.

### c. Special circumstances

*10 Even where administrative remedies are available and the defendants are not estopped from arguing exhaustion, the court must "consider whether 'special circumstances' have been plausibly alleged that justify 'the prisoner's failure to comply with administrative procedural requirements.' " Hemphill, 380 F.3d at 688 (quoting Giano, 380 F.3d at 676). For example, plaintiff's reasonable interpretation of regulations differing from prison official's interpretation has been held to constitute a "special circumstance." Giano, 380 F.3d at 676-77. No special circumstances have been alleged that would excuse Hargrove from availing himself of administrative remedies. See Sloane, 2006 WL 3096031, at *8; Freeman v. Goord, No. 02-CV-9033, 2004 U .S. Dist. LEXIS 23873, at * 9-10 (S.D.N.Y.2004) (granting motion to dismiss where "there is no evidence in the record ••• of any 'special circumstances' in this action.")

### (5)

### Hargrove's Failure to Exhaust, in Addition to his Fraud on the Court, Warrants Dismissal with Prejudice

Hargrove has not sufficiently rebutted the defendants' assertion of failure to exhaust, and a liberal reading of his submissions does not reveal any grounds to excuse that failure.

Because Hargrove filed a complaint in federal court before filing a grievance, permitting his unexhausted and unexcused claim to proceed would undercut one of the goals of the exhaustion doctrine by allowing NCCF to be haled into federal court without the "opportunity to correct

its own mistakes with respect to the programs it administers." Woodford, 126 S.Ct. at 2385. See also Ruggiero, 467 F.3d at 178 (citing Porter, 534 U.S. at 525). Thus, his complaint must be dismissed.

In general, dismissal without prejudice is appropriate where plaintiff has failed to exhaust but the time permitted for pursuing administrative remedies has not expired. Berry v. Kerik, 366 F.3d 85, 87 (2d Cir.2004). Dismissal with prejudice is appropriate where "administrative remedies have become unavailable after the prisoner had ample opportunity to use them and no special circumstances justified failure to exhaust." Berry, 366 F.3d at 88. Here, Hargrove's administrative remedies were available to him during his entire period of confinement at NCCF. He remained incarcerated in NCCF throughout the time period in which he alleges the PPD tests are given. He could have exhausted remedies for his grievances at any time. Therefore, Hargrove had ample opportunity to seek administrative remedies but failed to do so. Because there is no evidence in the record that administrative remedies are still available to Hargrove, as the five-day time period had run, and because Hargrove has alleged no special circumstances justifying his failure to exhaust, his complaint is accordingly dismissed with prejudice. Berry, 366 F.3d at 88 (upholding dismissal with prejudice where plaintiff had no justification for his failure to pursue administrative remedies while they were available.)

*11 Additionally, defendants' have moved for sanctions based on Hargrove's alleged submission of falsified evidence. If a party commits a fraud on the court, the court has the inherent power to do whatever is reasonably necessary to deter abuse of the judicial process. Shangold v. The Walt Disney Co., No. 03-CV-9522, 2006 WL 71672, at *4 (S.D.N.Y. January 12, 2006) (citing Chambers v. NASCO, Inc., 501 U.S. 32, 44 (1991)). Fraud upon the court has been defined as "fraud which seriously affects the integrity of the normal process of adjudication." Gleason v. Jandrucko, 860 F.2d 556, 559 (2d Cir.1988); McMunn v. Mem'l Sloan-Kettering Cancer Center, 191 F.Supp.2d 440, 445 (S.D.N.Y.2002). In order for a court to grant sanctions based upon fraud, it must be established by clear and convincing evidence that a party has "sentiently set in motion some unconscionable scheme calculated to interfere with the judicial system's ability impartially to adjudicate a matter by ... unfairly hampering

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

the presentation of the opposing party's claim or defense." *McMunn*, 191 F.Supp.2d at 455 (quoting *Aoude v. Mobil Oil Corp.*, 892 F.2d 1115, 1119 (1st Cir.1989).

After carefully reviewing the allegedly fraudulent documents, it must be concluded that Hargrove consciously falsified these documents. *See, e.g., Shangold,* 2006 WL 71672, at *1, *3 (finding clear and convincing evidence of fraud where plaintiffs fabricated a timeline and plot outlines to advance their claims); *McMunn,* 191 F.Supp.2d at 446 (finding clear and convincing evidence of fraud where plaintiff edited audio tapes and represented that they were unedited during discovery). The notaries performing services for prisoners at NCCF testify that they never notarized many of the documents supplied by Hargrove. *See* Klein Aff.; McDevitt Aff. Furthermore, a visual examination of the documents themselves makes it clear that many of the documents submitted by Hargrove are forgeries.

In considering what sanction to impose, courts consider the following five factors: (i) whether the misconduct was the product of intentional bad faith; (ii) whether and to what extent the misconduct prejudiced the plaintiffs; (iii) whether there was a pattern of misbehavior rather than an isolated instance; (iv) whether and when the misconduct was corrected; and (v) whether further misconduct is likely to occur in the future. *Scholastic, Inc. v. Stouffer,* 221 F.Supp.2d 425, 444 (S.D.N.Y.2002) (citing *McMunn,* 191 F.Supp.2d at 461).

Here, Hargrove's deception was not an isolated instance; he fabricated the dates on many grievance forms, in addition to improperly duplicating notary stamps on complaint letters to make them look authentic. Klein Aff. at 2; McDevitt Aff. at 2; County Defs.' 56.1 Statement ¶¶ C3, D3. He submitted these forgeries to defendants during discovery and again as exhibits to his Affidavit in Opposition to Defendant's Motion for Summary Judgment. A severe sanction is warranted as Hargrove's forgeries were intentional, he never corrected them once their authenticity was challenged and he continues to insist on their veracity. Aff. in Opp. at 1-4. Given that there is clear and convincing evidence that Hargrove has continuously and consciously perpetrated a fraud on the court through his submission of fraudulent documents and sworn

affirmations of those documents' authenticity, dismissal with prejudice is especially appropriate. *See, e.g., Shangold,* 2006 WL 71672, at *5 (dismissing with prejudice where plaintiffs fabricated evidence to advance their claims); *Scholastic,* 221 F.Supp.2d at 439-444 (dismissing with prejudice where plaintiff produced seven pieces of falsified evidence); *McMunn,* 191 F.Supp.2d at 445 (dismissing with prejudice where plaintiff "lie[d] to the court and his adversary intentionally, repeatedly, and about issues that are central to the truth-finding process").

**Conclusion**

**\*12** Because Hargrove did not satisfy the exhaustion requirement under the PLRA, defendants' motions for summary judgment are granted. Further, considering the fraud Hargrove perpetrated on the court, the claims are dismissed against all defendants with prejudice. The Clerk of the Court is directed to close the case.

SO ORDERED:

E.D.N.Y.,2007.
Hargrove v. Riley
Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2006 WL 2639369 (N.D.N.Y.)
(Cite as: 2006 WL 2639369 (N.D.N.Y.))

**C**

Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
James PETTUS, Plaintiff,
v.
Jospeh McCOY, Superintendent, Deputy Ryan,
Defendants.
No. 9:04-CV-0471.

Sept. 13, 2006.

James Pettus, Comstock, NY, pro se.

Charles J. Quackenbush, New York State Attorney
General, The Capitol Albany, NY, for Defendants.

### DECISION and ORDER

THOMAS J. McAVOY, Senior District Judge.

**\*1** Plaintiff commenced the instant action asserting
various violations of his constitutional rights arising out of
his placement at the Southport Correctional Facility. In his
Complaint, Plaintiff alleges that he was improperly sent to
the Special Housing Unit ("SHU") at a maximum security
facility and that being in SHU has put his life in jeopardy.
Currently before the Court is Defendants' motion for
summary judgment pursuant to Fed.R.Civ.P. 56 seeking
dismissal of the Complaint in its entirety for failure to
exhaust administrative remedies.

### I. FACTS[FN1]

> FN1. The following facts are taken from
> Defendants' statement of material facts submitted

pursuant to N.D.N.Y.L.R. 7.1(a)(3). These facts
are deemed admitted because they are supported
by the record evidence and Plaintiff failed to
submit an opposing statement of material facts as
required by Rule 7.1(a)(3). Plaintiff was
specifically advised by Defendants of his
obligation to file an opposing statement of
material facts and to otherwise properly respond
to the motion for summary judgment.

Plaintiff is an inmate in the custody of the New York State
Department of Correctional Services. Plaintiff signed the
instant Complaint on April 7, 2004. On his Complaint
form, Plaintiff indicated that there is a grievance
procedure available to him and that he availed himself of
the grievance procedure by filing a complaint with the
IGRC [FN2], followed by an appeal to the superintendent of
the facility, and then to the Central Office Review
Committee in Albany. The Complaint indicates that
Plaintiff is "waiting for response from Albany." The
Complaint was filed on April 27, 2004.

> FN2. Inmate Grievance Review Committee.

On April 12, 2004, prior to the filing of the instant
Complaint, Plaintiff filed a grievance relating to the issues
presented in this case. On April 19, 2004, the IGRC
recommended that Plaintiff's grievance be denied. Plaintiff
then appealed that decision to the facility Superintendent.
In the meantime, on April 27, Plaintiff commenced the
instant litigation. On May 3, 2004, after Plaintiff filed the
Complaint in this case, the Superintendent denied
Plaintiff's grievance. On May 5, 2004, Plaintiff appealed
the decision to the Central Office Review Committee in
Albany. On June 23, 2004, the Central Office Review
Committee denied Plaintiff's appeal. Plaintiff did not file
any other grievances in connection with the matters raised
in this lawsuit.

Defendants now move to dismiss on the ground that
Plaintiff commenced the instant action before fully
exhausting his available administrative remedies.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 2639369 (N.D.N.Y.)
(Cite as: 2006 WL 2639369 (N.D.N.Y.))

## II. DISCUSSION

The sole issue presented is whether Plaintiff was required to complete the administrative process before commencing this litigation. This issue has already been addressed by the Second Circuit in *Neal v. Goord,* 267 F.3d 116 (2d Cir.2001). The issue in that case was "whether plaintiff's complaint should have been dismissed despite his having exhausted at least some claims during the pendency of his lawsuit." *Id.* at 121. The Second Circuit held that "exhausting administrative remedies after a complaint is filed will not save a case from dismissal." *Id.*

In this case, Defendants have established from a legally sufficient source that an administrative remedy is available and applicable. *Mojias v. Johnson,* 351 F.3d 606, 610 (2d Cir.2003); *see also* 7. N.Y.C.R.R. § 701.1, *et seq.* Plaintiff's Complaint concerns his placement in SHU at a maximum security facility. These are matters that fall within the grievance procedure available to NYSDOCS inmates and are required to be exhausted under the Prison Litigation Reform Act, 42 U.S.C. § 1997e. Plaintiff has failed to demonstrate any applicable exception to the exhaustion requirement. Because Plaintiff commenced the instant litigation prior to fully completing the administrative review process, the instant Complaint must be dismissed without prejudice. *Neal,* 267 F.3d 116.

## III. CONCLUSION

**\*2** For the foregoing reasons, Defendants' motion for summary judgment is GRANTED and the Complaint is DISMISSED WITHOUT PREJUDICE. The Clerk of the Court shall close the file in this matter.

IT IS SO ORDERED.

N.D.N.Y.,2006.
Pettus v. McCoy
Not Reported in F.Supp.2d, 2006 WL 2639369 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2004 WL 324898 (S.D.N.Y.)
(Cite as: 2004 WL 324898 (S.D.N.Y.))

**H**

Only the Westlaw citation is currently available.

United States District Court,
S.D. New York.
William MINGUES, Plaintiff,
v.
C.O NELSON and C.O. Berlingame, Defendants.
**No. 96 CV 5396(GBD).**

Feb. 20, 2004.

**Background:** Inmate brought a § 1983 action asserting, inter alia, claims of excessive force during his wife's visit with him at the correctional facility.

**Holding:** On a defense motion to dismiss, the District Court, Daniels, J., held that the record established that the action was filed after the effective date of the Prison Litigation Reform Act (PLRA).
Motion granted.

West Headnotes

Civil Rights 78 ⚷  1395(7)

78 Civil Rights
  78III Federal Remedies in General
    78k1392 Pleading
      78k1395 Particular Causes of Action
        78k1395(7) k. Prisons and Jails; Probation and Parole. Most Cited Cases
Record established that inmate's § 1983 action was filed after the effective date of the Prison Litigation Reform Act of 1996 (PLRA), such that the inmate's failure to exhaust his administrative remedies precluded relief; examination of the initial complaint itself, on its face, unequivocally demonstrated that the inmate's subsequent allegation in his amended complaint that he filed the complaint in April of

1996 was patently false; there was no explanation offered that could reasonably support and account for the existence of May dates on the complaint. 42 U.S.C.A. § 1983; Civil Rights of Institutionalized Persons Act, § 7(a), 42 U.S.C.A. § 1997e(a).

*MEMORANDUM DECISION AND ORDER*

DANIELS, J.

**\*1** This § 1983 action was originally commenced by the plaintiff,[FN1] a prisoner in New York State custody, and his wife claiming their civil rights were violated during the wife's visit with plaintiff at the correctional facility. Discovery in this matter has concluded. Previously, all claims asserted by plaintiff's wife were dismissed for failure to prosecute. Additionally, defendants' summary judgment motion was denied with respect to plaintiff's claims of excessive force,[FN2] and summary judgment was granted dismissing all of plaintiff's other claims. Defendants now seek to dismiss the remaining excessive force claims on the grounds they are barred by the Prisoner Litigation Reform Act of 1996 ("PLRA"), 42 U.S.C. § 1997e(a), as plaintiff failed to exhaust his administrative remedies.

FN1. Plaintiff and his wife were proceeding *pro se* when they filed the complaint and amended complaint. Thereafter, plaintiff obtained legal representation.

FN2. In the amended complaint, plaintiff alleges he was beaten, kicked and punched. (Am.Compl. § 6). In his original complaint, he had also claimed that he was whipped." (Compl. at 7, 8). Plaintiff testified at his deposition that he was slapped once in the face, punched about four or five times in the lower back, and a correctional officer then laid on top of him. (Mingues Dep. at 78-81). The incident, which took approximately thirty to forty seconds, caused plaintiff to suffer from back pain for an unspecified period of time. (*Id.* at 81, 86).

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 324898 (S.D.N.Y.)
(Cite as: 2004 WL 324898 (S.D.N.Y.))

Subdivision (a) of § 1997e provides, "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." This provision became effective on April 26, 1996. *Blisset v. Casey,* 147 F.3d 218, 219 (2d Cir.1998). The PLRA's exhaustion requirement does not apply retroactively to actions pending when the Act was signed into law. *Scott v. Coughlin,* 344 F.3d 282, 291 (2d Cir.2003).

There is no dispute that plaintiff did not avail himself of the existing and available prison grievance procedure. Plaintiff, however, argues he was not required to exhaust his administrative remedies because, as alleged in his amended complaint, "petitioners (sic) had already filed in April 10-12 of 1996," prior to the PLRA's April 26, 1996 enactment date.[FN3] (Am.Compl. § 2). In order to determine the date that the instant action was commenced, the date of the filing of the amended complaint relates back to the filing date of the original complaint. Fed.R.Civ.P. 15(c). The original complaint was signed and dated by plaintiff's wife on May 8, 1996; it was stamped received by the Pro Se Office on May 10, 1996; and plaintiff's signature is dated May 13, 1996.[FN4]

    FN3. The amended complaint reads as follows:

        That the original complaint filed under and pursuant to Title 42 section 1983 and 1985 was made and submitted before this court in April of 1996, before the application of the Prisoner Litigation Reform Act of 1996 was signed into law. The Act was signed into law April 26, 1996 and petitioners had already filed in April 10-12 of 1996. (Am.Compl. § 2).

    FN4. Plaintiff's wife application for *in forma pauperis* relief was signed and dated May 8, 1996, and it is stamped as received by the Pro Se Office on May 10, 1996. Plaintiff's signature, on his initial application for appointment of counsel, is dated May 13, 1996, and it is stamped as

received by the Pro Se Office on May 10, 1996. Attached to plaintiff's application, is his signed Affirmation of Service, dated May 13, 1996, wherein plaintiff declared under penalty of perjury that he served his application upon the Pro Se Office. Plaintiff alleges that "between April 17, 1996 until October 7, 1996," all visitation was suspended between him and his wife and that their "only form of communications was correspondence ." (Am.Compl. § 7).

The matter was referred to Magistrate Judge Pitman for a Report and Recommendation ("Report"). Although the magistrate judge found that the three earliest possible dates that the evidence demonstrates the complaint could have been filed, *i.e.,* May 8th, 10th, and 13th of 1996, were all beyond the PLRA enactment date, he nevertheless recommended that the motion to dismiss be denied based on plaintiff's allegation in the amended complaint that he filed the original complaint April 10-12 of 1996, prior to the April 26, 1996 enactment date. The magistrate judge found that, "[i]n light of the express allegation in the Amended Complaint that plaintiff commenced the action before April 26, 1996 and the absence of a clear record to the contrary, the requirement that disputed factual issues be resolved in plaintiff's favor for purposes of this motion requires that the motion be denied." (Report at 12-13).

**\*2** Defendants object to the Report's conclusion that there is a material issue of fact regarding the date the action was filed. Plaintiff's attorney did not file any objections.[FN5] The Court must make a *de novo* determination as to those portions of the Report to which there are objections. Fed.R.Civ.P. 72(b); 28 U.S.C. § 636(b)(1)(C). It is not required that the Court conduct a *de novo* hearing on the matter. *United States v. Raddatz,* 447 U.S. 667, 676, 100 S.Ct. 2406, 65 L.Ed.2d 424 (1980). Rather, it is sufficient that the Court "arrive at its own, independent conclusion" regarding those portions to which the objections were made. *Nelson v. Smith,* 618 F.Supp. 1186, 1189-90 (S.D.N.Y.1985) (quoting *Hernandez v. Estelle,* 711 F.2d 619, 620 (5th Cir.1983)). Accordingly, the Court, in the exercise of sound judicial discretion, must determine the extent, if any, it should rely upon the magistrate judge's proposed findings and recommendations. *Raddatz,* 447 U.S. at 676. The Court may accept, reject or modify, in whole or in part, the findings and recommendations set forth within the Report. Fed.R.Civ.P. 72(b); 28 U.S.C. §

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 324898 (S.D.N.Y.)
(Cite as: 2004 WL 324898 (S.D.N.Y.))

636(b)(1)(C). Where there are no objections, the Court may accept the Report provided there is no clear error on the face of the record. *Nelson v. Smith,* 618 F.Supp. at 1189; *see also Heisler v. Kralik,* 981 F.Supp. 830, 840 (S.D.N.Y.1997), *aff'd sub nom. Heisler v. Rockland County,* 164 F.3d 618 (2d Cir.1998).

> FN5. Plaintiff himself filed objections which was not adopted by his counsel. Plaintiff objects to the magistrate judge's finding that an issue exists as to when plaintiff filed the complaint because plaintiff asserts he gave it to prison officials to be mailed in April. Additionally, plaintiff objects to the magistrate judge's suggestion that the defendants convert their motion to one for summary judgment asserting the same theory as set forth in the present motion. Since this Court finds that the instant motion is meritorious, the propriety of plaintiff personally submitting his own objections need not be address as those objections are moot.

Upon a *de novo* review, the Report's recommendation that the motion be denied is rejected by the Court. Section 1997e (a) requires that inmates exhaust all available administrative remedies prior to the commencement of a § 1983 action concerning prison conditions, and failure to do so warrants dismissal of the action. *Porter v. Nussel,* 534 U.S. 516, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002); *Scott,* 344 F.3d at 290. The exhaustion of one's administrative remedies, however, is not a jurisdictional requirement under the PLRA. *Richardson v. Goord,* 347 F.3d 431 (2d Cir.2003). A defendant may assert a non-exhaustion claim as an affirmative defense. *Jenkins v. Haubert,* 179 F.3d 19, 28-29 (2d Cir.1999). Since it is an affirmative defense, defendants bear the burden of proof in this regard. *See, McCoy v. Goord,* 255 F.Supp.2d 233, 248 (S.D.N.Y.2003); *Arnold v. Goetz,* 245 F.Supp.2d 527, 534-35 (S.D.N.Y.2003); *Reyes v. Punzal,* 206 F.Supp.2d 431, 433 (W.D.N.Y.2002). A motion to dismiss, pursuant to Fed.R.Civ.P. 12(b)(6), is an appropriate vehicle to be used by a defendant where the failure to exhaust is clear from the face of the complaint as well as any written instrument attached as an exhibit and any statements or documents incorporated by reference into the complaint. *See, Scott v. Gardner,* 287 F.Supp.2d 477, 485 (S.D.N.Y.2003) (citation omitted); *McCoy,* 255 F.Supp.2d at 249.

In the amended complaint, plaintiff alleges, in a conclusory manner, that he filed the original complaint before the effective date of the PLRA, sometime between April 10th and April 12th of 1996.[FN6] On a motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6), the court must accept all well-pleaded factual allegations in the complaint as true, and draw all reasonable inference in plaintiff's favor. *Resnick v. Swartz,* 303 F.3d 147, 150-51 (2d Cir.2002) (citation omitted); *Bolt Elec., Inc. v. City of New York,* 53 F.3d 465, 469 (2d Cir.1995). Dismissal is only warranted where it appears without doubt that plaintiff can prove no set of facts supporting his claims that would entitle him to relief. *Harris v. City of New York,* 186 F.3d 243, 247 (2d Cir.1999). The court's consideration is not limiting solely to the factual allegations set forth in the amended complaint. Rather, the court may also consider documents attached to the complaint as exhibits or incorporated in it by reference, matters of which judicial notice may be taken, or to documents either in plaintiff's possession or of which he has knowledge of and relied on in bringing the action. *Brass v. American Film Technologies, Inc.,* 987 F.2d 142, 150 (2d Cir.1993) (citation omitted). The court is not bound to accept as true a conclusory allegation where the pleadings are devoid of any specific facts or circumstances supporting such an assertion. *DeJesus v. Sears, Roebuck & Co., Inc.,* 87 F.3d 65, 70 (2d Cir.1996). Nor must the court "ignore any facts alleged in the complaint that undermine the plaintiff's claim." *Roots Partnership v. Lands' End, Inc.,* 965 F.2d 1411, 1416 (7th Cir.1992) (citation omitted).

> FN6. In response to then Chief Judge Thomas P. Griesa's 1996 order dismissing this action, plaintiff filed an Application for Reconsideration, dated October 28, 1996, wherein he claims that "on April 12, 1996 this petitioner filed a 1983 civil suit ..." (Pl.'s Mot. for Recons. at 1).

*3 Plaintiff fails to allege any factual basis in support of his claim that he filed the initial complaint between April 10-12, 1996. The Court is not required to accept this statement as a well-pleaded factual allegation in light of the existing record which clearly demonstrates that such an allegation is not only factually unsupported by the clear evidence, but is factually impossible. Generally, an

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 324898 (S.D.N.Y.)
(Cite as: 2004 WL 324898 (S.D.N.Y.))

amended complaint supersedes the original complaint, and renders it of no legal effect. *In re. Crysen/Montenay Energy Co.,* 226 F.3d 160, 162 (2d Cir.2000). In plaintiff's amended complaint, he states that he is submitting the amended complaint in support of his original complaint. Hence, the original complaint is incorporated by reference in the amended complaint, and may be considered by the Court. Even if the initial complaint was not so incorporated, given the circumstances of this case, the Court would nevertheless consider it as it relates to the original date of filing. An examination of the initial complaint itself, on its face, unequivocally demonstrates that plaintiff's subsequent allegation in his amended complaint that he filed the complaint between April 10th and 12th of 1996 is patently false.

The original complaint refers to plaintiff's prison disciplinary hearing arising out of the same incident forming the basis of the present lawsuit. Generally, the disciplinary charges against plaintiff were in connection with an alleged conspiracy by him and his wife to commit grand larceny against inmate Robert Cornell. That began on April 16, 1996, and concluded on April 19, 1996. (Defs.' Notice of Mot. for Summ. J. Ex. N, Transcript of Disciplinary Hr'g, conducted on April 16, 18-19, 1996.) Specifically, in the original complaint, plaintiff refers to the testimony given by this fellow inmate[FN7] (Compl. at 8). That inmate testified on April 19th. (Hr'g. Tr. at 53-54, 57). Thus, plaintiff's claim that he filed the complaint between April 10-12, 1996, is absolutely impossible as the initial complaint refers to events occurring after that time period. Merely because plaintiff boldly alleges in his amended complaint that he filed the original complaint between April 10th and 12th does not require this Court to turn a blind eye to plaintiff's prior pleadings demonstrating the absurdity of his claim.[FN8] *See, Silva Run Worlwide Ltd. v. Gaming Lottery Corp.,* 2001 WL 396521, *1 (S.D.N.Y. April 19, 2001) (citations omitted) (A court should not "accept allegations that are contradicted or undermined by other more specific allegations in the complaint or by written materials properly before the court.").

FN7. In the complaint, plaintiff alleges "that at his S.H.U. hearing petitioner called as a witness Robert Cornell who stated that this petitioner Mingues nor his wife (co-petitioner) Narvaez ever took any money from him. (Compl. at 8).

FN8. At his deposition, plaintiff testified that he filed the initial complaint "[a]pproximately around June of 1996." (Mingues Dep. at 37-38).

Lawsuits by inmates represented by counsel are commenced when the complaint is filed with the court. *See,* Fed.R.Civ.P. 3, 5(e). For *pro se* litigants, who are not imprisoned and have been granted *in forum pauperis* relief, their complaints are deemed filed when received by the Pro Se Office. *See, Toliver v. County of Sullivan,* 841 F.2d 41 (2d Cir.1998). The complaint of a *pro se* prisoner, however, is deemed filed when he or she gives the complaint to prisoner officials to be mailed. *Houston v. Lack,* 487 U.S. 266, 270, 108 S.Ct. 2379, 101 L.Ed.2d 245 (1988); *Dory v. Ryan,* 999 F.2d 679, 682 (2d Cir.1993), *modified on other grounds,* 25 F.3d 81 (2d Cir.1994). The "prison mailbox" rule is designed to combat inmate litigants' dependence on the prison facility's mail system and their lack of counsel so as to assure the timely filing of their legal papers with the court. *Noble v. Kelly,* 246 F.3d 93, 97 (2d Cir.2001) (citations omitted). Given the difficulty in determining when a prisoner relinquishes control of the complaint to prison personnel, the date the plaintiff signed the original complaint is presumed to be the date plaintiff gave the complaint to prison officials to be mailed. *See e.g., Forster v. Bigger,* 2003 WL 22299326, *2 (S.D.N.Y. Oct.7, 2003); *Hosendove v. Myers,* 2003 WL 22216809, *2 (D.Conn. Sept.19, 2003); *Hayes v. N .Y.S. D.O.C. Officers,* 1998 WL 901730, *3 (S.D.N.Y. Dec.28, 1998); *Torres v. Irvin,* 33 F.Supp.2d 257, 270 (S.D.N.Y.1998) (cases cited therein).

**\*4** In response to the Report and Recommendation, plaintiff asserts that, in April, the original complaint "was placed in the facility mail box." (Pl.'s Objection to Report at 1). However, it is uncontested that plaintiff's wife signed the complaint on May 8th; it was received by the Pro Se Office on May 10th; and plaintiff's signature is dated May 13th. There is no explanation offered that could reasonably support and account for the existence of these May dates on a complaint which plaintiff falsely claims to have deposited to be mailed during the period of April 10th and April 12th. Had plaintiff mailed the complaint directly to the court prior to April 26th, it would have been impossible for the plaintiff's wife to have signed the document two

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 324898 (S.D.N.Y.)
(Cite as: 2004 WL 324898 (S.D.N.Y.))

days prior to the date that the Pro Se Office stamped it received on May 10th.FN9 Moreover, absent evidence to the contrary, applying the mailbox rule would presume that plaintiff gave his complaint to prison officials on May 13, 1996, the date he signed it. *See, Johnson v. Coombe,* 156 F.Supp.2d 273, 277 (S.D.N.Y.2001) (quoting *Torres,* 33 F.Supp.2d at 270). Even if the Court gave plaintiff the benefit of the date plaintiff's wife signed the complaint, *i.e.,* the earliest date reflected on the filed complaint, it was still after the effective date of the PLRA. Hence, plaintiff is legally obligated to have pursued his prison grievance procedures prior to filing the instant action. The plaintiff has offered no explanation for the initial complaint's reference to events that occurred after the date he claims he filed it, the two May dates on which he and his former co-plaintiff wife signed the complaint, or the May date stamped received by the Pro Se Office. As the magistrate Judge observed:

> FN9. The benefit of the mailbox rule does not apply where the plaintiff delivers the complaint to someone outside the prison system to forward to the court. *Knickerbocker v. Artuz,* 271 F.3d 35, 37 (2d Cir.2001).

Apart from the allegation that certain events giving rise to the claims occurred on April 9, 1996, the Original Complaint contains no mention of dates in April, 1996. Mingues no where explains the contradiction between the signature dates on the Original Complaint and the allegations contained in Amended Complaint. (Report at 12).

New York state law provides a three tier grievance procedure applicable to plaintiff's claims of excessive force. *See,* N.Y. Correct. Law § 139 (McKinnney's 2003); N.Y. Comp.Codes R. & Regs. tit. 7, § 701.7 (2003); *Mendoz v. Goord,* 2002 WL 31654855 (S.D.N.Y.Nov.21, 2002); *Rodriguez v. Hahn,* 209 F.Supp.2d 344 (S.D.N.Y.2002). Plaintiff has not denied knowledge of the grievance procedure at his institution, nor claimed that anything or anyone caused him not to file a grievance and completely pursue it through the administrative process.FN10 The magistrate judge's determination that the defendants' Rule 12(b) motion should be denied because of an "absence of a clear record" contrary to plaintiff's express allegation in the amended complaint that he

commenced the action before April 26, 1996 is erroneous. The Court could have *sua sponte* dismiss this action as the record is unmistakably clear that an appropriate administrative procedure was available to him, that he was required to exhaust his administrative remedies, and that he failed to do so as required by the PLRA. *See, Mojias v. Johnson,* 351 F.3d 606 (2003); *Snider v. Melindez,* 199 F.3d 108, 112-13 (2d Cir.1999). In this case, plaintiff has been afforded notice and given an opportunity to respond to the exhaustion issue and his failure remains clear.

> FN10. In the original complaint, plaintiff stated he did not file a grievance, pursuant to the state's prisoner grievance procedure, "because this matter can not be dealt with by interdepartmental grievances." (Compl. at 2-3). In plaintiff's attorney's memorandum in opposition to the motion to dismiss, counsel contends that plaintiff is not required to file a grievance because the state's prison system provides extremely limited administrative remedies and money damages, which plaintiff seeks, are not available.

**\*5** Accordingly, it is hereby

ORDERED that the Report and Recommendation is not adopted; and it is further

ORDERED that the defendants' motion to dismiss the complaint is granted.

S.D.N.Y.,2004.
Mingues v. Nelson
Not Reported in F.Supp.2d, 2004 WL 324898 (S.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2000 WL 1809284 (S.D.N.Y.)
(Cite as: 2000 WL 1809284 (S.D.N.Y.))

**C**

Only the Westlaw citation is currently available.

United States District Court, S.D. New York.
Roger SULTON, Plaintiff,
v.
Charles GREINER, Superintendent of Sing Sing Corr.
Fac., Doctor Halko & P.A. Williams of Sing Sing Corr.
Fac. Medical Department, Doctor Lofton, Defendants.
**No. 00 Civ. 0727(RWS).**

Dec. 11, 2000.

Roger Sulton, Wende Correctional Facility, Alden, NY, Plaintiff, pro se.

Honorable Eliot Spitzer, Attorney General of the State of New York, New York, NY, By: S. Kenneth Jones, Assistant Attorney General, for Defendants, of counsel.

*OPINION*

SWEET, J.

**\*1** Defendants Charles Greiner ("Greiner"), past Superintendent of Sing Sing Correctional Facility ("Sing Sing") and Dr. Nikulas Halko, ("Halko"), P.A. Williams ("Williams"), and Dr. Lofton ("Lofton"), all of the Sing Sing Medical Department, (collectively, the "Defendants"), have moved to dismiss the amended complaint of *pro se* inmate Roger Sulton ("Sulton"), pursuant to Fed.R.Civ.P. 12(b)(6) and 12(h)(2) for failure to exhaust administrative remedies. For the reasons set forth below, the motion will be granted.

*Prior Proceedings*

Sulton filed the complaint in this action on February 2, 2000, asserting a claim against the Defendants under Section 1983 for alleged violation of his constitutional rights under the Eighth Amendment for acting with deliberate indifference to his serious medical needs. Sulton filed an amended complaint on May 3, 2000, to identify additional defendants to his suit. Additionally, Sulton alleges negligent malpractice by the Sing Sing medical staff. Sulton seeks monetary damages. The instant motion was filed on August 9, 2000, and was marked fully submitted on September 6, 2000.

*Facts*

The Defendants' motion comes in the posture of a motion to dismiss for failure to state a claim, pursuant to Federal Rule of Civil Procedure 12(b)(6). However, both the Defendants and Sulton have submitted materials outside the pleadings. Where a District Court is provided with materials outside the pleadings in the context of a 12(b)(6) motion to dismiss, it has two options: the court may exclude the additional materials and decide the motion on the complaint alone or convert the motion to one for summary judgment. *See* Fed.R.Civ.P. 12(b); *Kopec v. Coughlin,* 922 F.2d 152, 154 (2d Cir.1991); *Fonte v. Board of Managers of Continental Towers Condominium,* 848 F.2d 24, 25 (2d Cir.1988). The Court has determined to treat the instant motion as a motion for summary judgment. Therefore, the following facts are gleaned from the parties' submissions, with all inferences drawn in favor of the non-movant as required on a motion for summary judgment. They are not findings of fact by the Court.

Sulton is a prison inmate who was incarcerated in Sing Sing at the time of the incidents in question. Greiner was Superintendent of Sing Sing at that time. Halko was and is a doctor on medical staff at Sing Sing. Williams and Lofton are alleged to be affiliated with the Sing Sing Medical Department.

According to Sulton, on October 8, 1998, he slipped on a flight of wet stairs, where there was no "wet floor" sign posted, and injured his left knee. The next day his knee was swollen and the pain "was real bad." That same day

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1809284 (S.D.N.Y.)
(Cite as: 2000 WL 1809284 (S.D.N.Y.))

Sulton went to sick call and saw P.A. Williams. Williams ordered x-rays and also ordered "no-work, feed-in cell, pain killers and a cane" for Sulton. The swelling went down, but the pain got stronger.

For four months Sulton complained to the Sing Sing medical staff about his pain. During this time his left knee would give out "at any time." Yet, "nothing was done." However, the Sing Sing Medical Department did send Sulton to the Green Haven Correctional Facility for an M.R.I. and, subsequently, knee surgery was recommended by an attending physician on April 23, 1999. A hinged knee brace was recommended for post-surgery recovery.

**\*2** At some point thereafter, Sulton wrote to Greiner concerning his medical problem and he was placed on "a call-out" to see Halko. Halko then informed Sulton that he would not be going for surgery because Correctional Physician Services ("CPS") would not allow it. CPS wanted the inmate to undergo physical therapy before they would approve surgery. Sulton continued to be in pain and requested outside medical care from Williams. However, Williams could not do anything about Sulton's surgery until it was approved by CPS.

> FN1. CPS is the health maintenance organization which must pre-approve any outside medical service to be provided to inmates outside of the correctional facility.

In September 1999, Sulton was transferred to Wende Correctional Facility ("Wende"). The medical department there provided him with physical therapy for his left knee, which was "still in constant pain" and was prone to giving out beneath his body weight.

Sulton filed grievance # 14106-99 on November 3, 1999, and on November 24, 1999, he received a response from the Inmate Grievance Resolution Committee (the "IGRC"). Sulton contends that on that same date he indicated his desire to appeal their decision to the Superintendent. Sulton did not appeal his grievance to the highest level of administrative review, the Central Office Review Committee (the "CORC"). In a letter to Wende Superintendent Donnelly ("Donnelly") dated December

17, 2000, Sulton complained that he never received a response to his appeal of the IGRC decision. However, the Defendants have submitted a response from Donnelly dated December 6, 2000, in which Donnelly stated that he concurred with the IGRC's decision.

In January 2000, "plaintiff['s] legs gave out and the right leg took the weight of the body ... causing the plaintiff to suffer ... torn joints in the ankle area." Surgery was performed on the ankle and he was placed on "medical confinement status."

*Discussion*

I. *This Action Will Be Dismissed For Plaintiff's Failure To Comply With The Prison Litigation Reform Act Of 1996*

In his amended complaint, Sulton alleges that he filed a grievance and, although initially the Defendants were unable to identify the grievance, by his opposition to the instant motion Sulton has identified the process he undertook to pursue his grievance.

Section 1997e(a) of the Prison Litigation Reform Act (the "PLRA") provides that:

No action shall be brought with respect to prison conditions under ... 42 U.S.C. § 1983 ... or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

42 U.S.C. § 1997e(a).

In enacting Section 1997e(a), Congress made exhaustion mandatory. *Salahuddin v. Mead,* 174 F.3d 271, 274-75 (2d Cir.1999). As a result, where an inmate fails to satisfy the PLRA's exhaustion requirement, the complaint must be dismissed. *See, e.g., Santiago v. Meinsen,* 89 F.Supp.2d 435, 439-40 (S.D.N.Y.2000) (citations omitted).

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1809284 (S.D.N.Y.)
(Cite as: 2000 WL 1809284 (S.D.N.Y.))

In New York, the relevant administrative vehicle is the Inmate Grievance Program ("IGP"). *See* N.Y. Correct. Law § 139 (directing Commissioner of the Department of Correctional Services to establish a grievance mechanism in each correctional facility under the jurisdiction of the Department); N.Y. Comp.Codes R. & Regs., tit. 7, § 701.1 (instituting IGP). New York inmates can file internal grievances with the inmate grievance committee on practically any issue affecting their confinement. *See In re Patterson,* 53 N.Y.2d 98, 440 N.Y.S.2d 600 (N.Y.1981) (interpreting N.Y. Correct. Law § 139 broadly); N.Y. Comp.Codes R. & Regs., tit. 7, §§ 701.2(a) (inmates may file grievances about the "substance or application of any written or unwritten policy, regulation, procedure or rule of the Department of Correctional Services ...") and 701.7 (procedures for filing, time limits, hearings and appeals).

**\*3** The New York State Department of Correctional Services ("DOCS") has established a grievance program with specific procedures which must be followed in order for a prisoner to exhaust his administrative remedies. *See Petit v. Bender,* No. 99 Civ. 0969. 2000 WL 303280, at \*2- \*3 (S.D.N.Y. March 22, 2000) (holding that prisoner failed to exhaust his administrative remedies where prisoner only partially complied with the grievance procedures established by Section 701 *et seq.*). These procedures include a requirement that an inmate appeal a Superintendent's decision to the CORC by filing an appeal with the Grievance Clerk. *See* N.Y. Comp.Codes R. & Regs., tit. 7, § 701.7(c)(1).

There is, however, an additional issue to be addressed in this case, which is that the administrative remedies available to Sulton do not afford monetary relief. The Second Circuit has not yet ruled on whether the PLRA's exhaustion requirement applies where the available administrative remedies available do not provide the type of relief the prisoner seeks. *Snider v. Dylag,* 188 F.3d 51, 55 (2d Cir.1999) ("We note that it is far from certain that the exhaustion requirement of 42 U.S.C. § 1997e(a) applies to deliberate indifference claims ... under Section 1983, where the relief requested is monetary and where the administrative appeal, even if decided for the complainant, could not result in a monetary award.").

There is disagreement among the district courts within this circuit as to this issue, although there is "clear trend ... to

find exhaustion applicable even where the requested relief, money damages, cannot be awarded by the administrative body hearing the complaint." *Santiago v. Meinsen,* 89 F.Supp.2d at 440; *see Snider v. Melindez,* 199 F.3d 108, 114 n. 2 (2d Cir.1999) (noting disagreement among courts as to applicability of exhaustion requirement where administrative remedies are unable to provide the relief that a prisoner seeks in his federal action); *but cf. Nussle v. Willette,* 224 F.3d 95, (2d Cir.2000) (holding that exhaustion not required for excessive force claim because such claim is not "prison conditions" suit and overruling district court decisions applying exhaustion requirement to excessive force claims seeking monetary relief).

Moreover, this Court has previously held that a prisoner must exhaust his administrative remedies before seeking relief in federal court in connection with a prison conditions claim even where a prisoner seeks damages not recoverable under an established grievance procedure. *Coronado v. Goord,* No. 99 Civ. 1674, 2000 WL 52488, at \*2 (S.D.N.Y. Jan. 24, 2000); *Edney v. Karrigan,* No. 99 Civ. 1675, 1999 WL 958921, at \*4 (S.D.N.Y. Oct. 14, 1999). This is the rule that will be applied here.

In his response to the motion to dismiss, Sulton indicates that he filed grievance # 14106-99 on November 3, 1999 and on November 24, 1999 he received a response IGRC and that on the same date Sulton indicated his desire to appeal their decision to the Superintendent. Sulton does not contend that he appealed his grievance to the highest level of administrative review, namely, the CORC. Instead, Sulton has asserted that Superintendent Donnelly never replied to the appeal of the IGRC decision and submits a letter dated December 17, 2000 in which Sulton complains that he never received a response from Donnelly. However, the Defendants have submitted a response from Donnelly dated December 6, 2000, in which Donnelly concurred with the decision of the IGRC denying Sulton relief. There is no evidence in the record that Sulton appealed the grievance to CORC.

**\*4** Accordingly, because Sulton failed to exhaust his administrative remedies by appealing the grievance to the CORC, his claims of medical indifference will be dismissed pursuant to 42 U.S.C. § 1997e. *See Petit,* 2000 WL 303280, at \*3.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1809284 (S.D.N.Y.)
(Cite as: 2000 WL 1809284 (S.D.N.Y.))

*Conclusion*

Therefore, for the reasons set forth above, the Defendants'
motion will be granted and the amended complaint will be
dismissed without prejudice to the action being renewed
once Sulton has exhausted all administrative remedies.

It is so ordered.

S.D.N.Y.,2000.
Sulton v. Greiner
Not Reported in F.Supp.2d, 2000 WL 1809284
(S.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2002 WL 31309244 (N.D.N.Y.)
(Cite as: 2002 WL 31309244 (N.D.N.Y.))

C  Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
Karus LAFAVE, Plaintiff,
v.
CLINTON COUNTY, Defendants.
**No. CIV.9:00CV0744DNHGLS.**

April 3, 2002.

Karus Lafave, Plaintiff, Pro Se, Plattsburgh, for the Plaintiff.

Maynard, O'Connor Law Firm, Albany, Edwin J. Tobin, Jr., Esq., for the Defendants.

**REPORT-RECOMMENDATION** [FN1]

FN1. This matter was referred to the undersigned for Report-Recommendation by the Hon. David N. Hurd, United States District Judge, pursuant to 28 U.S.C. § 636(b)(1)(B) and L.R. 72.3(c).

SHARPE, Magistrate J.

**I. INTRODUCTION**

*1 Plaintiff, *pro se,* Karus LaFave ("LaFave") originally filed this action in Clinton County Supreme Court. The defendant filed a Notice of Removal because the complaint presented a federal question concerning a violation of LaFave's Eighth Amendment rights (Dkt. No. 1). Currently before the court is the defendant's motion to dismiss made pursuant to Rule 12(b)(6) and in the alternative, pursuant to Rule 56(b) of the Federal Rules of Civil Procedure (Dkt. No. 5). LaFave, in response, is requesting that the court deny the motion, excuse his inability to timely file several motions, and to permit the

matter to be bought before a jury [FN2]. After reviewing LaFave's claims and for the reasons set forth below, the defendant's converted motion for summary judgment should be granted.

FN2. It should be noted that the date for dispositive motions was February 16, 2001. The defendant's motion to dismiss was filed on September 29, 2000. On January 9, 2001, this court converted the defendant's motion to dismiss to a motion for summary judgment, and gave LaFave a month to respond. On April 16, 2001, after three months and four extensions, LaFave finally responded.

**II. BACKGROUND**

LaFave brings this action under 42 U.S.C. § 1983 claiming that the defendant violated his civil rights under the Eighth Amendment [FN3]. He alleges that the defendant failed to provide adequate medical and dental care causing three different teeth to be extracted.

FN3. LaFave does not specifically state that the defendant violated his Eighth Amendment rights but this conclusion is appropriate after reviewing the complaint.

**III. FACTS** [FN4]

FN4. While the defendant provided the court with a "statement of material facts not in issue" and LaFave provided the court with "statement of material facts genuine in issue," neither provided the court with the exact nature of the facts.

Between January and July of 1999, LaFave, on several occasions, requested dental treatment because he was experiencing severe pain with three of his teeth. After being seen on several occasions by a Clinton County

Not Reported in F.Supp.2d, 2002 WL 31309244 (N.D.N.Y.)
(Cite as: 2002 WL 31309244 (N.D.N.Y.))

Correctional Facility ("Clinton") doctor, he was referred to a dentist. Initially, LaFave's mother had made an appointment for him to see a dentist, but he alleges that Nurse LaBarge ("LaBarge") did not permit him to be released to the dentist's office [FN5]. Subsequently, he was seen by Dr. Boule, D.D.S ., on two occasions for dental examinations and tooth extractions.

> FN5. This appears to be in dispute because the medical records show that LaFave at first stated that his mother was going to make arrangements, but later requested that the facility provide a dentist.

IV. DISCUSSION

A. *Legal Standard*

Summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits ... show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Anderson v. Liberty Lobby, Inc .,* 477 U.S. 242, 247, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *accord F.D.I.C. v. Giammettei,* 34 F.3d 51, 54 (2d Cir.1994). The moving party has the burden of demonstrating that there is no genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). Once this burden is met, it shifts to the opposing party who, through affidavits or otherwise, must show that there is a material factual issue for trial. Fed.R.Civ.P. 56(e); *see Smythe v. American Red Cross Blood Services Northeastern New York Region,* 797 F.Supp. 147, 151 (N.D.N.Y.1992).

Finally, when considering summary judgment motions, *pro se* parties are held to a less stringent standard than attorneys. *Estelle v. Gamble,* 429 U.S. 97, 106, 97 S.Ct. 285, 292, 50 L.Ed.2d 251 (1976); *Haines v. Kerner,* 404 U.S. 519, 520-21, 92 S.Ct. 594, 596, 30 L.Ed.2d 652 (1972). Any ambiguities and inferences drawn from the facts must be viewed in the light most favorable to the non-moving party. *Thompson v. Gjivoje,* 896 F.2d 716, 720 (2d Cir.1990). With this standard in mind, the court

now turns to the sufficiency of LaFave's claims.

B. *Eighth Amendment Claims*

**\*2** LaFave alleges that his Eighth Amendment rights were violated when the defendant failed to provide adequate medical care for his dental condition. The Eighth Amendment does not mandate comfortable prisons, yet it does not tolerate inhumane prisons either, and the conditions of an inmate's confinement are subject to examination under the Eighth Amendment. *Farmer v. Brennan,* 511 U.S. 825, 832, 114 S.Ct. 1970, 1975, 128 L.Ed.2d 811 (1994). Nevertheless, deprivations suffered by inmates as a result of their incarceration only become reprehensible to the Eighth Amendment when they deny the minimal civilized measure of life's necessities. *Wilson v. Seiter,* 501 U.S. 294, 298, 111 S.Ct. 2321, 2324, 115 L.Ed.2d 271 (1991) (*quoting Rhodes v. Chapman,* 452 U.S. 337, 347, 101 S.Ct. 2392, 2399, 69 L.Ed.2d 59 (1981)).

Moreover, the Eighth Amendment embodies "broad and idealistic concepts of dignity, civilized standards, humanity, and decency ..." against which penal measures must be evaluated. See *Estelle v. Gamble,* 429 U.S. 97, 102, 97 S.Ct. 285, 290, 50 L.Ed.2d (1976). Repugnant to the Amendment are punishments hostile to the standards of decency that " 'mark the progress of a maturing society." ' *Id.* (*quoting Trop v. Dulles,* 356 U.S. 86, 101, 78 S.Ct. 590, 598, 2 L.Ed.2d 630 (1958) (plurality opinion)). Also repugnant to the Amendment, are punishments that involve " 'unnecessary and wanton inflictions of pain." ' *Id.* at 103,97 S.Ct. at 290 (*quoting Gregg v. Georgia,* 428 U.S. 153, 173, 96 S.Ct. 2909, 2925, 49 L.Ed.2d 859 (1976)).

In light of these elementary principles, a state has a constitutional obligation to provide inmates adequate medical care. See *West v. Atkins,* 487 U.S. 42, 54, 108 S.Ct. 2250, 2258, 101 L.Ed.2d 40 (1988). By virtue of their incarceration, inmates are utterly dependant upon prison authorities to treat their medical ills and are wholly powerless to help themselves if the state languishes in its obligation. *See Estelle,* 429 U.S. at 103, 97 S.Ct. at 290. The essence of an improper medical treatment claim lies in proof of "deliberate indifference to serious medical

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31309244 (N.D.N.Y.)
(Cite as: 2002 WL 31309244 (N.D.N.Y.))

needs." *Id.* at 104, 97 S.Ct. at 291. Deliberate indifference may be manifested by a prison doctor's response to an inmate's needs. *Id.* It may also be shown by a corrections officer denying or delaying an inmate's access to medical care or by intentionally interfering with an inmate's treatment. *Id.* at 104-105, 97 S.Ct. at 291.

The standard of deliberate indifference includes both subjective and objective components. The objective component requires the alleged deprivation to be sufficiently serious, while the subjective component requires the defendant to act with a sufficiently culpable state of mind. *See Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998). A prison official acts with deliberate indifference when he " 'knows of and disregards an excessive risk to inmate health or safety.' " *Id.* (*quoting Farmer,* 511 U.S. at 837, 114 S.Ct. at 1979). However, " 'the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.' " *Id.*

*3 However, an Eighth Amendment claim may be dismissed if there is no evidence that a defendant acted with deliberate indifference to a serious medical need. An inmate does not have a right to the treatment of his choice. *See Murphy v. Grabo,* 1998 WL 166840, at *4 (N.D.N.Y. April 9, 1998) (*citation omitted* ). Also, mere disagreement with the prescribed course of treatment does not always rise to the level of a constitutional claim. *See Chance,* 143 F.3d at 703. Moreover, prison officials have broad discretion to determine the nature and character of medical treatment which is provided to inmates. *See Murphy,* 1998 WL 166840, at *4 (*citation omitted* ).

While there is no exact definition of a "serious medical condition" in this circuit, the Second Circuit has indicated what injuries and medical conditions are serious enough to implicate the Eighth Amendment. *See Chance,* 143 F.3d at 702-703. In *Chance,* the Second Circuit held that an inmate complaining of a dental condition stated a serious medical need by showing that he suffered from great pain for six months. The inmate was also unable to chew food and lost several teeth. The Circuit also recognized that dental conditions, along with medical conditions, can vary in severity and may not all be severe. *Id.* at 702. The court acknowledged that while some injuries are not serious enough to violate a constitutional right, other very similar

injuries can violate a constitutional right under different factual circumstances. *Id.*

The Second Circuit provided some of the factors to be considered when determining if a serious medical condition exists. *Id.* at 702-703. The court stated that " '[t]he existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain' ' are highly relevant. *Id.* at 702-703 (*citation omitted* ). Moreover, when seeking to impose liability on a municipality, as LaFave does in this case, he must show that a municipal "policy" or "custom caused the deprivation." *Wimmer v. Suffolk County Police Dep't,* 176 F.3d 125, 137 (2d Cir.1999).

In this case, the defendant maintains that the medical staff was not deliberately indifferent to his serious medical needs. As a basis for their assertion, they provide LaFave's medical records and an affidavit from Dr. Viqar Qudsi[FN6], M.D, who treated LaFave while he was incarcerated at Clinton. The medical records show that he was repeatedly seen, and prescribed medication for his pain. In addition, the record shows that on various occasions, LaFave refused medication because "he was too lazy" to get out of bed when the nurse with the medication came to his cell (*Def. ['s] Ex. A, P. 4)* .

    FN6. Dr. Qudsi is not a party to this action.

According to the documents provided, Dr. Qudsi, examined LaFave on January 13, 1999, after LaFave reported to LaBarge that he had a headache and discomfort in his bottom left molar (*Qudsi Aff., P. 2*). Dr. Qudsi noted that a cavity was present in his left lower molar. *Id.* He prescribed Tylenol as needed for the pain and 500 milligrams ("mg") of erythromycin twice daily to prevent bacteria and infection. *Id.* On January 18, 19, and 20, 1999, the medical records show that LaFave refused his erythromycin medication (*Def. ['s] Ex. B, P. 1).*

*4 Between January 20, and April 12, 1999, LaFave made no complaints concerning his alleged mouth pain. On

Not Reported in F.Supp.2d, 2002 WL 31309244 (N.D.N.Y.)
(Cite as: 2002 WL 31309244 (N.D.N.Y.))

April 12, 1999, LaFave was examined by LaBarge due to a complaint of pain in his lower left molar (*Def. ['s] Ex. A, P. 4* ). Dr. Qudsi examined him again on April 14, 1999. *Id.* He noted a cavity with pulp decay and slight swelling with no discharge. *Id.* He noted an abscess in his left lower molar and again prescribed 500 mg erythromycin tablets twice daily and 600 mg of Motrin three times daily for ten days with instructions to see the dentist. *Id.* On the same day, LaBarge made an appointment for LaFave to see an outside dentist that provides dental service to facility inmates, Dr. Boule *(Qudsi Aff., P. 3).*

On May 3, 1999, LaBarge was informed by LaFave that his mother would be making a dental appointment with their own dentist and that the family would pay for the treatment (*Def. ['s] Ex. A, P. 4* ). On that same day, Superintendent Major Smith authorized an outside dental visit. *Id.* On May 12, 1999, he was seen by LaBarge for an unrelated injury and he complained about his lower left molar (*Def .['s] Ex. A, P. 5* ). At that time, LaFave requested that LaBarge schedule a new appointment with Dr. Boule because the family had changed their mind about paying an outside dentist. *Id.* LaBarge noted that he was eating candy and informed him of the deleterious effects of candy on his dental condition. *Id.* Thereafter, LaBarge scheduled him for the next available date which was June 24, 1999, at noon. *Id.*

On June 2, 1999, LaFave again requested sick call complaining for the first time about tooth pain in his upper right molar and his other lower left molar (*Def. ['s] Ex. A, P. 6* ). He claimed that both molars caused him discomfort and bothered him most at night. *Id.* LaFave confirmed that he had received treatment from Dr. Boule for his first lower left molar one week before. *Id.* The area of his prior extraction was clean and dry. *Id.* There was no abscess, infection, swelling, drainage or foul odor noted. *Id.* LaBarge recommended Tylenol as needed for any further tooth discomfort. *Id.*

On June 21, 1999, LaFave again requested a sick call and was seen by LaBarge (*Def. ['s] Ex. A, P. 6* ). No swelling, drainage or infection was observed. *Id.* However, LaBarge noted cavities in LaFave's lower left molar and right lower molars. *Id.* LaBarge made arrangements for Dr. Qudsi to further assess LaFave. *Id.* On June 23, 1999, Dr. Qudsi examined his right lower molar and noted cavitation with

decay in that area (*Def. ['s] Ex. A, P. 7* ). In addition, he noted that LaFave had a cavity in his second left lower molar. *Id.* He prescribed 500 mg of erythromycin twice daily for 10 days and 600 mg of Motrin three times daily for 10 days, with instructions to see a dentist. *Id.*

On June 30, 1999, Officer Carroll reported that LaFave was again non-compliant with his medication regimen as he refused to get up to receive his medication (*Def. ['s] Ex. A, P. 8* ). On July 7, 1999, he again requested sick call complaining of a toothache in his lower right molar (*Def. ['s] Ex. A, P. 9* ). Again, LaFave was non-compliant as he had only taken his erythromycin for five days instead of the ten days prescribed. *Id.* During the examination, Dr. Qudsi informed LaFave that extraction of these teeth could be necessary if he did not respond to conservative treatment. *Id.* At that time, LaFave informed Dr. Qudsi that he was going to be transferred to another facility. *Id.* Dr. Qudsi advised LaFave to follow-up with a dentist when he arrived at the new facility. *Id.* Dr. Qudsi prescribed 500 mg Naproxin twice daily for thirty days with instructions to follow-up with him in two weeks if the pain increased. *Id.* The following day, LaFave requested sick call complaining to LaBarge that he had taken one dose of Naproxin and it was not relieving the pain. *Id.* He was advised that he needed to take more than one dose to allow the Naproxin to take effect. *Id.*

**\*5** On July 17, 1999, LaFave was again seen by Dr. Qudsi and he indicated that he did not believe he was benefitting from the prescribed course of conservative treatment with medication (*Def. ['s] Ex. A, P. 10* ). Subsequently, LaBarge made a dental appointment for him on July 23 [FN7], 1999, at 3:15 p.m. *Id.* On July 23, 1999, a second extraction was conducted. *Id.* On July 28, 1999, he was again seen by Dr. Qudsi, for an ulceration at the left angle of his mouth for which he prescribed bacitracin ointment. *Id.* At this time, LaFave continued to complain of tooth pain so he was prescribed 600 mg of Motrin three times daily. *Id.*

FN7. The medical records contain an error on the July 17, 1999, note which indicted that an appointment was set for June 23, 1999, however, it should have been recorded as July 23, 1999.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31309244 (N.D.N.Y.)
(Cite as: 2002 WL 31309244 (N.D.N.Y.))

On August 4, 1999, he was seen for feeling a sharp piece of bone residing in the area of his lower left molar (*Def. ['s] Ex. A, P. 11* ). Dr. Qudsi recommended observation and to follow-up with dental care if his condition continued. *Id.* The defendant maintains that given all of the documentation that he was seen when he requested to be seen and prescribed numerous medications, the medical staff was not deliberately indifferent to his serious medical needs. The defendant contends that at all times, professional and contentious dental and medical treatment were provided in regards to his various complaints.

In his response, LaFave disagrees alleging that the county had a custom or policy not to provide medical treatment to prisoners. However, LaFave does not allege in his complaint that the county had a "custom or policy" which deprived him of a right to adequate medical or dental care. In his response to the motion for summary judgment, for the first time, LaFave alleges that the county had a policy which deprived him of his rights. He maintains that his continued complaints of pain were ignored and although he was prescribed medication, it simply did not relieve his severe pain.

This court finds that the defendant was not deliberately indifferent to his serious dental and medical needs. Moreover, even if this court construed his complaint to state a viable claim against the county, LaFave has failed to show that the county provided inadequate medical and dental treatment. As previously stated, an inmate does not have the right to the treatment of his choice. The record shows that he was seen numerous times, and referred to a dentist on two occasions over a six month period. While LaFave argues that the dental appointments were untimely, the record shows that the initial delay occurred because he claimed that his mother was going to make the appointment but later changed her mind. In addition, the record demonstrates that he did not adhere to the prescribed medication regime. On various occasions, LaFave failed to get out of bed to obtain his medication in order to prevent infection in his mouth. Although it is apparent that LaFave disagreed with the treatment provided by Clinton, the record does not show that the defendant was deliberately indifferent to his serious medical needs. Accordingly, this court recommends that the defendant's motion for summary judgment should be granted.

**\*6** WHEREFORE, for the foregoing reasons, it is hereby

RECOMMENDED, that the defendant's motion for summary judgment (Dkt. No. 5) be GRANTED in favor of the defendant in all respects; and it is further

ORDERED, that the Clerk of the Court serve a copy of this Report-Recommendation upon the parties by regular mail.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court within TEN days. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

N.D.N.Y.,2002.
Lafave v. Clinton County
Not Reported in F.Supp.2d, 2002 WL 31309244 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2008 WL 4104554 (N.D.N.Y.)

(Cite as: 2008 WL 4104554 (N.D.N.Y.))

---

**C**

Only the Westlaw citation is currently available.
United States District Court,

N.D. New York.
Vincent LOWMAN, Plaintiff,
v.
Kenneth PERLMAN, Superintendent of Mid-state
Correctional Facility, Glenn Goord, Commissioner of
New York State Department of Correctional Services,
Dr. Ramineni,[FN1] Director of Administrator Health
Services, Defendants.

FN1. The Complaint and Docket misspell this
Defendant's name as "Dr. Remeinena." We will
refer to the correct spelling used in the caption.

No. 9:06-CV-0422 (LEK/RFT).

Aug. 29, 2008.
Vincent Lowman, Marcy, N.Y., pro se.

Hon. Andrew M. Cuomo, Attorney General for the State
of New York, Stephen H. Schwartz, Esq., Assistant
Attorney General, of Counsel, Albany, N.Y., for
Defendants.

### *DECISION AND ORDER*

LAWRENCE E. KAHN, District Judge.
    **\*1** This matter comes before the Court following a
Report-Recommendation filed on August 4, 2008 by the
Honorable Randolph F. Treece, United States Magistrate
Judge, pursuant to 28 U .S.C. § 636(b) and L.R. 72.3 of
the Northern District of New York. Report-Rec. (Dkt. No.
54). After ten days from the service thereof, the Clerk has
sent the entire file to the undersigned, including the
objections by Plaintiff Vincent Lowman, which were filed
on August 8, 2008. Objections (Dkt. No. 55).

    It is the duty of this Court to "make a de novo
determination of those portions of the report or specified
proposed findings or recommendations to which objection
is made." 28 U.S.C. § 636(b). "A [district] judge ... may

accept, reject, or modify, in whole or in part, the findings
or recommendations made by the magistrate judge." *Id.*
This Court has considered the objections and has
undertaken a de novo review of the record and has
determined that the Report-Recommendation should be
approved for the reasons stated therein.

    Accordingly, it is hereby

    **ORDERED,** that the Report-Recommendation (Dkt.
No. 54) is **APPROVED** and **ADOPTED** in its
**ENTIRETY;** and it is further

    **ORDERED,** that Defendants' Motion for summary
judgment (Dkt. No. 42) is **GRANTED;** and it is further

    **ORDERED,** that Plaintiff's Complaint (Dkt. No. 1)
is **DISMISSED** in its entirety; and it is further

    **ORDERED,** that the Clerk serve a copy of this Order
on all parties.

    **IT IS SO ORDERED.**

### *REPORT-RECOMMENDATION and ORDER*

RANDOLPH F. TREECE, United States Magistrate
Judge.
    *Pro se* Plaintiff Vincent Lowman brings this civil
rights action, pursuant to 42 U.S.C. § 1983, asserting that
the Defendants were deliberately indifferent to his serious
medical needs in violation of his constitutional rights
under the Eighth Amendment. Dkt. No. 1, Compl.
Specifically, Plaintiff claims that the treatment and
medication he was receiving at Woodbourne Correctional
Facility ("Woodbourne") for his back, knee, high blood
pressure, and asthma were wrongly discontinued after his
transfer to Mid-State Correctional Facility ("Mid-State").
*Id.* at p. 3. Defendants now move for Summary Judgment
pursuant to Fed.R.Civ.P. 56, (Dkt. No. 42), which Plaintiff
opposes (Dkt. No. 48). For the reasons that follow, it is
recommended that the Defendants' Motion be **granted** and
the Complaint **dismissed.**

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4104554 (N.D.N.Y.)

(Cite as: 2008 WL 4104554 (N.D.N.Y.))

## I. FACTS

The following facts were derived mainly from the Defendants' Statement of Material Facts, submitted in accordance with N.D.N.Y.L.R. 7.1(a)(3), which were not, in their entirety, specifically countered nor opposed by Plaintiff. *See* N.D.N.Y.L.R. 7.1(a)(3) (*"Any facts set forth in the Statement of Material Facts shall be deemed admitted unless specifically controverted by the opposing party."* (emphasis in original)). In any event, most, if not all, of the material facts are not in dispute, but rather, the issue is whether those facts give rise to constitutional violations.

**\*2** Plaintiff was transferred from Woodbourne to Mid-State on June 28, 2005, where Defendant Dr. Ramineni was employed. Dkt. No. 42, Defs.' Mot. for Summ. J., Defs.' 7.1 Statement, at ¶ 1. During Plaintiff's first visit with Dr. Ramineni on August 18, 2005, he complained of pain in his lower back and right knee, although an examination revealed no swelling, discoloration, or any other signs of injury to his back or knee. *Id.* at ¶ 8. Dr. Ramineni prescribed Naprosyn, an anti-inflammatory drug. *Id.* On September 14, 2005, Plaintiff again complained of back and knee pain. Again, Dr. Ramineni found no inflammation nor swelling. *Id.* at ¶ 10. Plaintiff requested a magnetic resonance imaging (MRI) and a transcutaneous electrical nerve stimulator (TENS) unit, but Dr. Ramineni denied those requests as medically unnecessary. *Id.* at ¶ 11. Plaintiff's final meeting with Dr. Ramineni was on November 14, 2005. Plaintiff complained of pain in his left knee for which he was prescribed Motrin. *Id.* at ¶ 12.

## II. DISCUSSION

### A. Summary Judgment Standard

Pursuant to FED. R. CIV. P. 56(c), summary judgment is appropriate only where "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." The moving party bears the burden to demonstrate through "pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any," that there is no genuine issue of material fact. *F.D.I.C. v. Giammettei,* 34 F.3d 51, 54 (2d Cir.1994) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986)). "When a party has moved for summary judgment on the basis of asserted facts supported

as required by [Federal Rule of Civil Procedure 56(e) ] and has, in accordance with local court rules, served a concise statement of the material facts as to which it contends there exist no genuine issues to be tried, those facts will be deemed admitted unless properly controverted by the nonmoving party." *Glazer v. Formica Corp.,* 964 F.2d 149, 154 (2d Cir.1992).

To defeat a motion for summary judgment, the non-movant must "set forth specific facts showing that there is a genuine issue for trial," and cannot rest on "mere allegations or denials" of the facts submitted by the movant. FED. R. CIV. P. 56(e); *see also Scott v. Coughlin,* 344 F.3d 282, 287 (2d Cir.2003) ("Conclusory allegations or denials are ordinarily not sufficient to defeat a motion for summary judgment when the moving party has set out a documentary case."); *Rexnord Holdings, Inc. v. Bidermann,* 21 F.3d 522, 525-26 (2d Cir.1994). To that end, sworn statements are "more than mere conclusory allegations subject to disregard ... they are specific and detailed allegations of fact, made under penalty of perjury, and should be treated as evidence in deciding a summary judgment motion" and the credibility of such statements is better left to a trier of fact. *Scott v. Coughlin,* 344 F.3d at 289 (citing *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995) and *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983)).

**\*3** When considering a motion for summary judgment, the court must resolve all ambiguities and draw all reasonable inferences in favor of the non-movant. *Nora Beverages, Inc. v. Perrier Group of Am., Inc.,* 164 F.3d 736, 742 (2d Cir.1998). "[T]he trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution." *Gallo v. Prudential Residential Servs., Ltd. P'ship,* 22 F.3d 1219, 1224 (2d Cir.1994). Furthermore, where a party is proceeding *pro se,* the court must "read [his or her] supporting papers liberally, and ... interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994), accord, *Soto v. Walker,* 44 F.3d 169, 173 (2d Cir.1995). Nonetheless, mere conclusory allegations, unsupported by the record, are insufficient to defeat a motion for summary judgment.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4104554 (N.D.N.Y.)

(Cite as: 2008 WL 4104554 (N.D.N.Y.))

See *Carey v. Crescenzi,* 923 F.2d 18, 21 (2d Cir.1991).

**B. Personal Involvement**

The Second Circuit has held that "personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (citations omitted). Moreover, "the doctrine of *respondeat superior* cannot be applied to section 1983 actions to satisfy the prerequisite of personal involvement. Therefore, a prison official may not be found liable for a constitutional violation merely because of the acts of those under his control." *Kinch v. Artuz,* 1997 WL 576038, at *2 (S.D.N.Y. Sept. 15, 1997) (citing *Colon v. Coughlin,* 58 F.3d 865, 874 (2d Cir.1995) & *Wright v. Smith,* 21 F.3d at 501) (further citations omitted).

Nevertheless, if a plaintiff seeks to bring a § 1983 action for supervisory liability, liability on the part of the supervisor may exist

in one or more of the following ways: 1) actual direct participation in the constitutional violation, 2) failure to remedy a wrong after being informed through a report or appeal, 3) creation of a policy or custom that sanctioned conduct amounting to a constitutional violation, or allowing such a policy or custom to continue, 4) grossly negligent supervision of subordinates who committed a violation, or 5) failure to act on information indicating that unconstitutional acts were occurring.

*Hernandez v. Keane,* 341 F.3d 137, 145 (2d Cir.2003) (citing *Colon v. Coughlin,* 58 F.3d at 873) (further citations omitted).

In the case at bar, Plaintiff has not made any specific allegations against Defendants Perlman and Goord, nor has he advanced a theory of supervisory liability against them. *See generally* Compl. Because his Complaint is completely devoid of any mention of Defendants Perlman and Goord beyond listing them as Defendants, it is recommended that the Complaint be **dismissed** as to these Defendants.[FN2]

FN2. In addition, it appears that Plaintiff may not

have intended to file this action against Defendants Perlman and Goord. In his Statement of Undisputed Material Facts, included in his Opposition to the Defendants' Motion for Summary Judgment, Plaintiff states "[t]he plaintiff's [sic] only file [sic] a civil action against the defendant Dr. Ramineni." *See* Dkt. No. 48, Pl.'s Opp. to Defs.' Mot. for Summ. J., at p. 1.

**C. Eighth Amendment Claim**

**\*4** To state an Eighth Amendment claim for denial of adequate medical care, a prisoner must demonstrate that prison officials acted with "deliberate indifference to serious medical needs." *Estelle v. Gamble,* 429 U.S. 97, 104 (1976). The plaintiff must allege conduct that is " 'repugnant to the conscience of mankind' or 'incompatible with the evolving standards of decency that mark the progress of a maturing society.' " *Ross v. Kelly,* 784 F.Supp. 35, 44 (W.D.N.Y.1992), *aff'd,* 970 F.2d 896 (2d Cir.1992) (quoting *Estelle v. Gamble,* 429 U.S. at 102, 105-06).

To state a claim for denial of medical care, a prisoner must demonstrate (1) a serious medical condition and (2) deliberate indifference. *Farmer v. Brennan,* 511 U.S. 825, 834-35 (1994); *Hathaway v. Coughlin ("Hathaway I"),* 37 F.3d 63, 66 (2d Cir.1994). The first prong is an objective standard and considers whether the medical condition is sufficiently serious. The Second Circuit has stated that a medical need is serious if it presents " 'a condition of urgency' that may result in 'degeneration' or 'extreme pain.' " *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998) (quoting *Hathaway I,* 37 F.3d at 66). Among the relevant factors to consider are "[t]he existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individuals daily activities; or the existence of chronic and substantial pain." *Chance v. Armstrong,* 143 F.3d at 702 (quoting *McGuckin v. Smith,* 974 F.2d 1050, 1059-60 (9th Cir.1992)).

The second prong is a subjective standard requiring a plaintiff to demonstrate that the defendant acted with the requisite culpable mental state similar to that of criminal

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4104554 (N.D.N.Y.)

(Cite as: 2008 WL 4104554 (N.D.N.Y.))

recklessness. *Wilson v. Seiter,* 501 U.S. 294, 301-03 (1991); *Hathaway I,* 37 F.3d at 66. A plaintiff must demonstrate that the defendant acted with reckless disregard to a known substantial risk of harm. *Farmer v. Brennan,* 511 U.S. at 836. This requires "something more than mere negligence ... but something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Id,* at 835; *see also Weyant v. Okst,* 101 F.3d 845, 856 (2d Cir.1996) (citing *Farmer* ). Further, a showing of medical malpractice is insufficient to support an Eighth Amendment claim unless "the malpractice involves culpable recklessness, i.e., an act or a failure to act by the prison doctor that evinces 'a conscious disregard of a substantial risk of serious harm.' " *Chance v. Armstrong,* 143 F.3d at 702 (quoting *Hathaway v. Coughlin ("Hathaway II),* 99 F.3d 550, 553 (2d Cir.1996)); *see also Hernandez v. Keane,* 341 F.3d 137, 144 (2d Cir.2003) (citations omitted).

### 1. *Serious Medical Need*

Plaintiff alleges that prior to his arrival at Mid-State, he sustained injuries to his lower back and knee and suffered from asthma and high blood pressure, and that because the treatment he received at Woodbourne was discontinued upon his arrival at Mid-State, he suffered "swelling of the knee, continued lost [sic] of sleep, joint swelling and discoloration in the lower back area, and knee." Compl. at Statement of Facts, ¶¶ 2-4. Plaintiff also alleges that while at Mid-State he had problems going to the bathroom and may have had hemorrhoids. Compl. at [unnumbered] p. 4.

**\*5** Plaintiff's Ambulatory Health Record (AHR) reflects that he made several complaints of pain in his knee and back, but provides no additional evidence of any concrete injury beyond a pulled groin muscle he suffered while playing basketball and Dr. Ramineni's diagnosis of a sprained left knee. *See* Defs.' 7.1 Statement, Ex. A, AHR. Plaintiff has failed to allege any specific injury, serious or otherwise, with respect to his back. Plaintiff's indication that he had trouble going to the bathroom and suffered from hemorrhoids is supported by one entry in his AHR noting that he was constipated and possibly had hemorrhoids. AHR, entry dated Oct. 24, 2005. However, these conditions, without any other evidence or allegation as to their severity, are not sufficiently serious to establish

an Eighth Amendment claim. *See, e.g., Cabassa v. Gummerson,* 2006 WL 1559215, at *9-10 (N.D.N.Y. Mar. 30, 2006) (evidence that plaintiff may have suffered from hemorrhoids, without more, did not establish a viable Eighth Amendment claim); *see also Kendall v. Kittles,* 2004 WL 1752818, at *6 (S.D.N.Y. Aug. 4, 2004) (stating hemorrhoids "are a minor health issue, far removed from the category of medical conditions that have been deemed 'sufficiently serious' by other courts.")).

With respect to Plaintiff's knee, two referral orders indicate that a MRI from August 2004 "showed possible small partial tear of [Plaintiff's] ACL [anterior cruciate ligament]," and that after a consultation with orthopedics on December 6, 2005, Plaintiff was scheduled to have arthoscopic surgery on his left knee [FN3] and possibly ACL reconstruction. Defs.' 7.1 Statement, Ex. C, Referrals, dated Nov. 28, Dec. 6, 2005, & Jan. 10, Feb. 23, 2006 & CORC Response, dated Mar. 1, 2006 (stating "CORC also notes that on 2/27/06 the greivant was referred for arthroscopic [sic] knee surgery, which is pending approval.").[FN4]

> **FN3.** We note that it is not altogether clear which knee Plaintiff asserts was not properly treated. In his Complaint, Plaintiff refers nonspecifically to his knee, while his AHR entries make references to problems in both the left and right knees. *See* AHR, entries dated Aug. 18, Nov. 7, & Nov. 14, 2005. In any event, our analysis is the same.

> **FN4.** There is no record of Plaintiff's surgery in the AHR or in any other submissions to the Court, however, Plaintiff indicated in his Opposition to the Defendants' Motion for Summary Judgment that "[i]t took [him] two or three grievances to see another doctor and have the knee surgery done." Dkt. No. 48, Pl.'s Opp. to Defs.' Mot. for Summ. J., Pl.'s Decl., at ¶¶ 10 & 18. Thus, it appears that at some point after February 23, 2006, Plaintiff underwent arthoscopic knee surgery.

However, even assuming that Plaintiff suffered from a small tear in his ACL, generally speaking, "knee injuries have been [held] insufficient to trigger Eighth Amendment

Not Reported in F.Supp.2d, 2008 WL 4104554 (N.D.N.Y.)

(Cite as: 2008 WL 4104554 (N.D.N.Y.))

protection and support a deliberate indifference claim." *Guarneri v. Bates,* 2008 WL 686809, at *7 (N.D.N.Y. Mar. 10, 2008) (internal quotation marks and citations omitted). Furthermore, in this case, Plaintiff was able to walk and apparently play basketball until he pulled a groin muscle on July 8, 2005. AHR, entries dated July 8, 2005 (noting Plaintiff pulled his groin playing basketball) & Sept. 9, 2005 (noting Plaintiff's ability to walk without any pain). In addition, Dr. Ramineni noted that there was no inflammation nor restricted movement in Plaintiff's left knee. *Id.* at entry dated Nov. 14, 2005. Thus, Plaintiff's allegation that he suffered a knee injury in and of itself does not constitute a serious medical need. *See Williamson v. Goord,* 2006 WL 1977438, at *14 & 16 (N.D.N.Y. July 11, 2006) (partially torn ACL in conjunction with other knee problems did not establish Eighth Amendment claim); *see also Moody v. Pickles,* 2006 WL 2645124, at *6-7 (N.D.N.Y. Sept. 13, 2006) (holding that a "medial meniscal tear, with joint effusion," which did not render plaintiff immobile, was not a serious medical need).

### 2. *Deliberate Indifference*

**\*6** Even assuming, *arguendo,* that Plaintiff met his burden on the first prong, he has failed to establish that Dr. Ramineni was deliberately indifferent to his medical needs. Plaintiff claims that upon being transferred from Woodbourne to Mid-State, the treatment he had been receiving for his back and left knee was arbitrarily discontinued. Plaintiff first visited with Dr. Ramineni on August 18, 2005, complaining of pain in his lower back and right knee.[FN5] AHR, at entry dated Aug. 18, 2005. Dr. Ramineni observed no inflammation nor swelling in his knee and prescribed Naprosyn, an anti-inflammatory drug. *Id.;* Defs.' Mot. for Summ. J., Subbarao Ramineni, M.D., Decl., dated Dec. 20, 2007, at ¶ 5. Plaintiff saw Dr. Ramineni on September 14, 2005, again complaining of back and knee pain and requesting a MRI, a referral to orthopedics, a TENS unit, and physical therapy. AHR, at entry dated Sept. 14, 2005. Dr. Ramineni noted Plaintiff was able to walk without any pain and showed no objective signs of swelling nor inflammation, and denied Plaintiff's requests for a MRI and TENS unit because they were "not medically indicated." *Id.* With respect to Plaintiff's request for physical therapy, Dr. Ramineni noted he had received such treatment in the past but it did not

help. *Id.;* Ramineni Decl. at ¶ 8.

> FN5. Plaintiff's AHR indicates that he was a "no show" for an appointment with Dr. Ramineni scheduled for July 21, 2005. AHR, entry dated July 21, 2005.

November 14, 2005, was the date of Plaintiff's last meeting with Dr. Ramineni. Ramineni Decl. at ¶ 10. Plaintiff complained of pain in his left knee, although Dr. Ramineni observed no inflammation nor restricted movement. AHR, at entry dated Nov. 14, 2005. Dr. Ramineni diagnosed Plaintiff with a sprained knee and prescribed Motrin. *Id.*

Considering this record, there is no indication that Dr. Ramineni displayed anything close to the criminal recklessness required under the Eighth Amendment subjective prong. In order to establish deliberate indifference, an individual must " 'know of and disregard an excessive risk to inmate health or safety.' " *Cuoco v. Moritsugu,* 222 F.3d 99, 107 (2d Cir.2000) (quoting *Chance v. Armstrong,* 143 F.3d at 702 & *Farmer v. Brennan,* 511 U.S. at 837). Although Dr. Ramineni denied Plaintiff's requests for physical therapy, a MRI, and x-ray, those denials were based on his opinion that they were not medically necessary as Plaintiff showed no objective signs of serious injury such as swelling, inflammation, nor inhibited ambulation. Furthermore, Dr. Ramineni did not disregard Plaintiff's medical needs, but rather, prescribed him Naprosyn and Motrin for the pain he complained of in his knee.

Thus, Plaintiff has failed to establish that Dr. Ramineni displayed a deliberate indifference towards his medical needs. For the reasons stated above, this claim should be **dismissed.**

### III. CONCLUSION

For the reasons stated herein, it is hereby

**RECOMMENDED,** that the Plaintiff's Complaint (Dkt. No. 1) be **dismissed** in its entirety and Defendants' Motion for Summary Judgment **granted;** and it is further

**\*7 ORDERED,** that in the event the District Judge adopts this recommendation, Plaintiff's Motion to Compel

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4104554 (N.D.N.Y.)

(Cite as: 2008 WL 4104554 (N.D.N.Y.))

(Dkt. No. 44) is **denied** as moot; and it is further

   **ORDERED,** that the Clerk of the Court serve a copy of this Report-Recommendation and Order upon the parties to this action.

   Pursuant to 28 U.S.C. § 636(b)(1), the parties have ten (10) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. *FAILURE TO OBJECT TO THIS REPORT WITHIN TEN (10) DAYS WILL PRECLUDE APPELLATE REVIEW. Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec'y of Health and Human Servs .,* 892 F.2d 15 (2d Cir.1989)); *see also* 28 U.S.C. § 636(b) (1); FED. R. CIV. P. 72, 6(a), & 6(e).

N.D.N.Y.,2008.

Lowman v. Perlman
Not Reported in F.Supp.2d, 2008 WL 4104554 (N.D.N.Y.)
END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 1555656 (N.D.N.Y.)

(Cite as: 2006 WL 1555656 (N.D.N.Y.))

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2008 WL 4416411 (N.D.N.Y.)

(Cite as: 2008 WL 4416411 (N.D.N.Y.))

**H**

Only the Westlaw citation is currently available.
United States District Court,

N.D. New York.
Samuel CABASSA, Plaintiff,
v.
Craig GUMMERSON, Corrections Captain, Auburn
Correctional Facility; Donald Selsky, Assistant Deputy
Commissioner, Director of Special
Housing/Disciplinary Program; Anthony Graceffo,
Chief Medical Officer, Auburn Correctional Facility;
Glenn S. Goord; Hans Walker; Gary Hodges; D.W.
Seitz; Terry Halcott; Christine Coyne Nancy O'Connor;
Ann Driscoll; John McClellen; John Rourke, Captain,
Security Services at Auburn Correctional Facility;
Koors, Head Pharmacist at Auburn Correctional
Facility; Robrt Mitchell, Correctional Counselor at
Auburn Correctional Facility; and Androsko, Registered
Nurse, Auburn Correctional Facility, Defendants.
No. 9:01-CV-1039.

Sept. 24, 2008.
Samuel Cabassa, Malone, NY, pro se.

Hon. Andrew M. Cuomo, Attorney General of the State of
New York, David L. Fruchter, Esq., Asst. Attorney
General, of Counsel, Albany, NY, for Defendants.

***ORDER***

DAVID N. HURD, District Judge.

*1 Plaintiff, Samuel Cabassa, brought this civil rights
action pursuant to 42 U.S.C. § 1983. In a Report
Recommendation dated June 30, 2008, the Honorable
George H. Lowe, United States Magistrate Judge,
recommended that defendants' second motion for summary
judgment (Docket No. 81) be granted in part and denied
in part. Objections to the Report Recommendation have
been filed by the parties.

Based upon a de novo review of the portions of the
Report-Recommendation to which the parties have

objected, the Report-Recommendation is accepted and
adopted. *See* 28 U.S.C. 636(b)(1).

Accordingly, it is

ORDERED that

1. Defendants' motion to dismiss is GRANTED in
part and DENIED in part as follows:

A. Plaintiffs Fourth Cause of Action is DISMISSED in
its entirety;

B. Plaintiffs Fifth Cause of Action is DISMISSED to
the extent that it asserts:

(a) Any Fourteenth Amendment procedural due process
claim whatsoever;

(b) A First Amendment access to courts claim against
defendant Hans Walker;

(c) A First Amendment retaliation claim against
defendant Hans Walker;

2. Defendants' second motion for summary judgment
is otherwise DENIED, so that, surviving that motion is:

(a) Plaintiffs First Amendment access-to-courts claim
against defendants D.W. Seitz and Craig Gummerson
asserted in the Fourth Amended Complaint's Fifth Cause
of Action; and

(b) Plaintiffs First Amendment retaliation claim against
defendants D.W. Seitz and Craig Gummerson also
asserted in the Fifth Cause of Action.

IT IS SO ORDERED.

SAMUEL CABASSA,

Plaintiff,

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4416411 (N.D.N.Y.)

(Cite as: 2008 WL 4416411 (N.D.N.Y.))

v.

HANS WALKER, Superintendent, Auburn C.F.; D.W. SEITZ, Correctional Officer, Auburn C.F.; CRAIG GUMMERSON, Captain, Auburn C.F.,

Defendants.

### *REPORT-RECOMMENDATION*

GEORGE H. LOWE, United States Magistrate Judge.

This *pro se* prisoner civil rights action, commenced pursuant to 42 U.S.C. § 1983, has been referred to me for Report and Recommendation by the Honorable David N. Hurd, United States District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(c). Generally, in his Fourth Amended Complaint, Samuel Cabassa ("Plaintiff") alleges that fifteen employees of the New York State Department of Correctional Services ("DOCS") violated his rights under the First, Eighth and Fourteenth Amendments between January of 1998 and August of 1998 by confining him to the Auburn Correctional Facility ("Auburn C.F.") Special Housing Unit ("S.H.U.") without cause or explanation, and by being deliberately indifferent to his serious medical needs, which included severe dehydration during his hunger strike, a painful eye condition, a painful hemorrhoid condition and a deteriorating mental health condition. (*See generally* Dkt. No. 16 [Plf.'s Fourth Am. Compl.].)

On January 28, 2005, Defendants filed their *first* motion for summary judgment. (Dkt. No. 58.) By Order filed June 1, 2006, Judge Hurd granted in part, and denied in part, that motion, dismissing all of Plaintiff's claims except two groups of claims: (1) his Fourteenth Amendment claims against Auburn C.F. Superintendent Hans Walker and Correctional Officer D.W. Seitz (asserted in his Fourth Cause of Action); and (2) his First and Fourteenth Amendment claims against Walker, Seitz and Auburn C.F. Captain Craig Gummerson (asserted in his Fifth Cause of Action). (Dkt. No. 68.)

**\*2** Currently before the Court is Defendants' *second* motion for summary judgment. (Dkt. No. 81.) FN1 For the reasons that follow, I recommend that Defendants' motion be granted in part and denied in part.

FN1. By Order filed March 30, 2006, I granted Defendants leave to file a second motion for summary judgment. (Dkt. No. 62.)

### I. APPLICABLE LEGAL STANDARD

Under Fed.R.Civ.P. 56, summary judgment is warranted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In determining whether a genuine issue of material FN2 fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the moving party. FN3

FN2. A fact is "material" only if it would have some effect on the outcome of the suit. *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986).

FN3. *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir.1997) [citation omitted]; *Thompson v. Gjivoje*, 896 F.2d 716, 720 (2d Cir.1990) [citation omitted].

However, when the moving party has met its initial burden of establishing the absence of any genuine issue of material fact, the nonmoving party must come forward with "specific facts showing that there is a genuine issue for trial." FN4 The nonmoving party must do more than "rest upon the mere allegations ... of the [plaintiff's] pleading" or "simply show that there is some metaphysical doubt as to the material facts." FN5 Rather, "[a] dispute regarding a material fact is *genuine* if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." FN6

FN4. Fed.R.Civ.P. 56(e) ("When a motion for summary judgment is made [by a defendant] and supported as provided in this rule, the [plaintiff] may not rest upon the mere allegations ... of the [plaintiff's] pleading, but the [plaintiff's] response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the [plaintiff] does not so respond, summary judgment, if appropriate, shall be entered against the [plaintiff].");  *see also Matsushita Elec.*

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4416411 (N.D.N.Y.)

(Cite as: 2008 WL 4416411 (N.D.N.Y.))

*Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 585-87 (1986).

FN5. Fed.R.Civ.P. 56(e) ("When a motion for summary judgment is made [by a defendant] and supported as provided in this rule, the [plaintiff] may not rest upon the mere allegations ... of the [plaintiff's] pleading ...."); *Matsushita,* 475 U.S. at 585-86; *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48 (1986).

FN6. *Ross v. McGinnis,* 00-CV-0275, 2004 WL 1125177, at *8 (W.D.N . Y. Mar. 29, 2004) [internal quotations omitted; emphasis added].

Where a non-movant fails to adequately oppose a properly supported factual assertion made in a motion for summary judgment, a district court has no duty to perform an independent review of the record to find proof of a factual dispute, even if that non-movant is proceeding *pro se.*[FN7] In the event the district court chooses to conduct such an independent review of the record, any verified complaint filed by the plaintiff should be treated as an affidavit.[FN8] (Here, I note that Plaintiffs' Fourth Amended Complaint contains a verification pursuant to 28 U.S.C. § 1746.)[FN9] In any event, to be sufficient to create a factual issue for purposes of a summary judgment motion, an affidavit must, among other things, not be conclusory.[FN10] An affidavit is conclusory if, for example, its assertions lack any supporting evidence or are too general.[FN11] Finally, even where an affidavit (or verified complaint) is nonconclusory, it may be insufficient to create a factual issue where it is (1) "largely unsubstantiated by any other direct evidence" and (2) "so replete with inconsistencies and improbabilities that no reasonable juror would undertake the suspension of disbelief necessary to credit the allegations made in the complaint."[FN12]

FN7. *See Amnesty Am. v. Town of W. Hartford,* 288 F.3d 467, 470 (2d Cir.2002) ("We agree with those circuits that have held that Fed.R.Civ.P. 56 does not impose an obligation on a district court to perform an independent review of the record to find proof of a factual dispute.") [citations omitted]; *accord, Lee v. Alfonso,* No. 04-1921, 2004 U.S.App. LEXIS

21432 (2d Cir. Oct. 14, 2004), *aff'g,* 97-CV-1741, 2004 U.S. Dist. LEXIS 20746, at *12-13 (N.D.N .Y. Feb. 10, 2004) (Scullin, J.) (granting motion for summary judgment); *Fox v. Amtrak,* 04-CV-1144, 2006 U.S. Dist. LEXIS 9147, at *1-4 (N.D.N.Y. Feb. 16, 2006) (McAvoy, J.) (granting motion for summary judgment); *Govan v. Campbell,* 289 F.Supp.2d 289, 295 (N.D.N.Y. Oct. 29, 2003) (Sharpe, M.J.) (granting motion for summary judgment); *Prestopnik v. Whelan,* 253 F.Supp.2d 369, 371-372 (N.D.N.Y.2003) (Hurd, J.).

FN8. *See Patterson v. County of Oneida,* 375 F.3d 206, 219 (2d. Cir.2004) ("[A] verified pleading ... has the effect of an affidavit and may be relied upon to oppose summary judgment."); *Fitzgerald v. Henderson,* 251 F.3d 345, 361 (2d Cir.2001) (holding that plaintiff "was entitled to rely on [his verified amended complaint] in opposing summary judgment"), *cert. denied,* 536 U.S. 922 (2002); *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1993) ("A verified complaint is to be treated as an affidavit for summary judgment purposes.") [citations omitted].

FN9. (Dkt. No. 16, at 23 [Plf.'s Fourth Am. Compl.].)

FN10. *See* Fed.R.Civ.P. 56(e) (requiring that non-movant "set forth specific facts showing that there is a genuine issue for trial"); *Patterson,* 375 F.3d at 219 (2d. Cir.2004) ("Nor is a genuine issue created merely by the presentation of assertions [in an affidavit] that are conclusory.") [citations omitted]; *Applegate v. Top Assoc.,* 425 F.2d 92, 97 (2d Cir.1970) (stating that the purpose of Rule 56[e] is to "prevent the exchange of affidavits on a motion for summary judgment from degenerating into mere elaboration of conclusory pleadings").

FN11. *See, e.g., Bickerstaff v. Vassar Oil,* 196 F.3d 435, 452 (2d Cir.1998) (McAvoy, C.J., sitting by designation) ("Statements [for example, those made in affidavits, deposition

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4416411 (N.D.N.Y.)

(Cite as: 2008 WL 4416411 (N.D.N.Y.))

testimony or trial testimony] that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment.") [citations omitted]; *West-Fair Elec. Contractors v. Aetna Cas. & Sur.,* 78 F.3d 61, 63 (2d Cir.1996) (rejecting affidavit's conclusory statements that, in essence, asserted merely that there was a dispute between the parties over the amount owed to the plaintiff under a contract); *Meiri v. Dacon,* 759 F.2d 989, 997 (2d Cir.1985) (plaintiff's allegation that she "heard disparaging remarks about Jews, but, of course, don't ask me to pinpoint people, times or places.... It's all around us" was conclusory and thus insufficient to satisfy the requirements of Rule 56[e] ), *cert. denied,* 474 U.S. 829 (1985); *Applegate,* 425 F.2d at 97 ("[Plaintiff] has provided the court [through his affidavit] with the characters and plot line for a novel of intrigue rather than the concrete particulars which would entitle him to a trial.").

FN12. *See, e.g., Jeffreys v. City of New York,* 426 F.3d 549, 554-55 (2d Cir.2005) (affirming grant of summary judgment to defendants in part because plaintiff's testimony about an alleged assault by police officers was "largely unsubstantiated by any other direct evidence" and was "so replete with inconsistencies and improbabilities that no reasonable juror would undertake the suspension of disbelief necessary to credit the allegations made in the complaint") [citations and internal quotations omitted]; *Argus, Inc. v. Eastman Kodak Co.,* 801 F.2d 38, 45 (2d Cir.1986) (affirming grant of summary judgment to defendants in part because plaintiffs' deposition testimony regarding an alleged defect in a camera product line was, although specific, "unsupported by documentary or other concrete evidence" and thus "simply not enough to create a genuine issue of fact in light of the evidence to the contrary"); *Allah v. Greiner,* 03-CV-3789, 2006 WL 357824, at *3-4 & n. 7, 14, 16, 21 (S.D.N.Y. Feb. 15, 2006) (prisoner's verified complaint, which recounted specific statements

by defendants that they were violating his rights, was conclusory and discredited by the evidence, and therefore insufficient to create issue of fact with regard to all but one of prisoner's claims, although verified complaint was sufficient to create issue of fact with regard to prisoner's claim of retaliation against one defendant because retaliatory act occurred on same day as plaintiff's grievance against that defendant, whose testimony was internally inconsistent and in conflict with other evidence); *Olle v. Columbia Univ.,* 332 F.Supp.2d 599, 612 (S.D.N.Y.2004) (plaintiff's deposition testimony was insufficient evidence to oppose defendants' motion for summary judgment where that testimony recounted specific allegedly sexist remarks that "were either unsupported by admissible evidence or benign"), *aff'd,* 136 F. App'x 383 (2d Cir.2005) (unreported decision, cited as non precedential authority but merely to show the case's subsequent history, in accordance with Second Circuit Local Rule § 0.23).

It bears noting that Plaintiff is an experienced litigant. For example, before he filed his original Complaint in this action on June 25, 2001, he had litigated at least a half dozen civil actions in state or federal courts, challenging the conditions of his confinement.[FN13] In one of those actions, he was awarded $1,000 following a jury trial.[FN14] (He has also litigated numerous civil actions in state or federal courts since the filing of this action.) However, after carefully reviewing Plaintiff's litigation experience, I have concluded that his experience is not so extensive as to warrant a recommendation that the Court revoke the special solicitude normally afforded *pro se* litigants due to their inexperience.[FN15]

FN13. *See, e.g., Cabassa v. Kuhlmann,* 569 N.Y.S.2d 824 (N.Y.S.App.Div., 3d Dept., 1991) (Article 78 proceeding to review prison disciplinary conviction), *leave to appeal denied,* 78 N.Y.2d 858 (N.Y.1991); *Cabassa v. Coughlin,* 92-CV-6199 (W.D.N.Y. filed May 11, 1992) (personal injury action against prison officials); *Cabassa v. Wende Corr. Fac.,* Index No. 001846/1995 (N.Y.S. Sup.Ct., Erie County,

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4416411 (N.D.N.Y.)

(Cite as: 2008 WL 4416411 (N.D.N.Y.))

filed March 14, 1995) (Article 78 proceeding to review prison disciplinary conviction); *Cabassa v. Rufat,* 96-CV-6280 (W.D.N.Y. filed June 20, 1996) (prisoner civil rights action); *Cabassa v. Goord,* 720 N.Y.2d 76 (N.Y.S.App.Div., 4th Dept., Feb. 7, 2001) (Article 78 proceeding to review prison disciplinary conviction), *leave to appeal denied,* 96 N.Y.2d 713 (N.Y., June 5, 2001).

FN14. *See Cabassa v. Rufat,* 96-CV-6280, Judgment (W.D.N.Y. filed Sept. 9, 1999) (judgment for Plaintiff in amount of $1.00 in compensatory damages, and $1,000 in punitive damages, following jury trial in prisoner civil rights action).

FN15. "There are circumstances where an overly litigious inmate, who is quite familiar with the legal system and with pleading requirements, may not be afforded [the] special [liberality or] solicitude" that is normally afforded *pro se* litigants." *Koehl v. Greene,* 06-CV-0478, 2007 WL 2846905, at *3 & n. 17 (N.D.N.Y. Sept. 26, 2007) (Kahn, J., adopting Report-Recommendation) [citations omitted], *accord, Johnson v. Eggersdorf,* 8 F. App'x 140, 143 (2d Cir.2001) (unpublished opinion), *aff'g,* 97-CV-0938, Decision and Order (N.D.N.Y. filed May 28, 1999) (Kahn, J.), *adopting,* Report-Recommendation, at 1, n. 1 (N.D.N.Y. filed Apr. 28, 1999) (Smith, M.J.); *Johnson v. C. Gummerson,* 201 F.3d 431, at *2 (2d Cir.1999) (unpublished opinion), *aff'g,* 97-CV-1727, Decision and Order (N.D.N.Y. filed June 11, 1999) (McAvoy, J.), *adopting,* Report-Recommendation (N.D.N.Y. filed April 28, 1999) (Smith, M.J.); *Davidson v. Flynn,* 32 F.3d 27, 31 (2d Cir.1994); *see also Raitport v. Chem. Bank,* 74 F.R.D. 128, 133 (S.D.N.Y.1977)[citing *Ackert v. Bryan,* No. 27240 (2d Cir. June 21, 1963) (Kaufman, J., concurring).

## II. ANALYSIS

### A. Plaintiff's Fourth Cause of Action

**\*3** Construed with the *extra* degree of leniency with which *pro se* civil rights claims are generally afforded,[FN16] Plaintiff's Fourth Cause of Action alleges as follows: between **January 12, 1998,** and **June 22, 1998,** while Plaintiff was incarcerated at Auburn C.F., **Defendant Hans Walker** (the superintendent of Auburn C.F.) and **Defendant D.W. Seitz** (a lieutenant at Auburn C.F.) violated Plaintiff's rights under the Due Process Clause of the **Fourteenth Amendment** in the following three (related) ways: (1) they "fail[ed] to provide [a] meaningful review of his [original assignment to Administrative Segregation]," which occurred on January 12, 1998; (2) they "never re-visit[ed] the propriety [of] or [made] any meaningful determination as to the legitimacy of[,] the need for his continued confinement [in Administration Segregation]," even though "no new evidence was used to justify his ongoing confinement"; and (3) they intentionally "retain[ed] him in [Administrative Segregation]" for 161 days (i.e., from January 12, 1998, to June 22, 1998) "by perfunctor[ily] rubber-stamping ... [Administrative Segregation] review forms. (Dkt. No. 16, ¶¶ 3[c], 3[h], 6[18], 7 & "Fourth Cause of Action" [Plf.'s Fourth Am. Compl.].)

FN16. Of course, a liberal construction must be afforded to *all* pleadings (whether brought by *pro se* litigants or not), under Fed.R.Civ.P. 8. *See* Fed.R.Civ.P. 8(f) ("All pleadings shall be so construed as to do substantial justice."). However, an *extra* liberal construction must be afforded to the pleadings of *pro se* plaintiffs (especially those asserting civil rights claims). *See Cruz v. Gomez,* 202 F.3d 593, 597 (2d Cir.2000) ("[C]ourts must construe *pro se* pleadings broadly, and interpret them to raise the strongest arguments that they suggest.") [internal quotation marks and citation omitted]; *Estelle v. Gamble,* 429 U.S. 97, 106 (1976).

Defendants argue that Plaintiff's Fourth Cause of Action should be dismissed because the vast majority (if not the entirety) of that claim is based on events that occurred *before* June 20, 1998, and thus are outside the three-year limitations period governing Plaintiff's claims (which were deemed filed, along with his original

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4416411 (N.D.N.Y.)

(Cite as: 2008 WL 4416411 (N.D.N.Y.))

Complaint, on June 20, 2001). (Dkt. No. 81, Part 5, at 5 [Defs.' Memo. of Law].) Defendants argue further that, even if Plaintiff's Fourth Cause of Action were not barred by the applicable statute of limitations, that cause of action would fail as a matter of law because Plaintiff's confinement at Auburn C.F. between January 12, 1998, and June 22, 1998 (which consisted of a total of 60 days' confinement in the S.H.U. and 101 days' confinement in Auburn C.F. Infirmary because of his "hunger strike") did not present the type of "atypical, significant hardship" that is required to create a protected liberty interest for purposes of a procedural due process claim under the Fourteenth Amendment. (*Id.* at 4-8.)

Plaintiff responds to Defendants' position regarding his Fourth Cause of Action with two arguments. First, Plaintiff argues that the statute of limitations does not bar his claim to the extent the claim is based on events occurring before June 20, 1998, because those events were part of a "continuing violation," and thus his claim is exempt from the applicable statute of limitations. (Dkt. No. 85, Part 3, at 6-8.) Second, Plaintiff argues that his confinement at Auburn C.F. between January 12, 1998, and June 22, 1998, did indeed present the type of "atypical, significant hardship" that is required to create a protected liberty interest for purposes of a due process claim under the Fourteenth Amendment because (1) even when Plaintiff was in the Auburn C.F. Infirmary, he was in a part reserved for prisoners confined to S.H.U., and (2) the conditions of confinement (in S.H.U. and the Infirmary) were so harsh that they were atypical of those normally experienced in either the general populations of, or infirmaries in, correctional facilities in New York State. (*Id.* at 8-10; *see also* Dkt. No. 85, Part 2, ¶ 9 [Plf.'s Rule 7.1 Response].)

**\*4** Defendants reply to Plaintiff's response regarding his Fourth Cause of Action with two arguments. First, Defendants argue that Plaintiff cannot avail himself of the continuing-violation doctrine because (1) the acts that occurred outside of the statutory period were not sufficiently connected to the acts that occurred within the statutory period, and (2) Plaintiff has not shown the sort of compelling circumstances necessary to permit the application of the continuing-violation doctrine in the Second Circuit. (Dkt. No. 88, Part 1, at 1-2.) Second,

Defendants argue that whether or not Plaintiff's residence in the Auburn C.F. Infirmary was particularly restrictive is of no consequence since (1) it is to be expected that inmates housed in prison hospital will not be able to move around, or engage in activities, as much as inmates housed in the general population, and (2) Plaintiff was placed in the Infirmary due to the "hunger strike" that he chose to undertake. (*Id.* at 4-5.)

**1. Continuing Violation Doctrine**

For the sake of argument (and because Defendants do not argue that the continuing-violation doctrine does *not* apply to actions filed pursuant to 42 U.S.C. § 1983),[FN17] I will assume, for purposes of this Report-Recommendation, that the continuing-violation doctrine *does* apply to actions filed pursuant to 42 U.S.C. § 1983.[FN18] The first issue presented by the parties' arguments with regard to the continuing-violation doctrine is whether the relevant acts of Defendants Walker and Seitz that occurred outside of the relevant statutory period (i.e., between January 12, 1998, and June 19, 1998) were *sufficiently connected* to the relevant acts of those individuals that occurred within the statutory period (i.e., between June 20, 1998, and June 22, 1998). The second issue presented by the parties' arguments is whether Plaintiff has shown *compelling circumstances* to warrant the application of the continuing-violation doctrine.[FN19]

> FN17. (*See* Dkt. No. 81, Part 5, at 5-8 [Defs.' Memo. of Law, not arguing that the continuing-violation doctrine does *not* apply to actions filed pursuant to 42 U.S.C. § 1983], *accord,* Dkt. No. 88, Part 1, at 1-5 [Defs.' Reply Memo. of Law], Dkt. No. 66, Part 1 [Defs.' Objections to Judge Lowe's Report-Recommendation Regarding Defs.' *First* Motion for Summary Judgment].)

> FN18. *Compare Pino v. Ryan,* 49 F.3d 51, 54 (2d Cir.1995) (finding inmate's deliberate indifference claims under Section 1983 to be time-barred where inmate had "alleged no facts indicating a continuous or ongoing violation of his constitutional rights"), *aff'g, Pino v. Ryan,* 94-CV-0221, Order of Dismissal (N.D.N.Y. March 30, 2004) (Scullin, J.), *with McFarlan v. Coughlin,* 97-CV-0740, 1998 U.S. Dist. LEXIS

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4416411 (N.D.N.Y.)

(Cite as: 2008 WL 4416411 (N.D.N.Y.))

5541, at *11 (N.D.N.Y. March 13, 1998) (Homer, M.J.) ("The applicability of the continuing-violation doctrine to Section 1983 cases is uncertain.") [collecting cases], *adopted by* 1998 U.S. Dist. LEXIS 5518, at *3 (N.D.N.Y. Apr. 15, 1998) (Pooler, J.) (agreeing with magistrate judge's "carefully-reasoned decision" regarding, inter alia, the application of the continuing violation doctrine).

FN19. The requirement that *compelling circumstances* be shown to warrant the application of the continuing-violation doctrine appears to be a different issue than whether the acts that occurred outside of the relevant statutory period were *sufficiently connected* to the acts that occurred within the statutory period. *See Young v. Strack,* 05-CV-9764, 2007 WL 1575256, at *4 (S.D.N.Y. May 29, 2007) (treating the requirement that *compelling circumstances* exist as something distinct from the requirement that a sufficient connection exist between the acts in question), *accord, McFadden v. Kralik,* 04-CV-8135, 2007 WL 924464, at *6-7 (S.D.N.Y. March 28, 2007); *see also Blesdell v. Mobil Oil Co.,* 708 F.Supp. 1408, 1415 (S.D.N.Y.1989) (stating that compelling circumstances are needed to warrant the application of the continuing-violation doctrine, and that a sufficient connection between the acts in question is necessary to warrant the application of the continuing-violation doctrine, but not stating that compelling circumstances and sufficient connection are the same thing).

According to the undisputed record evidence, the relevant acts of Defendants Walker and Seitz were as follows:

1. On January 12, 1998, Defendant Seitz signed a written recommendation that Plaintiff be placed in administrative segregation. (*Compare* Dkt. No. 81, Part 2, ¶ 1 [Defs.' Rule 7 .1 Statement, asserting fact in question] *with* Dkt. No. 85, Part 2, ¶ 1 [Plf.'s Rule 7.1 Response, admitting fact in question].) That recommendation was based on information provided by three confidential

informants (each an inmate) that Plaintiff had threatened them. (*See* Dkt. No. 85, Part 4, at 15, 17 [Exs. A and B to Plf.'s Decl.].)

2. On January 14 and 15, 1998, Defendant Seitz testified at Plaintiff's administrative segregation hearing. (*See* Dkt. No. 81, Part 4, at 4-5 [Ex. B to Fruchter Decl., attaching Hearing Record Sheet].) At the conclusion of the hearing on January 15, 1998, the hearing officer (Captain Gummerson) found that Plaintiff should be placed in administrative segregation to preserve the safety and security of inmates at Auburn C.F. (including the three inmates in question). (*Compare* Dkt. No. 81, Part 2, ¶ 3 [Defs .' Rule 7.1 Statement, asserting fact in question] *with* Dkt. No. 85, Part 2, ¶ 3 [Plf.'s Rule 7.1 Response, admitting fact in question]; *see also* Dkt. No. 85, Part 4, at 16-17 [Ex. B to Plf.'s Decl.].)

**\*5** 3. On or about January 30, 1998, Defendant Walker approved a review of Plaintiff's administrative segregation status that had been conducted by a three-member Periodic Review Committee (consisting of a representative of the facility executive staff, a security supervisor, and a member of the guidance and counseling staff), pursuant to DOCS Directive 4933. (*See* Dkt. No. 85, Part 4, at 23 [Ex. E to Plf.'s Decl.].) FN20 Defendant Walker approved similar reviews on or about the following five dates: February 6, 1998; February 13, 1998; February 20, 1998; February 27, 1998; and March 6, 1998. (*See* Dkt. No. 85, Part 4, at 24-28 [Ex. E to Plf.'s Decl.].)

FN20. Specifically, DOCS Directive 4933 required that Plaintiff's administrative segregation status be reviewed every seven (7) days for the first two months of his administrative segregation, and every thirty (30) days thereafter, by a three-member committee (consisting of a representative of the facility executive staff, a security supervisor, and a member of the guidance and counseling staff), and then (after he receives the committee's review results) by the superintendent. (*See* Dkt. No. 85, Part 4, at 21-22 [Ex. D to Plf.'s Decl., attaching version of Directive 4933 dated 12/30/98].)

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4416411 (N.D.N.Y.)

(Cite as: 2008 WL 4416411 (N.D.N.Y.))

4. Plaintiff's fellow prisoner, Thomas O'Sullivan, swears that, in "late February or early March [of] 1998," Corrections Counselor Robert Mitchell stated to Mr. O'Sullivan that, although he (Robert Mitchell) was a member of the three-member Periodic Review Committee at Auburn C.F., he had "no say in the matter [of assisting prisoners to be released from segregation], since "security makes all of the decisions. They just send me papers periodically to sign. There is no actual committee that meets." (*See* Dkt. No. 85, Part 4, at 30 [Ex. F to Plf.'s Decl.].) FN21

FN21. Defendants argue that Inmate O'Sullivan's affidavit should not be considered by the Court on their second motion for summary judgment (1) because the evidence is inadmissible hearsay and (2) the events described in the affidavit are beyond the applicable limitations period. (Dkt. No. 88, Part 1, at 3-4 [Defs.' Reply Memo. of Law].) I do not understand, or agree with, Defendants' second reason. In any event, I will assume, for purposes of this Report-Recommendation, that Inmate O'Sullivan's affidavit is admissible because I do not believe it to alter the outcome of this Report-Recommendation.

5. On or about March 28, 1998, Plaintiff filed an Article 78 petition in New York State Supreme Court, Cayuga County, challenging the January 15, 1998, Tier III disciplinary determination that placed him in administrative segregation. (*Compare* Dkt. No. 81, Part 2, ¶ 5 [Defs.' Rule 7.1 Statement, asserting fact in question] *with* Dkt. No. 85, Part 2, ¶ 5 [Plf.'s Rule 7.1 Response, admitting fact in question]; *see also* Dkt. No. 81, Part 4, at 9 [Ex. D to Fruchter Affid., attaching final decision in the action, which states that Plaintiff's petition was verified on March 28, 1998], *accord,* Dkt. No. 85, Part 4, at 35 [Ex. H to Plf.'s Decl.].)

6. On May 26, 1998, Acting Supreme Court Justice Peter E. Corning (of the New York State Supreme Court, Cayuga County) issued a decision ordering that "the [aforementioned] Tier III disciplinary determination be annulled, the petitioner be restored to the status he held

prior to this determination, and that all references [to] this determination be expunged from his institutional record." (*See* Dkt. No. 81, Part 2, ¶ 6 [Defs.' Rule 7.1 Statement, essentially asserting fact in question]; Dkt. No. 85, Part 2, ¶ 6 [Plf.'s Rule 7.1 Response, admitting fact asserted by Defendants]; Dkt. No. 85, Part 4, ¶ 14 [Plf.'s Decl., asserting fact in question]; Dkt. No. 85, Part 4, at 37 [Ex. H to Plf.'s Decl., attaching decision in question].)

7. While it is unclear from the record, it appears that no correctional officials at Auburn C.F. became aware that Plaintiff had won his Article 78 proceeding until the morning of June 19, 2001. (Dkt. No. 85, Part 4, ¶ 15 [Plf.'s Decl., swearing that "[o]n June 19, 1998, early in the morning C.O. Exner (SHU Staff) informed plaintiff that the 'A' Officer *had just received a call* that the plaintiff won his Article 78 [proceeding] ...."] [emphasis added]; *see also* Dkt. No. 85, Part 4, at 33 [Ex. H to Plf.'s Decl., attaching "Notice of Entry of Order," dated June 18, 1998, from Assistant Attorney General Louis J. Tripoli to Plaintiff]; *cf .* Dkt. No. 85, Part 4, at 39, 43 [Ex. I to Plf.'s Decl., attaching letters dated June 22, 1998, from Plaintiff to Judge Corning and Assistant Attorney General Louis J. Tripoli, stating that *Plaintiff* was first told of decision on morning of June 19, 1998].)

*6 8. On the evening of June 20, 1998, at approximately 7:40 p.m., Plaintiff asked Defendant Seitz when Plaintiff was going to be returned from S.H.U. to the prison's general population (pursuant to the May 26, 1998, decision of Acting Supreme Court Justice Peter E. Corning); and Defendant Seitz responded that Plaintiff was not going back into the general population because "Auburn's Administration runs the prison, not the Judge." (*See* Dkt. No. 85, Part 4, ¶ 17 [Plf.'s Decl.]; Dkt. No. 85, Part 4, at 40-41 [Ex. I to Plf.'s Decl., stating approximate time of conversation]; Dkt. No. 16, ¶ 6 [15] [Plf.'s Verified Fourth Am. Compl.].)

9. On the afternoon of June 22, 1998, Plaintiff was released from S.H.U. and returned to the facility's general population. (*Compare* Dkt. No. 81, Part 2, ¶ 7 [Defs.' Rule 7.1 Statement, asserting fact in question] *with* Dkt. No. 85, Part 2, ¶ 7 [Plf .'s Rule 7.1 Response, admitting fact in question]; *see also* Dkt. No. 85, Part 4, ¶ 21 [Plf.'s Decl.]; Dkt. No. 16, ¶ 6[17] [Plf.'s Verified Fourth Am. Compl.].)

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4416411 (N.D.N.Y.)

(Cite as: 2008 WL 4416411 (N.D.N.Y.))

Liberally construed, Plaintiff's argument in support of the application of the continuing-violation doctrine is that Defendant Seitz's malicious statement on June 20, 1998 (regarding which Plaintiff filed a timely claim in this action), was yet another manifestation of a conspiracy between Defendants Seitz and Walker (and others) to wrongfully confine Plaintiff in the Auburn C.F. S.H.U., which stretched back to Defendant Walker's "rubber-stamping" of the results of the Periodic Review Committee's review of Plaintiff's administrative segregation status (on January 30, 1998, February 6, 1998, February 13, 1998, February 20, 1998, February 27, 1998, and March 6, 1998), and even to Defendant Seitz's issuance of the written recommendation that Plaintiff be placed in administrative segregation on January 12, 1998. (Dkt. No. 85, Part 3, at 6-8, 12 [Plf.'s Memo. of Law]; Dkt. No. 85, Part 4, ¶¶ 5-21 [Plf.'s Decl.].) <sup>FN22</sup>

FN22. I note that Plaintiff does not allege or assert, nor does any record evidence suggest, that Defendant Walker played any role during Plaintiff's appeal from the hearing decision in question (issued by Captain Craig Gummerson); rather, Plaintiff took that appeal directly to the Director of the Special Housing/Inmate Disciplinary Program at DOCS, Donald Selsky. (*See* Dkt. No. 16, ¶¶ 6[5]-6[6] [Plf.'s Verified Fourth Am. Compl.]; Dkt. No. 85, Part 4, ¶ 6, 13 [Plf.'s Decl.]; Dkt. No. 85, Part 4, at 17, 32 [Exs. B and G to Plf.'s Decl.].)

For the sake of argument, I will set aside the fact that I have found no reason to believe that any of the pre-June 20, 1998, actions of Defendants Seitz and Walker, described above, violated any provision of the Constitution. A prisoner enjoys no constitutional right against being issued an administrative segregation recommendation that turns out to be false.<sup>FN23</sup> Moreover, even if Defendant Seitz did somehow violate DOCS Directive 4933 when he approved the results of the Periodic Review Committee's review of Plaintiff's administrative segregation status, a violation of a DOCS Directive is not a violation of the Constitution, or of 42 U.S.C. § 1983.<sup>FN24</sup> The reason that I set these facts aside is that I can find no record evidence that there was any

connection whatsoever between the pre-June 20, 1998, actions of Defendants Seitz and Walker, described above, and Defendant Seitz's malicious statement on June 20, 1998.

FN23. *See Ciaprazi v. Goord,* 02-CV-0915, 2005 WL 3531464, at *13 (N.D.N.Y. Dec. 22, 2005) (Sharpe, J.; Peebles, M.J.) ("It is well established that in the absence of other aggravating factors, an inmate enjoys no constitutional right against the issuance of a false misbehavior report.") [citations omitted]; *Hodges v. Jones,* 873 F.Supp. 737, 743-44 (N.D.N.Y.1995) (Chin, J., sitting by designation) ("A prison inmate does not have a constitutionally guaranteed immunity from being falsely or wrongly accused of conduct which may result in deprivation of a protected liberty interest.") [internal quotation marks and citation omitted].

FN24. A violation of a state law or regulation, in and of itself, does not give rise to liability under 42 U.S.C. § 1983. *See Doe v. Conn. Dept. of Child & Youth Servs.,* 911 F.2d 868, 869 (2d Cir.1990) ("[A] violation of state law neither gives [plaintiff] a § 1983 claim nor deprives defendants of the defense of qualified immunity to a proper § 1983 claim.") [internal quotation marks and citation omitted]. Furthermore, the violation of a DOCS Directive, alone, is not even a violation of New York State law or regulation (much less a violation of 42 U.S.C. § 1983). *See Rivera v. Wohlrab,* 232 F.Supp.2d 117, 123 (S.D.N.Y.2002) [citation omitted]; *Lopez v. Reynolds,* 998 F.Supp. 252, 259 (W.D.N.Y.1997). This is because a DOCS Directive is "merely a system the [DOCS] Commissioner has established to assist him in exercising his discretion," which he retains, despite any violation of that Directive. *See Farinaro v. Coughlin,* 642 F.Supp. 276, 280 (S.D.N.Y.1986).

For example, there is no record evidence that Defendant Seitz issued his written recommendation of

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4416411 (N.D.N.Y.)

(Cite as: 2008 WL 4416411 (N.D.N.Y.))

January 12, 1998, maliciously, that is, *knowing* it to be based on information that was false. Judge Corning's decision of May 26, 1998, certainly did not so find. Rather, Judge Corning merely found error in the decision of the officer presiding over Plaintiff's administrative segregation hearing (Captain Gummerson) not to make an independent inquiry into the reliability or credibility of the confidential information provided by three of Plaintiff's fellow inmates, which formed the basis of the recommendation that Plaintiff be placed in administrative segregation. (*See* Dkt. No. 85, Part 4, at 36-37 [Ex. H to Plf.'s Decl.].)[FN25]

> FN25. Judge Corning expressly rejected Plaintiff's allegation that the hearing officer was not fair and impartial, and had committed other procedural errors. (*See* Dkt. No. 85, Part 4, at 36-37 [Ex. H to Plf.'s Decl.].)

**\*7** Similarly, there is no record evidence that Defendant Seitz gave *false* testimony at Plaintiff's administrative segregation hearing on January 14 and 15, 1998, for example, by falsely stating that he had knowledge of the credibility of the three confidential informants at issue. To the contrary, Judge Corning found that Defendant Seitz acknowledged at the hearing that he had based his recommendation solely on their reports. (*Id.*)[FN26]

> FN26. It bears noting that Plaintiff's success in his Article 78 proceeding against Defendant Walker carries no preclusive effect with regard to his prisoner civil rights claims against Defendant Seitz (or Defendant Walker) in this action. Setting aside the issue of whether Judge Corning had the power to award the full measure of monetary damages sought by Plaintiff in this action, there is the fact that Defendant Seitz was not a party to Plaintiff's Article 78 proceeding, and Defendant Walker was sued only in his official capacity. *See Zavaro v. Coughlin,* 775 F.Supp. 84, 87-88 (W.D.N .Y.1991) (judgment entered in Article 78 proceeding brought by prison inmate for relief from discipline unconstitutionally imposed in reliance on uncorroborated testimony of confidential

informers could not be given preclusive effect in inmate's civil rights actions against disciplinary hearing officer and DOCS Commissioner, where hearing officer was not even named as party in Article 78 proceeding, and Commissioner was sued in Article 78 proceeding only in his official capacity and thus had no opportunity to raise defenses available to him in civil rights action, including lack of personal involvement), *aff'd,* 970 F.2d 1148 (2d Cir.1992).

Furthermore, there is no record evidence that Defendant Seitz was a member of the aforementioned three-member Periodic Review Committee that (allegedly) shirked its duty, under DOCS Directive 4933, to adequately review Plaintiff's administrative segregation status. (*See* Dkt. No. 85, Part 4, at 23-38 [Ex. E to Plf.'s Decl., not indicating the signature of Def. Seitz on any of the relevant forms]; Dkt. No. 16, ¶ 6[18] [Plf.'s Verified Fourth Am. Compl., asserting that the Periodic Review Committee was made up of individuals other than Def. Seitz].) Nor is there even an allegation that Defendant Seitz somehow caused those Committee members to (allegedly) shirk their duty. (*See generally* Dkt. No. 16, ¶ 6 [Plf.'s Verified Fourth Am. Compl.].)

As for Defendant Walker, there is no record evidence that he approved the results of the reviews of the Periodic Review Committee (on January 30, 1998, February 6, 1998, February 13, 1998, February 20, 1998, February 27, 1998, and March 6, 1998) maliciously, that is, *knowing* Plaintiff's confinement to administrative segregation to be wrongful. For example, Plaintiff does not even allege or argue that Defendant Walker *knew* that the Periodic Review Committee was (as Plaintiff asserts) not physically meeting when it conducted its review of Plaintiff's administrative segregation status. (*See generally* Dkt. No. 16, ¶ 6 [Plf.'s Verified Fourth Am. Compl.]; Dkt. No. 85, Part 3, at 6-8, 12 [Plf.'s Memo. of Law]; Dkt. No. 85, Part 4, ¶¶ 8-12 [Plf.'s Decl.]; Dkt. No. 85, Part 4, at 23-31 [Exs. E-F to Plf.'s Decl.].)

Plaintiff is reminded that, according to Section 301.4(d) of the version of DOCS Directive 4933 that he submitted to the Court, a facility superintendent does not make a "final determination" of the "results" of the

Not Reported in F.Supp.2d, 2008 WL 4416411 (N.D.N.Y.)

(Cite as: 2008 WL 4416411 (N.D.N.Y.))

Periodic Review Committee's review of an inmate's administrative segregation status until those results are "forwarded, in writing, to the superintendent." (Dkt. No. 85, Part 4, at 21-22 [Ex. D to Plf.'s Decl., attaching version of Directive 4933 dated 12/30/98].) As a result, a facility superintendent (such as Defendant Walker) would not, under DOCS Directive 4933, participate in a Periodic Review Committee's review of an inmate's administrative segregation status sufficient to notify him that the review was somehow inadequate. Furthermore, as the superintendent of Auburn C.F., Defendant Walker was entitled to rely on his subordinate correctional officers (including the three members of the Periodic Review Committee) to conduct an appropriate investigation of an issue at the facility, without personally involving Defendant Walker in that issue. [FN27]

FN27. *See* *Brown v. Goord,* 04-CV-0785, 2007 WL 607396, at *6 (N.D . N.Y. Feb. 20, 2007) (McAvoy, J., adopting Report-Recommendation by Lowe, M.J., on *de novo* review) (DOCS Commissioner was entitled to delegate to high-ranking subordinates responsibility to read and respond to complaints by prisoners without personally involving DOCS Commissioner in constitutional violations alleged) [citations omitted]; *see also* *Sealey v. Giltner,* 116 F.3d 47, 51 (2d Cir.1997) (DOCS Commissioner was not personally involved in alleged constitutional violation where he forwarded plaintiff's letter of complaint to a staff member for decision, and he responded to plaintiff's letter inquiring as to status of matter); *Swindell v. Supple,* 02-CV-3182, 2005 WL 267725, at *10 (S.D.N.Y. Feb. 3, 2005) ("[A]ny referral by Goord of letters received from [plaintiff] to a representative who, in turn, responded, without more, does not establish personal involvement."); *Garvin v. Goord,* 212 F. Supp .2d 123, 126 (W.D.N.Y.(2002) ("[W]here a commissioner's involvement in a prisoner's complaint is limited to forwarding of prisoner correspondence to appropriate staff, the commissioner has insufficient personal involvement to sustain a § 1983 cause of action.").

*8 The closest that Plaintiff comes to making any connection at all between the pre-June 20, 1998, actions of Defendants Seitz and Walker, described above, and Defendant Seitz's statement on June 20, 1998, is when he asserts that unidentified corrections officers in S .H.U. told him, at some point between June 19, 1998, and June 21, 1998, that "word came back ... per Superintendent Walker ... that you aren't stepping foot back in [general population]." (Dkt. No. 85, Part 4, ¶ 18 [Plf.'s Decl.].) For the sake of argument, I will set aside (1) the potential hearsay problem with this piece of evidence, (2) the fact that the evidence is so late-blossoming, vague, and self-serving that a reasonable fact-finder would have great difficulty undertaking the suspension of disbelief necessary to believe it,[FN28] (3) the fact that the unidentified corrections officers in question did not state that, whenever Defendant Walker made the statement, he did so knowing of the decision of Judge Corning, and (4) the fact that the statement does not in any way suggest that Defendant Walker made the statement as part of a conspiracy with Defendant Seitz. The more serious problem with this piece of evidence is that, as explained above, there is no record evidence suggesting that the referenced statement by Defendant Seitz was *preceded by* any malicious (or knowingly wrongful) acts by Defendant Seitz.

FN28. It bears noting that the June 22, 1998, letters that Plaintiff wrote to Judge Corning and the New York State Attorney General's Office regarding the refusal of Auburn C.F. to release him from administrative segregation despite Judge Corning's decision of May 26, 1998, mentions the malicious statement (allegedly) made by Defendant Seitz on June 20, 1998, and another malicious statement made by Defendant Gummerson on June 19, 1998, but is conspicuously silent as to any order by Defendant Walker, issued between June 19, 1998, and June 21, 1998, that Plaintiff was not going to return to general population. (Dkt. No. 85, Part 4, at 39-45 [Ex. I to Plf.'s Decl.].) It bears noting also that any allegation regarding the referenced order by Defendant Walker is not contained in Plaintiff's Fourth Amended

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4416411 (N.D.N.Y.)

(Cite as: 2008 WL 4416411 (N.D.N.Y.))

Complaint. (*See generally* Dkt. No. 16, ¶ 6 [Plf.'s Verified Fourth Am. Compl.].)

As a result, I find that no rational fact finder could conclude, from the current record, that the relevant acts of Defendants Walker and Seitz that occurred outside of the relevant statutory period (i.e., between January 12, 1998, and June 19, 1998) were *sufficiently connected* to the relevant acts of those individuals that occurred within the statutory period (i.e., between June 20, 1998, and June 22, 1998) for purposes of the continuing-violation doctrine.

In any event, even if I had found that there was such a sufficient connection, I would find that compelling circumstances do not exist to warrant the application of the continuing-violation doctrine. Compelling circumstances (for purposes of the continuing-violation doctrine) exist

where the unlawful conduct takes place over a period of time, making it difficult to pinpoint the exact day the violation occurred; where there is an express, openly espoused policy that is alleged to be discriminatory; or where there is a pattern of covert conduct such that the plaintiff only belatedly recognizes its unlawfulness.

*Yip v. Bd. of Trustees of State Univ. of N.Y.,* 03-CV-0959, 2004 WL 2202594, at *4 (W.D.N.Y. Sept. 29, 2004) [internal quotation marks and citations omitted].

Here, although the unlawful conduct at issue took place over a period of time, that fact has in no way made it difficult for Plaintiff to pinpoint the exact dates on which the alleged violations occurred. To the contrary, his Fourth Amended Complaint and papers in opposition to Defendants' motion are replete with allegations that events (including violations) occurred on exact dates. (*See, e.g.,* Dkt. No. 16, ¶¶ 4[b][i], 4[b][ii], 6[2], 6[4]-6[17], 6[19], 6 [23], 6[30]-6[34], 6[36], 6[38], 6[41]-6[50], 6[52]-6[58], 6[61]-6[63] [Plf.'s Fourth Am. Compl.]; Dkt. No. 85, Part 2, ¶ 9 [Plf.'s Rule 7.1 Response]; Dkt. No. 85, Part 4, ¶¶ 5-7, 9-10, 13-17, 19-22 [Plf.'s Decl.].)

**\*9** Moreover, while Plaintiff has alleged that the wrongful actions taken against him were part of a conspiracy, he has not adduced evidence that the wrongful

actions alleged were part of an express and openly espoused *policy.* Nor has he adduced evidence that any such policy *discriminated* against him because of his membership in any protected class of individuals (e.g., classifications based on race, religion, etc.). Plaintiff would no doubt argue that Defendants Seitz and Walker treated him differently from other prisoners between June 19, 1998, and June 22, 1998 (by not releasing him from S.H.U.) due to the fact that he had won his Article 78 proceeding in New York State Supreme Court on May 26, 1998. However, any such disparate treatment (even if it did occur) came months *after* Defendant Seitz and Walker's actions in January, February, and March of 1998, which (again) have not been shown to have been malicious. Therefore, the two groups of actions cannot be rationally found to have been united under the umbrella of a single "policy" of disparate treatment.

Finally, there is no record evidence that the wrongful actions in question were committed *covertly* such that Plaintiff only belatedly recognized their unlawfulness. To the contrary, the record is clear that Plaintiff knew of the wrongful actions at the time they were committed. That is why, on January 18, 1998, he filed with DOCS an appeal from the decision to confine him in administrative segregation. (Dkt. No. 16, ¶ 6[6] [Plf.'s Verified Fourth Am. Compl.]; Dkt. No. 85, Part 4, at 32 [Ex. G to Plf.'s Decl .].) That is also why, by the third week of January of 1998, he commenced a hunger strike in protest of his confinement in administrative segregation. (Dkt. No. 85, Part 4, at 29 [Ex. F to Plf.'s Decl.]; Dkt. No. 16, ¶ 6[20] [Plf.'s Verified Fourth Am. Compl.].) That is also why, on March 28, 1998, he filed an Article 78 petition in New York State Court. (Dkt. No. 16, ¶ 6[11] [Plf.'s Verified Fourth Am. Compl.]; Dkt. No. 85, Part 4, at 35 [Ex. H to Plf.'s Decl.].)

Simply stated, once Plaintiff's appeal to DOCS was denied on March 11, 1998 (and thus his administrative remedies were exhausted), he could have, but failed to, file a complaint in this Court complaining of the wrongful actions that had occurred thus far. There was no compelling circumstance that prevented him from filing a complaint regarding those actions until June 20, 1998. Thus, there is no reason to toll the starting of the three-year limitations period until that date.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4416411 (N.D.N.Y.)

(Cite as: 2008 WL 4416411 (N.D.N.Y.))

For both of the above-stated alternative reasons, I find that the continuing violation doctrine does *not* apply to the acts of Defendants Walker and Seitz that occurred outside of the relevant statutory period (i.e., between January 12, 1998, and June 19, 1998), so as to render timely Plaintiff's claims concerning those acts. As a result, I recommend dismissal of Plaintiff's Fourth Cause of Action based on the three-year statute of limitations governing that claim.

**2. Protected-Liberty-Interest Requirement**

**\*10** The parties' arguments with regard to the protected-liberty-interest requirement present the issue of whether Plaintiff's confinement in the Auburn C.F. Infirmary for a total of 101 days, together with confinement in the Auburn C.F. S.H.U. for a total of 60 days, constituted an "atypical and significant hardship on [Plaintiff] in relation to the ordinary incidents of prison life," under _Sandin v. Connor,_ 515 U.S. 472, 484 (1995).

I have been unable to locate any decisions from within the Second Circuit addressing when an inmate's confinement in a segregated portion of a correctional facility's infirmary may be an atypical and significant hardship. However, Plaintiff has adduced record evidence that the restrictions he experienced in the Auburn C.F. Infirmary were generally harsher than those he experienced in the Auburn C.F. S.H.U. (*See* Dkt. No. 85, Part 4, ¶¶ 23-25 [Plf.'s Decl., describing conditions in Auburn C.F. Infirmary].) As a result, for purposes of Defendants' second motion for summary judgment, I will treat the entire 161-day period in question as a continuous period of administrative segregation under conditions of confinement that varied and/or alternated in their level of restrictiveness.

In order to determine whether Plaintiff possessed a protected liberty interest in avoiding the administrative segregation that he experienced during the 161-day period in question, it is necessary to consider not simply the length of that confinement but the specific circumstances of that confinement (and whether they were harsher than ordinary). _Brooks v. DiFasi,_ 112 F.3d 46, 49 (2d Cir.1997); _Vasquez v. Coughlin,_ 2 F.Supp.2d 255, 259 (N.D.N.Y.1998) (McAvoy, C.J.).

Here, at most, the record evidence establishes that the conditions of Plaintiff's segregated confinement during the time in question were as follows:

(1) for all 161 days in question, he was deprived of the opportunity to work and attend schooling out of his cell; he was deprived of "grooming equipment," "hygiene products," "personal food," and television; and he was allowed only restricted visitation and law library access;

(2) for the 60 days during which he was confined to a cell in the Auburn C.F. S.H.U., he was confined to that cell for twenty-three (23) hours per day; he was allowed into the yard for one hour per day, where he could exercise, and "play hardball and cards" and converse with other inmates; he was allowed (as clothing) two sets of state-issued pants and shirts, and a sweatshirt; he was provided "good heating"; and he was allowed to possess "personal books and correspondence[ ] and family pictures"; and

(3) for the 101 days during which he was confined to a hospital room in the Auburn C.F. Infirmary, he was confined to his room for twenty-four (24) hours per day and not allowed to converse or play with other inmates; he was allowed (as clothing) only "one pair of under-clothes and socks" and a "thin linen-cotton hospital gown"; he was subjected to "cold temperatures"; and he was not allowed to possess "personal books and correspondence[ ] and family pictures." (Dkt. No. 85, Part 4, ¶ 25 [Plf.'s Decl., describing the conditions in the Auburn C.F. Infirmary, and comparing those conditions to the conditions in the Auburn C.F. general population].)

**\*11** The conditions of confinement that Plaintiff experienced during the 60 days he spent in the Auburn C.F. S.H.U. appear to mirror the conditions of confinement ordinarily experienced by inmates confined to Special Housing Units in other correctional facilities within the New York State DOCS.[FN29] Moreover, I can find no evidence in the record that, during the 101 days which Plaintiff spent in the Auburn C.F. Infirmary (which Plaintiff characterizes as the harshest portion of his administrative confinement), he was *completely* denied clothing, medicine and adequate nutrition (e.g., calories, protein, etc.), or that he was *in any way* denied running

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4416411 (N.D.N.Y.)

(Cite as: 2008 WL 4416411 (N.D.N.Y.))

water, showers and bedding. (Dkt. No. 85, Part 4, ¶ 25 [Plf.'s Decl.].)

> FN29. *See Colon v. Howard,* 215 F.3d 227, 230 (2d Cir.2000) (describing the following conditions as "normal" conditions of S.H .U. confinement in New York: "Colon was placed in a solitary confinement cell, kept in his cell for 23 hours a day, permitted to exercise in the prison yard for one hour a day ..., limited to two showers a week, and denied various privileges available to general population prisoners, such as the opportunity to work and obtain out-of-cell schooling. Visitors were permitted, but the frequency and duration was less than in general population. The number of books allowed in the cell was also limited. As to duration, Colon was required to serve 305 days of the 360-day sentence imposed.") (citing N.Y.C.R.R. §§ 304.1-304.14).

Numerous district courts in this Circuit have issued well-reasoned decisions finding no atypical and significant hardship experienced by inmates who served sentences in S.H.U. of 161 days or more, under conditions of confinement that were, to varying degrees, more restrictive than those in the prison's general population.[FN30] Several of those cases have also recognized (1) the fact that restrictions (such as the amount of time allowed out of one's cell to exercise and the number of showers allowed per week) are placed even on inmates in the general population,[FN31] and (2) the fact that a sentence in S.H.U. is a relatively common and reasonably expected experience for an inmate in the general population of a New York State correctional facility,[FN32] especially for an inmate serving a sentence of 30 years to life in a maximum-security correctional facility (as Plaintiff appears to be).[FN33]

> FN30. *See, e.g., Spence v. Senkowski,* 91-CV-0955, 1998 WL 214719, at *3 (N.D.N.Y. Apr. 17, 1998) (McCurn, J.) (180 days that plaintiff spent in S.H.U., where he was subjected to numerous conditions of confinement that were more restrictive than those in general population, did not constitute atypical and significant

hardship in relation to ordinary incidents of prison life); *accord, Husbands v. McClellan,* 990 F.Supp. 214, 217-19 (W.D.N.Y.1998) (180 days in S.H.U. under numerous conditions of confinement that were more restrictive than those in general population); *Warren v. Irvin,* 985 F.Supp. 350, 353-56 (W.D.N.Y.1997) (161 days in S.H.U. under numerous conditions of confinement that were more restrictive than those in general population); *Ruiz v. Selsky,* 96-CV-2003, 1997 WL 137448, at *4-6 (S.D.N.Y.1997) (192 days in S.H.U. under numerous conditions of confinement that were more restrictive than those in general population); *Horne v. Coughlin,* 949 F.Supp. 112, 116-17 (N.D.N.Y.1996) (Smith, M.J.) (180 days in S.H.U. under numerous conditions of confinement that were more restrictive than those in general population); *Nogueras v. Coughlin,* 94-CV-4094, 1996 WL 487951, at *4-5 (S.D.N.Y. Aug. 27, 1996) (210 days in S.H.U. under numerous conditions of confinement that were more restrictive than those in general population); *Carter v. Carriero,* 905 F.Supp. 99, 103-04 (W.D.N.Y.1995) (270 days in S.H.U. under numerous conditions of confinement that were more restrictive than those in general population).

> FN31. *See, e.g., Husbands,* 990 F.Supp. 218-19 ("The conditions of confinement in SHU also are not dramatically different from those experienced in the general population. For example, as stated previously, all inmates in SHU are allowed one hour of outdoor exercise daily. [7 NYCRR] § 304.3. This is the same amount of time allotted for exercise to general population inmates, *id.* § 320.3(d)(2), and is in full compliance with constitutional requirements.... SHU inmates are allowed a minimum of two showers per week, 7 NYCRR § 304.5(a), while general population inmates are allowed three showers per week, *id.* § 320.3(d)(1). SHU inmates are confined to their cells approximately twenty-three hours a day. General population inmates are confined to their cells approximately twelve hours a day during

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4416411 (N.D.N.Y.)

(Cite as: 2008 WL 4416411 (N.D.N.Y.))

the week and even more on the weekends.... Thus, conditions at New York correctional facilities involve a significant amount of lockdown time even for inmates in the general population."); *accord, Warren,* 985 F.Supp. at 354-55; *see also Ruiz,* 1997 WL 137448, at *5 ("Indeed, the conditions at Halawa [prison] involve significant amounts of 'lockdown time' even for inmates in the general population. Based on a comparison between inmates inside and outside disciplinary segregation, the State's actions in placing him there for 30 days did not work a major disruption in his environment.").

FN32. *See, e.g., Husbands,* 990 F.Supp. 217 ("[The plaintiff] was convicted of a drug-related crime and was serving an indeterminate sentence of six years to life at the time of the events in question. With respect to the duration of his confinement in SHU, [the plaintiff] spent six months there. Lengthy disciplinary confinement is prevalent in New York State prisons. In fact, New York law imposes no limit on the amount of SHU time that may be imposed for Tier III infractions. 7 NYCRR § 254.7(a)(1)(iii). As of March 17, 1997, there were 1,626 inmates in SHU for disciplinary reasons.... Of those inmates, 28 had SHU sentences of 59 days or less; 129 had SHU sentences of 60-119 days; 127 had SHU sentences of 120-179 days; 545 had SHU sentences of 180-365 days; and 797 had SHU sentences exceeding 365 days. These statistics suggest that lengthy confinement in SHU-for periods as long as or longer than [the plaintiff's 180-day] stay-is a normal element of the New York prison regime."); *accord, Warren,* 985 F.Supp. at 354.

FN33. *See* N.Y.S. DOCS Inmate Locator Service http:// nysdocslookup.docs.state.ny.us [last visited May 29, 2008].

Under the circumstances, I simply cannot find, based on the current record, that the 161 days in question constituted an atypical and significant hardship in relation to the ordinary incidents of prison life (causing Plaintiff to possess a protected liberty interest that conferred upon him a right to procedural due process).

I note that, in *Sandin v. Connor,* the Supreme Court noted that an involuntary commitment to a state mental hospital would be a hardship that would qualify as "atypical and significant," because of the "stigmatizing consequences" caused by such a confinement. *Sandin v. Connor,* 515 U.S. 472, 479, n. 4 (1995). However, here, the Auburn C.F. Infirmary was not a mental hospital. Moreover, it is difficult to characterize Plaintiff's stay there as *involuntary,* since that stay was caused by his choice to conduct a "hunger strike." (Stated differently, who *caused* Plaintiff to be placed in the Auburn C.F. Infirmary is a relevant issue in an atypical-and-significant-hardship analysis.) FN34

FN34. *See Goros v. Pearlman,* 03-CV-1303, 2006 U.S. Dist. LEXIS 19661, at *22-24 (N.D.N.Y. Feb. 21, 2006) (DiBianco, M.J..) (reasoning that, in determining whether plaintiff's confinement to prison medical unit constituted an atypical and significant hardship, it was necessary to determine who was responsible for causing plaintiff to be classified as "patient prisoner"), *accepted in pertinent part on de novo review,* 2006 U.S. Dist. LEXIS 19658, at *2 (N.D.N.Y. March 24, 2007) (McAvoy, J.).

In the alternative, even if I were to find that the 161 days at issue constituted an atypical and significant hardship in relation to the ordinary incidents of prison life (conferring on Plaintiff a right to procedural due process), I can find no admissible evidence in the record that Plaintiff was denied any of the process to which he would have been due during the period of January through March of 1998. FN35 For example, he received notice and a hearing; he received the opportunity to appeal the written hearing decision; and he received several written memoranda regarding his administrative segregation status signed by Defendant Walker and three members of the Periodic Review Committee. Most importantly, even if some sort of due process violation did occur during the period of January through March of 1998, I can find no evidence in the record that either Defendant Seitz or Defendant Walker committed that due process violation.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4416411 (N.D.N.Y.)

(Cite as: 2008 WL 4416411 (N.D.N.Y.))

FN35. "[Courts] examine procedural due process questions in two steps: the first asks whether there exists a liberty or property interest which has been interfered with by the State ...; the second examines whether the procedures attendant upon that deprivation were constitutionally sufficient ...." *Kentucky Dept. of Corr. v. Thompson,* 490 U.S. 454, 460 (1989).

**\*12** As explained above in Part II.A.1. of this Report-Recommendation, a prisoner enjoys no right under the Fourteenth Amendment (or any other constitutional provision) against being issued an administrative segregation recommendation that turns out to be false. Moreover, no record evidence exists that Defendant Seitz gave false testimony at Plaintiff's administrative segregation hearing on January 14 and 15, 1998 (for example, by falsely stating that he had knowledge of the credibility of the three confidential informants at issue). Finally, even if Defendant Seitz did somehow violate DOCS Directive 4933 when he approved the results of the Periodic Review Committee's review of Plaintiff's administrative segregation status (on January 30, 1998, February 6, 1998, February 13, 1998, February 20, 1998, February 27, 1998, and March 6, 1998), a violation of a DOCS Directive is not a violation of the Constitution, or of 42 U.S.C. § 1983.

For these reasons, I recommend that, in the alternative, Plaintiff's Fourth Cause of Action should be dismissed due to his failure to adduce sufficient record evidence to demonstrate that he enjoyed a right of procedural due process with regard to the confinement in question, or that (even if he did enjoy such a right) Defendants Seitz or Walker denied him the process to which he was due.

**B. Plaintiff's Fifth Cause of Action**

Construed with the extra degree of leniency with which *pro se* civil rights claims are generally afforded, Plaintiff's Fifth Cause of Action alleges as follows: between **June 19, 1998,** and **June 22, 1998, Defendants Walker, Seitz,** and **Gummerson** violated Plaintiff's right to due process under the **Fourteenth Amendment,** and

his right "to access ... the court and ... seek redress" under the **First Amendment,** when they intentionally delayed his release from the Auburn C.F. S.H.U. for three days (i.e., from June 19, 1998, to June 22, 1998), despite learning (on June 19, 1998) that the Cayuga County Supreme Court had issued an order directing that Plaintiff be released from the S.H.U. (Dkt. No. 16, ¶¶ 3[g], 6[11]-6[17], 7 [Plf.'s Fourth Am. Compl., asserting his Fifth Cause of Action].)

Defendants argue that Plaintiff's Fifth Cause of Action should be dismissed because his confinement at the Auburn C.F. S.H.U. from June 19, 1998, to June 22, 1998, did not present the type of "atypical, significant hardship" that is required to create a protected liberty interest for purposes of a procedural due process claim under the Fourteenth Amendment. (Dkt. No. 81, Part 5, at 4-8 [Defs.' Memo. of Law].)

Plaintiff responds to Defendants' argument regarding his Fifth Cause of Action with two arguments. First, Plaintiff argues that, in trying to persuade the Court that Plaintiff's wrongful confinement in S.H.U. between June 19, 1998, and June 22, 1998, was too short to constitute an "atypical, significant hardship" for purposes of a due process claim, Defendants fail to take into account the *intentional* and *retaliatory* nature of that four-day deprivation, which in and of itself created a protected liberty interest. (Dkt. No. 85, Part 3, at 10-11, 13-14 [Plf.'s Memo. of Law, arguing that "Defendants [ ] incorrectly couch this claim as a mere 4-day delay to release him from SHU" and that "plaintiff need not show Sand[l]in's atypicality [requirement] because the injury [that Plaintiff experienced consisted of] the retaliatory conduct itself."].) Second, Plaintiff argues that Defendants have ignored the First Amendment claim contained in his Fifth Cause of Action. (*Id.* at 10-13.) In so doing, Plaintiff argues that he was attempting to assert *two* types of First Amendment claims in his Fourth Amended Complaint. (*Id.*) The first type of First Amendment claim was the "access to courts" claim described above. (*Id.*) FN36 The second type of First Amendment claim (according to Plaintiff) was a *retaliation* claim. (*Id.*) Specifically, he argues that, in his Fourth Amended Complaint, he intended to allege, in part, that, when Defendants Walker, Seitz and Gummerson intentionally delayed Plaintiff's release from S.H.U. between June 19, 1998, and June 22, 1998, they were

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4416411 (N.D.N.Y.)

(Cite as: 2008 WL 4416411 (N.D.N.Y.))

retaliating against him for having filed (and won) an Article 78 proceeding in Cayuga County Supreme Court regarding his confinement in S.H.U. (*Id.*) [FN37]

> FN36. I note that, while Plaintiff does not focus much on his access-to-courts claim in his opposition papers, I do not liberally construe anything in those papers as withdrawing his access-to-courts claim, which he rather expressly asserted in his Fourth Amended Complaint. (*See* Dkt. No. 85, Part 3, at 11, 12 [Plf.'s Memo. of Law, arguing that there is "no doubt that plaintiff [alleged] ... that Defendants infringed upon his right to seek redress and access of the courts," and that "the strongest argument in plaintiff's favor is that defendants ... cause[d] injury [to plaintiff] by delaying his release from SHU in violation of his First ... Amendment right[ ] to access of the courts ...."].)

> FN37. For example, he cites Paragraph "6(60)" of his Fourth Amended Complaint in which he alleges that, on or about April 30, 1998, Auburn C.F. First Deputy Superintendent Gary Hodges (who has been dismissed as a defendant in this action) "menacingly told plaintiff that ... if he wins his Article 78 [proceeding], he's going to get hit was another [sentence in Administrative Segregation]." (*Id.* at 11-12.)

**\*13** Defendants reply to Plaintiff's response regarding his Fifth Cause of Action by arguing that Plaintiff's First Amendment claim should be dismissed because (1) his allegations of "conspiracy" are "conclusory," and (2) his allegation of "retaliation" is "last-minute" (or late-blossoming). (Dkt. No. 88, Part 1, at 2-3.)

**1. Procedural Due Process Claim Under the Fourteenth Amendment**

In support of his argument that he "need not show Sand[l]in's atypicality [requirement] because the injury [that he experienced consisted of] the retaliatory conduct itself," Plaintiff cites two cases: *Dixon v. Brown,* 38 F.3d 379 (8th Cir.1994), and *Hershberger v. Scaletta,* 33 F.3d 955 (8th Cir.1994). The problem is that neither of these two cases stands for such a proposition.

In *Dixon v. Brown,* an inmate alleged that a correctional officer had violated his rights under the First Amendment by filing a false disciplinary charge against him in retaliation for his having filed a prison grievance against the officer. 38 F.3d 379, 379 (8th Cir.1994). The district court granted the officer's motion for summary judgment on the ground that, because the prison disciplinary committee had dismissed the officer's disciplinary charge against the inmate, the inmate had not been punished and thus had not suffered "an independent injury" *Id.* The Eighth Circuit reversed, holding that, when an inmate has shown that a correctional officer has filed a false disciplinary charge against the inmate in retaliation for having filed a prison grievance against the officer, the inmate need not show an "independent injury" (such as being punished following a conviction on the disciplinary charge) because the retaliatory filing of the false charge is *in and of itself* an injury. *Id.* at 379-80. Such a holding, which regards the requirement for establishing a retaliation claim filed under the First Amendment, has nothing to do with the requirement for a procedural due process claim filed under the Fourteenth Amendment.

Plaintiff cites *Hershberger v. Scaletta,* for the proposition that "a systematic denial of inmates' constitutional right of access to the courts is such a fundamental deprivation that it is an injury in itself." 33 F.3d 955, 956 (8th Cir.1994) [citations omitted]. As an initial matter, in the current action, the Court is not faced with any record evidence (or even an allegation) that there has been a systematic denial of a right of access to the courts possessed by multiple *inmates.* Moreover, *Hershberger* was decided the year *before* the Supreme Court revised its due process analysis in *Sandin v. Connor,* narrowing its focus to whether or not the restraint in question "imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." 515 U.S. 472, 483-84 (1995).

Furthermore, I have found no cases suggesting that *Sandin's* atypicality requirement is automatically satisfied when a prisoner has been subjected to retaliation. Rather, in every on-point case I have found (in my non-exhaustive search), courts have considered allegations (and evidence) of retaliation *separately* from allegations (and evidence) of procedural due process violations. *See, e.g., Wells v.*

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4416411 (N.D.N.Y.)

(Cite as: 2008 WL 4416411 (N.D.N.Y.))

*Wade,* 36 F.Supp.2d 154, 158-59 (S.D.N.Y.1996) (finding that evidence did *not* exist that plaintiff experienced atypical and significant hardship, due to placement in pre-hearing keeplock confinement, for purposes of due process claim, but that evidence *did* exist that defendant took adverse action against plaintiff, by causing him to be placed in pre-hearing keeplock confinement, because he engaged in protected activity for purposes of retaliation claim); *Watson v. Norris,* 07-CV-0102, 2007 WL 4287840, at *3-5 (E.D.Ark. Dec. 7, 2007) (finding that prisoner's allegations, arising from placement in segregated housing, did *not* plausibly suggest atypical and significant hardship for purposes of due process claim, and but that his allegations-arising from same placement in segregated housing-*did* plausibly suggest that defendants took adverse action against him because he engaged in protected activity for purposes of retaliation claim); *Harris v. Hulkoff,* 05-CV-0198, 2007 WL 2479467, at *4-5 (W.D.Mich. Aug. 28, 2007) (first considering whether evidence existed that plaintiff experienced atypical and significant hardship, due to placement on suicide watch, for purposes of due process claim, and *then* considering whether evidence existed that defendants took adverse action against plaintiff, by placing him on suicide watch, because he engaged in protected activity for purposes of retaliation claim).

**\*14** As a result, I reject Plaintiff's argument that he is excused from having to satisfy *Sandin'* s atypicality requirement simply by alleging (and presumptively adducing some evidence) that he has been subjected to retaliation. I turn, then, to the issue of whether Plaintiff's wrongful confinement in S.H.U. between June 19, 1998, and June 22, 1998, constituted an "atypical, significant hardship" for purposes of a due process claim.

I must answer this question in the negative for the reasons stated above in Part II.A.2. of this Order and Report-Recommendation, and for the reasons advanced (and cases cited) by Defendants in their memorandum of law. (Dkt. No. 81, Part 5, at 4-8 [Defs.' Memo. of Law].) Simply stated, considering the three-day length of Plaintiff's continued confinement in the Auburn C.F. S.H.U. *and* the specific circumstances of that continued confinement (which included one hour out of his cell per day, "good heating," and the ability to possess "personal

books and correspondence[ ] and family pictures," *see* Dkt. No. 85, Part 4, ¶ 25 [Plf.'s Decl.] ), I find that the three-day continued confinement at issue did not constitute an atypical and significant hardship in relation to the ordinary incidents of prison life (conferring on Plaintiff a right to procedural due process).

For all of these reasons, I recommend that the procedural due process claim asserted in Plaintiff's Fifth Cause of Action be dismissed for insufficient record evidence to create a genuine issue of material fact, under Fed.R.Civ.P. 56.

I note that, while I do not rely on this evidence in making my recommendation, I believe it worth mentioning that at least some evidence exists in the record that, during the three-day time period in question, various officials at Auburn C.F. were attempting to transfer Plaintiff to another correctional facility in order to avoid his being returned to Auburn C.F.'s general population, where he would have access to the three informants whose statements had been the impetus for his original placement in administrative segregation.[FN38] I believe it would not be extraordinary (or atypical) for a prisoner to reasonably expect to have his release from administrative segregation briefly delayed under such a circumstance.

FN38. (Dkt. No. 85, Part 4, at 20 [Ex. C to Plf.'s Decl., attaching Plaintiff's Inmate Transfer History, indicating that an unsuccessful request to transfer Plaintiff from Auburn C.F. was made on June 22, 1998; Dkt. No. 85, Part 4, at 44 [Ex. I to Plf.'s Decl., attaching Plf.'s letter of June 22, 1998, to N.Y.S. Attorney General's Office stating that "Capt. Gummerson ... retorted [to Plaintiff on June 19, 1998] that the Cayuga Supreme Court Judge does not run Auburn's prison and that I was going to remain in SHU until a transfer [to another prison] can be effectuated, because I was not setting foot into the inmate general population again."], *accord,* Dkt. No. 16, ¶ 6[14] [Plf.'s Verified Fourth Am. Compl ., asserting same fact]; *see also* Dkt. No. 85, Part 4, ¶ 20 [Plf.'s Decl., stating that, on June 22, 1998, Auburn C.F.'s administration submitted a request that Plaintiff be transferred, which was

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4416411 (N.D.N.Y.)

(Cite as: 2008 WL 4416411 (N.D.N.Y.))

subsequently denied], *accord,* Dkt. No. 16, ¶¶ 6[16], 6[19] [Plf.'s Verified Fourth Am. Complt., asserting same fact].)

**2. Claims Under the First Amendment**

Plaintiff is correct when he argues that Defendants, in their *initial* memorandum of law in support of their motion, ignored the First Amendment claim contained in his Fifth Cause of Action. (Dkt. No. 85, Part 3, at 11-13.) Defendants are partly correct, and partly incorrect, when they argue, in their *reply* memorandum of law, that Plaintiff's First Amendment claim should be dismissed because (1) his allegations of "conspiracy" are "conclusory," and (2) his allegation of "retaliation" is "last-minute" (or late-blossoming). (Dkt. No. 88, Part 1, at 2-3.)

**a. Access-to-Courts Claim**

Setting aside for the moment whether or not Plaintiff's Fourth Amended Complaint has alleged facts plausibly suggesting a First Amendment *retaliation claim,* that Complaint has alleged facts plausibly suggesting a First Amendment *access-to-courts claim*-at least against Defendants Seitz and Gummerson. FN39

FN39. *See Carroll v. Callanan,* 05-CV-1427, 2007 WL 965435, at *5-6 (N.D.N.Y. March 30, 2007) (Kahn, J.) (describing elements of retaliation claim arising under First Amendment as different than elements of access-to-courts claim arising under First Amendment) [citing cases]; *Stokes v. Goord,* 03-CV-1402, 2007 WL 995624, at *5-6 (N.D.N.Y. March 30, 2007) (Kahn, J.) (describing elements of retaliation claim arising under Constitution as different than elements of access-to-courts claim arising under Constitution); *Gonzalez-Cifuentes v. Torres,* 04-CV-1470, 2007 WL 499620, at *4-6 (N.D.N.Y. Feb. 13, 2007) (Sharpe, J.) (describing elements of retaliation claim arising under First Amendment different than elements of access-to-courts claim arising under First Amendment); *Burke v. Seitz,* 01-CV-1396, 2006 WL 383513, at *1, 6-7, & n. 2 (N .D.N.Y. Feb. 13, 2006) (Sharpe, J.) (describing elements of retaliation claim arising under First Amendment as different than elements of access-to-courts

claim arising under First Amendment); *Colondres v. Scoppetta,* 290 F.Supp.2d 376, 381-82 (E.D.N.Y.2003) (recognizing distinction between [1] an access-to-courts claim arising under First Amendment and/or other constitutional provisions and [2] a retaliation claim arising under First Amendment) [citing cases].

***15** Plaintiff's "Fifth Cause of Action" alleges as follows:

The action of defendants WALKER, GUMMERSON, and SEITZ stated in paragraph 6(13-15), in intentionally delaying [Plaintiff's] release from the 'SHU' after his successful Article 78 [petition], infringed upon his right to access to the court and to seek redress, in violation of his First and Fourteenth Amendment [r]ights [under] the United States Constitution. (Dkt. No. 16, "Fifth Cause of Action" [Plf.'s Am. Complt.].) In Paragraphs "6(13)" through "6(15)" of his Fourth Amended Complaint, Plaintiff alleges facts plausibly suggesting that (1) on the morning of June 19, 2008, a corrections officer by the name of "Exner" informed Plaintiff that he had won his Article 78 proceeding and would be released into the prison's general population later than morning, (2) on the evening of June 19, 2008, Defendant Gummerson did not release him from S.H.U. even though he knew that the Cayuga County Supreme Court had issued a decision in Plaintiff's favor, and (3) on the evening of June 20, 2008, Defendant Seitz did not release him from S.H.U. even though he knew that the Cayuga County Supreme Court had issued a decision in Plaintiff's favor. (*Id.* at ¶¶ 6[13]-6 [15].)

Indeed, in my Report-Recommendation of March 30, 2006 (addressing Defendants' first motion for summary judgment), I expressly found that Plaintiff's Fifth Cause of Action contained a First Amendment access-to-courts claim against Defendants Seitz, Gummerson and *Walker.* (Dkt. No. 62, at 13, 30.)

In their second motion for summary judgment, the only conceivable argument Defendants offer as to why Plaintiff's First Amendment access-to-courts claim should be dismissed is that Plaintiff's allegation of a "conspiracy"

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4416411 (N.D.N.Y.)

(Cite as: 2008 WL 4416411 (N.D.N.Y.))

is "conclusory." (Dkt. No. 81, Part 5, at 5-8 [Defs.' Memo. of Law]; Dkt. No. 88, Part 1, at 1-3.) I interpret this argument as meaning that the only specific access-to-courts allegation that Plaintiff levels against Defendant Walker is an implicit allegation that Walker (who was the superintendent of Auburn C.F. during the time in question) caused, through some kind of conspiratorial behavior, Defendants Gummerson and Seitz to not release Plaintiff from S.H.U. on the evening of June 19, 2008, the entirety of June 20 and 21, 2008, and the morning of June 22, 2008, despite the fact that the Cayuga County Supreme Court had issued a decision in Plaintiff's favor. (Dkt. No. 16, "Fifth Cause of Action," & ¶¶ 6[12]-[17].) I also interpret Defendants' argument as attacking that allegation of conspiracy as conclusory. (Dkt. No. 88, Part 1, at 3.)

As a result of this argument, I have carefully reconsidered my finding (in my Report-Recommendation of March 30, 2006) that Plaintiff has, in his Fourth Amended Complaint, alleged facts plausibly suggesting that *Defendant Walker* somehow violated Plaintiff's First Amendment right of access to the courts. Having done so, I now agree with Defendants that the only specific access-to-courts allegation that Plaintiff levels against Defendant Walker is an implicit allegation that Defendant Walker (who was the superintendent of Auburn C.F.), somehow caused, in a conspiratorial manner, Defendants Gummerson and/or Seitz to ignore the decision issued by the Cayuga County Supreme Court. I also agree with Defendants that this allegation, which is woefully vague and speculative, fails to allege facts plausibly suggesting the personal involvement of Defendant Walker (a supervisor) in the constitutional violation alleged.[FN40]

> FN40. I note that, even if I were to not find that Plaintiff's access-to-courts claim against Defendant Walker fails to meet the pleading standard required by Fed.R.Civ.P. 8 and 12, I would find that the claim fails to meet the evidentiary standard required by Fed.R.Civ.P. 56.

**\*16** For these reasons, I recommend that the Court dismiss Plaintiff's First Amendment access-to-courts claim against Defendant Walker. I recommend that this Order of

Dismissal be either (1) issued on Defendants' motion for summary judgment (which may, of course, assert a failure-to-state-a-claim argument),[FN41] or (2) issued *sua sponte* pursuant to 28 U.S.C. §§ 1915(e)(2)(B)(ii), 1915A.

> FN41. "Where appropriate, a trial judge may dismiss for failure to state a cause of action upon motion for summary judgment." *Schwartz v. Compagnise General Transatlantique,* 405 F.2d 270, 273-74 (2d Cir.1968) [citations omitted], *accord, Katz v. Molic,* 128 F.R.D. 35, 37-38 (S.D.N.Y.1989) ("This Court finds that ... a conversion [of a Rule 56 summary judgment motion to a Rule 12(b)(6) motion to dismiss the complaint] is proper with or without notice to the parties.").

However, I do not liberally construe Plaintiff's access-to-court claim against *Defendant Seitz* as depending on any sort of conspiracy between him and someone else (such as Defendants Gummerson and/or Walker). Rather, that claim stands on its own. (Dkt. No. 16, "Fifth Cause of Action," & ¶ 6[15].) Nor do I liberally construe Plaintiff's access-to-court claim against *Defendant Gummerson* as depending on any sort of conspiracy between him and someone else (such as Defendants Seitz and/or Walker). Rather, that claim also stands on its own. (*Id.* at "Fifth Cause of Action," & ¶ 6[14].) The issue, then, is whether these two claims are specific enough to survive an analysis under Fed.R.Civ.P. 8(a)(2) and 12(b)(6).

It is well settled that inmates have a First Amendment right to "petition the Government for a redress of grievances."[FN42] This right, which is more informally referred to as a "right of access to the courts," requires States "to give prisoners a reasonably adequate opportunity to present claimed violations of fundamental constitutional rights."[FN43] "However, this right is not 'an abstract, freestanding right ...' and cannot ground a Section 1983 claim without a showing of 'actual injury.' "[FN44] As a result, to state a claim for denial of access to the courts, a plaintiff must allege facts plausibly suggesting that (1) the defendant acted deliberately and maliciously, and (2) the plaintiff suffered an actual injury as a result of that act.[FN45]

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4416411 (N.D.N.Y.)

(Cite as: 2008 WL 4416411 (N.D.N.Y.))

FN42. *See* U.S. CONST. amend I ("Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances.").

FN43. *Bounds v. Smith,* 430 U.S. 817, 828 (1977), *modified on other grounds,* *Lewis v. Casey,* 518 U.S. 343, 350 (1996); *see also* *Bourdon v. Loughren,* 386 F.2d 88, 92 (2d Cir.2004) [citations omitted].

FN44. *Collins v. Goord,* 438 F.Supp.2d 399, 415 (S.D.N.Y.2006) (quoting *Lewis v. Casey,* 518 U.S. 343, 351 [1996] ).

FN45. *Lewis,* 518 U.S. at 353; *Renelique v. Duncan,* 03-CV-1256, 2007 WL 1110913, at *9 (N.D.N.Y. Apr. 12, 2007) (Strom, J.); *Howard v. Leonardo,* 845 F.Supp. 943, 946 (N.D.N.Y.1994) (Hurd, M.J.).

Here, I find that Plaintiff has alleged facts plausibly suggesting both (1) that Defendant Seitz acted *deliberately and maliciously* when he refused to release Plaintiff from the Auburn C .F. S.H.U. on the evening of June 20, 1998 (despite knowing that Acting Supreme Court Justice Peter E. Corning had ruled in Plaintiff's favor in his Article 78 proceeding regarding that segregated confinement), and (2) that Plaintiff suffered an *actual injury* as a result of that deliberate and malicious act, namely, he was not released from S.H.U. for another two days. In addition, I make the same finding with regard to Plaintiff's claim against Defendant Gummerson.

It is all but self-evident that a prison official's knowing refusal to obey a state court order directing an inmate's release from S.H.U. (following that inmate's filing a suit requesting that order) would make that official liable for infringing upon the inmate's right of "access to the courts" under the First Amendment. The Southern District thoroughly and clearly so explained in a case similar to ours:

**\*17** [Plaintiff's] interest in having defendants comply with the Appellate Division's order [releasing him from SHU, issued in plaintiff's Article 78 proceeding] ... implicates his constitutional right of access to the courts. The First Amendment to the U.S. Constitution prohibits any law abridging the freedom ... to petition the government for a redress of grievances. That freedom ... encompasses the constitutional right of unfettered access to the courts....

.... The right of access is ... implicated by a state official's knowing refusal to obey a state court order affecting a prisoner's rights.... Logic compels the conclusion that if a prisoner's initial access to a forum is allowed, but final access to the remedy decreed denied, the prisoner's broader right to petition [the] government for redress of grievances is vitiated.... [Plaintiff's] assertion of this right is not limited by *Sandin* [v. Connor, 115 S.Ct. 2293 (1995) ], which dealt exclusively with procedural due process and did not address fundamental rights arising elsewhere in the Constitution. As the Supreme Court explicitly stated [in *Sandin* ], 'prisoners ... retain other protection from arbitrary state action .... They may invoke the First ... Amendment[ ] ... where appropriate ...' *Sandin,* 115 S.Ct. at 2302, n. 11.

*Johnson v. Coughlin,* 90-CV-1731, 1997 WL 431065, at *6-7, 1997 U.S. Dist. LEXIS 11025, at *21-22 (S.D.N.Y. July 30, 1997) [internal quotation marks, citations and emphasis omitted; other emphasis added]; *see also* *Acre v. Miles,* 85-CV-5810, 1991 WL 123952, at *9, 1991 U.S. Dist. LEXIS 8763, at *27 (S.D.N.Y. June 28, 1991) ("Above all else, such conduct has the effect of denying inmates full access to the courts [under, in part, the First Amendment].... If a prisoner's initial access to a forum is allowed, but final access to the remedy decreed denied, the prisoner's broader right to petition [the] government for redress of grievances is vitiated.") [internal quotation marks and citations omitted].FN46

FN46. *Cf.* *Woods v. Interstate Realty Co.,* 337 U.S. 535, 538 (1949) ("[A] right which ... does not supply ... a remedy is no right at all ...."); *Abney v. McGinnis,* 380 F.3d 663, 669 (2d

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4416411 (N.D.N.Y.)

(Cite as: 2008 WL 4416411 (N.D.N.Y.))

Cir.2004) ("The defendants' failure to implement the multiple rulings in [the inmate's] favor rendered administrative relief 'unavailable' under the [Prison Litigation Reform Act].") [citations omitted].

Furthermore, it is important to note that a person's right of access to the courts has been found to arise not only under the First Amendment but under other parts of the Constitution, including the Due Process Clause of the Fourteenth Amendment. *See Monsky v. Moraghan,* 127 F.3d 243, 246 (2d Cir.1997) ("[T]he source of this right [of access to the courts] has been variously located in the First Amendment right to petition for redress [of grievances], the Privileges and Immunities Clause of Article IV, section 2, and the Due Process Clauses of the Fifth and Fourteenth Amendments.") [citations omitted]; *accord, Colondres v. Scoppetta,* 290 F. Supp .2d 376, 381 (E.D.N.Y.2003); *Brown v. Stone,* 66 F.Supp.2d 412, 433 (E.D.N.Y.1999).

This is why courts have specifically held that a prison official's knowing refusal to obey a state court order directing an inmate's release from S.H.U. would make that official *also* for infringing upon the inmate's personal liberty protected by the *substantive* due process clause of the Fourteenth Amendment. Again, the Southern District of New York thoroughly and clearly so explained:

**\*18** A prison official's knowing refusal to obey a state court order affecting a prisoner's rights would make that official liable for infringing upon the inmate's personal liberty protected by the substantive due process clause of the Fourteenth Amendment.... This is true not only when an official keeps an inmate in prison past the date when a court orders his permanent release ... but also when an official disregards a court order for the inmate's temporary release for work during daytime hours, ... *or disregards an order directing the inmate's release from SHU....* This principle is not disturbed by *Sandin* [*v. Connor,* 515 U.S. 472 (1995) ], since ... the *Sandin* test applies only to determine when a constitutional liberty interest arises from state prison regulations, thus requiring certain process to deny that liberty interest.... The liberty interest at stake in this case arises from the plaintiff's *nonderogable right to be free from restraints*

*or punishments that a court has expressly deemed to be improper.*

*Coughlin,* 1997 WL 431065, at \*6, 1997 U.S. Dist. LEXIS 11025, at \*19-20 [internal quotation marks, citations and emphasis omitted; other emphasis added]; *see also Acre,* 1991 WL 123952, at \*9, 1991 U.S. Dist. LEXIS 8763, at \*26-27 ("[I]t is all but self-evident that a state official's knowing refusal to obey a state court order affecting a prisoner's rights would make the official liable under section 1983 for infringing upon the inmate's personal liberty protected by the substantive due process clause of the Fourteenth Amendment.") [internal quotation marks and citations omitted]; *cf. Franco v. Kelly,* 854 F.2d 584, 589 (2d Cir.1988) ("Like the right of access to the courts, the right to petition [the government for the redress of grievances] is substantive rather than procedural and therefore cannot be obstructed, regardless of the procedural means applied.") [internal quotation marks and citations omitted].[FN47]

FN47. *Accord, Fleming v. Dowdell,* 434 F.Supp.2d 1138, 1160 & n. 17 (M.D.Ala.2005) (recognizing that, where state official knows of court order, yet refuses to comply with it, he incurs liability under substantive due process clause of Fourteenth Amendment) [citations omitted]; *Rodriguez v. Northampton County,* 00-CV-1898, 2003 WL 22594318, at \*4, n. 4, 2003 U.S. Dist. LEXIS 19567, \*12, n. 4 (E.D.Pa. Oct. 21, 2003) ("A prison official's knowing refusal to obey a state court order affecting a prisoner's rights would make that official liable for infringing upon the inmate's personal liberty protected by the substantive due process clause of the Fourteenth Amendment.") [internal quotation marks and citations omitted]; *Huddleston v. Shirley,* 787 F.Supp. 109, 111 (N.D.Miss.1992) ( "[I]t is undisputed that [defendant] continued to confine [plaintiff] in the county jail during the day in direct conflict with the state court order to release him as specified.... [This] refusal to obey the [court] order violated [plaintiff's] substantive due process rights."); *Tasker v. Moore,* 738 F.Supp. 1005, 1010-11 (S.D.W.Va.1990) ("It is beyond peradventure

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4416411 (N.D.N.Y.)

(Cite as: 2008 WL 4416411 (N.D.N.Y.))

that officials who willfully, intentionally or recklessly keep an inmate in prison past the date he was ordered released are liable under section 1983 for infringing upon the inmate's personal liberty protected by the substantive due process clause of the Fourteenth Amendment.") [citations omitted].

As to the precise issue of whether the delay alleged by Plaintiff was long enough to constitute an "actual injury" for purposes of an access-to-courts claim, Plaintiff's Fourth Amended Complaint alleges that the delay caused by Seitz occurred from "the evening of June 20, 1998 (when Defendant Seitz allegedly refused to release Plaintiff because "Auburn's Administration runs the prison, not the Judge") to "[the] afternoon" of June 22, 1998 (when Plaintiff was released from S.H.U. back into the general population). (Dkt. No. 16, ¶¶ 6[15]-6[17] [Plf.'s Fourth Am. Compl.].) As a result, I liberally construe Plaintiff's Fourth Amended Complaint as alleging that the delay in question was between thirty-six (36) and forty-eight (48) hours in length. FN48 The alleged delay caused by Defendant Gummerson was even longer, his refusal to release Plaintiff allegedly occurred on the evening of June 19, 1998-approximately twenty-four hours before Defendant Seitz's refusal to release Plaintiff. (Id. at ¶ 6[14].)

FN48. Without burdening this already lengthy Report-Recommendation with a detailed and esoteric discussion of semantics, I note that I arrive at this conclusion by reasoning that, by the term "afternoon," Plaintiff meant the period of time between noon and dinnertime (i.e., at approximately 6:00 p.m.), and by the term "evening," Plaintiff meant the period of time between dinnertime and midnight.

*19 Delays in releasing prisoners following the issuance of release orders have been found to be actionable under the Constitution even where those delays were much less than thirty-six hours in length. See Arline v. City of Jacksonville, 359 F.Supp.2d 1300, 1308-09 (M.D.Fla.2005) (jury question was presented as to whether defendants' imprisonment of plaintiff for two-and-a-half-hours after plaintiff had been acquitted at

criminal trial was unreasonable for purposes of Fourth Amendment); Lara v. Sheahan, 06-CV-0669, 2007 WL 1030304, at *4-5, 2007 U.S. Dist. LEXIS 24261, at *11-12 (N.D.Ill. March 30, 2007) (denying defendants' Rule 12[b] [6] motion to dismiss with regard to plaintiff's claim that defendants delayed up to nine hours and fifteen minutes in releasing him after judge had issued release order, because, depending on evidence, delay could have been unreasonable for purposes of Due Process Clause); Lewis v. O'Grady, 853 F.2d 1366, 1368-70 & n. 9 (7th Cir.1988) (jury question was presented as to whether defendants' imprisonment of plaintiff for eleven hours after judge had determined he was not the man named in arrest warrant was unreasonable for purposes of Fourth and Fourteenth Amendments). FN49 In addition, it should be remembered that Plaintiff has also alleged facts plausibly suggesting that the approximate-two-day delay in question was accompanied by constructive (and perhaps actual) notice on the part of Defendants Seitz and/or Gummerson that Plaintiff's release had been ordered by Judge Corning more than three weeks before the evening of June 19 and 20, 1998, i.e., on May 26, 1998. (Dkt. No. 16, ¶¶ 6[12]-6[15] & "Fifth Cause of Action" [Plf.'s Fourth Am. Compl.].)

FN49. Cf. Brass v. County of Los Angeles, 328 F.3d 1192,1195,1199-1202 (9th Cir.2003) (record evidence on defendants' motion for summary judgment did not present genuine issue of fact as to whether sheriff's department "processing" policy, which caused thirty-nine hour delay after judge had issued release order, was unreasonable under Fourth and Fourteenth Amendments).

As a result of all of the foregoing, I find that Plaintiff has alleged facts plausibly suggesting that the delay he experienced due to the action (or inaction) of Defendants Seitz and Gummerson caused him an "actual injury" for purposes of an access-to-courts claim.

Usually on a motion for summary judgment, when an analysis of the pleading sufficiency of a plaintiff's claims has been completed, it is appropriate to conduct an analysis of the evidentiary sufficiency of that claim. However, here, Defendants have not challenged Plaintiff's

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4416411 (N.D.N.Y.)

(Cite as: 2008 WL 4416411 (N.D.N.Y.))

access-to-courts claim against Defendants Seitz or Gummerson on the basis of evidentiary insufficiency. By not offering any argument that Plaintiff has not adduced any evidence establishing these access-to-courts claims, Defendants have failed to meet their threshold burden with regard to any request for dismissal of those claims under Fed.R.Civ.P. 56 and Local Rule 7.1. On a motion for summary judgment, before the nonmoving party must come forward with specific facts showing that there is a genuine issue for trial, the moving party must meet its initial burden of establishing the absence of any genuine issue of material fact.[FN50] This initial burden, while modest, is not without substance.[FN51]

FN50. Fed.R.Civ.P. 56(e) ("When a motion for summary judgment is made [by a defendant] and supported as provided in this rule, the [plaintiff] may not rest upon the mere allegations ... of the [plaintiff's] pleading, but the [plaintiff's] response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the [plaintiff] does not so respond, summary judgment, if appropriate, shall be entered against the [plaintiff]."); see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 585-87 (1986).

FN51. See Vermont Teddy Bear Co., Inc. v. 1-800 Beargram Co., 373 F.3d 241, 243 (2d Cir.2004) ("[A] district court may not grant [a] motion [for summary judgment] without first examining the moving party's submission to determine if it has met its burden of demonstrating that no material issue of fact remains for trial.... If the evidence submitted in support of the summary judgment motion does not meet the movant's burden of production, then summary judgment must be denied even if no opposing evidentiary matter is presented.... [I]n determining whether the moving party has met this burden of showing the absence of a genuine issue for trial, the district court may not rely solely on the statement of undisputed facts contained in the moving party's Rule 56.1 Statement. It must be satisfied that the citation to

evidence in the record supports the assertion.") [internal quotation marks and citations omitted]; _Champion v. Artuz,_ 76 F.3d 483, 486 (2d Cir.1996) ("Such a motion may properly be granted only if the facts as to which there is no genuine dispute show that ... the moving party is entitled to a judgment as a matter of law.") [internal quotation marks and citation omitted]. This requirement (that the Court determine, as a threshold matter, that the movant's motion has merit) is also recognized by Local Rule 7.1(b)(3) of the Local Rules of Practice for this Court, which provides that "the non-moving party's failure to file or serve ... [opposition] papers ... shall be deemed as consent to the granting ... of the motion ... unless good cause is shown," _only where the motion has been "properly filed" and "the Court determines that the moving party has met its burden to demonstrate entitlement to the relief requested therein."_ N.D.N.Y. L.R. 7.1(b)(3) [emphasis added].

**\*20** Furthermore, even if Defendants had offered such argument, I am confident that I would find that a genuine issue of fact exists with regard to that claim, based on the current record. (_See, e.g.,_ Dkt. No. 85, Part 4, ¶¶ 14-18 [Plf.'s Decl.]; Dkt. No. 85, Part 4, at 40-41 [Ex. I to Plf.'s Decl., stating approximate time of conversation between Plaintiff and Defendant Seitz on evening of June 20, 1998]; Dkt. No. 16, ¶¶ 6[12]-[15] [Plf.'s Verified Fourth Am. Compl.].)

Simply stated, then, because Plaintiff has alleged facts plausibly suggesting First Amendment access-to-courts claims against Defendants Seitz and Gummerson, and because Defendants have not successfully challenged those claims on the basis of evidentiary insufficiency in their second motion for summary judgment, I can find no reason why those claims should be dismissed. As a result, I recommend that Plaintiff's First Amendment access-to-courts claims against Defendants Seitz and Gummerson survive Defendants' second motion for summary judgment.

One more point bears mentioning before I proceed to an analysis of whether or not Plaintiff has successfully

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4416411 (N.D.N.Y.)

(Cite as: 2008 WL 4416411 (N.D.N.Y.))

asserted a First Amendment retaliation claim: an argument exists (at least in my opinion) that Judge Corning's judgment need not have been acted on until the deadline by which respondents in the Article 78 proceeding could file an appeal from that judgment had expired, since that judgment (arguably) was not "final" until then.[FN52] However, it appears that, under the New York Civil Practice Law and Rules, the deadline by which respondents in an Article 78 proceeding can file an appeal from the judgment against them expires thirty-five days after they mail to the petitioner a copy of the judgment and written notice of its entry [FN53] (which mailing presumably occurred, in this case, on the date of the notice, June 18, 1998). [FN54] As a result, such a rule would lead to the rather absurd result that, where the respondents in an Article 78 proceeding successfully brought by a prisoner confined to S.H.U. choose to simply *not* mail the prisoner a copy of the judgment and written notice of its entry, the deadline by which respondents must file an appeal from the judgment (and thus the prisoner's S.H.U. confinement) would be extended indefinitely-in total frustration of a court judgment that has not in any way been invalidated. Rather, I believe that the more sensible rule, and the operative one, is that the judgment is stayed (for purposes of a subsequent constitutional accessto-courts claim by the petitioner) only upon the actual filing of a notice of appeal by the respondent (or the issuance of a court order granting such a stay).[FN55] No evidence exists in the record that such a notice of appeal was filed, or even considered.

FN52. *See Slone v. Herman,* 983 F.2d 107, 110 (8th Cir.1993) ("We conclude that when Judge Ely's order suspending [plaintiff's] sentence became final and nonappealable, the state lost its lawful authority to hold [plaintiff]. Therefore, any continued detention unlawfully deprived [plaintiff] of his liberty, and a person's liberty is protected from unlawful state deprivation by the due process clause of the Fourteenth Amendment.") [citations omitted]; *cf. Wright v. Rivera,* 06-CV-1725, 2007 U.S. Dist. LEXIS 72218, at *11 (E.D.N.Y. Sept. 25, 2007) (stating that "the judgment in [the plaintiff's] Article 78 proceeding [would] become[ ] final by the conclusion of direct review or the expiration of the time for seeking such review ... in state

court").

FN53. (Dkt. No. 85, Part 4, at 33 [Ex. H to Plf.'s Decl., attaching "Notice of Entry of Order," dated June 18, 1998, stating that Judge Corning's judgment had been "duly entered ... and filed in the Clerk's Office, Cayuga County on May 27, 1998"].)

FN54. N.Y. C.P.L.R. § 5513(a); *see also* David Siegel, 1999 Practice Commentary, "Time to Appeal or Move for Leave, In General," C5513:1, reprinted in 7B McKinney's Consolidated Laws of New York Ann., Supplement, p. 82 (West 2005).

FN55. *See Tasker v. Moore,* 738 F.Supp. 1005, 1007, 1011 (S.D.W.Va.1990) (during stay of judge's release orders pending appeal from those orders, no liability ensued for not complying with those orders); *cf. Coughlin,* 1997 WL 431065, at *7, 1997 U.S. Dist. LEXIS 11025, at *23 (recognizing that it was not until the New York State Appellate Division decided respondents' appeal from the judgment of the New York State Supreme Court granting the inmate's Article 78 petition that prison officials incurred liability for not promptly complying with the judgment granting the Article 78 petition).

**b. Retaliation Claim**

Defendants' argument that Plaintiff has failed to assert a retaliation claim is based on the fact that the word "retaliation" does not appear in the portion of Plaintiff's Fourth Amended Complaint labeled "Fifth Cause of Action." (*Id.*) This, of course, is true: Plaintiff's "Fifth Cause of Action" alleges, in pertinent part, that Defendants Walker, Gummerson and Seitz, by "intentionally delaying his release from the 'SHU' after his successful Article 78 [petition], infringed upon his right to access to the court and to seek redress, in violation of his First ... Amendment [r]ights [under] the United States Constitution." (Dkt. No. 16, "Fifth Cause of Action" [Plf.'s Fourth Am. Compl.].)

**\*21** In order to convert the claim raised in this

Not Reported in F.Supp.2d, 2008 WL 4416411 (N.D.N.Y.)

(Cite as: 2008 WL 4416411 (N.D.N.Y.))

allegation from an access-to-courts claim to a retaliation claim, one would have to stretch the meaning of the word "after" in the allegation so that it means "because of" (thus rendering the allegation as stating that "[Defendants Walker, Gummerson and Seitz] intentionally delay[ed] his release from the 'SHU' [*because of*] his successful Article 78 [petition] ...." (*Id.*) Fortunately, the Court need not engage in such a reconstruction.

This is because Plaintiff's "Fifth Cause of Action" begins by expressly stating that the wrongful conduct that is the subject of the Cause of Action is described in Paragraphs "6(13)" through "6(15)" of his Fourth Amended Complaint. (*Id.*) In those paragraphs, Plaintiff alleges facts plausibly suggesting that Defendants Gummerson and Seitz did not release him from S.H.U. (which, of course, constituted adverse action) *because* Plaintiff had filed, and won, his Article 78 proceeding in Cayuga County Supreme Court (which, of course, was activity protected under the First Amendment). (*Id.* at ¶¶ 6[13]-6[15] [alleging that Defendant Gummerson stated to Plaintiff on June 19, 2008, that he was not being released from S.H.U. because "the Cayuga Supreme Court does not run Auburn," and that Defendant Seitz stated to Plaintiff on June 20, 2008, because "Auburn's Administration runs the prison, not the judge."] [internal quotation marks omitted].) [FN56]

FN56. Of course, this sort of adoption of allegations by reference to them in a complaint is expressly permitted under the Federal Rules of Civil Procedure. *See* Fed.R.Civ.P. 10(c) ("A statement in a pleading may be adopted by reference elsewhere in the same pleading ....")

It must be remembered that, in the Second Circuit, when a *pro se* civil rights litigant's allegations are construed with special solicitude, the legal claims he has asserted are limited only by what legal claims his factual allegations plausibly suggest, not by his invocation of legal terms. *Phillips v. Girdich,* 408 F.3d 124, 130 (2d Cir.2005) ("We leave it for the district court to determine what other claims, if any, Phillips has raised. In so doing, the court's imagination should be limited only by Phillips' factual allegations, not by the legal claims set out in his pleadings.") [citations omitted]. [FN57] Indeed, this is also the

case for complaints filed by plaintiffs who are *not* proceeding *pro se*. *See* Albert v. Carovano, 851 F.2d 561, 571, n. 3 (2d Cir.1988) ("The failure in a complaint to cite a statute, or to cite the correct one, in no way affects the merits of a claim. Factual allegations alone are what matters.") [citation omitted], *accord,* Wynder v. McMahon, 360 F.3d 73, 75, 77 & n. 11 (2d Cir.2004), Northrup v. Hoffman of Simsbury, Inc., 134 F.3d 41, 46 (2d Cir.1997).

FN57. It should be noted that the Second Circuit, in *Phillips v. Girdich,* stated that the legal claims asserted by a *pro se* civil rights litigant are limited only by what legal claims his factual allegations *conceivably* suggest, not what they "plausibly" suggest. *See* 408 F.3d at 130 ("It is enough that [*pro se* litigants] allege that they were injured, and that their allegations can conceivably give rise to a viable claim .... [T]he court's imagination should be limited only by Philips' factual allegations ....") [emphasis added; citations omitted]. To the extent that *Phillips* was based on a *conceivability* standard as opposed to a *plausibility* standard, I interpret *Phillips* to have been abrogated by the Supreme Court's decision last year in *Bell Atlantic Corporation v. Twombly,* 127 S.Ct. 1955, 1965-74 (2007) (rather than turn on the "conceivab[ility]" of an actionable claim," the Rule 8 standard turns on the "plausibility" of an actionable claim in that his "[f]actual allegations must be enough to raise a right to relief above the speculative level [to a plausible level]"); *see also Goldstein v. Pataki,* 07-CV-2537, 2008 U.S.App. LEXIS 2241, at *14 (2d Cir. Feb. 1, 2008) (*"Twombly* requires ... that the complaint's '[f]actual allegations be enough to raise a right to relief above the speculative level ....' ") [internal citation omitted].

Simply stated, a plaintiff need not necessarily use the legal term "retaliation" [FN58] in his complaint in order to assert a retaliation claim. *See* Williams v. Manternach, 192 F.Supp.2d 980, 986-87 (N.D.Iowa 2002) ("[E]ven though the Complaint does not use the appropriate term of art for a 'retaliation' claim, it alleges both factual issues that

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4416411 (N.D.N.Y.)

(Cite as: 2008 WL 4416411 (N.D.N.Y.))

implicated that legal proposition ..., and provides sufficient factual allegations to provide for relief on a retaliation theory.") [internal quotation marks and citations omitted]; *Baltoski v. Pretorius,* 291 F.Supp.2d 807, 810-11 (N.D.Ind.2003) ( "To state a claim for retaliatory treatment [under the First Amendment], a complaint need only allege a chronology of events from which retaliation may be inferred.") [citation omitted]; *cf. Thomas v. Hill,* 963 F.Supp. 753, 756 (N .D. Ill.1997) ("Mr. Thomas does not claim that the defendants' verbal threats and abuse were motivated by retaliation, and the word 'retaliate' does not appear in his complaint. Nonetheless, the facts alleged would arguably state a retaliation claim."); *Lashley v. Wakefield,* 367 F.Supp.2d 461, 470, n. 6 (W.D.N.Y.2005) ("Even though plaintiff uses the word 'retaliatory' and not 'harassment' in the third claim, ... I construe his third claim as a ... claim against Aidala and Piccolo for cruel and unusual punishment by way of harassment ....").[FN59] Rather, the governing standard is whether a plaintiff has alleged facts plausibly suggesting that a defendant subjected him to retaliation for purposes of the First Amendment. *That* is how the defendant receives fair notice of the plaintiff's claim under Fed.R.Civ.P. 8.

> FN58. *See Trask v. Rios,* 95-CV-2867, 1995 U.S. Dist. LEXIS 18945, at *13 (N.D.Ill.Dec. 18, 1995) (" 'Harass,' 'discriminate,' and 'retaliate' are words to which legal significance attaches. Alone, they are legal conclusions that do not place defendants on notice of the circumstances from which the accusations arise and therefore are inappropriate pleading devices.") [citations omitted].

> FN59. This point of law has also been specifically recognized in the analogous context of prisoner grievances. *See Varela v. Demmon,* 05-CV-6079, 2007 U.S. Dist. LEXIS 35873, at *15 (S.D.N.Y.2007) ("Varela's grievance does not use the word 'retaliation' in describing what occurred. But, fairly read [for purposes of the issue of whether Varela exhausted his administrative remedies regarding his retaliation claim], it does suggest that the assault occurred in response to Varela's prior complaint to

Demmon's supervisors."), *adopted,* 2007 U.S. Dist. LEXIS 47939 (S.D.N.Y. June 14, 2007); *accord, Allah v. Greiner,* 03-CV-3789, 2007 U.S. Dist. LEXIS 31700, at *18-19 (S.D.N.Y. Apr. 30, 2007) (prisoner's grievance asserted claim of retaliation, for purposes of exhaustion of administrative remedies, even though grievance used word "harassment" rather than "retaliation"); *Trenton v. Ariz. Dep't of Corr.,* 04-CV-2548, 2008 U.S. Dist. LEXIS 6990, at *11 (D.Ariz. Jan. 16, 2008) (prisoner's grievance asserted claim of retaliation, for purposes of exhaustion of administrative remedies, even though grievance did not use word "retaliation"); *Wheeler v.. Prince,* 318 F.Supp.2d 767, 772, n. 3 (E.D.Ark.2004) (prisoner's grievance asserted claim of retaliation, for purposes of exhaustion of administrative remedies, even though grievance did not use word "retaliation"). This point of law has also been recognized in other contexts. *See, e.g., Manzi v. DiCarlo,* 62 F.Supp.2d 780, 794 (E.D.N.Y.1999) (recognizing that word "discrimination" may be used to articulate a "retaliation" claim for purposes of claim under Americans with Disabilities Act).

**\*22** Based on the extra liberal construction that must be afforded to Plaintiff's Fourth Amended Complaint due to his special status as a *pro se* civil rights litigant, I find that the Fourth Amended Complaint has alleged facts plausibly suggesting that Defendant Seitz did not release Plaintiff from the Auburn C.F. S.H.U. on the evening of June 20, 1998 (i.e., he took adverse action against Plaintiff), *because* Plaintiff had filed, and won, his Article 78 proceeding in Cayuga County Supreme Court (i.e., because Plaintiff had engaged in protected activity). Similarly, I find that Plaintiff's Fourth Amended Complaint has alleged facts plausibly suggesting that Defendant Gummerson did not release Plaintiff from the Auburn C.F. S.H.U. on the evening of June 19, 1998 (i.e., he took adverse action against Plaintiff), *because* Plaintiff had filed, and won, his Article 78 proceeding in Cayuga County Supreme Court (i.e., because Plaintiff had engaged in protected activity).

Because Defendants have not challenged Plaintiff's

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4416411 (N.D.N.Y.)

(Cite as: 2008 WL 4416411 (N.D.N.Y.))

First Amendment retaliation claims against Defendants Seitz and Gummerson on the basis of evidentiary insufficiency in their second motion for summary judgment, I can find no reason why those claims should be dismissed.[FN60] As a result, I recommend that Plaintiff's First Amendment retaliation claims against Defendants Seitz and Gummerson survive Defendants' second motion for summary judgment.

> [FN60.] To the extent that Plaintiff's allegation that Defendant Gummerson refused to release him from S.H.U. on the evening of June 19, 1998, falls outside the applicable three-year limitations period, I find that Plaintiff may, and should, benefit from the continuing violation doctrine with regard to that specific allegation, because (1) the event in question was *sufficiently connected* to Plaintiff's continued incarceration in S.H.U. on June 20, June 21 and part of June 22 (which occurred within the applicable limitations period), and (2) Defendant Gummerson's refusal to release Plaintiff, and Plaintiff's continued confinement in S.H.U., was *express, openly espoused,* and *discriminatory* (relative to other prisoners who had not filed Article 78 petitions regarding their confinement to S.H.U.).

Having said all of that, I also find that Plaintiff's Fourth Amended Complaint contains no factual allegations plausibly suggesting that *Defendant Walker* caused Plaintiff to not be released from S.H.U. because Plaintiff had filed, and won, his Article 78 proceeding in Cayuga County Supreme Court. Rather, Plaintiff's sole theory of liability against Defendant Walker (who was the superintendent of Auburn C.F.) appears to be that Walker somehow caused, in a conspiratorial manner, Defendants Gummerson and/or Seitz to not release Plaintiff because of the decision issued by the Cayuga County Supreme Court. However, Plaintiff's Fourth Amended Complaint is woefully vague and speculative with regard to the details supporting such a theory of liability. Viewed from another perspective, Plaintiff's Fourth Amended Complaint fails to allege facts plausibly suggesting the personal involvement of Defendant Walker (a supervisor) in the constitutional violation alleged. As a result, I recommend that Plaintiff's

First Amendment retaliation claim against Defendant Walker be *sua sponte* dismissed pursuant to 28 U.S.C. §§ 1915(e)(2)(B)(ii), 1915A.

I hasten to add that, in reaching these conclusions, I in no way rely on any allegations made by Plaintiff for the first time in his opposition papers (as Plaintiff urges the Court to do, out of an extension of special solicitude to him).[FN61] That is because it is too late in this proceeding for Plaintiff to constructively amend his pleading in such a way. It should be noted that Plaintiff has already amended his pleading *four* times.

> [FN61.] (*See* Dkt. No. 85, Part 3, at 10-11 [Plf.'s Memo. of Law].)

**\*23** One final point bears mentioning: I imagine that Defendants may try to prove at trial (or perhaps during a *third* motion for summary judgment, should they be given an opportunity to file such a motion) that Defendants Gummerson and Seitz would have taken the same actions on June 19 and 20, 1998, regardless of whether or not Plaintiff had filed, and won, his Article 78 petition. I say this because, as I mentioned earlier, it appears from the record that corrections officials at Auburn C.F. *may have* kept Plaintiff in S.H.U. between June 19, 1998, and June 22, 1998, merely so that they could transfer him to another correctional facility rather than return him to Auburn C.F.'s general population (where he would have access to the three inmates who had essentially accused him of making threats against them).[FN62] In other words, it appears from the record that the motivation of Defendants Gummerson and/or Seitz *may have* been merely to keep Plaintiff from the three inmates in question, rather than to retaliate against Plaintiff for litigating the legality of his placement in administrative segregation. However, while some evidence exists in the record supporting such a fording, other evidence exists to the contrary.[FN63] Even if such contrary record evidence did not exist, I would find it inappropriate to recommend dismissal of Plaintiff's retaliation claim against Defendants Gummerson and/or Seitz on such a ground. This is because Defendants did not base their motion on this ground .[FN64] As a result, Plaintiff was not notified of this argument and provided an opportunity to adduce evidence in opposition to it. As stated earlier, on a motion for summary judgment, before

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4416411 (N.D.N.Y.)

(Cite as: 2008 WL 4416411 (N.D.N.Y.))

the nonmoving party must come forward with specific facts showing that there is a genuine issue for trial, the moving party must meet its initial burden of establishing the absence of any genuine issue of material fact. This initial burden, while modest, is not without substance.

FN62. (Dkt. No. 85, Part 4, at 20 [Ex. C to Plf.'s Decl., attaching Plaintiff's Inmate Transfer History, indicating that an unsuccessful request to transfer Plaintiff from Auburn C.F. was made on June 22, 1998]; Dkt. No. 85, Part 4, at 44 [Ex. I to Plf.'s Decl., attaching Plf.'s letter of June 22, 1998, to N.Y.S. Attorney General's Office stating that "Capt. Gummerson ... retorted [to Plaintiff on June 19, 1998] that the Cayuga Supreme Court Judge does not run Auburn's prison and that I was going to remain in SHU until a transfer [to another prison] can be effectuated, because I was not setting foot into the inmate general population again."], accord, Dkt. No. 16, ¶ 6[14] [Plf.'s Verified Fourth Am. Compl ., asserting same fact]; see also Dkt. No. 85, Part 4, ¶ 20 [Plf.'s Decl., stating that, on June 22, 1998, Auburn C.F.'s administration submitted a request that Plaintiff be transferred, which was subsequently denied], accord, Dkt. No. 16, ¶¶ 6[16], 6[19] [Plf.'s Verified Fourth Am. Compl., asserting same fact].)

FN63. (Dkt. No. 16, ¶¶ 6[11]-6[15] [Plf.'s Verified Fourth Amended Compl., swearing that Defendant Gummerson stated to Plaintiff on June 19, 2008, that he was not being released from S.H.U. because "the Cayuga Supreme Court does not run Auburn," and that Defendant Seitz stated to Plaintiff on June 20, 2008, because "Auburn's Administration runs the prison, not [Judge Corning].") [internal quotation marks omitted]. As explained earlier in this Report-Recommendation, verified pleadings have the effect of an affidavit during a motion for summary judgment. See, supra, Part I, and note 8, of this Report-Recommendation. Here, Plaintiffs' Fourth Amended Complaint contains a verification pursuant to 28 U.S.C. § 1746.

(Dkt. No. 16, at 23 [Plf.'s Fourth Am. Compl.].) Furthermore, the statements that Plaintiff asserts Defendants Gummerson and Seitz made to him on the evenings of June 19 and 20, 1998 (which would presumably be offered by Plaintiff to prove the truth of the matters asserted therein) would not be hearsay because they would each be an admission of a party opponent. See Fed.R.Evid. 801(d)(2). Even if both statements were hearsay, they would arguably be admissible under the hearsay exception for a statement of the declarant's then-existing state of mind. See Fed.R.Evid. 803(3).

FN64. (See generally Dkt. No. 81, Part 5, at 5-8 [Defs.' Memo. of Law]; Dkt. No. 88, Part 1, at 1-5 [Defs.' Reply Memo. of Law, challenging only the pleading insufficiency of Plaintiff's "conclusory" and "last-minute" retaliation claim].)

**ACCORDINGLY,** it is

**RECOMMENDED** that Defendants' second motion for summary judgment (Dkt. No. 81) be **GRANTED** in part and **DENIED** in part, in the following respects:

(1) Plaintiff's Fourth Cause of Action be **DISMISSED** in its entirety based on the three-year statute of limitations governing that claim or, in the alternative, based on the lack of record evidence establishing a violation of any right to procedural due process under the Fourteenth Amendment;

(2) Plaintiff's Fifth Cause of Action be **DISMISSED** to the extent that it asserts (a) any Fourteenth Amendment procedural due process claim whatsoever, (b) a First Amendment access-to-courts claim against Defendant Walker, and (c) a First Amendment retaliation claim against Defendant Walker; and

(3) Defendants' second motion for summary judgment be **otherwise DENIED** so that, surviving that motion is (a) Plaintiff's First Amendment access-to-courts claim against Defendants Seitz and Gummerson, asserted in the Fourth Amended Complaint's Fifth Cause of Action, and

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4416411 (N.D.N.Y.)

(Cite as: 2008 WL 4416411 (N.D.N.Y.))

(b) Plaintiff's First Amendment retaliation claim against Defendants Seitz and Gummerson, also asserted in the Fifth Cause of Action.

**\*24  ANY  OBJECTIONS  to  this Report-Recommendation must be filed with the Clerk of this Court within TEN (10) WORKING DAYS, PLUS THREE (3) CALENDAR DAYS from the date of this Report-Recommendation.** *See* 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72(b); N.D.N.Y. L.R. 72.1(c); Fed.R.Civ.P. 6(a)(2), (d).

**BE ADVISED that the District Court, on** *de novo* **review, will ordinarily refuse to consider arguments, case law and/or evidentiary material that could have been, but was not, presented to the Magistrate Judge in the first instance.**[FN65]

FN65. *See, e.g., Paddington Partners v. Bouchard,* 34 F.3d 1132, 1137-38 (2d Cir.1994) ("In objecting to a magistrate's report before the district court, a party has no right to present further testimony when it offers no justification for not offering the testimony at the hearing before the magistrate.") [internal quotation marks and citations omitted]; *Pan Am. World Airways, Inc. v. Int'l Bhd. of Teamsters,* 894 F.2d 36, 40 n. 3 (2d Cir.1990) (district court did not abuse its discretion in denying plaintiff's request to present additional testimony where plaintiff "offered no justification for not offering the testimony at the hearing before the magistrate"); *Alexander v. Evans,* 88-CV-5309, 1993 WL 427409, at \*18 n. 8 (S.D.N.Y. Sept. 30, 1993) (declining to consider affidavit of expert witness that was not before magistrate) [citation omitted]; s*ee also Murr v. U.S.,* 200 F.3d 895, 902, n. 1 (6th Cir.2000) ("Petitioner's failure to raise this claim before the magistrate constitutes waiver."); *Marshall v. Chater,* 75 F.3d 1421, 1426 (10th Cir.1996) ("Issues raised for the first time in objections to the magistrate judge's recommendations are deemed waived.") [citations omitted]; *Cupit v.. Whitley,* 28 F.3d 532, 535 (5th Cir.1994) ("By waiting until after the magistrate judge had issued its findings and recommendations [to raise its procedural default

argument] ... Respondent has waived procedural default ... objection [ ].") [citations omitted]; *Greenhow v. Sec'y of Health & Human Servs.,* 863 F.2d 633, 638-39 (9th Cir.1988) ("[A]llowing parties to litigate fully their case before the magistrate and, if unsuccessful, to change their strategy and present a different theory to the district court would frustrate the purpose of the Magistrates Act."), *overruled on other grounds by U.S. v. Hardesty,* 977 F.2d 1347 (9th Cir.1992); *Patterson-Leitch Co. Inc. v. Mass. Mun. Wholesale Elec. Co.,* 840 F.2d 985, 990-91 (1st Cir.1988) ("[A]n unsuccessful party is not entitled as of right to de novo review by the judge of an argument never seasonably raised before the magistrate.") [citation omitted].

**BE ALSO ADVISED that the failure to file timely objections to this Report-Recommendation will PRECLUDE LATER APPELLATE REVIEW of any Order of judgment that will be entered.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec'y of H.H.S.,* 892 F.2d 15 [2d Cir.1989] ).

N.D.N.Y.,2008.

Cabassa v. Gummerson
Not Reported in F.Supp.2d, 2008 WL 4416411 (N.D.N.Y.)
END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2006 WL 1555656 (N.D.N.Y.)

(Cite as: 2006 WL 1555656 (N.D.N.Y.))

**H**

Only the Westlaw citation is currently available.
United States District Court,

N.D. New York.
Samuel CABASSA, Plaintiff,
v.
Craig GUMMERSON, Corrections Captain, Auburn
Correctional Facility; Donald Selsky, Assistant Deputy
Commissioner/Director of Special Housing/Disciplinary
Program; Anthony Graceffo, Chief Medical Doctor,
Auburn Correctional Facility; Glenn S. Goord; Hans
Walker; Gary Hodges; D.W. Seitz; Terry A. Halcott;
Christine Coyne; Nancy O'Connor; Ann Driscoll; John
McClellen; John Rourke, Captain Security Services at
Auburn Correctional Facility; Koors, Head Pharmacist
at Auburn Correctional Facility; Robert Mitchell,
Correctional Counselor at Auburn Correctional Facility;
and Androsko, Registered Nurse, Auburn Correctional
Facility, Defendants.
No. 9:01-CV-1039.

June 1, 2006.
Samuel Cabassa, Wallkill, NY, pro se.

Hon. Eliot Spitzer, Attorney General of the State of New
York, David Fruchter, Esq., Asst. Attorney General, of
counsel, Albany, NY, for Defendant Department of Law,
the Capitol.

### *ORDER*

DAVID N. HURD, United States District Judge.

**\*1** Plaintiff, Samuel Cabassa, brought this civil rights
action pursuant to 42 U.S.C. § 1983. In a Report
Recommendation dated March 30, 2006, the Honorable
George H. Lowe, United States Magistrate Judge,
recommended that defendants' motion for summary
judgment be denied to the extent it seeks dismissal of (1)
claims asserted against defendants Walker and Seitz in
the Fourth Cause of Action of plaintiff's Fourth Amended
Complaint; and (2) the claims asserted against defendants
Walker, Gummerson, and Seitz in the Fifth Cause of
Action of Plaintiff's Fourth Amended Complaint, but that
defendants' motion be granted in all other respects.
Objections to the Report Recommendation have been filed
by all parties.

Based upon a de novo review of the portions of the
Report-Recommendation to which the parties have
objected, the remainder of the Report-Recommendation is
accepted and adopted. *See* 28 U.S.C. 636(b)(1).

Accordingly, it is

ORDERED that

1. The objections to the Report Recommendation are
REJECTED;

2. The defendants' motion for summary judgment is
DENIED to the extent it seeks dismissal of:

a. The claims asserted against defendants Walker and
Seitz in the Fourth Cause of Action of plaintiff's Fourth
Amended Complaint; and

b. The claims asserted against defendants Walker,
Gummerson, and Seitz in the Fifth Cause of Action of
Plaintiff's Fourth Amended Complaint;

3. The defendants' motion is GRANTED in all other
respects; and

4. The remaining claims in plaintiff's Fourth Amended
Complaint are DISMISSED.

IT IS SO ORDERED.

N.D.N.Y.,2006.

Cabassa v. Gummerson
Not Reported in F.Supp.2d, 2006 WL 1555656
(N.D.N.Y.)
END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 1555656 (N.D.N.Y.)

(Cite as: 2006 WL 1555656 (N.D.N.Y.))

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2004 WL 1752818 (S.D.N.Y.)

(Cite as: 2004 WL 1752818 (S.D.N.Y.))



Only the Westlaw citation is currently available.
United States District Court,

S.D. New York.
Cyril KENDALL, Plaintiff,
v.
C.O. KITTLES, Shield No. 15396; C.O. Charles, Shield
No. 10739; C.O. Johnson; C.O. Cunningham; Frank
Squillante; William J. Fraser; New York City Dept. of
Correction; Rikers Island Correctional Facility,
Defendants.
No. C0 Civ. 628(GEL).

Aug. 4, 2004.
Cyril Kendall, plaintiff pro se.

Michael A. Cardozo, Corporation Counsel for the City of
New York, New York, N.Y. (Hillary A. Frommer) for
defendants Kittles, Charles, Squillante and Fraser, of
counsel.

OPINION AND ORDER

LYNCH, J.

*1 This action concerns allegations by plaintiff Cyril
Kendall that he was denied certain medical
accommodations and housing conditions while he was a
pre-trial detainee at Rikers Island Correctional Facility
("Rikers"), and that these denials infringed his
constitutional right to be free from cruel and unusual
punishment. Defendants Kittles and Charles are
corrections officers at Rikers, defendant Squillante is the
Warden of the North Infirmary Command unit where
Kendall was housed at Rikers, and defendant Fraser is the
former Commissioner of the New York City Department
of Correction. All four defendants now move for summary
judgment and, for the reasons that follow, the motion will
be granted.

BACKGROUND

Kendall was arrested on March 13, 2002, and was

held as a pre-trial detainee at the North Infirmary
Command ("NIC") unit at Rikers. (Frommer Decl., Ex.
D.) Kendall filed his Complaint in this action on January
28, 2003, asserting that during his time at Rikers he was
denied medically-indicated accommodations for his
asthma and for his hemorrhoid condition.[FN1]

    FN1. Kendall conducted no discovery in this
    action, and the only discovery taken by
    defendants was to subpoena Kendall's medical
    records. Although Kendall complains in his
    opposition brief that he was unable to take
    discovery due to his incarceration, he was
    provided ample opportunity for discovery by the
    Court and neither complained to the Court about
    his inability to take discovery during this period
    nor sought any assistance in doing so. Indeed,
    even now Kendall does not ask for any further
    discovery or suggest what discovery might be
    relevant or helpful. Accordingly, the Court will
    view the record as closed for purposes of
    summary judgment, and the factual discussion
    below will be drawn from the documentary
    evidence attached to Kendall's Complaint or
    submitted as exhibits to the Declaration of
    Assistant Corporation Counsel Hillary Frommer.

Asthma and Non–Smoking Housing

Kendall's medical records indicate that on August 26,
2002, Dr. Adriana Vives of the NIC medical clinic
requested that Kendall be housed in a non-smoking area
"for medical reasons." (Frommer Decl., Ex. A) The same
request was made again by Dr. Vives, again without
further explanation, on September 24, 2002. (Id.) Neither
request mentioned Kendall's alleged asthma. When
Kendall visited the medical clinic at NIC on September
30, 2002, the treating physician noted that Kendall had
previously complained of swelling in his neck, hands and
lips, but that none of these conditions had been observed
during any of Kendall's previous visits to the clinic. (Id.,
Ex. J.) Apparently Kendall himself reported to the treating
physician during this visit that his
previously-complained-of swelling had resolved and that

Not Reported in F.Supp.2d, 2004 WL 1752818 (S.D.N.Y.)

(Cite as: 2004 WL 1752818 (S.D.N.Y.))

he had "no breathing difficulty." (*Id.*) The doctor noted that the physical exam revealed neither swelling, nor signs of recent swelling, in the face, eyes, lips, tongue, or neck. (*Id.*)

On January 4, 2003, Kendall apparently fell from his bed and was discovered unconscious on the floor of his cell around ten p.m. (*Id.,* Ex. K.) He was attended by emergency medical technicians at Rikers and transferred by ambulance to Elmhurst General Hospital within thirty minutes. (*Id.*) Kendall returned to Rikers on January 6, after refusing a transfer to Bellevue Hospital for further evaluation. (*Id.*) Kendall avers that he "passed out" due to secondhand smoke inhalation. (P. Mem. & Aff. ¶ 15.) It is undisputed that Kendall remained in a smoking-permitted housing unit throughout his time at Rikers.

### *Hemorrhoids*

Kendall was treated at the Bellevue Hospital Rectal Clinic for swollen hemorrhoids on September 9, 2002. (Frommer Decl., Ex. J.) On October 4, 2002, Dr. Vives requested that Kendall be allowed to keep bottled water and some additional food in his cell "for medical reasons." (*Id.,* Ex. A.) Kendall avers that he was not provided with bottled water and was denied access to a water fountain, and so had to drink water from the sink in his cell. (P. Mem. & Aff. ¶¶ 7–8.) On the same day, Dr. Vives prescribed a "donut" pillow for Kendall to sit on, as well as stool softeners and suppositories, all to relieve his discomfort from the hemorrhoid condition. (Frommer Decl., Ex. J.) On October 10, 2002, Kendall again visited the Bellevue Rectal Clinic; the treatment notes from the second visit state that Kendall was "doing well" following a rubber band ligation procedure to address a prolapsed hemorrhoid. (*Id.*) Kendall received follow-up care at the NIC clinic on October 11 and 15, 2002. (*Id.*) On November 11, 2002, Physician's Assistant Allen Walker requested that Kendall be allowed an extra sheet to use for privacy while using the toilet, and that he be allowed to hold material to change his surgical dressings in his cell. (*Id.,* Ex. A.) Kendall avers that the defendants denied him these recommended supplies. (P. Mem. & Aff. ¶¶ 14–15.) On November 13, 2002, Dr. Vives filed a consultation request for Kendall to be seen again at the Bellevue Rectal Clinic for additional treatment. (Frommer Decl., Ex. J.) Kendall was seen at Bellevue the following day and

received an additional rubber band ligation on another prolapsed hemorrhoid; the treating physician noted that a "small amount of bleeding is normal" and requested a follow-up visit in five weeks. (*Id.*) On December 12, 2002, Kendall refused to attend his next scheduled visit to the Bellevue Rectal Clinic, despite having the medical consequences of such refusal explained to him. (*Id.*)

**\*2** Throughout the fall of 2002, Kendall was repeatedly seen and treated in the NIC medical clinic for a series of other medical complaints—flu-like symptoms, podiatry complaints, pain in his shoulder, difficulty digesting prison food, etc. (*Id.*)

### *Exhaustion of Administrative Remedies*

On September 26, 2002, Kendall's counsel in his criminal case wrote to Warden Squillante, alerting him to the medical staff's recommendations of surgery for Kendall's hemorrhoid condition and transfer to a non-smoking housing unit on account of Kendall's asthma. (Frommer Decl., Ex. A.) Kendall asserts, both in the Complaint and in the sworn Affidavit submitted in opposition to the defendants' summary judgment motion, that he attempted to file a formal grievance with Mohammed Akinlolu, the Grievance Coordinator at NIC, but was told by Akinlolu that his complaints did not qualify as a grievance. (*Id.,* P. Mem. & Aff. ¶ 11.) According to Kendall, Akinlolu refused even to document these conversations. (*Id.*) Kendall also states that he requested and was denied an interview with the Grievance Resolution Committee at Rikers, and that he was unable to make any further efforts to comply with the Rikers grievance procedures because he was housed in protective custody, without access to the grievance form kept in another part of the prison, and because various corrections officers refused his requests to supply him with grievance forms. (*Id.* ¶¶ 11–12.)

Unsurprisingly, defendants dispute Kendall's version of his pursuit of administrative remedies for his complaints. Grievance Coordinator Akinlolu declares in a sworn affidavit that Kendall had free and unimpeded access to grievance forms. (Frommer Decl., Ex. B. ¶ 3.) Akinlolu recalls discussing with Kendall his complaints regarding non-smoking housing and the desire to keep food and water in his cell, but Akinlolu avers that he merely told Kendall that, in order to grieve medical

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 1752818 (S.D.N.Y.)

(Cite as: 2004 WL 1752818 (S.D.N.Y.))

concerns, he would need written physician authorization for each request. (*Id.* ¶¶ 4–5.) Defendants have also submitted sworn affidavits from Arthur Harris, the director of the Inmate Grievance Resolution Program for the New York City Department of Corrections, and from Tonya Glover, intake secretary for the Board of Correction, both asserting that a diligent search of the relevant records reveals no grievance or other correspondence from Kendall regarding his desire to be placed in non-smoking housing or the alleged denial of medical accommodations. (*Id.,* Exs. F & H.) Defendant Squillante testified by affidavit that he never received any correspondence from Kendall. (*Id.,* Ex. G.) Finally, defendants Charles and Kittles likewise testified by affidavit that neither of them (i) were aware of any medical condition suffered by Kendall, (ii) were ever shown or given any medical authorizations regarding Kendall, (iii) ever denied Kendall access to a water fountain, or (iv) ever prohibited or prevented Kendall from keeping bottled water or food in his cell. (*Id.,* Exs. L & M.)

**\*3** Defendants previously moved to dismiss this action under Federal Rule of Civil Procedure 12(b)(6). In an Opinion and Order dated September 15, 2003, this Court granted the motion as to defendants Johnson and Cunningham for lack of service, and as to defendants New York City Department of Corrections and Rikers Island Correctional Facility on the ground that they are non-suable agencies of the City of New York under the New York City Charter. The motion was denied as to all other defendants. Those remaining defendants filed the instant motion for summary judgment pursuant to Federal Rule of Civil Procedure 56 on April 9, 2004.

DISCUSSION

I. *Standard on Summary Judgment*

Summary judgment must be granted where "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). A fact is "material" if it "might affect the outcome of the suit under the governing law," and an issue of fact is "genuine" where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.* 477 U.S. 242, 248 (1986). On a motion for summary judgment, the evidence

must be viewed in the light most favorable to the nonmoving party, and the Court must resolve all ambiguities and draw all reasonable inferences in its favor. *Id.* at 255; *Cronin v. Aetna Life Ins. Co.,* 46 F.3d 196, 202 (2d Cir.1995).

To defeat a motion for summary judgment, however, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986). "[C]onclusory allegations or unsubstantiated assertions" will not suffice. *Scotto v. Almenas,* 143 F.3d 105, 114 (2d Cir.1998). Rather, the nonmoving party must "set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e); *Matsushita,* 475 U.S. at 587 ("Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.' ") (quoting *First Nat'l Bank v. Cities Service Co.,* 391 U.S. 253, 289 (1968)).

II. *Exhaustion of Administrative Remedies*

On their motion for summary judgment, defendants renew the argument made in their motion to dismiss that plaintiff's claims cannot succeed because he has failed to exhaust the available administrative remedies before bringing this action. The Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e(a), provides that:

No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

An action for deliberate medical indifference is an action "with respect to prison conditions," and is thus subject to the PLRA's exhaustion requirements. *See, e.g., Harris v. N.Y.C. Dept. of Corrections,* 00 Civ. 7164(NRB), 2001 WL 845448, at \*2 (S.D.N.Y. July 25, 2001). Where exhaustion of administrative remedies is required, failure to do so must result in dismissal of the claims. *Neal v. Goord,* 267 F.3d 116, 117 (2d Cir.2001). As a number of courts in this district have detailed, and as defendants outline in their motion for summary judgment, prisoners in the custody of the New York City Department of Corrections must complete a three-step inmate

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 1752818 (S.D.N.Y.)

(Cite as: 2004 WL 1752818 (S.D.N.Y.))

grievance procedure, including two levels of appeals, to exhaust their administrative remedies. *See, e.g., McCoy v. Goord,* 255 F.Supp.2d 233, 246 (S.D.N.Y.2003).

**\*4** However, where a prison fails to provide access to grievance forms, a prisoner's complaint cannot be dismissed for failure to exhaust. *See Feliciano v. Goord,* 97 Civ. 263(DLC), 1998 WL 436358 (S.D.N.Y. July 27, 1998) (denying dismissal on failure to exhaust grounds where corrections officers refused to provide inmate with grievance forms); *Burns v. Moore,* 99 Civ. 977(LMM), 2002 WL 91607, at * 5 (S.D.N.Y. Jan. 24, 2002) ("if an inmate is not allowed to file a grievance by prison authorities, a question exists as to whether he ... had any available administrative remedies"). The plain language of the statute requires only "available" administrative remedies to be exhausted. *See Miller v. Norris,* 247 F.3d 736, 740 (8th Cir.2001) ("a remedy that prison officials prevent a prisoner from utilizing is not an "available" remedy under § 1997e(a)") (internal quotations omitted). Common sense and fundamental fairness support this reading. A custodian cannot prevent an inmate's access to a grievance procedure, thereby frustrating the inmate's attempt to resolve his complaints administratively, and then defend against the inmate's subsequent lawsuit by faulting the inmate for failure to exhaust the administrative process. Congress could not have intended the PLRA's administrative exhaustion requirement to produce such a Kafkaesque result. On similar reasoning, a custodian may be estopped from arguing that an inmate failed to exhaust administrative remedies where the custodian previously informed the inmate that the complaints are "non-grievable." *See Feliciano,* 1998 WL 436358, at *2; *Davis v. Frasier,* 98 Civ. 2658(HB), 1999 WL 395414, at *4 (S.D.N.Y. June 15, 1999).

The parties present in the instant motion the same factual dispute that was presented on the motion to dismiss. As noted above, plaintiff claims that he did not fail to exhaust "available" administrative remedies because the actions of various corrections officials prevented him from availing himself of the inmate grievance procedure, both by denying him access to the proper forms and by informing him that his complaints were not grievable. (P. Mem. & Aff. ¶¶ 10–13.) Defendants claim that plaintiff's allegations are not true

and that he had numerous opportunities to comply with the available grievance procedures but simply chose not to. (D. Mem. 3–5, 12–14; Frommer Decl., Exs. F–H, L–M.) The only difference between the presentation of this dispute in the two motions is that plaintiff has now submitted a sworn affidavit, and defendants have supplemented their factual presentation with additional sworn affidavits. However, the core factual dispute as to whether Kendall did or did not have access to grievance forms during the relevant period, and was or was not told by corrections officials that his complaints were nongrievable, remains. Whatever the relative persuasiveness of defendants' affidavit testimony versus plaintiff's affidavit testimony, such credibility determinations are properly for a jury, not for this Court on a motion for summary judgment.

**\*5** Viewing all evidence and making all reasonable inferences in the plaintiff's favor, as the Court must on summary judgment, the defendants have failed to establish that there is no material factual dispute as to the availability of administrative remedies, or that no reasonable fact-finder could find for the plaintiff on this issue. Defendants' argument that they are entitled to summary judgment because plaintiff has submitted "no evidence" is unavailing; Kelly's own sworn affidavit, relating his version of the conversation with Akinlolu and his experience trying to secure grievance forms, does constitute evidence creating a factual dispute, whatever defendants' views on its credibility. Accordingly, the motion for summary judgment on the ground of failure to comply with the requirements of the PLRA is denied.

III. *Section 1983 and the Eighth Amendment*

However, as to the substance of Kendall's claims—that the denial of requests for non-smoking housing and to be allowed to keep food, bottled water, and extra sheets and surgical dressing in his cell violated his Constitutional rights, the defendants' motion for summary judgment will be granted because, even accepting Kendall's version of disputed facts, his claims do not rise to the level of a Constitutional violation.

Kendall predicates his section 1983 claim on the Eighth Amendment, which protects prisoners from "cruel and unusual punishment" in the form of "unnecessary and

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 1752818 (S.D.N.Y.)

(Cite as: 2004 WL 1752818 (S.D.N.Y.))

wanton infliction of pain" at the hands of prison officials. *See, e.g., Wilson v. Seiter,* 501 U.S. 294, 297 (1991); *Estelle v. Gamble,* 429 U.S. 97, 104–05 (1976). To establish an Eighth Amendment violation in the context of denial of medical care or accommodation, an inmate must show that prison officials acted with "deliberate indifference" to the inmate's serious medical needs. *Helling v. McKinney,* 509 U.S. 25, 32 (1993); *Estelle v. Gamble,* 429 U.S. at 104–05; *Fulmore v. Mamis,* 2001 WL 417119 at *7 (S.D.N.Y. Apr. 23, 2001); *Carbonell v. Goord,* 2000 WL 760751 at *6 (S.D.N.Y. Jun. 13, 2000). The requirement has two prongs—an objective inquiry as to whether the deprivation of medical attention is "sufficiently serious," and a subjective inquiry as to whether the prison officials acted with "a sufficiently culpable state of mind." *Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996) (*Hathaway II* ).

As to the first prong, it is well established that more than discomfort or minor injury is required in order for a plaintiff to demonstrate a serious medical need. *Harrison v. Barkley,* 219 F.3d 132, 136 (2d Cir.2000) (serious medical need may be demonstrated if "unnecessary and wanton infliction of pain" results, or if the denial of treatment causes an inmate to suffer a life-long handicap or permanent loss of function); *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994) (*Hathaway I* ) (the standard contemplates "a condition of urgency, one that may produce death, degeneration, or extreme pain.") *Compare Sonds v. St. Barnabas Hosp.,* 151 F.Supp.2d 303, 311 (S.D.N.Y.2001) ("cut finger, even where skin is 'ripped off,' ... does not, as a matter of law, qualify as an injury severe enough to justify civil rights relief"); *Henderson v. Doe,* 98 Civ. 5011(WHP) 1999 WL 378333, at *2 (S.D.N.Y. June 10, 1999) (broken finger does not rise to sufficient level of urgency); *Veloz v. New York,* 35 F.Supp.2d 305, 312 (S.D.N.Y.1999) (foot condition involving a fracture fragment, bone cyst and degenerative arthritis not sufficiently serious) *with Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998) (asserting that suffering "great pain" for six months from abscessed teeth where plaintiff could not chew properly and choked on his food, rose to the level of sufficiently serious condition); *Hathaway I,* 37 F.3d at 67 (finding that plaintiff had serious medical needs where his degenerative hip condition required surgery prior to incarceration and

produced extreme pain that led to registered complaints on almost seventy occasions); *Liscio v. Warren,* 901 F.2d 274, 277 (2d Cir.1990) (failure to provide medical attention to a delirious inmate for three days was sufficiently serious).

**\*6** Kendall's complaints, even viewing the evidence in the light most favorable to him, simply do not rise to the level of Constitutional seriousness. Although placement in non-smoking housing would undoubtedly be preferable, from a health perspective, to exposure to secondhand smoke from other prisoners, there is no evidence that Kendall suffered any serious health consequences from this housing. The medical consultation forms that recommend he be transferred to non-smoking housing do not specify any medical condition, nor do they suggest that any serious consequences will result if the transfer does not occur. (Frommer Decl., Ex. A.) Kendall's medical records indicate that he was examined for his complaints of swelling due to secondhand smoke exposure, and that those complaints were not substantiated. (*Id.,* Ex. J.) Kendall himself told medical personnel that his previously-complained-of swelling had subsided and that he had no further breathing difficulties. (*Id.*) The one serious incident was the apparent fall that rendered Kendall unconscious. However, the medical records clearly indicate that Kendall received prompt and appropriate treatment, including hospitalization at a non-prison facility, and that Kendall refused further evaluation or treatment, even though he was advised of the possible medical consequences. (*Id.,* Ex. K.) No reasonable factfinder could, on this record, conclude that the failure to transfer Kendall to a non-smoking housing unit was "sufficiently serious" as to constitute a deprivation of Eighth Amendment rights.

The record similarly does not support a finding of a Constitutional violation with regard to Kendall's hemorrhoid condition. Hemorrhoids, albeit uncomfortable, are a minor health issue, far removed from the category of medical conditions that have been deemed "sufficiently serious" by other courts. Moreover, Kendall's medical records indicate that he received frequent and appropriate medical treatment for this condition, and that the only time he was without medical care for his hemorrhoids was when Kendall refused to attend a scheduled visit to the

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 1752818 (S.D.N.Y.)

(Cite as: 2004 WL 1752818 (S.D.N.Y.))

Bellevue Rectal Clinic for a follow-up exam. (*Id.*, Ex. J.) The medical recommendation that Kendall be allowed to keep bottled water and extra food in his cell is not, on its face, even connected to his hemorrhoid condition (it appears connected to Kendall's complaints to NIC clinic staff about his difficulty adjusting to prison food). (*Id.*, Exs. A & J.) However, even assuming that the recommendation was related to the hemorrhoids, there is no evidence that the alleged failure to follow this recommendation caused any health consequences whatsoever for Kendall, much less consequences that are "sufficiently serious" to constitute an Eighth Amendment violation.

Finally, Kendall's allegations in his Complaint about the alleged failure of corrections officers to allow him an extra sheet or extra surgical dressing in his cell are not, at bottom, complaints about medical care, but rather amount to an argument that Kendall suffered embarrassment due to the difficulty of hiding the physical consequences of his hemorrhoid condition. (*Id.*, Ex. A.) While the Court sympathizes with Kendall's embarrassment, some loss of privacy and attendant loss of dignity is an inevitable consequence of incarceration, and, so long as no serious medical consequences result, these allegations likewise do not amount to a Constitutional deprivation.

**\*7** As to the second prong of the inquiry, an official will be found to act with "deliberate indifference" to a prisoner's needs when he "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw that inference." *Farmer v. Brennan,* 511 U.S. 825, 837 (1994). Mere negligence, even that which is tantamount to medical malpractice, does not amount to an Eighth Amendment violation. *Estelle v. Gamble,* 429 U.S. at 106; *Hathaway I,* 37 F.3d at 66 (2d Cir.1994) ("[d]eliberate indifference requires more than mere negligence, but less than conduct undertaken for the very purpose of causing harm"). On the present record, no reasonable factfinder could conclude that Kendall has satisfied this standard—chiefly because, as noted above, the recommendations that were allegedly disregarded (request for non-smoking housing, request to keep bottled water and extra food in cell, request for "personal care"

items such as an extra sheet for privacy and extra surgical dressing) did not constitute "an excessive risk to inmate health or safety." Thus, even accepting Kendall's testimony that defendants Kittles, Charles, and Squillante were all aware of the medical recommendations and aware of Kendall's complaints and requests, their alleged disregard of these recommendations does not give rise to a Constitutional violation.

All of the medical evidence in this case indicates that, while in the custody of the New York City Department of Corrections, Kendall received frequent, prompt, and appropriate medical treatment for his hemorrhoid condition, as well as for a variety of other complaints, both substantiated and unsubstantiated. (Frommer Decl., Exs. A, J, K .) Even though Kendall was denied requested transfers to non-smoking housing, and may have been denied permission to keep bottled water and extra food in his cell, there is no evidence that any of the medical personnel that examined or treated Kendall on a nearly weekly basis observed or noted any serious consequences from these circumstances. In short, the record of Kendall's time at Rikers does not remotely demonstrate the kind of callous disregard of the inmate's needs that is "repugnant to the conscience of mankind" and incompatible with "evolving standards of decency" that would constitute cruel and unusual punishment. *Estelle v. Gamble,* 429 U.S. at 105–06. Accordingly, the defendants' motion for summary judgment on Kendall's section 1983 and Eighth Amendment claims is granted.

CONCLUSION

For the foregoing reasons, defendants' motion for summary judgment is granted on the grounds that plaintiff has failed to establish an Eighth Amendment violation.

SO ORDERED:

S.D.N.Y.,2004.

Kendall v. Kittles
Not Reported in F.Supp.2d, 2004 WL 1752818 (S.D.N.Y.)
END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2011 WL 797506 (S.D.N.Y.)

(Cite as: 2011 WL 797506 (S.D.N.Y.))

**H**

Only the Westlaw citation is currently available.
United States District Court,

S.D. New York.
Abdul–Malik MUHAMMAD, Plaintiff,
v.
NEW YORK DEPT. OF CORRECTIONS, et al.,
Defendants.
No. 10 Civ. 1707(RJS)(RLE).

Feb. 3, 2011.
Abdul–Malik Muhammad, Cape VincentCorrectional Facility, Cape Vincent, NY, for Plaintiff.

Ana Maria Vizzo, Heidell, Pittoni, Murphy & Back, LLP, New York, NY, for Denfendants' counsel.

### REPORT AND RECOMMENDATION

RONALD L. ELLIS, United States Magistrate Judge.
**\*1 To the HONORABLE RICHARD J. SULLIVAN, U.S.D.J.:**
### I. INTRODUCTION

*Pro Se* Plaintiff Abdul–Malik Muhammad ("Muhammad") brings this action pursuant to 42 U.S.C. § 1983 against Defendants Jean Richards ("Richards"), M.D., Deputy Warden Raino Hill ("Hill"), and other named defendants.[FN1] Muhammad claims that while he was detained at Rikers Island Correctional Facility, Defendants refused to follow a treatment plan prescribed by a physician for his hemorrhoids, causing him to experience severe and excruciating pain. Muhammad alleges that Defendants' conduct demonstrates deliberate indifference to his medical condition, constituting cruel and unusual punishment in violation of the Fourteenth Amendment.[FN2] Before the Court is Defendants' motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6). For the reasons that follow, 1 recommend that the motion be **GRANTED.**

FN1. In addition to Richards and Hill, the other named Defendants are the New York Department of Corrections, the New York City Department of Health and Hospital Services, and "Captain Patterson." (*See* Compl.) Muhammad only served Hill and Richards, and has never served the other Defendants named in the Complaint. The Court therefore does not address the claims made against the other Defendants in the Complaint.

FN2. After reviewing the submitted documents, Muhammad appears to assert his claim solely under the Fourteenth Amendment and makes no claim under the Eighth Amendment. (*But see* Mem. of Law in Supp. of Defs.' Mot. to Dismiss ("Defs.' Mem.") at 1 ("Plaintiff alleges that defendants deprived him of his civil rights under the Eighth and Fourteenth Amendments").) The significance of this distinction is that the Eighth Amendment protections extend to convicted prisoners while the Fourteenth Amendment protects pretrial detainees. *Paul v. Bailey,* No. 09 Civ. 5784(JSR)(JCF), 2010 WL 3292673, \*1 n. 3 (S.D.N.Y. July 21, 2010). It appears that Muhammad was a pretrial detainee at the time his claims arose. (*See* Defs.' Mot. at 1.) For present purposes, however, the distinction is not critical because medical care claims of pretrial detainees made pursuant to the Fourteenth Amendment are evaluated by the same standards as those of convicted prisoners made pursuant to the Eighth Amendment. *Caiozzo v. Koreman,* 581 F.3d 63, 72 (2d Cir.2009).

### II. BACKGROUND

For purposes of deciding Defendants' motion to dismiss, the Court assumes that the following factual allegations in the Complaint are true. On November 17, 2008, while Muhammad was incarcerated at Rikers Island Correctional Facility pending trial, he reported to the "AMKC" medical center seeking treatment for hemorrhoids. (Compl., Statement of Facts ("SOF") ¶ 2.)

Not Reported in F.Supp.2d, 2011 WL 797506 (S.D.N.Y.)

(Cite as: 2011 WL 797506 (S.D.N.Y.))

On January 28, 2009, Muhammad was examined by the "medical staff at Rikers Island, who referred him to see a "facility surgeon" on February 10, 2009. (*Id.* ¶ 3.) Upon further examination, it was determined that Muhammad would be sent to an outside hospital for treatment. (*Id.*) After an evaluation by an "outside doctor," a diagnosis was made and "a treatment plan was ordered," but the medical staff at Rikers Island refused to follow the treatment plan, and instead provided Muhammad with an over-the-counter prescription of "Hydrocortisone cream, Hemonhordal Suppositories, and Docusate Sodium." (*Id.* ¶¶ 4, 7.) Muhammad filed a grievance against the medical staff, which was denied by "Captain Patterson" and Deputy Warden Hill, and later upheld by a "senior administrator ." (*Id.* ¶¶ 5–6.)

As a result of Defendants' failure to provide adequate medical treatment for his condition, and their interference with his prescribed treatment plan, Muhammad's skin became extremely raw, (*Id.* ¶ 8.) Muhammad alleges that any type of undergarment that comes in contact with his skin "causes unbearable and excruciating pain." (*Id.*) The condition has also made it "practically impossible" for him to use the bathroom, and the "on going experience" has caused him to become "chronically weaken[ed] ." (*Id.*) Muhammad seeks $3,000,000 in damages, a total that includes compensatory and punitive damages, as well as damages for his pain and suffering. (Compl. at 5.) Muhammad also seeks an order requiring Defendants to immediately treat his medical condition. (*Id.*)

Muhammad filed the instant Complaint on March 3, 2010, and Defendants filed their motion to dismiss on July 15, 2010. After the Court granted Muhammad's request for an extension of time to respond to the motion, his response was due on September 24, 2010. As of this date, Muhammad has not submitted a response.

### III. DISCUSSION

**A. Standard for a Motion to Dismiss**
**\*2** "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.' " *Ashcroft v. Iqbal,* ––– U.S. ––––, 129 S.Ct. 1937, 1949 (2009) (quoting *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 570 (2007)). A court should draw all reasonable inferences in favor of the plaintiff, but the plaintiff must

plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal,* 129 S.Ct. at 1949. *Pro se* plaintiffs are entitled to have their complaints construed liberally, *Harris v. Mills,* 572 F.3d 66, 72 (2d Cir.2009), and interpreted to raise the strongest arguments that they suggest. *Harris v. Westchester County Department of Corrections,* No. 06 Civ.2011(RJS), 2008 WL 953616, \*2 (S.D.N.Y.Apr.3, 2008). However, a court does not have to accept as true "conclusions of law or unwarranted deductions of fact." *First Nationwide Bank v. Gelt Funding Corp.,* 27 F.3d 763, 771 (2d Cir.1994), *cert. denied,* 513 U.S. 1079 (1995) (quoting 2A Moore & Lucas, Moore's Federal Practice ¶ 12.08, at 2266–69 (2d ed.1984)).

**B. Muhammad's Deliberate Indifference Claim Should Be Dismissed Pursuant to Rule 12(b)(6)**

To state a claim under 42 U.S.C. § 1983, a plaintiff must show that while acting under color of state law, a defendant deprived him of federal constitutional or statutory rights. *McKithen v. Brown,* 481 F.3d 89, 99 (2d Cir.2007), Here, Muhammad alleges that he received inadequate medical care in violation of the Fourteenth Amendment's protection against cruel and unusual punishment.

Inadequate medical treatment may give rise to a constitutional deprivation under the Fourteenth Amendment where a prisoner alleges "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle v. Gamble,* 429 U.S. 97, 106 (1976) (establishing the standard to treatment of convicted prisoners under the Eighth Amendment); *see Weyant v. Okst,* 101 F.3d 845, 856 (2d Cir.1996) (applying the same standard to pretrial detainees under the Fourteenth Amendment). A cognizable claim of deliberate indifference consists of (1) an objective "medical need" element measuring the severity of the alleged deprivation, and (2) a subjective "deliberate indifference" element measuring whether the prison official acted with a sufficiently culpable state of mind. *Smith v. Carpenter,* 316 F.3d 178, 183–84 (2d Cir.2003).

**1. Serious Medical Need**

To satisfy the objective prong, the alleged deprivation of adequate medical care must be "sufficiently serious."

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 797506 (S.D.N.Y.)

(Cite as: 2011 WL 797506 (S.D.N.Y.))

*Salahuddin v. Goord,* 467 F.3d 263, 279 (2d Cir.2006) (internal quotations omitted). In determining whether an alleged deprivation of medical care is sufficiently serious, a court must "examine how the offending conduct is inadequate and what harm, if any, the inadequacy has caused or will likely cause the prisoner." *Id.* at 280. If there is a complete failure of treatment, the court must look to the seriousness of the inmate's medical condition. *Smith v.. Carpenter,* 316 F.3d 178, 186–86 (2d Cir.2003). An impairment that a reasonable doctor or patient would find important and worthy to treat, a medical condition that affects the daily activities of an individual, or the existence of chronic and substantial pain are all factors that are relevant in the consideration of whether a medical condition was serious. *See Chance v. Armstrong,* 143 F.3d 698, 702–03 (2d Cir.1998). If the complaint alleges that treatment was provided but was inadequate, the seriousness inquiry is more narrowly confined to that alleged inadequacy, rather than focusing upon the seriousness of the medical condition. *Salahnddin,* 467 F.3d at 280.

**\*3** Here, Muhammad alleges that his medical condition has caused him to experience "unbearable and excruciating pain," left him "chronically weaken [ed]," and has interfered with daily activities by making it "practically impossible" for him to use the bathroom. Although Muhammad concedes that he received medical treatment from Defendants, he alleges that the treatment he received from the medical staff was inadequate, and that the medical staff refused to follow the prescribed treatment plan of the "outside doctor." Defendants argue, in part, that Muhammad's claim should be dismissed because courts that have found hemorrhoids to not be a sufficiently serious medical condition. (Defs.'Mem. at 5.) However, the cases Defendants rely upon were decided at the summary judgment stage, following full discovery. *See Kendall v. Kittles,* 03 Civ. 628(GEL), 2004 WL 1752818, *6 (S.D.N.Y. Aug. 4, 2004). It may become clear, at some later stage in the litigation, that Muhammad's claims are not adequately supported, but the Court finds that Muhammad has sufficiently pled that his medical condition constituted a serious medical need. Furthermore, issues of fact currently exists as to the adequacy of the treatment Defendants provided, including issues regarding the treatment the "outside doctor" ordered, how it was different from the treatment Muhammad received from the

medical staff at Rikers Island, and what difference the treatment would have made to his condition. At this early stage of the proceedings, the Court finds that Muhammad has made allegations sufficient to allow the Court to make the plausible inference that his condition was sufficiently serious to constitute a serious medical need, and that he received inadequate medical care to treat his condition.

**2. Deliberate Indifference**

The subjective prong of an Eighth Amendment claim of inadequate medical care requires that "the charged official [ ] act with a sufficiently culpable state of mind." *Hathaway,* 99 F.3d at 553; *See Myrie v. Calvo/Calvoba,* 591 F.Supp.2d 620, 625 (S.D.N .Y.2008) (noting that the Second Circuit has applied the Eighth Amendment test for adequate medical care to a pretrial detainee's rights to the same). "In order to establish deliberate indifference, plaintiffs must show that "the acts of defendants involved more than lack of due care, but rather involved obduracy and wantonness in placing [plaintiff's] health in danger ... In other words ... defendants knew of the health dangers and yet refused to remedy the situation." *LaBounty v. Coughlin,* 137 F.3d 68, 72–73 (2d Cir.1998). To state the standard another way, plaintiffs must establish that prison officials "know of and disregard an excessive risk to inmate health or safety; the official must ... be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, ... draw the inference and fail to take reasonable measures to abate it." *Trammell v. Kean,* 338 F.3d 155, 164 (2d Cir.2003) (citing *Farmer v. Brennan,* 511 U.S. 825, 837, 847 (1994)). Each defendants state of mind must be analyzed separately. *Paul,* 2010 WL 3292673, \*5.

**a. Dr. Jean Richard**

**\*4** Muhammad's Complaint fails to state any direct or personal involvement in his medial treatment by Richard. Muhammad alleges that he was examined by Rikers Island "medical staff" and a "facility surgeon," but he does not allege that Richard ever treated him or was in any way responsible for failing to provide him with adequate medical care, (*See* Compl.) Moreover, Muhammad does not allege that he ever complained to Richard or that Richard was otherwise made aware of Muhammad's condition. Accordingly, the Complaint fails to allege that Richard was deliberately indifferent to his medical needs,

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 797506 (S.D.N.Y.)

(Cite as: 2011 WL 797506 (S.D.N.Y.))

and the Court recommends that Muhammad's claim against Richard be **DISMISSED** pursuant to Rule 12(b)(6).

**b. Deputy Warden Raino Hill**

Muhammad alleges that he complained directly to Mill when the facility medical staff failed to follow the treatment plan prescribed by the "outside doctor," and that Hill denied his grievance. (SOF ¶ 4.) Muhammad does not allege that Hill was aware of the pain he was experiencing or that Hill was aware that the treatment he was receiving from the medical staff was inadequate. Furthermore, Muhammad does not allege that Hill was aware of the alleged likelihood that the treatment plan prescribed by the "outside doctor" would better alleviate his symptoms than the treatment he was receiving from the medical staff. Moreover, Muhammad does not make any allegation as to an ulterior motivation Hill may have had to deny his grievance, which could lead the Court to infer that Hill had a culpable state of mind. Therefore, the Court finds that Muhammad hasn't alleged sufficient facts to allow for the plausible inference that Hill knew of and disregarded an excessive risk to Muhammad's health and safety when he denied the grievance. Because Muhammad has failed to plead sufficient facts to allow for the plausible inference that Hill was deliberately indifferent to Muhammad's medical needs, the Court recommends that the claims against Hill should be **DISMISSED** pursuant to Rule 12(b)(6).

### IV. CONCLUSION

For the foregoing reasons, the Court recommends that Defendants' motion to dismiss the claims against Richard and Hill should be **GRANTED.**

Pursuant to Rule 72, Federal Rules of Civil Procedure, the Parties shall have fourteen (14) days after being served with a copy of the recommended disposition to file written objections to this Report and Recommendation. Such objections shall be filed with the Clerk of the Court and served on all adversaries, with extra copies delivered to the chambers of the Honorable Richard J. Sullivan, 500 Pearl Street, Room 640, and to the chambers of the undersigned, 500 Pearl Street, Room 1970. Failure to file timely objections shall constitute a waiver of those objections in both the District Court and on later appeal to the United States Court of Appeals. *See*

*Thomas v. Arn,* 474 U.S. 140, 150 (1985); *Small v. Sec'y of Health and Human Servs.,* 892 F.2d 15, 16 (2d Cir.1989) (*per curiam* ); 28 U.S.C. § 636(b)(1) (West Supp.1995); Fed.R.Civ.P. 72, 6(a), 6(d).

S.D.N.Y.,2011.

Muhammad v. New York Dept. of Corrections
Not Reported in F.Supp.2d, 2011 WL 797506 (S.D.N.Y.)
END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2011 WL 797672 (S.D.N.Y.)

(Cite as: 2011 WL 797672 (S.D.N.Y.))

**H**

Only the Westlaw citation is currently available.
United States District Court,

S.D. New York.
Abdul–Malik MUHAMMAD, Plaintiff,
v.
NEW YORK DEPARTMENT OF CORRECTIONS, et
al., Defendants.
No. 10 Civ. 1707(RJS)(RLE).

March 3, 2011.
*ORDER ADOPTING REPORT AND
RECOMMENDATION*

RICHARD J. SULLIVAN, District Judge.
**\*1** *Pro se* Plaintiff Abdul–Malik Muhammad filed his
Complaint on March 3, 2010, bringing claims pursuant to
42 U.S.C. § 1983 against Defendants Jean Richards, M.D.,
Deputy Warden Raino Hill, and other named Defendants
who have not yet been served.[FN1] Plaintiff alleges that
while he was detained at Rikers Island Correctional
Facility, Defendants refused to follow a hemorrhoid
treatment plan recommended by an outside doctor, causing
Plaintiff excruciating pain. Plaintiff contends that
Defendants' deliberate indifference to his medical
condition constitutes cruel and unusual punishment in
violation of the Fourteenth Amendment.

> FN1. Specifically, Plaintiff has not served the
> New York Department of Corrections, the New
> York City Department of Health and Hospital
> Services, and "Captain Paterson."

By Order dated March 30, 2010, this matter was
referred to the Honorable Ronald L. Ellis, Magistrate
Judge, for general pre-trial purposes and dispositive
motions requiring a report and recommendation. On July
15, 2010, Defendants Richards and Hill filed a motion to
dismiss the Complaint pursuant to Rule 12(b)(6) of the
Federal Rules of Civil Procedure. Judge Ellis granted
Plaintiff's request for an extension of time to serve his
opposition and set forth a September 24, 2010 deadline for

the response. Plaintiff did not submit any opposition.

On February 3, 2011, Judge Ellis issued a Report and
Recommendation (the "Report"), recommending that
Defendants' motion to dismiss the claims against Richards
and Hill be granted. Judge Ellis noted that the parties shall
have fourteen days from the date of the Report to file
written objections and that the failure to file timely
objections would constitute a waiver of those objections.
*See* 28 U.S.C. § 636(b)(1)(C); Fed.R.Civ.P. 72(b). No
party has filed objections to the Report, and the time to do
so has expired. *Cf. Frank v. Johnson,* 968 F.2d 298 (2d
Cir.1993).

When no objections to a report and recommendation
are made, the Court may adopt the report if there is no
clear error on the face of the record. *Adee Motor Cars,
LLC v. Amato,* 388 F.Supp.2d 250, 253 (S.D.N.Y.2005);
*La Torres v. Walker,* 216 F.Supp.2d 157, 159
(S.D.N.Y.2000). After reviewing the record, the Court
finds that Judge Ellis's Report and Recommendation is not
facially erroneous. Accordingly, the Court adopts the
Report in its entirety, and for the reasons set forth therein,
dismisses the Complaint as to Defendants Richards and
Hill.

SO ORDERED.

S.D.N.Y.,2011.

Muhammad v. New York Dept. of Corrections
Not Reported in F.Supp.2d, 2011 WL 797672 (S.D.N.Y.)
END OF DOCUMENT



Slip Copy, 2010 WL 2985081 (N.D.N.Y.)

(Cite as: 2010 WL 2985081 (N.D.N.Y.))

**C**

Only the Westlaw citation is currently available.
**This decision was reviewed by West editorial staff and not assigned editorial enhancements.**

United States District Court,

N.D. New York.
Richard BLACK, Plaintiff,
v.
Brian FISCHER, Commissioner; Kenneth Perlman, Superintendent, Mid-State Correctional Facility; R. Calidonna, Administrator II, Mid-State Correctional Facility; M.D. Lester Wright, MD, Deputy Commissioner, Defendants.
Civil Action No. 9:08-CV-0232 (FJS/DEP).

July 1, 2010.
Richard Black, Bronx, NY, pro se.

Hon. Andrew M. Cuomo, Attorney General of the State of New York, Christopher W. Hall, Esq., Assistant Attorney General, of Counsel, Albany, NY, for Defendants.

*REPORT AND RECOMMENDATION*

DAVID E. PEEBLES, United States Magistrate Judge.

**\*1** Plaintiff Richard Black, a former New York State prison inmate who is proceeding *pro se* and *in forma pauperis,* has commenced this action pursuant to 42 U.S.C. § 1983 claiming deprivation of his civil rights. Alleging claims under the Eighth Amendment, plaintiff's complaint asserts that the food he was served at the facility in which he was housed at the relevant times, as well as the medical treatment he received there for a hemorrhoid, subjected him to cruel and unusual punishment. As relief, plaintiff seeks to recover compensatory and punitive damages.

Currently pending before the court is defendants' motion for summary judgment dismissing plaintiff's complaint in its entirety, in part based upon plaintiff's failure to exhaust his administrative remedies, and

substantively in light of the fact that he cannot prove that his Eighth Amendment rights were abridged. Having carefully considered the record now before the court in light of the defendants' motion and the plaintiff's arguments in opposition, I find that defendants have established that no reasonable fact finder could conclude plaintiff's Eighth Amendment rights were violated, and therefore recommend that their motion be granted.

I. *BACKGROUND*[FN1]

> FN1. In light of the procedural posture of the case the following recitation is derived from the record now before the court, with all inferences drawn and ambiguities resolved in favor of the plaintiff. *Terry v. Ashcroft,* 336 F.3d 128, 137 (2d Cir.2003). It should be noted, however, that many if not most of plaintiff's allegations are sharply contested by the defendants.

Plaintiff is a former prison inmate who at all times relevant to the complaint was entrusted to the care and custody of the New York State Department of Correctional Services ("DOCS"). *See generally* Complaint (Dkt. No. 26). From on or about March 14 until July 3, 2007, plaintiff was confined to the Mid-State Correctional Facility ("Mid-State"), located in Marcy, New York. Defendants' Rule 7.1(a)(3) Statement of Material Facts (Dkt. No. 37-1) ¶ 3.

While at Mid-State the plaintiff became constipated and, on or about April 6, 2007, observed a hemorrhoid "hanging down" and noticed bleeding. Plaintiff's Deposition Transcript ("Tr.") (Dkt. No. 37-3) 34, 36-37. Plaintiff is a "very sensitive eater", and attributes his condition to the cold, overcooked, unhealthy, and sometimes spoiled food served to him while at Mid-State, although no medical person employed at the facility has ever told him that the hemorrhoid was caused by his diet. In fact, to the contrary, he was advised by a nurse at the facility that hemorrhoids are caused by straining or inappropriate sitting. *Id.* at 32-33, 60. At the time he began complaining of his hemorrhoid, plaintiff was housed in a

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 2985081 (N.D.N.Y.)

(Cite as: 2010 WL 2985081 (N.D.N.Y.))

special housing unit ("SHU")[FN2] and was confined to his cell for twenty-three hours each day; while confined to SHU, Black was taking what he described as "mental medication", each dose consisting of 300 milligrams of Seroquel, and was visited twice daily by a nurse who administered the medication.[FN3] *Id.* at 37-38, 44, 58.

> **FN2.** Prisoners may be placed in SHU for a variety of reasons, including for disciplinary purposes. *Lee v. Coughlin,* 26 F.Supp.2d 615, 618 (S.D.N.Y.1998) (quoting, *inter alia,* 7 N.Y.C.R .R. § 301.6); 7 N.Y.C.R.R. § 301.7. Inmates in SHU are not completely restricted. *Husbands v. McClellan,* 990 F.Supp. 214, 217 (W.D.N.Y.1998); *see also* 7 N.Y.C.R.R. pt. 304. They are allowed two showers per week and one of hour of outdoor exercise per day. *Id.* They are entitled to unlimited legal visits and one non-legal visit per week. *Id.* SHU inmates have access to counselors and sick call. *Id.* Additionally, they can participate in cell study programs and can receive books from the library. *Id.*

> **FN3.** Seroquel is the trade name for a preparation of quetiapine fumarate, a dibenzothiazepine derivative that is an antagonist to multiple neurotransmitter receptors in the brain and is used as an antipsychotic in the treatment of schizophrenia and other psychotic disorders. DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 1591, 1723 (31st ed.2007). Plaintiff testified that the medication put him to sleep, helped him get through the day, made him hungry, and gave him dry mouth. Tr. 38-39, 558-59.

On April 7, 2007, the day after he first noticed the hemorrhoid, plaintiff discussed his condition with a nurse, who advised that it was not serious and that if he wanted to see a doctor, it would take two or three weeks to be seen. Tr. 56. The nurse instructed Black to drink water and provided him with a stool softener, Pepto Bismol, and Preparation H-an over-the-counter medication that reduces the swelling, inflammation, and discomfort associated with hemorrhoids-and advised the plaintiff to apply the

ointment with his finger. Tr. 44, 56-57; Felker Aff. (Dkt. No. 37-2) ¶¶ 15-17. Following the nurse's instructions, plaintiff applied the Preparation H to his rectum area approximately eight times daily. Tr. 45. Plaintiff described the pain he experienced from the hemorrhoid as "harsh ... like a tingling sensation." *Id.*

**\*2** On April 8, 2007, as a result of his continued complaints, plaintiff was given another three-day supply of Preparation H. Felker Aff. (Dkt. No. 37-2) ¶ 18. Approximately a week and a half after first reporting the hemorrhoid to a nurse, Black was visited by a doctor who told plaintiff that his condition was not life threatening and should resolve itself within a week or two. Tr. 46-47. According to plaintiff, the hemorrhoid continued to bleed, which he reported to the nurse, and having discovered that there is an "instrument" to apply the ointment, he requested that he be provided that tool. *Id.* at 47-48. The nurse responded that she was not permitted to dispense the applicator for security reasons. *Id.* Plaintiff understood that in denying plaintiff the applicator for applying the Preparation H the nurses were not being malicious, but instead simply following prison policy. Defendants' Rule 7.1(a)(3) Statement (Dkt. No. 37-1) ¶ 28; Tr. 53. In response to his complaints of blood loss, the nurses monitored Black's blood pressure, as well as whether he was dehydrated, and questioned him regarding the amount of water that he was drinking. Plaintiff claims that the water at the facility contained excessive chemicals, and that as a result he could not drink much water because after ingesting eight cups he would experience a headache. Tr. 33; Plaintiff's Decl. (Dkt. No. 38-2) ¶ 13.

While in SHU confinement at Mid-State plaintiff experienced headaches, heavy gas, and stomach cramps, causing him to stop eating, lose about six pounds, and become weak and "distressful"; he also alleges that he was unable to take his prescribed psychiatric medication twice daily as required because the medication made him hungry. *Id.* at 58, 61; Plaintiff's Decl. (Dkt. No. 38-2) ¶¶ 1, 9, 12.[FN4] According to Black, he therefore stopped taking the medication as prescribed and was "harboring" the pills, and, as a result, the medication was discontinued, which caused him to become verbally and physically violent. *Id.* at ¶ 12.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 2985081 (N.D.N.Y.)

(Cite as: 2010 WL 2985081 (N.D.N.Y.))

FN4. In opposition to defendants' motion, plaintiff has submitted an affidavit and a declaration, both sworn to October 20, 2009.

Plaintiff's ambulatory health records ("AHR") reveal that while housed at Mid-State he was seen by medical personnel approximately forty times over a 104-day period, or an average of every two and one-half days. Felker Aff. (Dkt. No. 37-2) ¶ 14. Plaintiff's last complaint regarding hemorrhoids occurred on May 3, 2007, at which time he again was advised to use Preparation H. *Id.* ¶¶ 22-23.

While at Mid-State, plaintiff filed a single grievance, in it complaining of uncooked rice. Tr. 78-80. That grievance was informally resolved to plaintiff's satisfaction, having received an explanatory letter from defendant R. Calidonna, the food administrator at the facility. *Id.* Additionally, although he does not claim to have complained himself, plaintiff alleges that "many prisoners" informally advised defendant K. Perlman of the "food conditions" at the facility while he a was making daily rounds through the S-Block at Mid-State. Plaintiff's Decl. (Dkt. No. 38-2) ¶ 7.

**\*3** Plaintiff was transferred to out of Mid-state and into the Southport Correctional Facility ("Southport") on July 3, 2007. Felker Aff. (Dkt. No. 37-2) ¶ 26. Upon arrival at Southport, plaintiff refused to submit to the incoming draft physical, and the nurse noted that Black had no physical conditions preventing him from being placed on a disciplinary diet.FN5 *Id.* While at Southport, on December 28, 2007, plaintiff filed a grievance complaining of the food, having suffered from gas pains, constipation, and blood loss, and of not being placed on a special diet while housed at Mid-State. *Id.* at ¶ 28 and Exh. B. Plaintiff admitted that he filed the grievance at Southport in effort to exhaust his administrative remedies before commencing this lawsuit. Tr. 84-85.

FN5. A disciplinary diet is high in fiber and consists of a loaf of bread made with vegetables and wheat flour that is nutritionally adequate. Felker Aff. (Dkt. No. 27) ¶ 27.

The nurse administrator at Southport, Ms. Catherine

Felker, investigated Black's grievance and found it to be without merit. Defendants' Rule 7.1(a)(3) Statement (Dkt. No. 37-1) ¶ 67; Felker Aff. (Dkt. No. 37-2) ¶¶ 29-30 and Exh. C. Nurse Felker concluded that the results of laboratory testing showed no evidence of significant blood loss; and that plaintiff's upset stomach was appropriately treated with antacids, as needed, adding that "[c]onstipation is a common complaint for inmates in SHU due to lack of normal activity and failure to drink adequate amounts of fluid. A special diet is not indicated for his complaints. Food temperature is checked and the food is given immediately upon arrival to the housing unit. At no time is spoiled, undercooked or overcooked food served to the inmate population." FN6 *Id.* at Exh. C.

FN6. Nurse Felker's comments regarding the food are addressed to the food service provided to the plaintiff at Southport, and not Mid-State. Defendants' Rule 7.1(a)(3) Statement (Dkt. No. 37-1) ¶ 75.

## II. *PROCEDURAL HISTORY*

Plaintiff commenced this action on February 27, 2008.FN7 Dkt. No. 1. Plaintiff's complaint, as amended, names as defendants Brian Fischer, Commissioner of the DOCS; Kenneth Perlman, the Superintendent at Mid-State; R. Calidonna, an administrator at Upstate; and Dr. Lester Wright, Deputy Commissioner and Chief Medical Officer of the DOCS. Dkt. No. 26. Plaintiff alleges that he was subjected to cruel and unusual punishment in violation of the Eighth Amendment, in that defendants were deliberately indifferent to both his basic human needs and his serious medical needs. *Id.* As relief, plaintiff's complaint seeks recovery of compensatory damages of $1,000,000, and an additional award of punitive damages in an unspecified amount. *Id.*

FN7. Plaintiff's complaint was accompanied by an application to proceed *in forma pauperis.* Dkt. Nos. 1 and 2. After routine review of the complaint, by order of March 12, 2008, plaintiff was granted leave to proceed *in forma pauperis* and directed to file an amended complaint. Dkt. No. 5. In compliance with that order, Black filed an amended complaint on March 27, 2008. Dkt. No. 6. He was subsequently granted permission

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 2985081 (N.D.N.Y.)

(Cite as: 2010 WL 2985081 (N.D.N.Y.))

to file a second amended complaint, Dkt. No. 20, which is now the operative pleading in this lawsuit.

On October 1, 2009, following the close of discovery, defendants moved pursuant to Federal Rule of Civil Procedure 56 for summary judgment dismissing plaintiff's complaint. Dkt. No. 37. In support of their motion defendants assert that those portions of plaintiff's claims in the action that are based upon the failure of prison officials to provide an applicator for use in administering his hemorrhoid medication are barred due to his failure to exhaust available administrative remedies before commencing suit, and that substantively plaintiff cannot establish a violation of the Eighth Amendment. *See id.* Plaintiff has since responded in opposition to defendants' motion through the submission of an affidavit with attached exhibits, along with a statement of material facts in dispute, and a memorandum of law.[FN8] Dkt. No. 17.

> FN8. With his opposition papers plaintiff also filed a notice of motion seeking "an order dismissing the named defendants [sic] motion pursuant to Rule 56 ...". Dkt. No. 38.

**\*4** Defendants' motion, which is now fully briefed and ripe for determination, has been referred to me for the issuance of a report and recommendation, pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c). *See also* Fed.R.Civ.P. 72(b).

III. *DISCUSSION*

A. *Summary Judgment Standard*

Summary judgment motions are governed by Rule 56 of the Federal Rules of Civil Procedure. Under that provision, summary judgment is warranted when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 2509-10, 91 L.Ed.2d 202 (1986); *Security Ins. Co. of Hartford v.*

*Old Dominion Freight Line, Inc.,* 391 F.3d 77, 82-83 (2d Cir.2004). A fact is "material", for purposes of this inquiry, if it "might affect the outcome of the suit under the governing law." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510; *see also Jeffreys v. City of New York,* 426 F.3d 549, 553 (2d Cir.2005) (citing *Anderson* ). A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510.

A party moving for summary judgment bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue; the failure to meet this burden warrants denial of the motion. *Anderson,* 477 U.S. at 250 n. 4, 106 S.Ct. at 2511 n. 4; *Security Ins.,* 391 F.3d at 83. In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material issue of fact for trial. Fed.R.Civ.P. 56(e); *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553; *Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511. Though *pro se* plaintiffs are entitled to special latitude when defending against summary judgment motions, they must establish more than mere "metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); *but see Vital v. Interfaith Med. Ctr.,* 168 F.3d 615, 620-21 (2d Cir.1999) (noting obligation of court to consider whether *pro se* plaintiff understood nature of summary judgment process).

When deciding a summary judgment motion, a court must resolve any ambiguities, and draw all inferences from the facts, in a light most favorable to the nonmoving party. *Jeffreys,* 426 F.3d at 553; *Wright v. Coughlin,* 132 F.3d 133, 137-38 (2d Cir.1998). The entry of summary judgment is warranted only in the event of a finding that no reasonable trier of fact could rule in favor of the non-moving party. *See Building Trades Employers' Educ. Ass'n v. McGowan,* 311 F.3d 501, 507-08 (2d Cir.2002) (citation omitted); *see also Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511 (summary judgment is appropriate only when "there can be but one reasonable conclusion as to the verdict").

B. *Plaintiff's Failure to File a Proper Local Rule 7.1(a)(3)*

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 2985081 (N.D.N.Y.)

(Cite as: 2010 WL 2985081 (N.D.N.Y.))

*Statement*

**\*5** This court's rules provide that a party opposing a motion for summary judgment

shall file a response to the [moving party's] Statement of Material Facts. The non-movant's response shall mirror the movant's Statement of Material Facts by admitting and/or denying each of the movant's assertions in matching numbered paragraphs. Each denial shall set forth a specific citation to the record where the factual issue arises. The non-movant's response may also set forth any additional material facts that the non-movant contends are in dispute in separately numbered paragraphs.

N.D.N.Y.L.R. 7.1(a)(3). This rule, which is typical of similar rules from many other courts, serves to assist the court in identifying material issues in a case and determining whether they are genuinely disputed. *See Monahan,* 214 F.3d at 292. While in opposing defendants' motion plaintiff has filed a document entitled "Statement of Material Facts In Opposition to the Defendants [sic] Motion For Summary Judgment", plaintiff's filing fails to comport with the requirements of Local Rule 7.1(a)(3). The consequences of this failure are potentially significant.

By its terms, Local Rule 7.1(a)(3) provides that *"[t]he Court shall deem admitted any facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert."* N.D.N.Y.L.R. 7.1(a)(3) (Emphasis in original). Courts in this district have not hesitated to enforce Rule 7.1(a)(3) and its predecessor, Rule 7.1(f), by deeming facts admitted upon an opposing party's failure to properly respond. *See, e.g., Elgamil v. Syracuse Univ.,* No. 99-CV-611, 2000 WL 1264122, at *1 (Aug. 22, 2000)* (McCurn, S.J.) (listing cases)[FN9]; *see also Monahan v. New York City Dep't of Corr.,* 214 F.3d 275, 292 (2d Cir.2000)* (discussing district courts' discretion to adopt local rules like 7.1(a)(3)).[FN10]

FN9. Copies of all unreported decisions cited in this document have been appended for the convenience of the *pro se* plaintiff. [Editor's Note: Attachments of Westlaw case copies deleted for online display.]

FN10. As to those facts not contained in the defendants' Local Rule 7.1(a)(3) statements, I assume for purposes of this motion that plaintiff's version of those facts is true, as plaintiff is entitled to the benefit of all inferences at this stage. *Wright v. Coughlin,* 132 F.3d 133, 137 (2d Cir.1998).

Although plaintiff's statement includes seven separately numbered paragraphs, those paragraphs do not directly respond or correspond to the eighty-one separately numbered paragraphs contained in the Defendants' Local Rule 7.1(a)(3) Statement. Additionally, plaintiff has neglected to include any citations to the record in his Local Rule 7.1(a)(3) Statement. More importantly, plaintiff expressly acknowledges that the defendants' "document numbered from 1/81 in paragraphs are true statements looking back at the deposition transcripts ..." but argues that "the format in which they are said to challenge the plaintiff [sic] is completely swindling the genuine issue of facts." Plf.'s Local Rule 7.1(a) (3) Stmt. (Dkt. No. 38-1) As this excerpt suggests, for the most part, plaintiff's Local Rule 7.1(a)(3) Statement improperly consists of argument, rather than statements of fact.

Because plaintiff has failed to comply with the requirements of Local Rule 7.1(a)(3) and submit a proper statement of material facts responding to that filed by defendants, I recommend that the court deem those facts set forth in defendants' Local Rule 7.1(a) (3) Statement to have been admitted.

C. *Exhaustion of Remedies*

**\*6** In support of their motion for summary judgment, the defendants argue that plaintiff's complaint must be dismissed because he failed to exhaust his administrative remedies. This prong of defendants' motion is based upon Black's alleged failure to raise any complaint in the grievances he filed while in prison regarding treatment of his hemorrhoid or the refusal of prison medical personnel to supply him with an applicator.

The Prison Litigation Reform Act of 1996 ("PLRA"), Pub.L. No. 104-134, 110 Stat. 1321 (1996), which imposes several restrictions on the ability of prisoners to

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 2985081 (N.D.N.Y.)

(Cite as: 2010 WL 2985081 (N.D.N.Y.))

maintain federal civil rights actions, expressly requires that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a); see Woodford v. Ngo, 548 U.S. 81, 84, 126 S.Ct. 2378, 2382, 165 L.Ed.2d 368 (2006); Hargrove v. Riley, No. CV-04-4587, 2007 WL 389003, at *5-6 (E.D.N.Y. Jan.31, 2007). "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." Porter v. Nussle, 534 U.S. 516, 532, 122 S.Ct. 983, 992, 152 L.Ed.2d 12 (2002) (citation omitted). Plaintiff's claims, which relate to the his medical treatment, qualify under the PLRA as the type of claims requiring exhaustion as a prerequisite to asserting them in the context of a civil rights action. Kendall v. Kittles, No. CO Civ. 628(GEL), 2004 WL 1752818, at *3 (S.D.N.Y. Aug. 4, 2004).

New York prison inmates are subject to an Inmate Grievance Program ("IGP") established by the DOCS and recognized as an "available" remedy for purposes of the PLRA. See Mingues v. Nelson, No. 96 CV 5396, 2004 WL 324898, at *4 (S.D.N.Y. Feb.20, 2004) (citing Mojias v. Johnson, 351 F.3d 606 (2d Cir.2003) and Snider v. Melindez, 199 F.3d 108, 112-13 (2d Cir.1999)). The IGP consists of a three-step review process. First, a written grievance is submitted to the Inmate Grievance Review Committee ("IGRC") within twenty-one days of the incident.[FN11] 7 N.Y.C.R.R. § 701.5(a). The IGRC, which is comprised of inmates and facility employees, then issues a determination regarding the grievance. Id. §§ 701.4(b), 701.5(b). If an appeal is filed, the superintendent of the facility next reviews the IGRC's determination and issues a decision. Id. § 701.5(c). The third level of the process affords the inmate the right to appeal the superintendent's ruling to the Central Office Review Committee ("CORC"), which makes the final administrative decision. Id. § 701.5(d). Ordinarily, absent the finding of a basis to excuse non-compliance with this prescribed process, only upon exhaustion of these three levels of review may a prisoner seek relief pursuant to section 1983 in a federal court. Reyes v. Punzal, 206

F.Supp.2d 431, 432 (W.D.N.Y.2002) (citing, inter alia, Sulton v. Greiner, No. 00 Civ. 0727, 2000 WL 1809284, at *3 (S.D.N.Y. Dec.11, 2000)).

> FN11. The IGP supervisor may waive the grievance timeliness requirement due to "mitigating circumstances." 7 N.Y.C.R.R. § 701.6(g)(1)(i)(a)-(b).

*7 In this case, plaintiff filed only two relevant grievances. The first, complaining of uncooked rice, was filed while Black was confined to Mid-State and was informally resolved, apparently to his satisfaction. The second grievance was filed on December 7, 2007, several months after he Black was transported to Southport.

Defendants' position regarding exhaustion is somewhat schizophrenic. In their memorandum, defendants assert that the grievance filed by plaintiff at Southport did not reference the hemorrhoid medication applicator issue. See Defendants' Memorandum (Dkt. No. 37-6) at p. 9. It seems clear that this is the case since in that grievance, in which plaintiff complained that he suffered constipation, blood loss, and an upset stomach, was deprived of adequate medical treatment and a special diet, and served cold, spoiled, uncooked, and overcooked meals while at Mid-State, does not reference the applicator issue. See Felker Aff. (Dkt. No. 37-2) Exh. B.

In their local rule 7.1(a)(3) Statement, however, defendants offer conflicting accounts regarding that grievance, at one point asserting that the Southport Grievance did in fact reference the hemorrhoid ointment applicator issue. Compare Defendants Local Rule 7.1(a)(3) Statement (Dkt. No. 37-1) ¶ 50 ("Five months after plaintiff left Mid-State, while at Southport Correctional Facility, plaintiff finally filed a grievance related to his claims in this lawsuit: i.e., bad food and being denied an applicator for hemorrhoid ointment at Mid-State"); with id. ¶ 78 ("in his grievance plaintiff fails [sic] that he was denied an applicator to apply ointment to his hemorrhoid." (citing to December 7, 2007 grievance).

The record is therefore at least slightly equivocal as to whether plaintiff's Southport grievance was construed by prison officials as dealing with the applicator issue.

Slip Copy, 2010 WL 2985081 (N.D.N.Y.)

(Cite as: 2010 WL 2985081 (N.D.N.Y.))

This confusion is furthered by plaintiff's deposition testimony, in which he stated that the applicator issue was intended by him to be included within the December 7, 2007 grievance. *See* Tr. 81-90. There is no indication of whether the result of the December 7, 2007 grievance, which was apparently a denial, was pursued by the plaintiff through to the CORC-a requirement for complete exhaustion. Given these various unresolved issues, notwithstanding my recommendation with regard to the merits, I have opted not to recommend dismissal of the applicator claim on this procedural ground.

D. *Plaintiff's Eighth Amendment Claims*

As an additional basis for granting summary judgment, defendants argue that plaintiff has failed to state a cognizable Eighth Amendment claim. The essence of plaintiff's complaint appears to be that he was denied the basic human right to adequate food, and that the defendants failed to properly treat his hemorrhoid.

The Eighth Amendment's prohibition of cruel and unusual punishment encompasses punishments that involve the "unnecessary and wanton infliction of pain" and are incompatible with "the evolving standards of decency that mark the progress of a maturing society." *Estelle v. Gamble,* 429 U.S. 97, 102, 104, 97 S.Ct. 285, 290, 291, 50 L.Ed.2d 251 (1976); *see also Whitley v. Albers,* 475 U.S. 312, 319, 106 S.Ct. 1076, 1084 (1986) (citing, *inter alia, Estelle* ). While the Eighth Amendment does not mandate comfortable prisons, neither does it tolerate inhumane treatment of those in confinement; thus, the conditions of an inmate's confinement are subject to Eighth Amendment scrutiny. *Farmer v. Brennan,* 511 U.S. 825, 832, 114 S.Ct. 1970, 1976, 128 L.Ed.2d 811 (1994) (citing *Rhodes v. Chapman,* 452 U.S. 337, 349, 101 S.Ct. 2392, 2400, 69 L.Ed.2d 59 (1981)).

**\*8** A claim alleging that prison conditions violate the Eighth Amendment must satisfy both an objective and subjective requirement-the conditions must be "sufficiently serious" from an objective point of view, and the plaintiff must demonstrate that prison officials acted subjectively with "deliberate indifference". *See Leach v. Dufrain,* 103 F.Supp.2d 542, 546 (N.D.N.Y.2000) (Kahn, J.) (citing *Wilson v. Seiter,* 501 U.S. 294, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991)); *Waldo v. Goord, No.*

97-CV-1385, 1998 WL 713809, at *2 (N.D.N.Y. Oct. 1, 1998) (Kahn, J. and Homer, M.J.); *see also, generally, Wilson,* 501 U.S. 294, 111 S.Ct. 2321, 115 L.Ed.2d 271. Deliberate indifference exists if an official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer,* 511 U.S. at 837, 114 S.Ct. at 1978; *Leach,* 103 F.Supp.2d at 546 (citing *Farmer* ); *Waldo,* 1998 WL 713809, at *2 (same).

1. *Plaintiff's Claim That He Was Denied Adequate Food*

To satisfy the objective prong of an Eighth Amendment conditions of confinement claim, a plaintiff must demonstrate a deprivation of " 'the minimal civilized measure of life's necessities,' such as adequate food, clothing shelter, sanitation, medical care, and personal safety." *May v. DeJesus,* No.3:06CV1888, 2010 WL 1286800, at *4 (D.Conn. Mar.30, 2010) (quoting *Alvarez v. County of Cumberland,* Civil No. 07-346(RBK), 2009 WL 750200, at *2 (D.N.J. Mar.18, 2009) (citation omitted)). Conditions that are merely restrictive or harsh, however, do not implicate the Eighth Amendment; "they are merely part of the penalty that criminal offenders pay for their offense against society." *May,* 2010 WL 1286800, at *4 (quoting *Alvarez,* 1009 WL 750200, at *2). The Second Circuit has recognized that the Eighth Amendment requires that prisoners be provided with "nutritionally adequate food that is prepared and served under conditions which do not present an immediate danger to the health and well being of the inmates who consume it." *Robles v. Coughlin,* 725 F.2d 12, 15 (2d Cir.1983) (citation omitted); *Brown v. Eagen,* No. 9:08-CV-0009, 2009 WL 815724, at *10 (N.D.N.Y. Mar.26, 2009) (McAvoy, S.J.) (citations omitted); *Midalgo v. Bass,* No. 9:03-CV-1128, 2006 WL 2795332, at *11 (N.D.N.Y. Sept.26 2006) (Mordue, C.J.) (citations omitted).

In this instance, plaintiff has failed to present evidence demonstrating that the food at Mid-State was prepared and served in a manner that endangered his health. Instead, plaintiff's food complaints consist entirely of broad and conclusory allegations which, while at first blush troublesome, are devoid of the specifics necessary

Slip Copy, 2010 WL 2985081 (N.D.N.Y.)

(Cite as: 2010 WL 2985081 (N.D.N.Y.))

to prove such a claim. Plaintiff states, for example, that after entering Mid-State he "became aware of the mostly uncooked and cold foods serviced [sic] in which immediately caused stomach cramps and heavy gas." Plaintiff's Decl. (Dkt. No. 38-2) ¶ 1. Black further asserts that the food was "unacceptable, unhealthy, and ... apparently unnutritiously inadequate both quantity and quality ... there was spoiled vegetables, over cooked and uncooked rice and meats serviced ... the bread regularly be air filters stale ... the food service was un-consumable and none-chewable ... period." *Id.* ¶ 11. Plaintiff does not, however, identify any specific occasions, or number of occasions, or meals he claims were spoiled or uncooked. Although he claims to have lost six pounds while at Mid-State, admittedly as a result of his own refusal to eat, he does not produce any evidence that meals or food that he consumed caused him to become ill on any specific instance, or otherwise immediately threatened his physical well being. Indeed, there is no evidence in Black's AHR that he suffered any dire physical consequences as a direct result of food consumed by him, or his refusal to eat the allegedly unhealthy food. Simply stated, plaintiff's allegations are no more than generalized allegations which are troublesome at first blush, but lack the specifics necessary to substantiate an Eighth Amendment claim while housed at Mid-State. *Brown,* 2009 815724, at *10.

**\*9** In further support of his position plaintiff submits the declaration of Michael Perkins, also an inmate at Mid-State in 2007, who alleges that while housed there he filed grievances complaining about the rations of food, and the facts that it was cold and, at times, spoiled. *See* Black Decl. (Dkt. No. 38-2) Exh. A at ¶ 4. Unfortunately, the Perkins declaration is similarly conclusory and does not provide any factual support for plaintiff's claim. Perkins does not provide any detail regarding the date of and the specific complaint included in any grievance that he filed, or any specific instances that he was served spoiled food while at Mid-State. At best, the Black affidavit and Perkins declaration establish only that the food at Mid-State was not to their liking, and, on occasion meals may have been cold and/or included some spoiled food. "Insofar as [the plaintiff] alleges that the food in the prison was merely cold, or that spoiled food was only served on a few occasions, he fails to state a cause of action." *Lunney v. Brureton,* No. 04 Civ. 2438, 2005 WL 121720, at *6 (S.D.N.Y. Jan.21, 2005).

Even if plaintiff were able to over come the objective prong of the Eighth Amendment analysis, he still fails with respect to the subjective component. To show deliberate indifference, a plaintiff must demonstrate that the prison official sued was aware of and disregarded an excessive risk to the inmate's health or safety. *Farmer,* 511 U.S. at 837, 114 S.Ct. at 1978. Plaintiff does not claim that defendants Fischer or Wright had actual knowledge of the alleged unhealthy food condition; instead, plaintiff alleges in his complaint that these defendants had "constructive knowledge". Complaint (Dkt. No. 26) ¶ 17.

With regard to defendant Perlman, the plaintiff alleges only that through daily rounds he would be advised of the food conditions by many prisoners. While plaintiff claims that he made defendant Calidonna aware through his grievance, the record is undisputed that Black filed only one grievance during the time he was housed at Mid-State, and in that grievance he complained only of uncooked rice. Plaintiff has otherwise failed to adduce any evidence that any of the named defendants were made aware of a pervasive problem of uncooked or spoiled food being served at Mid-State. Nor has he produced any evidence that any of them had noticed that problems with food service endangered prisoners' health; there is no evidence that anyone, including plaintiff, suffered a serious illness as a direct result of ingesting the prison food. For these reasons, the evidence in the record is insufficient to establish a triable issue of fact concerning whether defendants were aware of and disregarded a serious problem with the food. *Newman v. Zenk,* No. 05-CV-259, 2007 6888112, at *6 (E.D.N.Y. Mar. 29, 2007) (citing *Salahuddin v. Goord,* 467 F.3d 263, 281 (2d Cir.2006)), *aff'd,* 309 Fed. App'x 535 (2d Cir. Feb.17, 2009). Accordingly, I find that defendants' motion as to plaintiff's food-related claim should be granted.

2. *Plaintiff's Claims Regarding Inadequate Medical Treatment*

**\*10** Plaintiff's medical indifference claim appears to have two components, one in which he complains of the denial of an applicator for use with Preparation H, and the other contending that the treatment he received for his

Slip Copy, 2010 WL 2985081 (N.D.N.Y.)

(Cite as: 2010 WL 2985081 (N.D.N.Y.))

hemorrhoid was inadequate. Like plaintiff's food-related claim, claims that prison officials have intentionally disregarded an inmate's medical needs fall under the umbrella of protection afforded by the Eighth Amendment, Estelle, 429 U.S. at 102, 104, 97 S.Ct. at 291, and are subject to the two-prong analysis requiring that a plaintiff establish both the objective and subjective elements, Hathaway v. Coughlin, 37 F.3d 63, 66 (2d Cir.1994).

a) Objective Requirement

Analysis of the objective, "sufficiently serious" requirement of a Eighth Amendment medical indifference claim begins with an inquiry into "whether the prisoner was actually deprived of adequate medical care ...", and focuses on whether prison officials acted reasonably in treating the plaintiff. Salahuddin, 467 F.3d at 279. The second prong of the objective test addresses whether the inadequacy in medical treatment was sufficiently serious. Id. at 280. If there is a complete failure to provide treatment, the court must look to the seriousness of the inmate's medical condition. Smith v. Carpenter, 316 F.3d 178, 185-86 (2d Cir.2003). If, on the other hand, the complaint alleges that treatment was provided but was inadequate, the seriousness inquiry is more narrowly confined to that alleged inadequacy, rather than focusing upon the seriousness of the medical condition. Salahuddin, 467 F.3d at 280. "For example, if the prisoner is receiving on-going treatment and the offending conduct is an unreasonable delay or interruption in treatment ... [the focus of] the inquiry is on the challenged delay or interruption, rather that the prisoner's underlying medical condition alone." Id., at 280 (quoting Smith, 316 F.3d at 185) (internal quotations omitted). In other words, the critical question is the seriousness of the medical need, or whether the temporary deprivation was objectively harmful enough to establish a constitutional violation. Smith, 316 F.3d at 186. Of course, "when medical treatment is denied for a prolonged period of time, or when a degenerative medical condition is neglected over sufficient time, the alleged deprivation of care can no longer be characterized as 'delayed treatment, but may properly be viewed as a 'refusal' to provide medical treatment." Id. at 186, n. 10 (quoting Harrison v. Barkley, 219 F.3d 132, 137 (2d Cir.2000)).

Addressing the seriousness of the plaintiff's condition

first, plaintiff's AHR establishes that he complained of constipation and an external hemorrhoid for a period of less than one month, during which he experienced typical symptoms, including discomfort and minor bleeding. These conditions, without more, are not sufficiently serious to establish an Eighth Amendment claim. Lowman v. Perlman, No. 9:06-CV-0422, 2008 WL 4104554, at *5 (N.D.N.Y. Aug.29, 2008) (Kahn, D.J. and Treece, M.J.); Cabassa v. Gummerson, No. 01-CV-1039, 2006 WL 1559215, at *9-10 (N.D.N.Y. Mar.30, 2006) (Lowe, M.J.), report and recommendation adopted by, 2006 WL 1555656 (N.D.N.Y. Jun.1, 2006) (Hurd, D.J.); Kendall v. Kittles, 2004 WL 1752818, at *6 ("Hemorrhoids, albeit, uncomfortable, are a minor issue, far removed from the category of medical conditions that have been deemed 'sufficiently serious' by other courts.").

*11 Additionally, I note that it cannot seriously be argued that Black did not receive medical attention while incarcerated. In fact, plaintiff's AHR shows that in response to various minor physical complaints including constipation, upset stomach, hemorrhoids, and bleeding, he was seen by medical personnel approximately forty times during the four months that he was confined to Mid-State. When plaintiff first noticed the hemorrhoid, he was visited by a nurse, who provided him with ointment and a stool softener and instructions regarding avoiding hemorrhoids, including that he drink water and exercise. Plaintiff apparently failed to follow these instructions. Each time he complained of the hemorrhoid, plaintiff was provided with more Preparation H. Plaintiff was reassured by a physician that, despite some bleeding, his condition was not serious or life threatening and that the hemorrhoid would disappear in time. Because plaintiff admittedly suffered an external hemorrhoid, an applicator was not necessary for treatment with Preparation H.[FN12] Felker Aff. (Dkt. No. 37-2) ¶¶ 35, 39.

> FN12. Even if plaintiff's hemorrhoid required the use of an applicator, it appears that he likely would have been denied access to such a tool based on security concerns, and not out of malice. See Felker Aff. (Dkt. No. 37-2) ¶¶ 40-41. Under these circumstances, the deliberate indifference standard cannot be established as the record demonstrates that the withholding of the

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 2985081 (N.D.N.Y.)

(Cite as: 2010 WL 2985081 (N.D.N.Y.))

applicator was reasonably calculated to maintain prison security. *See Trammel v. Keane,* 338 F.3d 155, 163 (2d Cir.2003) ( "[p]rison administrators ... should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security") (quoting *Bell v. Wolfish,* 441 U.S. 520, 547, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979)).

The record now before the court clearly establishes that prison officials were attentive and acted reasonably in treating plaintiff's hemorrhoid. Plaintiff's obvious dissatisfaction or disagreement with treatment that he received for his hemorrhoid is patently insufficient to establish an Eighth Amendment violation. *Tafari v. McCarthy,* No. 9:07-CV-654, 2010 WL 2044705, at *32 (N.D.N.Y. May 24, 2010) (Hurd, J. and Lowe, M.J.) (citation omitted); *McQueen v. County of Albany,* No. 9:08-CV-799, 2010 WL 338081, at * (N.D.N.Y. Jan.28, 2010) (Hurd, J. and Peebles, M.J.) (citations omitted).

b) *Subjective Element*

The second, subjective, requirement for establishing an Eighth Amendment medical indifference claim mandates a showing of a sufficiently culpable state of mind, or deliberate indifference, on the part of one or more of the defendants. *Salahuddin,* 467 F.3d at 280 (citing *Wilson,* 501 U.S. at 300, 111 S.Ct. 2321, 115 L.Ed.2d 271). Deliberate indifference is a mental state equivalent to subjective recklessness as the term is used in criminal law. *Salahuddin,* 467 F.3d at 280 (citing *Farmer,* 511 U.S. at 839-40, 114 S.Ct. 1970, 128 L.Ed.2d 811). As previously discussed, to establish deliberate indifference a plaintiff must show that the official was aware of facts from which it could be concluded that a substantial risk of serious harm existed and must also draw that conclusion. *See Farmer,* 511 U.S. at 837, 114 S.Ct. at 1979. Mere negligence on the part of a physician or other prison medical official in treating or failing to treat a prisoner's medical condition does not implicate the Eighth Amendment and is not properly the subject of a § 1983 action. *Estelle,* 429 U.S. at 105-06, 97 S.Ct. at 292; *Chance,* 143 F.3d at 703.

For the same reasons that plaintiff cannot prove the objective element of a medical indifference claim, he fails with respect to the subjective element. Plaintiff's hemorrhoid did not expose him to substantial risk of harm if left untreated, and the condition, in fact, was not ignored by prison personnel. In sum, the record is devoid of any evidence suggesting that any defendant, or any prison official for that matter, was deliberately indifferent to plaintiff's medical needs.

**\*12** After carefully reviewing the record before the court, I find that there are no material issues of fact with respect to plaintiff's Eighth Amendment medical indifference claim and that defendants' motion for summary judgment dismissing this claim should therefore be granted.

IV. *SUMMARY AND CONCLUSION*

Plaintiff complains regarding the conditions of confinement while housed at Mid-State, alleging the food he was served and the medical treatment that he was provided with regard to a hemorrhoid subjected him to cruel and unusual punishment. These complaints, however, amount to nothing more than dissatisfaction with the harsh realities of prison life. The record fails to show that the food that plaintiff was served was not nutritionally adequate, or posed an immediate danger to plaintiff's health, and that defendants were aware of that fact. Turning to plaintiff's hemorrhoid, no reasonable factfinder could conclude that it satisfies the threshold constitutional requirement of a serious medical condition, and in any event, the record establishes that plaintiff was rendered reasonable medical treatment for his hemorrhoid.

Unfortunately for plaintiff, while the Eighth Amendment ensures that inmates are provided the minimal civilized measures of life's necessities, it does not create a right to comfortable prisons. For this reason, though I have concluded that issues of fact remain as to whether plaintiff exhausted his administrative remedies, I have found that substantively plaintiff has failed to state a constitutional claim and that defendants' motion for summary judgment therefore should be granted.

Accordingly, it is hereby respectfully

Slip Copy, 2010 WL 2985081 (N.D.N.Y.)

(Cite as: 2010 WL 2985081 (N.D.N.Y.))


RECOMMENDED that defendants' motion for summary judgment dismissing plaintiff's complaint (Dkt. No. 37) be GRANTED, and that plaintiff's complaint be DISMISSED in its entirety, with prejudice.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections must be filed with the clerk of the court within FOURTEEN days of service of this report. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(d), 72; Roldan v. Racette, 984 F.2d 85 (2d Cir.1993).

It is hereby ordered that the clerk is also serve a copy of the report and recommendation upon the parties in accordance with this court's local rules.

N.D.N.Y.,2010.

Black v. Fischer
Slip Copy, 2010 WL 2985081 (N.D.N.Y.)
END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2010 WL 338081 (N.D.N.Y.)

(Cite as: 2010 WL 338081 (N.D.N.Y.))

**c**

Only the Westlaw citation is currently available.
**This decision was reviewed by West editorial staff
and not assigned editorial enhancements.**

United States District Court,

N.D. New York.
Michael McQUEEN, Plaintiff,
v.
COUNTY OF ALBANY; Thomas Wigger,
Superintendent, Albany County Correctional Facility;
and Correctional Medical Services, Defendants.
No. 9:08-CV-799.

Jan. 28, 2010.
Michael McQueen, Stormville, NY, pro se.

Napierski, Vandenburgh & Napierski, L.L.P., Shawn F.
Brousseau, Esq., of Counsel, Albany, NY, for Defendants
County of Albany and Thomas Wigger.

Thuillez, Ford, Gold, Butler & Young, L.L.P., Kelly
Monroe, Esq., of Counsel, Albany, NY, for Correctional
Medical Services.

Michael McQueen, Dannemora, NY, pro se.

### DECISION and ORDER

DAVID N. HURD, District Judge.
    *1 Plaintiff, Michael McQueen, brought this civil
rights action in July 2008, pursuant to 42 U.S.C. § 1983.
By Report-Recommendation dated December 22, 2009,
the Honorable David E. Peebles, United States Magistrate
Judge, recommended that defendants' motions for
summary judgment (Docket Nos. 19 and 22) be granted in
relevant part, and that all of plaintiff's claims against
defendants be dismissed, with prejudice with respect to
plaintiff's federal claims, but without prejudice to his right
to assert any pendent state law claims in an appropriate
state court. The plaintiff has filed objections to the

Report-Recommendation. Defendants County of Albany
and Thomas Wigger have filed a response to the plaintiff's
objections to the Report/Recommendation claiming,
among other things, that the objections were filed
untimely. Defendant Correctional Medical Services has
filed a response to the plaintiff's objections to the
Report/Recommendation also claiming, among other
things, that the objections were filed untimely.
    Based upon a de novo review of the portions of the
Report-Recommendation to which the plaintiff has
objected and to which the defendants have filed responses,
the Report-Recommendation is accepted and adopted in
all respects. See 28 U.S.C. 636(b) (1).

    Accordingly, it is

    ORDERED that

    1. Defendants' motions for summary judgment
(Docket Nos. 19 and 22) are GRANTED, in relevant part;

    2. All of plaintiff's claims against defendants are
DISMISSED, with prejudice with respect to his federal
claims, but without prejudice to his right to assert any
pendent state law claims in an appropriate state court;

    3. The Clerk is directed to file judgment accordingly
and close the file.

    IT IS SO ORDERED.

### REPORT AND RECOMMENDATION

DAVID E. PEEBLES, United States Magistrate Judge.
    Plaintiff Michael McQueen, a New York State prison
inmate who is proceeding *pro se* and *in forma pauperis,*
commenced this action pursuant to 42 U.S.C. § 1983
alleging deprivation of his civil rights arising out of his
pretrial detention at the Albany County Correctional
Facility. In his complaint, plaintiff alleges that he slipped
and injured himself while exiting a shower area and was
thereafter denied medical treatment, in violation of his
constitutional rights.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 338081 (N.D.N.Y.)

(Cite as: 2010 WL 338081 (N.D.N.Y.))

Currently pending before the court are two separate but similar motions by the defendants for summary judgment dismissing plaintiff's claims against them. In their motions, defendants argue that plaintiff's claims against them are subject to dismissal on a variety of grounds, including procedurally based upon his failure to exhaust available administrative remedies before commencing suit, and on the merits. Having carefully considered the record now before the court in light of defendants' arguments and plaintiff's failure to properly oppose the defendants' motions, while I find the existence of triable issues of fact surrounding the defense of exhaustion, precluding dismissal on this procedural basis, I recommend that the motions be granted, in relevant part, and that plaintiff's complaint be dismissed on the merits.

I. *BACKGROUND*[FN1]

FN1. In light of the procedural posture of the case the following recitation is derived from the record now before the court, with all inferences drawn and ambiguities resolved in favor of the plaintiff. *Terry v. Ashcroft,* 336 F.2d 128, 137 (2d Cir.2003). It should be noted, however, that many if not most of plaintiff's allegations are sharply contested by the defendants.

*2 After being arrested on charges not disclosed in the record, plaintiff was temporarily housed at the Albany County Correctional Facility ("ACCF") as a pretrial detainee from October 2, 2007 until March 19, 2008, when he was transferred into the custody of the New York State Department of Correctional Services (the "DOCS"). *See* ACCF Medical Record (Dkt. No. 22-5). Upon his arrival at ACCF, plaintiff was screened by defendant Correctional Medical Services and found to have no physical complaints. *See id .*

On January 22, 2008, as he was exiting the facility's shower area, McQueen slipped on a puddle of water and fell.[FN2] Complaint (Dkt. No. 1) p. 3. When he slipped, plaintiff "pulled" his right side and felt a sharp pain in the lower right side of his abdomen. *Id.* Plaintiff reported this incident and his injury to the corrections officer on duty and was told to complete a sick call request. *Id.*

FN2. There is some discrepancy in the record as to the date of plaintiff's accident. In his complaint and during his deposition testimony, plaintiff alleged that the incident occurred on January 22, 2008. *See* Complaint (Dkt. No. 1) p. 3; *see also* Deposition Transcript ("Tr.") (Dkt. No. 19-5) p. 19. Later during his deposition, however, plaintiff testified that the incident occurred on January 14, 2008, which coincides with the date of his first sick call request. Tr. (Dkt. No. 19-5) pp. 21-22.

The first request for health services from plaintiff contained in the record relating to a problem on his right side is dated January 14, 2008, and states, "I believe I have an [sic] hernia on my top right side, witch [sic] is causing me discomfort and pain."[FN3] *See* ACCF Medical Record (Dkt.22-5); *see also* Tr. (Dkt. No. 19-5) pp. 21-22. McQueen was seen by a nurse the following day, who consulted with a physician and prescribed Motrin for his pain. *See* ACCF Medical Record (Dkt. No. 22-5). Plaintiff was administered Motrin over the period of January 15 through 25, 2008. *See id.*

FN3. Plaintiff testified that the January 14, 2008 request was his second, and that he never received a copy of the first one that he filled out. Tr. (Dkt. No. 19-5) p. 22. Plaintiff did not identify the date or testify as to the substance of the first request.

On January 31, 2008, plaintiff lodged another complaint of a right side hernia and requested to see a doctor. *See* ACCF Medical Record (Dkt. No. 22-5). Plaintiff was seen the following day by a physician's assistant, who prescribed a ten-day supply of Motrin to be taken at night for the pain. Tr. (Dkt. No. 19-5) p. 23. On that occasion, McQueen was told that the physical examination revealed a small lump, but there was nothing more that could be done for him. *Id.* at 24.

The record reflects that McQueen did not complain about his condition again until more than two weeks later when, on February 17, 2008, he completed another request for health services identifying a right side hernia and pain. *See* ACCF Medical Record (Dkt. No. 22-5). Plaintiff was

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 338081 (N.D.N.Y.)

(Cite as: 2010 WL 338081 (N.D.N.Y.))

again seen the following day by a member of the facility's medical staff, on this occasion a nurse. *Id.* The record of plaintiff's examination on that date reveals a diagnosis of "intermittent bulging [of the] upper right inguinal area with discomfort", and notes plaintiff's request to see a physician. *Id.*

Plaintiff was examined on February 19, 2008 by Dr. Michael Salzman. Tr. (Dkt. No. 19-5) p. 25; *see also* Affidavit of Michael A. Salzman, M.D. ("Salzman Aff.") (Dkt. No. 22-9) ¶ 6. Based upon his examination, Dr. Salzman diagnosed McQueen as suffering from a mild right side femoral hernia, one-half centimeter in size, with an estimated onset of about two months.[FN4] *See* ACCF Medical Record (Dkt. No. 22-5). Dr. Salzman states that although plaintiff wrote on the health services request form that he was experiencing pain, McQueen did not voice any complaints of pain during his visit of February 19, 2008, and the doctor's examination revealed no objective or subjective signs of pain. Salzman Aff. (Dkt. No. 22-9) ¶ 6.

> FN4. Plaintiff testified to having experienced a hernia when he was a child, and that he had it surgically repaired. Tr. (Dkt. No. 19-5) at pp. 13-14.

**\*3** According to Dr. Salzman, a mild hernia does not require surgical intervention provided that it is not incarcerated. Salzman Aff. (Dkt. No. 22-9) ¶ 7. Upon examination of plaintiff's hernia, Dr. Salzman determined that it was not. *Id.* Dr. Salzman advised plaintiff of his diagnosis as well as the fact that the hernia was not life threatening and did not require immediate surgery. Tr. (Dkt. No. 19-5) p. 25. Dr. Salzman recommended to plaintiff that if he was going home, he should see his own medical provider regarding removal of the hernia, adding that if he was being transferred to the custody of the DOCS, it would be that agency's responsibility to treat him. *Id.* at pp. 25-26. Dr. Salzman provided plaintiff with 650 milligrams of Tylenol and a stool softener, which was administered from February 19 through 29, 2008, and released him back to his unit. *Id.*

The following day, plaintiff left ACCF for a court appearance and subsequently was transferred into the custody of the DOCS. Tr. (Dkt. No. 19-5) p. 26. Since that time McQueen has not had surgery to repair the hernia, takes ibuprofen occasionally for pain, and has only been restricted in his ability to work out and lift a coffee urn. *Id.* at pp. 27, 33.

Albany County Sheriff James L. Campbell reports that a review of ACCF records reflects that plaintiff did not file any informal or formal grievances or grievance appeals while housed at that facility. Affidavit of James L. Campbell ("Campbell Aff.") (Dkt. No. 19-10) ¶ 5. According to the plaintiff, however, on January 30, 2008, while still housed at ACCF he hand wrote a document labeled by him as an "inmate grievance complaint to Albany County Correctional Facility", complaining of a dangerous slippery condition resulting from a puddle in the shower area where his accident occurred and requesting the installation of rubber mats to prevent future similar occurrences. *See* Attachment to Complaint (Dkt. No. 1). The written complaint did not include any reference to his injuries or complaints regarding his medical treatment. Plaintiff also wrote a letter to Superintendent Wigger on February 8, 2008, referencing his earlier grievance, advising of his accident and injuries, and on this occasion complaining that he was denied medical treatment. *See id.* Plaintiff received no response to either the grievance or his letter, nor did he take any further action regarding the complaints voiced in those documents. Tr. (Dkt. No. 19-5) pp. 30, 38.

## II. *PROCEDURAL HISTORY*

Plaintiff commenced this action on July 23, 2008, and was thereafter granted leave to proceed *in forma pauperis.* Dkt. Nos. 1, 8. His complaint names three defendants, including the County of Albany; Thomas Wigger, the superintendent of the ACCF; and Correctional Medical Services. In it, plaintiff asserts a claim of cruel and unusual punishment based upon an alleged deliberate indifference of medical officials to the hernia allegedly sustained after he slipped and fell. As relief, plaintiff seeks compensatory damages.

**\*4** Following joinder of issue and the close of discovery, all defendants moved for summary judgment dismissing plaintiff's claims against them on a variety of grounds.[FN5] Dkt. Nos. 19, 22. In their motions, defendants

Not Reported in F.Supp.2d, 2010 WL 338081 (N.D.N.Y.)

(Cite as: 2010 WL 338081 (N.D.N.Y.))

argue that 1) plaintiff's claims are subject to dismissal based upon his failure to exhaust available administrative remedies before commencing suit; 2) plaintiff has failed to demonstrate entitlement to compensatory damages; 3) plaintiff cannot establish deliberate indifference to a serious medical need; 4) plaintiff's claims against the superintendent of the facility must be dismissed for lack of personal involvement; 5) plaintiff has failed to demonstrate a sufficient basis for holding Albany County or Correctional Medical Services liable; and 6) plaintiff's pendent state law claims, if any, are barred by virtue of his failure to file a notice of claim.

> FN5. The County of Albany and defendant Wigger are jointly represented by counsel, and Correctional Medical Services is separately represented by another attorney. The defendants have filed two separate but similar motions for summary judgment.

Despite the passage of the deadline for doing so, which was extended upon his request, *see* Text Order of March 16, 2009, plaintiff has failed to respond to defendants' motion, which is now ripe for determination and has been referred to me for the issuance of a report and recommendation, pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c). *See also* Fed.R.Civ.P. 72(b).

III. *DISCUSSION*

A. *Summary Judgment Standard*

Summary judgment motions are governed by Rule 56 of the Federal Rules of Civil Procedure. Under that provision, summary judgment is warranted when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see* Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 2509-10, 91 L.Ed.2d 202 (1986); Security Ins. Co. of Hartford v. Old Dominion Freight Line, Inc., 391 F.3d 77, 82-83 (2d Cir.2004). A fact is "material," for purposes of this

inquiry, if it "might affect the outcome of the suit under the governing law." Anderson, 477 U.S. at 248, 106 S.Ct. at 2510; *see also* Jeffreys v. City of New York, 426 F.3d 549, 553 (2d Cir.2005) (citing *Anderson* ). A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248, 106 S.Ct. at 2510.

A party seeking summary judgment bears the initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue; the failure to meet this burden warrants denial of the motion. Anderson, 477 U.S. at 250 n. 4, 106 S.Ct. at 2511 n. 4; Security Ins., 391 F.3d at 83. In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material issue of fact for trial. Fed.R.Civ.P. 56(e); Celotex, 477 U.S. at 324, 106 S.Ct. at 2553; Anderson, 477 U.S. at 250, 106 S.Ct. at 2511. Though *pro se* plaintiffs are entitled to special latitude when defending against summary judgment motions, they must establish more than mere "metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); *but see* Vital v. Interfaith Med. Ctr., 168 F.3d 615, 620-21 (2d Cir.1999) (noting obligation of court to consider whether *pro se* plaintiff understood nature of summary judgment process).

**\*5** When deciding a summary judgment motion, a court must resolve any ambiguities, and draw all inferences from the facts, in a light most favorable to the nonmoving party. *Jeffreys,* 426 F.3d at 553; Wright v. Coughlin, 132 F.3d 133, 137-38 (2d Cir.1998). The entry of summary judgment is warranted only in the event of a finding that no reasonable trier of fact could rule in favor of the non-moving party. *See* Building Trades Employers' Educ. Ass'n v. McGowan, 311 F.3d 501, 507-08 (2d Cir.2002) (citation omitted); *see also* Anderson, 477 U.S. at 250, 106 S.Ct. at 2511 (summary judgment is appropriate only when "there can be but one reasonable conclusion as to the verdict").

B. *Plaintiff's Failure to Oppose Defendants' Motions*

Before turning to the merits of plaintiff's claims, a

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 338081 (N.D.N.Y.)

(Cite as: 2010 WL 338081 (N.D.N.Y.))

threshold issue to be addressed is the legal significance, if any, of his failure to oppose defendants' summary judgment motions, and specifically whether that failure automatically entitles defendants to dismissal of plaintiff's complaint, based upon their motions.

Undeniably, *pro se* plaintiffs are entitled to special latitude when defending against summary judgment motions. *See Jemzura v. Public Serv. Comm'n, 961 F.Supp. 406, 415 (N.D.N.Y.1997)* (McAvoy, C.J.). Despite this measure of deference, the failure of an unrepresented plaintiff to oppose a summary judgment motion does not preclude the court from deciding the motion. *Robinson v. Delgado,* No. 96-CV-169, 1998 WL 278264, at *2 (N.D.N.Y. May 22, 1998)* (Pooler, J. & Hurd, M.J.) [FN6]; *Cotto v. Senkowski,* No. 95-CV-1733, 1997 WL 665551, at *1 (N.D.N.Y. Oct. 23, 1997)* (Pooler, J. & Hurd, M.J.); *Wilmer v. Torian,* 980 F.Supp. 106, 106-07 (N.D.N.Y.1997)* (Pooler, J. & Hurd, M.J.). Before such a motion can be granted under such circumstances, however, the court must review the motion to determine whether it is facially meritorious. *See Allen v. Comprehensive Analytical Group, Inc.,* 140 F.Supp.2d 229, 231-32 (N.D.N.Y.2001)* (Scullin, C.J.); *Leach v. Dufrain,* 103 F.Supp.2d 542, 545-46 (N.D.N.Y.2000)* (Kahn, J.); *see also* N.D.N.Y.L.R. 7.1(b)(3).

> FN6. Copies of all unreported decisions cited in this document have been appended for the convenience of the *pro se* plaintiff. [Editor's note: Copies accessible on Westlaw as separate documents.]

While a plaintiff's failure to properly oppose a defendant's motion does not assure that the motion, however lacking in merit, will be granted, that failure is not without consequences. This court's rules require that "[a]ny motion for summary judgment shall contain a Statement of Material Facts setting forth, in numbered paragraphs, each material fact about which the moving party contends there exists no genuine issue." N.D.N.Y.L.R. 7.1(a)(3). By electing not to submit papers in opposition to their motion, plaintiff has left the facts set forth in defendants' Local Rule 7.1(a)(3) Statement unchallenged. Courts in this district have routinely invoked Local Rule 7.1(a)(3) and its predecessor, Local Rule 7.1(f), deeming facts set forth in a statement of

material facts not in dispute to have been admitted based upon an opposing party's failure to properly respond to that statement.[FN7] *See, e.g., Elgamil v. Syracuse Univ.,* No. 99-CV-611, 2000 WL 1264122, at *1 (N.D.N.Y. Aug. 22, 2000)* (McCurn, S.J.) (listing cases); *see also Monahan v. New York City Dep't of Corrs.,* 214 F.3d 275, 292 (2d Cir.2000)* (discussing district courts' discretion to adopt local rules like 7.1(a)(3)).

> FN7. According to Local Rule 7.1(a)(3), *"[t]he Court shall deem admitted any facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert."* *See* N.D.N.Y.L.R. 7.1(a)(3) (Emphasis in original).

**\*6** I recommend that the court follow this well-established practice when reviewing defendants' motions for facial sufficiency and, notwithstanding McQueen's *pro se* status, accept the facts set forth in defendants' Local Rule 7.1(a)(3) Statements as uncontroverted, in light of plaintiff's failure to respond to those statements.

C. *Failure to Exhaust*

While plaintiff's complaint alleges that he exhausted available administrative remedies before commencing suit, and attaches two documents which he claims to have filed with officials at ACCF complaining of the dangerous condition in the shower and subsequently of the alleged denial of medical treatment for his injuries, Albany County and defendant Wigger assert that a review of ACCF records shows that plaintiff filed no grievances or appeals while housed at that facility. Defendants therefore argue that plaintiff failed to avail himself of the inmate grievance procedure available at ACCF and that having failed to exhaust administrative remedies, he cannot now maintain this action.

With an eye toward "reduc[ing] the quantity and improv[ing] the quality of prisoner suits[,]" *Porter v. Nussle,* 534 U.S. 516, 524, 122 S.Ct. 983, 988, 152 L.Ed.2d 12 (2002),* Congress altered the inmate litigation landscape considerably through the enactment of the Prison Litigation Reform Act of 1996 ("PLRA"), Pub.L. No. 104-134, 110 Stat. 1321 (1996),* imposing several

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 338081 (N.D.N.Y.)

(Cite as: 2010 WL 338081 (N.D.N.Y.))

restrictions on the ability of prisoners to maintain federal civil rights actions. An integral feature of the PLRA is a revitalized exhaustion of remedies provision which requires that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a); see Woodford v. Ngo, 548 U.S. 81, 84, 126 S.Ct. 2378, 2382, 165 L.Ed.2d 368 (2006); Hargrove v. Riley, No. CV-04-4587, 2007 WL 389003, at *5-6 (E.D.N.Y. Jan.31, 2007). This limitation is intended to serve the dual purpose of affording "prison officials an opportunity to resolve disputes concerning the exercise of their responsibilities before being haled into court[,]" and to improve the quality of inmate suits filed through the production of a "useful administrative record." Jones v. Bock, 549 U.S. 199, 204, 127 S.Ct. 910, 914-15, 166 L.Ed.2d 798 (2007) (citations omitted); see Woodford, 548 U.S. at 91-92, 126 S.Ct. at 2386; see also Johnson v. Testman, 380 F.3d 691, 697 (2d Cir.2004). "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." Porter, 534 U.S. at 532, 122 S.Ct. at 992 (citation omitted).

In the event a defendant named in such an action establishes that the inmate plaintiff failed properly to exhaust available remedies prior to commencing the action, any unexhausted claims are subject to dismissal. See Pettus v. McCoy, No. 04-CV-0471, 2006 WL 2639369, at *1 (N.D.N.Y. Sept. 13, 2006) (McAvoy, J.); see also Woodford, 548 U.S. at 94-95, 126 S.Ct. at 2387-88 (holding that the PLRA requires "proper exhaustion" of available remedies). "Proper exhaustion" requires a plaintiff to procedurally exhaust his or her claims by "compl[ying] with the system's critical procedural rules." Woodford, 548 U.S. at 95, 126 S.Ct. at 2388; see also Macias v. Zenk, 495 F.3d 37, 43 (2d Cir.2007) (citing Woodford ). While placing prison officials on notice of a grievance through less formal channels may constitute claim exhaustion "in a substantive sense", an inmate plaintiff nonetheless must meet the procedural requirement of exhausting his or her available administrative remedies within the appropriate grievance

construct in order to satisfy the PLRA. Macias, 495 F.3d at 43 (quoting Johnson, 380 F.3d at 697-98) (emphasis omitted).

**\*7** In a series of decisions rendered since the enactment of the PLRA, the Second Circuit has crafted a three-part test for determining whether dismissal of an inmate plaintiff's complaint is warranted for failure to satisfy the PLRA's exhaustion requirement.[FN8] Macias, 495 F.3d at 41; see Hemphill v. New York, 380 F.3d 680, 686 (2d Cir.2004). Under the prescribed algorithm, a court must first determine whether administrative remedies were available to the plaintiff at the relevant times. Macias, 495 F.3d at 41; Hemphill, 380 F.3d at 686. If such a remedy existed and was available, the court must next examine whether the defendants have forfeited the affirmative defense of non-exhaustion by failing to properly raise or preserve it or whether, through their own actions preventing the exhaustion of plaintiff's remedies, they should be estopped from asserting failure to exhaust as a defense. Macias, 495 F.3d at 41; Hemphill, 380 F.3d at 686. In the event the proffered defense survives these first two levels of scrutiny, the court lastly must examine whether special circumstances nonetheless exist and "have been plausibly alleged" to justify the plaintiff's failure to comply with the applicable administrative procedural requirements.[FN9] Macias, 495 F.3d at 41; Hemphill, 380 F.3d at 686.

FN8. As will be seen, whether the *Hemphill* test survives following the Supreme Court's decision in *Woodford,* has been a matter of some speculation. *See, e.g., Newman v. Duncan,* No. 04-CV-395, 2007 WL 2847304, at \* 2 n. 4 (N.D.N.Y. Sept. 26, 2007) (McAvoy, S.J. & Homer, M.J.).

FN9. In practicality these three prongs of the prescribed test, though perhaps intellectually distinct, plainly admit of significant overlap. See Hargrove, 2007 WL 389003, at \*8 n. 14; see also Giano v. Goord, 380 F.3d 670, 677 n. 6 (2d Cir.2004).

a) *Availability of Remedy*

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 338081 (N.D.N.Y.)

(Cite as: 2010 WL 338081 (N.D.N.Y.))

The record reveals that inmates at ACCF have available to them an inmate grievance procedure ("IGP") for complaining of conditions of their confinement. Brousseau Aff. (Dkt. No. 19-2) Exh. F. That policy sets forth both informal and formal channels for handling grievances, providing for grievance forms to be made available to inmates, and refers inmates to the inmate handbook for further instructions. *Id.*

Despite an inmate's entitlement to file and pursue a grievance in accordance with the IGP prescribed by ACCF, there are circumstances under which the grievance procedure nonetheless could be deemed not to have been available to the plaintiff. *See Hemphill,* 380 F.3d at 687-88. Thus, for example, "[e]xhaustion may be considered unavailable in situations where plaintiff is unaware of the grievance procedures or did not understand it, ... or where defendants' behavior prevents plaintiff from seeking administrative remedies." *Hargrove,* 2007 WL 389003, at *8 (citations omitted) (noting, for example, that a defendant's failure to advance plaintiff's grievances or the issuance of threats against an inmate to deter the filing of a grievance may effectively render the administrative process unavailable). When testing the availability of administrative remedies in the face of claims that undue influence from prison workers has caused a plaintiff inmate to forego the formal grievance process, courts employ an objective test, examining whether "a similarly situated individual of ordinary firmness [would] have deemed them available." *Hemphill,* 38 F.3d at 688 (quotations and citations omitted); *see also Hargrove,* 2007 WL 389003, at *8 n. 15.

b) *Presentation of Defense/Estoppel*

**\*8** The second prong of the *Hemphill* analysis focuses upon "whether the defendants may have forfeited the affirmative defense of non-exhaustion by failing to raise or preserve it, or whether the defendants' own actions inhibiting the inmate's exhaustion of remedies may estop one or more of the defendants from raising the plaintiff's failure to exhaust as a defense." *Hemphill,* 380 F.3d at 686 (citations omitted).

c) *Special Circumstances*

The third, catchall factor to be considered under the Second Circuit's prescribed exhaustion rubric focuses upon whether special circumstances have been plausibly alleged which, if demonstrated, would justify excusing a plaintiff's failure to exhaust administrative remedies. *Hemphill,* 380 F.3d at 689; *see also Giano,* 380 F.3d at 676-77; *Hargrove,* 2007 WL 389003, at *10. Among the circumstances potentially qualifying as "special" under this prong of the test is where a plaintiff's reasonable interpretation of applicable regulations regarding the grievance process differs from that of prison officials and leads him or her to conclude that the dispute is not grievable. *Giano,* 380 F.3d at 676-77; *see also Hargrove,* 2007 WL 389003, at *10 (quoting and citing *Hemphill,* 380 F.3d at 688).

In this case, the first prong of the *Hemphill* test is easily satisfied. As was previously discussed, defendants have produced a copy of the Albany County Sheriff's Department's Inmate Grievance Procedure, which is applicable to inmate grievances at ACCF. It thus appears that there was an internal remedy available to the plaintiff.

As to the second and third prongs of the analysis, however, they are not so easily dispensed with. The evidence in the record bearing upon the issue of whether plaintiff filed any grievance related to the matters set out in his complaint is equivocal. Based upon the record before the court it appears that on January 30, 2008 plaintiff submitted a written complaint, designated as an "inmate grievance complaint," though not filed utilizing the prescribed form, complaining of a constant puddle in the shower area creating a slippery condition and requesting the installation of rubber mats; no mention is made in that letter of the failure to provide requested medical treatment. The record also reveals that just over a week later, on February 8, 2008, plaintiff wrote a letter to Superintendent Wigger, in which he referenced his earlier grievance and also alleged that he had slipped and fallen in a puddle in the shower area, causing him to sustain a hernia, and also complained that he had been refused medical treatment, in violation of his Eighth Amendment rights. *See* Attachments to Complaint (Dkt. No. 1). Plaintiff admits that he did not receive any response to either his grievance or the letter to defendant Wigger, and that he did not file any other grievances or appeals regarding the incidents at issue. It is unclear whether defendants dispute having received the documents attached to plaintiff's complaint. In support of their

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 338081 (N.D.N.Y.)

(Cite as: 2010 WL 338081 (N.D.N.Y.))

motion, they merely assert somewhat obliquely that a review of ACCF records reveals that McQueen did not file any informal or formal grievances or appeals.

**\*9** Undeniably, the document that plaintiff labeled as an inmate grievance does not complain of medical indifference. Plaintiff's subsequent letter of February 8, 2008, however, does include this complaint. Ordinarily, under an analogous procedure prescribed for use by New York State prison inmates, letters to DOCS employees and officials are not considered as sufficient to satisfy the grievance exhaustion requirement. *See Colon v. Farrell,* No. 01-CV6480(FE), 2004 WL 2126659, at \*5 (W.D.N.Y. Sept.23, 2004) (noting that "letters of complaints to DOCS employees and officials do not satisfy the grievance procedure exhaustion requirement"); *Conner v. Hurley,* No. 00 Civ. 8354(LTS)(AJP), 2004 WL 885828, at \*2 (S.D.N.Y. Apr. 26, 2004) (letters to facility superintendent and DOCS commissioner "may not be deemed substitutes for strict compliance with requirements of the IGP").

In this case, the IGP at issue outlines a protocol for inmates to follow in registering both informal and formal complaints. *See generally* Albany County Sheriff's Dep't IGP (Dkt. No. 19-8). In accordance with the formal process, the Tour Commander is required to provide assistance to an inmate in the preparation of the written grievance "if assistance is requested or obviously necessary because of language barriers or literacy problems." *Id.* at § II .G. While an inmate grievance form is attached to the IGP, the written procedures provided to the court do not explicitly mandate that an inmate utilize that form and, more importantly, the procedure does not expressly identify with whom a written grievance must be filed.[FN10] In fact, the Albany County Sheriff's Department grievance procedure seems to require an effort at informal resolution before the formal process is instituted and, in the event that the informal process is unsuccessful, appears to delegate the responsibility of initiating the formal grievance process to a corrections officer. *See id.* at §§ II.F and II.G.

FN10. A note appearing at the end of the Albany County Sheriff's Department IGP states, "NOTE: Inmate instructions regarding filing grievances

are contained within the Inmate Rules and Regulations Handbook." No further information regarding the Inmate Rules and Regulations Handbook has been provided to the court, and there is nothing before the court that contradicts my analysis of the relevant procedures as discussed above.

When viewed in light of the Albany County Sheriff's Department's prescribed procedures, it is at least arguable that plaintiff's February 8, 2008 letter to the superintendent sufficed as an informal grievance and placed defendants on notice of plaintiff's complaint. It is not clear whether Superintendent Wigger denies receiving the letter. It is obvious, however, that this unresolved issue raises a material question of fact as to whether defendants' actions, or inaction, interfered with McQueen's ability to exhaust administrative remedies. Conceivably, plaintiff's letter was delivered to the superintendent, and by their inaction defendants prevented plaintiff from pursuing available internal remedies. Drawing all inferences and resolving all ambiguities in plaintiff's favor, I am therefore unable to say no reasonable factfinder could conclude that plaintiff did not properly apprise defendants, both procedurally and substantively, of his claim concerning medical indifference, and therefore recommend denial of the portion of defendants' motions seeking dismissal of plaintiff's claim for failure to exhaust.

### D. *Plaintiff's Medical Indifference Claims*

**\*10** The centerpiece of plaintiff's complaint in this action is his claim that he was denied medical treatment for the injuries allegedly sustained after he slipped and fell. In their motions, defendants assert that the record does not support a finding of liability on plaintiff's medical indifference claim, both because plaintiff's condition was not sufficiently serious and because defendants were not indifferent to that condition.

As a pretrial detainee, plaintiff's conditions of confinement were subject to safeguards emanating from the Due Process Clause of the Fourteenth Amendment, rather than the Eighth Amendment, which governs such claims brought by inmates serving prison sentences. *Benjamin v. Fraser,* 343 F.3d 35, 49-50 (2d Cir.2003). In *Benjamin,* the Second Circuit acknowledged the

Not Reported in F.Supp.2d, 2010 WL 338081 (N.D.N.Y.)

(Cite as: 2010 WL 338081 (N.D.N.Y.))

government's duty to assume responsibility for the safety, general well-being, and basic human needs of those whose liberty it involuntarily restrains, and specifically distinguished between the circumstances presented by a pretrial detainee, who is still presumed innocent, and an inmate who has been convicted of a crime. *Id.* at 50-51. Following *Benjamin,* however, there was significant uncertainty surrounding the precise standard to be applied to claims of deliberate medical indifference brought by pretrial detainees. While it was clear that such claims were subject to analysis under the Due Process Clause of the Fourteenth Amendment, *Bryant v. Maffucci,* 923 979, 983 (2d Cir.1991), the precise contours of the obligation imposed thereunder had not been definitively established by the Second Circuit until its recent decision in *Caiozzo v. Koreman,* wherein the court pronounced that "[c]laims for deliberate indifference to a serious medical condition or other serious threat to health or safety of a person in custody should be analyzed under the same standard irrespective of whether they are brought under the Eighth or Fourteenth Amendment." 581 F.3d 63, 72 (2d Cir.2009).

The Eighth Amendment's prohibition of cruel and unusual punishment encompasses punishments that involve the "unnecessary and wanton infliction of pain" and are incompatible with "the evolving standards of decency that mark the progress of a maturing society." *Estelle v. Gamble,* 429 U.S. 97, 102, 104, 97 S.Ct. 285, 290, 291, 50 L.Ed.2d 251 (1976); *see also Whitley v. Albers,* 475 U.S. 312, 319, 106 S.Ct. 1078, 1084, 89 L.Ed.2d 251 (1986) (citing, *inter alia, Estelle).* While the Eighth Amendment does not mandate comfortable prisons, neither does it tolerate inhumane treatment of those in confinement; thus the conditions of an inmate's confinement are subject to Eighth Amendment scrutiny. *Farmer v. Brennan,* 511 U.S. 825, 832, 114 S.Ct. 1970, 1976, 128 L.Ed.2d 811 (1994) (citing *Rhodes v. Chapman,* 452 U.S. 337, 349, 101 S.Ct. 2392, 2400, 69 L.Ed.2d 59 (1981)). Claims that prison officials have intentionally disregarded an inmate's medical needs are encompassed within the Eighth Amendment's prohibition of cruel and unusual punishment. *Estelle,* 429 U.S. at 104, 97 S.Ct. at 291.

*1. Serious Medical Need*

**\*11** In order to state a medical indifference claim under the Eighth Amendment, a plaintiff must first allege a deprivation involving a medical need which is, in objective terms, " 'sufficiently serious' ". *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994) (quoting *Wilson,* 501 U.S. at 298, 111 S.Ct. at 2324). A medical need is serious for constitutional purposes if it presents " 'a condition of urgency' that may result in 'degeneration' or 'extreme pain'." *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998) (citations omitted). A serious medical need can also exist where " 'failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain' "; since medical conditions vary in severity, a decision to leave a condition untreated may or may not be unconstitutional, depending on the facts. *Harrison v. Barkley,* 219 F.3d 132, 136-37 (2d Cir.2000) (quoting, *inter alia, Chance,* 143 F.3d at 702). Relevant factors informing this determination include whether the plaintiff suffers from an injury that a "reasonable doctor or patient would find important and worthy of comment or treatment", a condition that "significantly affects" a prisoner's daily activities, or "the existence of chronic and substantial pain." *Chance,* 143 F.3d at 701 (citation and internal quotations omitted); *Lafave v. Clinton County,* No. CIV. 9:00CV0774, 2002 WL 31309244, at \*3 (N.D.N.Y. Apr.3, 2002) (Sharpe, M.J.) (citation omitted).

In this instance, the record leads invariably to the conclusion that plaintiff's hernia is not objectively sufficient to qualify as constitutionally significant. There is no indication that plaintiff's condition was emergent or one that could produce death, degeneration, or extreme pain. Plaintiff's subjective complaints of pain are not substantiated by any objective evidence, and he variously described what he felt as "discomfort" and "pain." After his first two requests for treatment, which came a week apart, plaintiff did not require medical services again until more than two weeks later, all suggesting that plaintiff was by no means in constant or extreme pain, or suffering from a dire physical condition.

Significantly, Dr. Salzman states that plaintiff did not voice any complaints of pain during his examination of February 19, 2009, the hernia was not incarcerated and therefore did not necessitate surgery, and any surgery at

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 338081 (N.D.N.Y.)

(Cite as: 2010 WL 338081 (N.D.N.Y.))

that time would have been merely elective. Dr. Salzman's opinion is buttressed by the fact that even as of the time of his deposition, approximately ten months after the treatment complained of, plaintiff had not undergone surgery and, by his own admission, experienced pain only occasionally. The evidence thus establishes that, at worst, plaintiff's hernia caused him to suffer intermittent pain and/or discomfort, which is patently insufficient to objectively prove that his condition was serious. Indeed, other courts have recognized that an inguinal hernia is not objectively serious enough to satisfy the objective prong of the Eighth Amendment test. *Arroyo v. City of New York,* No. 99 Civ. 1458, 2003 WL 22211500, at *2-3 (S.D.N.Y. Sept. 25, 2003); *see also, Day v. Lantz,* No. 3:07-CV-388, 2009 WL 801612, at *3 (D.Conn. Mar. 25, 2009) (citing cases).

*12 For these reasons, I find that plaintiff's hernia was not sufficiently serious to warrant constitutional protection.

2. *Deliberate Indifference*

In addition to establishing the existence of a serious medical need, to prevail on a medical indifference claim a plaintiff must also establish indifference to that condition on the part of one or more of the defendants. *Leach v. Dufrain,* 103 F.Supp.2d 546. Deliberate indifference, in a constitutional sense, exists if an official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he [or she] must also draw the inference." *Farmer,* 511 U.S. at 837, 114 S.Ct. at 1979; *Leach,* 103 F.Supp.2d at 546 (citing *Farmer,* 511 U.S. at 837, 114 S.Ct. at 1979); *Waldo v. Goord,* No. 97-CV-1325, 1998 WL 713809, at *2 (same) (N.D.N.Y. Oct. 1, 1998) (Kahn, D.J. & Hurd, M.J.).

It should be noted that the constitution does not afford prisoners a right to medical treatment of their choosing; the question of that diagnostic techniques and treatments should be administered to address an inmate's medical condition is a "classic example of a matter for medical judgment" and, accordingly, prison medical personnel are vested with broad discretion to determine what method of care and treatment to provide to their patients. *Estelle,* 429

U.S. at 107, 97 S.Ct. at 293; *Chance,* 143 F.3d at 703 (citation omitted); *Rosales v. Coughlin,* 10 F.Supp.2d 261, 264 (W.D.N.Y.1998) (citation omitted). "Charges that amount only to allegations of malpractice, and mere disagreements with respect to quality of medical care do not state an Eighth Amendment claim." *Arroyo,* 2003 WL 22211500, at * 2 (citing *Estelle,* 429 U.S. at 105-06, 97 S.Ct. at 292).

The record now before the court overwhelmingly demonstrates the lack of merit of this prong of plaintiff's claim of deliberate indifference. The evidence in the record flatly contradicts the notion that plaintiff was exposed to an excessive risk to his health and safety. Each time plaintiff requested medical attention he was seen within twenty four hours, and on each occasion was examined and given medication for pain. At best, plaintiff's apparent complaint that the hernia was not surgically removed amounts to nothing more than a disagreement as to the method of treatment and fails to rise to the level of indifference necessary to support a medical indifference claim under the Fourteenth Amendment. See *Wandell v. Koenigsmann,* 99-CV-8652, 2000 WL 1036030, at *5 (S.D.N.Y. July 27, 2000) (differences in opinion between a doctor and a prisoner over appropriate medication is simply disagreement over treatment plan and does not implicate the Eighth Amendment); *see also Grant v. Burroughs,* 96-CV-2753, 2000 WL 1277592, at *5 (S.D.N.Y.Sept.8, 2000) (prisoner denied pain medication does not have a constitutional right to treatment of his choice). Accordingly, even if plaintiff's hernia were sufficiently serious to implicate the due process clause of the Fourteenth Amendment, the evidence shows that defendants were not deliberately indifferent to that medical need.

IV. *SUMMARY AND CONCLUSION*

*13 This action stems from an alleged slip and fall in the shower occurring on January 14, 2008, as a result of which plaintiff claims to have sustained a hernia. Thereafter, plaintiff contends, he requested but was denied medical treatment for his injuries. Although defendants have asserted that the action must be dismissed as a result of plaintiff's failure to exhaust administrative remedies, the

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 338081 (N.D.N.Y.)

(Cite as: 2010 WL 338081 (N.D.N.Y.))

record establishes the existence of triable issues of material fact in this regard, and I am therefore not recommending dismissal on this procedural basis at this juncture. As to the merits of plaintiff's medical indifference claim, however, the record now before the court firmly establishes that plaintiff's condition was not sufficiently serious to trigger constitutional protection and, moreover, that he was provided with timely and adequate medical treatment each time it was requested. I therefore recommend dismissal of plaintiff's medical indifference claim on the merits, and in light of that recommendation have not addressed the other arguments raised in the defendants' motions.[FN11]

> [FN11.] To the extent that plaintiff's complaint may be regarded as encompassing state law claims against defendants, I recommend that the court not exercise pendent jurisdiction of such claims, "pursuant to 28 U.S.C. § 1367, which authorizes a federal court to decline supplemental jurisdiction over a state claim if all of the claims over which the court had original jurisdiction were dismissed ." *Stephenson v. Albany County Policymakers,* Civ. No. 6:09-CV-326, 2009 WL 2922805, at *2 (N.D.N.Y. Aug.14, 2009) (Kahn, J. & Treece, M.J.) (citing 28 U.S.C. § 1367(c)(3)). In light of this recommendation, I have declined to address defendants' argument that plaintiff's state law claims must be dismissed for failure to file a notice of claim.

Based upon the foregoing it is hereby

RECOMMENDED, that defendants' motions for summary judgment (Dkt. Nos. 19 and 22) be GRANTED, in relevant part, and that all of plaintiff's claims against defendants be DISMISSED, with prejudice with respect to plaintiff's federal claims, but without prejudice to his right to assert any pendent state law claims in an appropriate state court.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court within TEN days. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE

REVIEW. 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a) and (d), 72; *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993).

It is hereby ORDERED that the clerk of the court serve a copy of this Report and Recommendation upon the parties in accordance with this court's local rules, and to mail an additional copy, addressed to the plaintiff at the Green Haven Correctional Facility.[FN12]

> [FN12.] Plaintiff is listed on the docket sheet as being confined in the Clinton Correctional Facility. A search of the New York State Department of Correctional Services inmate locator website, however, reflects that he may now be housed in the Green Haven Correctional Facility. If so, then plaintiff has failed to fulfill his obligation to notify the court of any change of address while this action is pending. *See* N.D.N.Y.L.R. 10.1(c).

N.D.N.Y.,2010.

McQueen v. County of Albany
Not Reported in F.Supp.2d, 2010 WL 338081 (N.D.N.Y.)
END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.



Page 1

Not Reported in F.Supp.2d, 1998 WL 713809 (N.D.N.Y.)
(Cite as: 1998 WL 713809 (N.D.N.Y.))

**C** Only the Westlaw citation is currently available.

United States District Court, N.D. New York.
Jerome WALDO, Plaintiff,
v.
Glenn S. GOORD, Acting Commissioner of New York
State Department of Correctional Services; Peter J.
Lacy, Superintendent at Bare Hill Corr. Facility;
Wendell Babbie, Acting Superintendent at Altona Corr.
Facility; and John Doe, Corrections Officer at Bare Hill
Corr. Facility, Defendants.
**No. 97-CV-1385 LEK DRH.**

Oct. 1, 1998.

Jerome Waldo, Plaintiff, pro se, Mohawk Correctional
Facility, Rome, for Plaintiff.

Hon. Dennis C. Vacco, Attorney General of the State of
New York, Albany, Eric D. Handelman, Esq., Asst.
Attorney General, for Defendants.

DECISION AND ORDER

KAHN, District J.

**\*1** This matter comes before the Court following a
Report-Recommendation filed on August 21, 1998 by the
Honorable David R. Homer, Magistrate Judge, pursuant to
28 U.S.C. § 636(b) and L.R. 72.3(c) of the Northern
District of New York.

No objections to the Report-Recommendation have been
raised. Furthermore, after examining the record, the Court
has determined that the Report-Recommendation is not
clearly erroneous. See Fed.R.Civ.P. 72(b), Advisory

Committee Notes. Accordingly, the Court adopts the
Report-Recommendation for the reasons stated therein.

Accordingly, it is

ORDERED that the Report-Recommendation is
APPROVED and ADOPTED; and it is further

ORDERED that the motion to dismiss by defendants is
GRANTED; and it is further

ORDERED that the complaint is dismissed without
prejudice as to the unserved John Doe defendant pursuant
to Fed.R.Civ.P. 4(m), and the action is therefore dismissed
in its entirety; and it is further

ORDERED that the Clerk serve a copy of this order on all
parties by regular mail.

IT IS SO ORDERED.
HOMER, Magistrate J.

REPORT-RECOMMENDATION AND ORDER FN1

FN1. This matter was referred to the undersigned
pursuant to 28 U.S.C. § 636(b) and
N.D.N.Y.L.R. 72.3(c).

The plaintiff, an inmate in the New York Department of
Correctional Services ("DOCS"), brought this pro se
action pursuant to 42 U.S.C. § 1983. Plaintiff alleges that
while incarcerated in Bare Hill Correctional Facility
("Bare Hill") and Altona Correctional Facility ("Altona"),
defendants violated his rights under the Eighth and
Fourteenth Amendments. FN2 In particular, plaintiff alleges
that prison officials maintained overcrowded facilities
resulting in physical and emotional injury to the plaintiff

© 2010 Thomson Reuters. No Claim to Orig. US Gov.
Works.

Not Reported in F.Supp.2d, 1998 WL 713809 (N.D.N.Y.)
(Cite as: 1998 WL 713809 (N.D.N.Y.))

and failed to provide adequate medical treatment for his injuries and drug problem. Plaintiff seeks declaratory relief and monetary damages. Presently pending is defendants' motion to dismiss pursuant to Fed.R.Civ.P. 12(b). Docket No. 18. For the reasons which follow, it is recommended that the motion be granted in its entirety.

FN2. The allegations as to Bare Hill are made against defendants Goord, Lacy, and Doe. Allegations as to Altona are made against Goord and Babbie.

I. Background

Plaintiff alleges that on August 21, 1997 at Bare Hill, while he and two other inmates were playing cards, an argument ensued, and one of the two assaulted him. Compl., ¶ 17. Plaintiff received medical treatment for facial injuries at the prison infirmary and at Malone County Hospital. Id. at ¶¶ 18-19. On September 11, 1997, plaintiff was transferred to Altona and went to Plattsburgh Hospital for x-rays several days later. Id. at ¶ 21.

Plaintiff's complaint asserts that the overcrowded conditions at Bare Hill created a tense environment which increased the likelihood of violence and caused the physical assault on him by another inmate. Id. at ¶¶ 10-11. Additionally, plaintiff contends that similar conditions at Altona caused him mental distress and that he received constitutionally deficient medical treatment for his injuries. Id. at ¶¶ 21-22. The complaint alleges that Altona's lack of a drug treatment program and a dentist or specialist to treat his facial injuries constitutes cruel and unusual punishment under the Eighth and Fourteenth Amendments. Id. at ¶¶ 22, 27-28.

II. Motion to Dismiss

*2 When considering a Rule 12(b) motion, a court must assume the truth of all factual allegations in the complaint and draw all reasonable inferences from these facts in favor of the plaintiff. Leeds v. Meltz, 85 F.3d 51, 53 (2d Cir.1996). The complaint may be dismissed only when "it

appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Staron v. McDonald's Corp., 51 F.3d 353, 355 (2d Cir.1995) (quoting Conley v. Gibson, 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). "The issue is not whether a plaintiff is likely to prevail ultimately, but whether the claimant is entitled to offer evidence to support the claims. Indeed, it may appear on the face of the pleading that a recovery is very remote and unlikely, but that is not the test." Gant v. Wallingford Bd. of Educ., 69 F.3d 669, 673 (2d Cir.1995) (citations omitted). This standard receives especially careful application in cases such as this where a pro se plaintiff claims violations of his civil rights. Hernandez v. Coughlin, 18 F.3d 133, 136 (2d Cir.), cert. denied, 513 U.S. 836, 115 S.Ct. 117, 130 L.Ed.2d 63 (1994).

III. Discussion

A. Conditions of Confinement

Defendants assert that plaintiff fails to state a claim regarding the conditions of confinement at Bare Hill and Altona. For conditions of confinement to amount to cruel and unusual punishment, a two-prong test must be met. First, plaintiff must show a sufficiently serious deprivation. Farmer v. Brennan, 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) (citing Wilson v. Seiter, 501 U.S. 294, 298, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991)); Rhodes v. Chapman, 452 U.S. 347, 348 (1981)(denial of the "minimal civilized measure of life's necessities"). Second, plaintiff must show that the prison official involved was both "aware of facts from which the inference could be drawn that a substantial risk of serious harm exist[ed]" and that the official drew the inference. Farmer, 511 U.S. at 837.

1. Bare Hill

In his Bare Hill claim, plaintiff alleges that the overcrowded and understaffed conditions in the dormitory-style housing "resulted in an increase in tension, mental anguish and frustration among prisoners, and dangerously increased the potential for violence." Compl.,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1998 WL 713809 (N.D.N.Y.)
(Cite as: 1998 WL 713809 (N.D.N.Y.))

¶ 11. Plaintiff asserts that these conditions violated his constitutional right to be free from cruel and unusual punishment and led to the attack on him by another prisoner. The Supreme Court has held that double-celling to manage prison overcrowding is not a per se violation of the Eighth Amendment. *Rhodes*, 452 U.S. at 347-48. The Third Circuit has recognized, though, that double-celling paired with other adverse circumstances can create a totality of conditions amounting to cruel and unusual punishment. *Nami v. Fauver*, 82 F.3d 63, 67 (3d Cir.1996). While plaintiff here does not specify double-celling as the source of his complaint, the concerns he raises are similar. Plaintiff alleges that overcrowding led to an increase in tension and danger which violated his rights. Plaintiff does not claim, however, that he was deprived of any basic needs such as food or clothing, nor does he assert any injury beyond the fear and tension allegedly engendered by the overcrowding. Further, a previous lawsuit by this plaintiff raised a similar complaint, that double-celling and fear of assault amounted to cruel and unusual punishment, which was rejected as insufficient by the court. *Bolton v. Goord*, 992 F.Supp. 604, 627 (S.D.N.Y.1998). The court there found that the fear created by the double-celling was not "an objectively serious enough injury to support a claim for damages." *Id.* (citing *Doe v. Welborn*, 110 F.3d 520, 524 (7th Cir.1997)).

**\*3** As in his prior complaint, plaintiff's limited allegations of overcrowding and fear, without more, are insufficient. *Compare Ingalls v. Florio*, 968 F.Supp. 193, 198 (D.N.J.1997) (Eighth Amendment overcrowding claim stated when five or six inmates are held in cell designed for one, inmates are required to sleep on floor, food is infested, and there is insufficient toilet paper) *and Zolnowski v. County of Erie*, 944 F.Supp. 1096, 1113 (W.D.N.Y.1996) (Eighth Amendment claim stated when overcrowding caused inmates to sleep on mattresses on floor, eat meals while sitting on floor, and endure vomit on the floor and toilets) *with Harris v. Murray*, 761 F.Supp. 409, 415 (E.D.Va.1990) (No Eighth Amendment claim when plaintiff makes only a generalized claim of overcrowding unaccompanied by any specific claim concerning the adverse effects of overcrowding). Thus, although overcrowding could create conditions which might state a violation of the Eighth Amendment, plaintiff has not alleged sufficient facts to support such a finding here. Plaintiff's conditions of confinement claim as to Bare

Hill should be dismissed.

2. Altona

Plaintiff also asserts a similar conditions of confinement claim regarding Altona. For the reasons discussed above, plaintiff's claim that he suffered anxiety and fear of other inmates in the overcrowded facility (Compl., ¶¶ 21-22) is insufficient to establish a serious injury or harm.

Plaintiff's second claim regarding Altona relates to the alleged inadequacies of the medical treatment he received. The government has an "obligation to provide medical care for those whom it is punishing by incarceration." *Estelle v. Gamble*, 429 U.S. 97, 103, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). The two-pronged *Farmer* standard applies in medical treatment cases as well. *Hemmings v. Gorczyk*, 134 F.3d 104, 108 (2d Cir.1998). Therefore, plaintiff must allege facts which would support a finding that he suffered a sufficiently serious deprivation of his rights and that the prison officials acted with deliberate indifference to his medical needs. *Farmer*, 511 U.S. at 834.

Plaintiff alleges that the medical treatment available at Altona was insufficient to address the injuries sustained in the altercation at Bare Hill. Specifically, plaintiff cites the lack of a dentist or specialist to treat his facial injuries as an unconstitutional deprivation. Plaintiff claims that the injuries continue to cause extreme pain, nosebleeds, and swelling. Compl., ¶¶ 22 & 26. For the purposes of the Rule 12(b) motion, plaintiff's allegations of extreme pain suffice for a sufficiently serious deprivation. *See Hathaway v. Coughlin*, 99 F.3d 550, 553 (2d Cir.1996).

Plaintiff does not, however, allege facts sufficient to support a claim of deliberate indifference by the named defendants. To satisfy this element, plaintiff must demonstrate that prison officials had knowledge of facts from which an inference could be drawn that a "substantial risk of serious harm" to the plaintiff existed and that the officials actually drew the inference. *Farmer*, 511 U.S. at 837. Plaintiff's complaint does not support, even when liberally construed, any such conclusion. Plaintiff offers

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1998 WL 713809 (N.D.N.Y.)
(Cite as: 1998 WL 713809 (N.D.N.Y.))

no evidence that the Altona Superintendent or DOCS Commissioner had any actual knowledge of his medical condition or that he made any attempts to notify them of his special needs. Where the plaintiff has not even alleged knowledge of his medical needs by the defendants, no reasonable jury could conclude that the defendants were deliberately indifferent to those needs. *See Amos v. Maryland Dep't of Public Safety and Corr. Services,* 126 F.3d 589, 610-11 (4th Cir.1997), *vacated on other grounds,*524 U.S. 935, 118 S.Ct. 2339, 141 L.Ed.2d 710 (1998).

*4 Plaintiff's second complaint about Altona is that it offers "no type of state drug treatment program for the plaintiff." Compl., ¶ 22. Constitutionally required medical treatment encompasses drug addiction therapy. *Fiallo v. de Batista,* 666 F.2d 729, 731 (1st Cir.1981); *Inmates of Allegheny County Jail v. Pierce,* 612 F.2d 754, 760-61 (3d Cir.1979). As in the *Fiallo* case, however, plaintiff falls short of stating an Eighth Amendment claim as he "clearly does not allege deprivation of essential treatment or indifference to serious need, only that he has not received the type of treatment which he desires." *Id.* at 731. Further, plaintiff alleges no harm or injury attributable to the charged deprivation. Plaintiff has not articulated his reasons for desiring drug treatment or how he was harmed by the alleged deprivation of this service. *See Guidry v. Jefferson County Detention Ctr.,* 868 F.Supp. 189, 192 (E.D.Tex.1994) (to state a section 1983 claim, plaintiff must allege that some injury has been suffered).

For these reasons, plaintiff's Altona claims should be dismissed.

B. Failure to Protect

Defendants further assert that plaintiff has not established that any of the named defendants failed to protect the plaintiff from the attack by the other inmate at Bare Hill. Prison officials have a duty "to act reasonably to ensure a safe environment for a prisoner *when they are aware that* there is a significant risk of serious injury to that prisoner." *Heisler v. Kralik,* 981 F.Supp. 830, 837 (S.D.N.Y.1997) (emphasis added); *see also Villante v. Dep't of Corr. of City of N.Y.,* 786 F.2d 516, 519 (2d

Cir.1986). This duty is not absolute, however, as "not ... every injury suffered by one prisoner at the hands of another ... translates into constitutional liability." *Farmer,* 511 U.S. at 834. To establish this liability, *Farmer's* familiar two-prong standard must be satisfied.

As in the medical indifference claim discussed above, plaintiff's allegations of broken bones and severe pain from the complained of assault suffice to establish a "sufficiently serious" deprivation. *Id.* Plaintiff's claim fails, however, to raise the possibility that he will be able to prove deliberate indifference to any threat of harm to him by the Bare Hill Superintendent or the DOCS Commissioner. Again, plaintiff must allege facts which establish that these officials were aware of circumstances from which the inference could be drawn that the plaintiff was at risk of serious harm and that they actually inferred this. *Farmer,* 511 U.S. at 838.

To advance his claim, plaintiff alleges an increase in "unusual incidents, prisoner misbehaviors, and violence" (Compl., ¶ 12) and concludes that defendants' continued policy of overcrowding created the conditions which led to his injuries. Compl., ¶ 10. The thrust of plaintiff's claim seems to suggest that the defendants' awareness of the problems of overcrowding led to knowledge of a generalized risk to the prison population, thus establishing a legally culpable state of mind as to plaintiff's injuries. Plaintiff has not offered any evidence, however, to support the existence of any personal risk to himself about which the defendants could have known. According to his own complaint, plaintiff first encountered his assailant only minutes before the altercation occurred. Compl., ¶ 17. It is clear that the named defendants could not have known of a substantial risk to the plaintiff's safety if the plaintiff himself had no reason to believe he was in danger. *See Sims v. Bowen,* No. 96-CV-656, 1998 WL 146409, at *3 (N.D.N.Y. Mar.23, 1998)(Pooler, J.)("I conclude that an inmate must inform a correctional official of the basis for his belief that another inmate represents a substantial threat to his safety before the correctional official can be charged with deliberate indifference"); *Strano v. City of New York,* No. 97-CIV-0387, 1998 WL 338097, at *3-4 (S.D.N.Y. June 24, 1998) (when plaintiff acknowledged attack was "out of the blue" and no prior incidents had occurred to put defendants on notice of threat or danger, defendants could not be held aware of any substantial risk

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1998 WL 713809 (N.D.N.Y.)
(Cite as: 1998 WL 713809 (N.D.N.Y.))

of harm to the plaintiff). Defendants' motion on this ground should, therefore, be granted.

### IV. Failure to Complete Service

**\*5** The complaint names four defendants, including one "John Doe" Correctional Officer at Bare Hill. Defendants acknowledge that service has been completed as to the three named defendants. Docket Nos. 12 & 13. The "John Doe" defendant has not been served with process or otherwise identified and it is unlikely that service on him will be completed in the near future. *See* Docket No. 6 (United States Marshal unable to complete service on "John Doe"). Since over nine months have passed since the complaint was filed (Docket No. 1) and summonses were last issued (Docket entry Oct. 21, 1997), the complaint as to the unserved defendant should be dismissed without prejudice pursuant to Fed.R.Civ.P. 4(m) and N.D .N.Y.L.R. 4.1(b).

### V. Conclusion

WHEREFORE, for the reasons stated above, it is

RECOMMENDED that defendants' motion to dismiss be GRANTED in all respects; and

IT IS FURTHER RECOMMENDED that the complaint be dismissed without prejudice as to the unserved John Doe defendant pursuant to Fed.R.Civ.P. 4(m) and N.D.N.Y.L.R. 4.1(b); and it is

ORDERED that the Clerk of the Court serve a copy of this Report-Recommendation and Order, by regular mail, upon parties to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW. *Roldan v.*

*Racette,* 984 F.2d 85, 89 (2d Cir.1993); *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

N.D.N.Y.,1998.
Waldo v. Goord
Not Reported in F.Supp.2d, 1998 WL 713809 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.